**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| THE UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> STATE OF CONNECTICUT; NED LAMONT, Governor of Connecticut, in his official capacity; WILLIAM TONG, Attorney General of Connecticut, in his official capacity; PATRICK GRIFFIN, Chief State's Attorney of Connecticut, in his official capacity; and ELIOT D. PRESCOTT, Deputy Chief State's Attorney, Inspector General, in his official capacity, <br><br><br> Defendants. | No. 3:26-cv-758 <br><br> **MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

**ORAL ARGUMENT REQUESTED**

**TABLE OF CONTENTS**

Page

INTRODUCTION ......................................................................................................1

BACKGROUND ......................................................................................................2

    I.     Governing Principles of Federal Law Enforcement ...................................2

    II.    The Challenged Connecticut Act ..............................................................5

LEGAL STANDARDS.............................................................................................8

ARGUMENT.............................................................................................................9

    I.     The United States Has Pre-Enforcement Standing...................................9

    II.    The United States is Likely to Succeed on the Merits of its Claims .........12

         A.  Applicable Law...............................................................................13

         B.  The Challenged Provisions Impermissibly Regulate the Federal Government...15

         C.  The Tenth Amendment Does Not Justify the Challenged Law............19

    III.   The United States Faces Irreparable Harm Absent Preliminary Relief .....................20

    IV.   The Balance of Hardships and the Public Interest Weigh in the United States' Favor ......................................................................................................23

CONCLUSION.......................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*A.H. v. French*,
985 F.3d 165 (2d Cir. 2021) ................................................................................ 24

*Am. Fin. Servs. Assn. v. Burke*,
169 F. Supp. 2d 62 (D. Conn. 2001) ................................................................... 24

*Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*,
883 F.3d 32 (2d Cir. 2018) ..................................................................................... 8

*Arizona v. California*,
283 U.S. 423 (1931) ............................................................................................. 13

*Arizona v. United States*,
567 U.S. 387 (2012) ......................................................................................... 4, 20

*Arizona v. Yellen*,
34 F.4th 841 (9th Cir. 2022) ............................................................................... 10

*Babbitt v. United Farm Workers Nat'l Union*,
442 U.S. 289 (1979) ............................................................................................... 9

*Blackburn v. United States*,
100 F.3d 1426 (9th Cir. 1996) ............................................................................ 13

*CoreCivic, Inc. v. Governor of N.J.*,
145 F.4th 315 (3d Cir. 2025) .................................................................. 13, 14, 18

*Glidedowan, LLC v. New York State Dep't of Health*,
768 F. Supp. 3d 503 (W.D.N.Y. 2025) ............................................................... 24

*Goodyear Atomic Corp. v. Miller*,
486 U.S. 174 (1988) ............................................................................................. 13

*Hancock v. Train*,
426 U.S. 167 (1976) ....................................................................................... 13, 14

*In re Neagle*,
135 U.S. 1 (1890) ................................................................................................. 16

*Jensen v. Lane Cnty.*,
222 F.3d 570 (9th Cir. 2000) .............................................................................. 12

*Johnson v. Maryland*,
254 U.S. 51 (1920) ......................................................................................... 14, 16

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ............................................................................................... 9

*Mastrio v. Sebelius*,
768 F.3d 116 (2d Cir. 2014) ................................................................................... 8

*Mayo v. United States*,
319 U.S. 441 (1943) ....................................................................................... 13, 19

*McCulloch v. Maryland*,
  17 U.S. (4 Wheat.) 316 (1819) .................................................................... 13, 23

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
  584 U.S. 453 (2018) ......................................................................................... 19

*New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans,*
  491 U.S. 350 (1989) ......................................................................................... 20

*New York v. Tanella*,
  374 F.3d 141 (2d Cir. 2004) ............................................................................ 22

*New York v. United States Dep't of Homeland Sec.*,
  969 F.3d 42 (2d Cir. 2020) ................................................................................ 8

*New York v. United States*,
  505 U.S. 144 (1992) ......................................................................................... 19

*Nken v. Holder*,
  556 U.S. 418 (2009) ........................................................................................... 8

*North Dakota v. United States*,
  495 U.S. 423 (1990) ......................................................................................... 13

*Pub. Utils. Comm'n of State of Cal. v. United States*,
  355 U.S. 534 (1958) ......................................................................................... 18

*Rowe v. N.H. Motor Transp. Ass'n*,
  552 U.S. 364 (2008) ......................................................................................... 23

*Salinger v. Colting*,
  607 F.3d 68 (2d Cir. 2010) .............................................................................. 25

*Seila L. LLC v. Consumer Fin. Prot. Bureau*,
  591 U.S. 197 (2020) ........................................................................................... 2

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ........................................................................................... 9

*Steffel v. Thompson*,
  415 U.S. 452 (1974) ........................................................................................... 9

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ........................................................................................... 9

*Tennessee v. Davis*,
  100 U.S. 257 (1879) .................................................................................. passim

*Tweed-New Haven Airport Auth. v. Tong*,
  930 F.3d 65 (2d Cir. 2019) ................................................................................ 9

*United States v. Alabama*,
  691 F.3d 1269 (11th Cir. 2012) ....................................................................... 24

*United States v. Arizona*,
  641 F.3d 339 (9th Cir. 2011) ........................................................................... 20

iii

*United States v. California,*
2026 WL 363346 (C.D. Cal. Feb. 9, 2026)................................................................. 23

*United States v. California,*
173 F.4th 1060 (9th Cir. 2026)............................................................................. passim

*United States v. California,*
921 F.3d 865 (9th Cir. 2019)................................................................................ 17, 18

*United States v. City of Arcata,*
629 F.3d 986 (9th Cir. 2010)........................................................................... 14, 16, 17

*United States v. Connecticut,*
566 F. Supp. 571 (D. Conn. 1983) ............................................................................ 20

*United States v. Fresno Cnty.,*
429 U.S. 452 (1977)................................................................................................... 23

*United States v. Town of Windsor,*
765 F.2d 16 (2d Cir. 1985) ........................................................................................ 13

*Vitagliano v. Cnty. of Westchester,*
71 F.4th 130 (2d Cir. 2023)......................................................................................... 9

*Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens,*
529 U.S. 765 (2000)................................................................................................... 10

*Winter v. NRDC,*
555 U.S. 7 (2008)......................................................................................................... 8

**Constitution and Statutes**

U.S. Const. art. I, § 8, cl................................................................................................. 1

U.S. Const. art. II ......................................................................................................... 19

U.S. Const. art. II, § 3 .............................................................................................. 1, 12

U.S. Const. art. 1099 .................................................................................................... 16

5 U.S.C. §
301 ............................................................................................................................. 4
5901.......................................................................................................................... 4

6 U.S.C. §
211............................................................................................................................. 3
252............................................................................................................................. 3

8 U.S.C. §
1103(a)(2).................................................................................................................. 4
1182........................................................................................................................... 4

18 USC 115(c)(1)..................................................................................................... 6, 12

21 U.S.C. § 801 ................................................................................................................. 3

28 U.S.C. §
    509 ........................................................................................................................... 4
    531 ........................................................................................................................... 3

29 U.S.C. § 668 ................................................................................................................. 4

34 USC 50301(5) ......................................................................................................... 6, 12

**Rules**

Fed. R. Civ. P. 41 .............................................................................................................. 3

**Regulations**

28 C.F.R. § 0.100-0.101 .................................................................................................... 3

**Other Authorities**

Reorganization Plan No. 2 of 1973, 38 F.R. 15932 ......................................................... 3

Conn. Gen. Stat. 53a26(d)(4) ....................................................................................... 6, 15

Senate Bill 397 ......................................................................................................... passim

## INTRODUCTION

The Constitution establishes a system of dual sovereignty. Under that system, while states may govern legitimate areas of local concern, they may not regulate the Federal Government. Yet Connecticut, through its new and misleadingly titled Senate Bill 397, "An Act Concerning Democracy and Government Accountability and the Use and Retention of Data from Automated License Plate Reader Systems," (hereinafter the "Act" or "SB 397")[1], seeks to do the latter. Section 6 prohibits federal law enforcement agents from wearing facial coverings in the performance of their official duties, except in limited circumstances, and requires federal law enforcement agents to clearly display their name and badge when arresting someone or interacting with the public during the course of their official duties. Violations of these sections of the Act, which took effect immediately upon signing on May 4, 2026, carry criminal, and in some instances civil, penalties. Sections 3, 4, and 5 of SB 397 seek to regulate federal agent use of force, including which law enforcement activities may allow for use of force, the factors a federal agent must consider before using force, and the tactics a federal agent must engage in before using force.

Connecticut has no authority to regulate federal officers in this way, any more than the state could regulate the color of their vests, forbid agents from carrying guns, or require federal agents to give state-law warnings before effectuating arrests. As the Ninth Circuit recently held, a law that "aims to regulate the manner and conditions under which federal agents can enforce federal law" including by "overrid[ing] the federal government's power to determine whether, how, and when to publicly identify its officers" "directly regulates conduct reserved to sovereigns" and "is barred by intergovernmental immunity." *United States v. California*, 173 F.4th 1060, 1067-

---

[1] A copy of the legislature signed by the Governor is attached to the Complaint as Exhibit A. *See* ECF 1-1. All references to Sections 3, 4, 5, and 6, herein refer to that Exhibit.

68 (9th Cir. 2026).

The United States therefore moves this Court for a preliminary injunction prohibiting Connecticut and its officials from enforcing Sections 3, 4(a)-(d), and 5(a), (d), and (e), and Section 6 of SB 397 against the Federal Government. Those sections violate the Supremacy Clause by seeking to regulate the uniforms and conduct of federal agents and the policies of federal agencies.

These constitutional violations and injuries to federal sovereignty alone establish irreparable harm, but the harm here is even greater. If forced to comply with these laws, federal agents will face increased incidents of doxxing and harassment, and law enforcement operations will be compromised. The law threatens to cause federal agents to hesitate in use-of-force situations, which could prove deadly, or chill them from enforcing federal laws and conducting investigations to avoid such scenarios. Meanwhile, if agents refuse to comply, they risk criminal prosecution.

Finally, the balance of equities and the public interest favor an injunction: there is a significant sovereign injury from laws that seek to regulate the Federal Government, and there is significant public interest in protecting federal officers' safety, removing unlawful impediments to federal law enforcement operations, and permitting agents to uphold federal law.

The United States is therefore entitled to a preliminary injunction.

## BACKGROUND

### I.    Governing Principles of Federal Law Enforcement

The President has a constitutional duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II § 3. The authority to discharge that duty "extend[s] over the whole territory of the Union, acting upon the States and upon the people of the States." *Tennessee v. Davis*, 100 U.S. 257, 263 (1879). Because "no single person could fulfill that responsibility alone, the Framers

2

expected that the President would rely on subordinate officers for assistance." *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203-04 (2020). In executing the laws, the Federal Government "can act only through [those] officers and agents," who must in turn "act within the States." *Davis*, 100 U.S. at 263. Accordingly, federal law enforcement activities necessarily take place within the several States, including in Connecticut.

Federal law enforcement agencies, including those within the Departments of Justice ("DOJ") and Homeland Security ("DHS"), are created by federal law. *See, e.g.*, 28 U.S.C. §§ 531 (Federal Bureau of Investigation ("FBI")), 561 (U.S. Marshal Service), 599A (Bureau of Alcohol Tobacco Firearms and Explosives); 6 U.S.C. § 252 (Immigration and Customs Enforcement ("ICE")); 6 U.S.C. § 211 (U.S. Customs and Border Protection ("CBP")); Reorganization Plan No. 2 of 1973, 38 F.R. 15932, 87 Stat. 1091, as amended Pub. L. 93–253, §1, Mar. 16, 1974, 88 Stat. 50 (Drug Enforcement Administration ("DEA")). All agents within these agencies have the power to swear out and execute search warrants based upon probable cause. Fed. R. Civ. P. 41. Different law enforcement agencies within the Federal Government have different, but sometimes overlapping, authorities for the types of crimes and offenses they investigate and prosecute.

For example, the DEA enforces the Nation's controlled-substances laws. *See generally* 21 U.S.C. § 801, *et seq*. In carrying out that mission, the DEA investigates and aids in the prosecution of violators of controlled substances laws; seizes and forfeits assets derived from illicit drug trafficking; and manages a national drug intelligence program in cooperation with federal, state, local, and foreign officials. *See* 28 C.F.R. § 0.100-0.101.

The FBI is charged with rooting out violent crime, defending the homeland against terrorist attacks, and investigating and combating cybercrime, among other duties. *See id*. § 0.85. It conducts extensive operations throughout the country and in partnership with federal, state, local,

and foreign officials.

DHS and its component agencies of ICE and CBP are primarily responsible for enforcing the nation's immigration laws. Those laws are primarily contained in the Immigration and Nationality Act ("INA"), and, pursuant to Congress's power to "establish an uniform Rule of Naturalization," U.S. Const., art. I § 8, cl. 4, make up the framework for the "governance of immigration and alien status," *see Arizona v. United States*, 567 U.S. 387, 395 (2012). The INA gives the Executive Branch broad authority to inspect, investigate, arrest, detain, and remove aliens who are unlawfully in the United States. *See, e.g.*, 8 U.S.C. §§ 1182, 1225-29a, 1231.

To achieve the goals outlined above, the heads of each agency have the power to govern the agency's affairs and direct their agents' activities. *See, e.g.*, 5 U.S.C. § 301 (authorizing the head of an Executive or military department to "prescribe regulations for the government of his department [and] the conduct of its employees"); 28 U.S.C. § 509 (vesting all functions of other officers, agencies, and employees of the Department of Justice in the Attorney General); 8 U.S.C. § 1103(a)(2) (authorizing the DHS Secretary to "control, direct[], and supervis[e]" all DHS employees). Included within that power to govern the agencies is the power to determine how agents must conduct themselves when engaged in official duties and their use of force in accordance with federal law. Federal law similarly empowers the Executive to provide for and dictate federal law enforcement officers' uniforms and equipment when carrying out their official duties. *See, e.g.*, *id.*; 5 U.S.C. § 5901 (directing the head of each federal agency to furnish its employees a uniform or an allowance for a uniform); 29 U.S.C. § 668 (requiring heads of federal agencies to, as part of their occupational safety and health programs, acquire, maintain, and require the use of safety equipment, personal protective equipment, and devices reasonably necessary to protect employees).

## II.    The Challenged Connecticut Act

SB 397 was passed by the Connecticut legislature on May 1, 2026, and the Governor signed it into law on May 4, 2026. *See* ECF 1-1, Compl. Ex. A. Sections 3, 4, 5, and 6 of the Act took effect immediately. *See id.* at §§ 3, 4, 5, 6 (stating "*Effective from passage"*).

Section 6 of the Act regulates the use of facial coverings and display of officer names and badges by "peace officers," including federal agents. Because "peace officer" explicitly includes federal agents, *see* § 6(a)(1) (incorporating definition of § 3(a)(1)(A)), Section 6(b)'s limitations on facial coverings purport to directly regulate federal agents. In particular, Section 6(b) of the Act requires that "[a] peace officer, while carrying out the enforcement of laws of this state, any other state or the United States, shall not wear any facial covering or personal disguise while interacting with the public in the performance of such officer's duties[.]" *See id.* §6(b). "Facial covering" is defined broadly to include "any opaque mask, garment, helmet, headgear or other item that conceals or obscures the facial identity of an individual, including, but not limited to, a balaclava, tactical mask, gator, ski mask and any similar type of facial covering or face-shielding item." *Id.*§ 6(a)(2). The exceptions to the rule are narrow and relate to masks for health, safety, or for an "active undercover operation or assignment" if wearing a facial covering in that undercover work is authorized by a supervisor or court. § 6(b).

Section 6(c) also pertains to any "peace officer," including federal agents; it applies when "conducting a planned arrest" or "interacting with the public" in an official capacity; and it dictates that a federal officer must be "clearly identified" by "badge and name tag on the officer's uniform." *Id.* § 6(c). Section 6(c) contains narrowly drawn exceptions for active undercover assignments, compliance with the policy of section 7-294ii of the Connecticut General Statutes, relating to the wearing of name tags and badges for state and local police officers, if compliance is excused by

5

court order, or if weather or safety-related conditions preclude compliance. *Id.*

Any federal agent who violates either of Sections 6(b) or 6(c) "shall be guilty of a class D misdemeanor" which is punishable by up to 30 days in jail. Conn. Gen Stat. § 53a26(d)(4). Beyond such criminal liability, Section 6(d) seeks to impose civil liability on agents by purporting to prohibit any assertion of "any privilege or immunity" in tort cases if the agent was "wearing a facial covering or personal disguise in a knowing and wilful [sic] violation of this section." ECF 1-1, § 6(d).

Sections 3, 4, and 5 of the Act relate to an officer's use of force while making an arrest or preventing escape and purport to regulate federal agents directly by defining "peace officer" to include "any federal law enforcement officer as defined under 18 USC 115(c)(1) and 34 USC 50301(5)." *See* ECF 1-1 at §3(a)(1)(A); *see also id.* at § 4(a)(1)(B) (incorporating same definition); §5(a) (incorporating same definition).

Section 4 provides that an officer is justified in using force when the officer reasonably believes such use is necessary to "effect[] an arrest pursuant to a warrant," "prevent[] an escape from custody," or "defend himself or herself or a third person from the use or imminent use of physical force" while effecting an arrest or preventing an escape from custody unless the officer knows "that the arrest or custody is unauthorized." *Id.* § 4(a)(2); (b). Section 4(c) defines when deadly force is justified. It requires a use of force be consistent with Section 4(b) (*e.g.*, effecting an arrest or preventing an escape from custody) and also requires that the actions must be "objectively reasonable under the given circumstances," and either the officer "reasonably believes" deadly force is necessary to defend himself or a third party against "imminent use of deadly physical force" or the officer has "reasonably determined" a long list of factors including:

- that "there are no available reasonable alternatives to the use of deadly physical

6

force"; and

- he "reasonably believes" that "the force employed creates no unreasonable risk of injury to a third party"; and

- reasonably believes "such use of force to be necessary to" effect an arrest of a person whom he "reasonably believes has committed or attempted to commit a felony which involved the infliction of serious physical injury," or

- to "prevent the escape from custody" of such person if that person "poses a significant threat of death or serious physical injury to others"

- as long as the officer, in both scenarios and if feasible, gave "warning of his or her intent to use deadly physical force."

*Id.* §4(c)(1)(A) & (B). Section 4(c)(2) provides "factors to be considered" in evaluating whether deadly force was justified, including whether the person "possessed or appeared to possess a deadly weapon," whether the peace officer "engaged in reasonable deescalation measures prior to using deadly physical force," and whether the peace officer's conduct was "unreasonable" and "led to an increased risk of an occurrence of the situation that precipitated the use of such force." *Id.* § 4(c)(2). Section 4(d) defines specifically when "chokeholds," a type of force, are permitted. Sections 4(e)-(h) appear not to pertain to federal agents.

Sections 3 and 5 purport to give the state of Connecticut the authority to investigate and prosecute uses of force by federal agents, and Section 3 purports to give the State the power to exclude the Federal Government from any collection of evidence in such an investigation. For example, Section 3(a)(2) states that in any use of deadly force or use of physical force by a federal officer resulting in death, "the Division of Criminal Justice shall cause an investigation to be made" and the Inspector General "shall" determine "whether the use of physical force by the [federal]

7

officer was justifiable" under Connecticut law. *Id.* §3(a)(2); *see also id.* § 5(a). A similar investigation and determination is required if a person dies in the custody of a federal officer. *Id.* § 3(a)(3)(A); *see id.* §5(a)(5) (same). The law is explicit that any investigation is to be conducted by the "Division of Criminal Justice and the Inspector General" who "shall have the unrestricted right to access the scene and collect evidence" even if only a federal officer was involved, and may seek injunctive relief in Connecticut state court if anyone "restricts" their right to access the scene and collect evidence. *Id.* § 3(a)(5)(B), (C). If it is determined by the state that the use of force was not justified or there was a failure to intervene, the "Office of the Inspector General shall prosecute" the case. *Id.* § 3(c); *see also id.* § 5(a)(2) (same).

## LEGAL STANDARDS

A preliminary injunction may be granted if the plaintiff establishes (1) "he is likely to succeed on the merits," (2) "he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in his favor," and (4) "an injunction is in the public interest." *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 58-59 (2d Cir. 2020) (quoting *Winter v. NRDC*, 555 U.S. 7, 20 (2008)). Where, as here, the government is a party to the suit, the final two factors merge. *Id.* (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

A prohibitive preliminary injunction is designed to maintain the status quo ante until a final decision on the merits of the litigation can be entered. *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018). The status quo ante is "the last actual, peaceable uncontested status which preceded the pending controversy." *Id.* (quoting *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (per curiam)).

8

**ARGUMENT**

## I.    The United States Has Pre-Enforcement Standing

Article III standing requires a plaintiff to demonstrate a concrete injury that is fairly traceable to the conduct of the defendant and judicially redressable. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). To satisfy this requirement based on the threatened enforcement of a law, "it is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). Rather, that requirement is satisfied where the plaintiff alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). In the Second Circuit, once a plaintiff shows that a law facially covers its conduct, enforcement is presumed and the burden shifts to the defendant government to affirmatively disavow it. *Vitagliano v. Cnty. of Westchester*, 71 F.4th 130, 138 (2d Cir. 2023). The "credible-threat standard sets a low threshold and is quite forgiving to plaintiffs seeking such preenforcement review, as courts are generally willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund." *Id.* (quotations/citations omitted). Further, "the [traceability] requirement is met" where "a plaintiff is threatened by the enforcement of a statute that specifically targets the plaintiff." *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 71 (2d Cir. 2019) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992)).

The United States easily satisfies these requirements. First, the United States asserts "an intention to engage in a course of conduct arguably affected with a constitutional interest, but

proscribed by a [state] statute[.]" *Driehaus*, 573 U.S. at 159 (citation omitted). The United States has sovereign authority to manage federal law enforcement activities and, under the Supremacy Clause, need not cede that authority to Connecticut (or any State) by complying with Connecticut's purported requirements for federal law enforcement officers. Indeed, the very fact that a state is attempting to regulate the conduct of the Federal Government inflicts a "sovereign injury" on the United States. *United States v. California*, 173 F.4th at 1069 ("irreparable harm necessarily results from allowing California to enforce a law invalid under the doctrine of intergovernmental immunity."); *cf. Arizona v. Yellen*, 34 F.4th 841, 851-53 (9th Cir. 2022); *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000).

To be clear, the United States will not direct its law enforcement agencies to adopt the policies that Connecticut demands or require its officers to comply with these provisions of Connecticut law. *See* O'Brien Decl.[2] ¶ 20; Allen Decl.[3] ¶ 22; Cleveland Decl.[4] ¶ 15. In consequence, federal officers are threatened with criminal prosecution. That poses a serious and concrete injury that the Federal Government is entitled to address through this pre-enforcement challenge.

Second, the threat of future enforcement is substantial. Sections 3, 4, 5, and 6 of the Act took effect immediately as of May 4, 2026. Not only has Connecticut *not* disclaimed enforcement of the Act, it has affirmatively proclaimed its intent to enforce the Act against federal agents. Governor Lamont stated that the newly-signed law is "the law of the land in the State of

---

[2] "O'Brian Decl." refers to the May 22, 2026, declaration of P.J O'Brian of FBI, filed concurrently herewith.

[3] "Allen Decl." refers to the May 22, 2026, declaration of Matthew W. Allen of DEA, filed concurrently herewith.

[4] "Cleveland Decl." refers to the May 22, 2026 declaration of Dr. Floyd Cleveland of ICE, filed concurrently herewith.

Connecticut" and "this is what Connecticut is all about."[5] He further proclaimed that by signing

SB 397, "Connecticut will not stand by while federal agents violate the constitutional rights of our

residents. Protected areas, accountability measures, and the right to sue federal agents who break

the law."[6] Connecticut's Attorney General echoed those sentiments, claiming, "[w]e are sovereign

in this state, this is the sovereign state of Connecticut. That is why we have a Supreme Court. That

is why we have state laws. That's why we have a Capitol"[7] and that "[t]oday's passage of Senate

Bill 397 reaffirms a simple truth. In Connecticut, no one is above the law, including federal

immigration officials."[8] Such enforcement would subject federal officers to potential jail time.

Indeed, targeting federal officers is the whole point.

The Connecticut law further threatens immediate harm to the United States, because the

challenged provisions, which put officer and agent safety at risk, will disincentivize officers from

using such protective measures and can chill federal law enforcement operations. *See, e.g.*,

O'Brien Decl. ¶ 18; Allen Decl. ¶ 22; Egerton Decl.[9] ¶ 15. These laws may also cause officers to

hesitate before using force in dangerous situations. Such situations require split-second

decisionmaking and can be deadly if an officer hesitates. For that reason, federal officers are

trained extensively on federal policy to enable them to make such split-second decisions. *See*

---

[5] *See* Compl. ¶ 33, citing https://www.youtube.com/watch?v=5Z1etP04_As (last visited May 14, 2026).

[6] *See* Compl. ¶ 33, citing X post, May 4, 2026 (@GovNedLamont), https://perma.cc/45CT-N2YM.

[7] *See* Compl. ¶ 33, citing Eng, https://perma.cc/8MXR-82X3 (May 4, 2026, 2:11 p.m.) (last visited May 14, 2026).

[8] *See* Compl. ¶ 33, citing https://perma.cc/7Q5F-ZXUE (last visited May 14, 2026).

[9] "Egerton Decl." refers to the May 22, 2026, declaration of Jeffrey Egerton of CBP, filed concurrently herewith.

O'Brien Decl. ¶ 16; Allen Decl. ¶ 21; DuBan Decl.[10] ¶ 13; Cleveland Decl. ¶ 17, 18. Layering the onerous requirements of Connecticut's laws onto that decisionmaking process could prove deadly. These laws thus threaten the strong federal interest in "serv[ing] the public good by zealous enforcement of the law and the avoidance of deterring talented candidates from entering government employment for fear of liability." *Jensen v. Lane Cnty.*, 222 F.3d 570, 576 (9th Cir. 2000).

In short, Sections 3, 4, 5, and 6 of the Act impose concrete and immediate harms on the Federal Government and its interests, by threatening federal agents with prosecution and, in turn, chilling their protected conduct and endangering their safety and the integrity of federal operations. *See, e.g.*, O'Brien Decl. ¶ 8-12, 17-18; Allen Decl. ¶ 13, 22; Egerton Decl. ¶ 15-16; DuBan Decl. ¶ 13; Cleveland Decl. ¶ 18, 34. The United States thus has standing to challenge these laws and need not wait for the potentially dangerous situation that would occur were the State of Connecticut to attempt to arrest a federal officer in the performance of his official duties.

## II.    The United States is Likely to Succeed on the Merits of its Claims

The Act is invalid as it pertains to federal officers because it purports to regulate the Federal Government directly by defining "peace officer" to include "any federal law enforcement officer as defined under 18 USC 115(c)(1) and 34 USC 50301(5)," *see* Section 3(a)(1)(A), and by applying its provisions relating to facial coverings, identification, and use of force (including penalties for violations), to them, *see* §3 (all); §4(a), (b), (c), (d); §5(a), (d), (e); § 6(a)-(d). All such regulation of federal officers violates the Supremacy Clause. The United States therefore is likely to succeed on the merits.

---

[10] "DuBan Decl." refers to the May 22, 2026, declaration of Joseph DuBan of CBP, filed concurrently herewith.

### A.    Applicable Law

Under the Supremacy Clause, States have no power to "in any manner control[] the operations of" the Federal Government. *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819); *see Mayo v. United States*, 319 U.S. 441, 445 (1943) ("[T]he activities of the Federal Government are free from regulation by any state."). The intergovernmental immunity doctrine encapsulates this principle. A state law violates intergovernmental immunity if it "regulates the United States directly," *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality op.), "unless Congress provides 'clear and unambiguous' authorization for such regulation," *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 175 (1988) (citation omitted); *United States v. Town of Windsor*, 765 F.2d 16, 18 (2d Cir. 1985) ("Absent congressional consent, direct state regulation of the activities of the Government is barred by the Supremacy Clause."). "[I]ntergovernmental immunity … forbids States from regulating the federal government *qua* government and from controlling federal governmental functions in any manner and to any degree." *United States v. California*, 173 F.4th at 1068. An Act that "applies exclusively to law enforcement agencies and their officers, including federal law enforcement agencies and federal law enforcement officers…. directly regulates conduct reserved to sovereigns" and is impermissible under the Supremacy Clause. *Id.*; *see CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 321 (3d Cir. 2025) (A state law unlawfully regulates the United States when it "'places [either] a prohibition' or mandate on the federal government." (quoting *Hancock v. Train*, 426 U.S. 167, 180 (1976))). That is because the Supreme Court has long held that "the activities of the Federal Government are free from regulation by any state." *Mayo*, 319 U.S. at 445. That is an absolute rule: "No other adjustment of competing enactments or legal principles is possible." *Id*. Simply put, "states may not directly regulate the Federal Government's operations." *Blackburn v. United States*, 100 F.3d 1426, 1435

(9th Cir. 1996). As the Supreme Court put it nearly a century ago: "The United States may perform its functions without conforming to the police regulations of a state." *Arizona v. California*, 283 U.S. 423, 451 (1931). Indeed, "[i]f when ... acting ... within the scope of their authority, [federal] officers can be arrested and brought to trial in a State court, for an alleged offence against the law of the State ... the operations of the general government may at any time be arrested at the will of one of its members." *Davis*, 100 U.S. at 262-63.

Indeed, decisions of the Supreme Court and courts of appeals illustrate the kinds of state laws that unlawfully regulate the Federal Government's operations. For instance, in *Johnson v. Maryland*, 254 U.S. 51 (1920), the Supreme Court held that a state could not require a Post Office employee to obtain a driver's license from the state, explaining that the state may not "require[] qualifications in addition to those that the [federal] Government has pronounced sufficient." *Id.* at 57. In *Hancock v. Train*, 426 U.S. 167 (1976), the Supreme Court concluded that a state could not forbid federal facilities from operating without a state pollution permit, as such a requirement improperly "place[d] a prohibition on the Federal Government." *Id.* at 179-80 (quotation marks omitted). In *United States v. City of Arcata*, 629 F.3d 986 (9th Cir. 2010), the Ninth Circuit invalidated local ordinances that prohibited federal military recruiters from recruiting minors. *Id.* at 991-92. "By constraining the conduct of federal agents and employees," the ordinances impermissibly "regulate[d] the [federal] government directly." *Id.* at 991. In *CoreCivic, Inc.*, the Third Circuit invalidated a New Jersey law on intergovernmental immunity principles because the law "prevent[ed] the federal government from choosing how and through whom it will carry out a core federal function" relating to immigration detention. 145 F.4th at 325.

Nonetheless, that is precisely what Connecticut seeks to do. The Act challenged here purports to regulate federal agents directly, and Congress has provided no authorization—let alone

clear and unambiguous authorization—for Connecticut's actions.

### B. The Challenged Provisions Impermissibly Regulate the Federal Government

Section 6(b) of the Act prohibits any "peace officer" in Connecticut, including federal agents, from wearing a "facial covering" (as broadly defined in §6(a)), except in narrow circumstances relating to masks for health, safety, or for an "active undercover operation or assignment" subject to certain preconditions. § 6(b). Similarly, Section 6(c) of the Act requires a "peace officer" in Connecticut, including federal agents, to be "clearly identified" by "badge and name tag on the officer's uniform" when "conducting a planned arrest" or "interacting with the public" in an official capacity, again subject to narrow exceptions. §6(c). Any agent who violates either of Sections 6(b) or 6(c) "shall be guilty of a class D misdemeanor" which is punishable by up to 30 days in jail. Conn. Gen Stat. § 53a26(d)(4). And, if such violation is "knowing and wilful [sic]" then the agent loses any claim of immunity or privilege in a tort lawsuit. Section 6(d). Section 6 of the Act, as it pertains to federal agents, impermissibly regulates those agents in violation of the Supremacy Clause.

As the Ninth Circuit observed with regard to a similar California law that sought to require federal law enforcement officers to "visibly display identification" when "performing their enforcement duties," Section 6 "seeks to control [federal officers'] conduct in performing law enforcement operations." *United States v. California*, 173 F.4th at 1067. The Ninth Circuit held that the challenged identification requirement "purports to override the federal government's power to determine whether, how, and when to publicly identify its officers," "[a]nd in so doing, it aims to regulate the manner and conditions under which federal agents can enforce federal law." *Id.* That reasoning applies directly to the Connecticut identification requirement in Section 6(c), and applies with equal force to the facial coverings ban in Section 6(b). Each section seeks to

15

regulate the manner and conditions under which federal officers must operate when conducting their official duties and enforcing the law. *See id.* States have no power to do that.

Sections 3, 4, and 5, of the Act suffer from similar flaws in their efforts to regulate federal agents. Section 4 defines permissible uses of force and deadly force, while Sections 3 and 5 provide that Connecticut's Criminal justice Division shall investigate uses of force and prosecute if any use of force is found not to be justified. *See* ECF 1-1, § 4(a)-(d); § 3, § 5(a), (d), (e). But federal agents are subject to *federal* use-of-force policies, including with respect to review and any discipline or prosecution. Indeed, federal law enforcement agencies enforce federal law throughout the United States and in doing so are generally not required to comply with individual state laws when operating within the scope of their official duties. *See, e.g.*, *Johnson*, 254 U.S. 51; *Davis*, 100 U.S. at 262-63 ("If, when ... acting ... within the scope of their authority, [federal] officers can be arrested and brought to trial in a State court, for an alleged offence against the law of the State ... the operations of the general government may at any time be arrested at the will of one of its members."); *In re Neagle*, 135 U.S. 1, 75 (1890) ("[I]f the prisoner is held in the state court to answer for an act which he was authorized to do by the law of the United States, which it was his duty to do as marshal of the United States, and if in doing that act he did no more than what was necessary and proper for him to do, he cannot be guilty of a crime under ... [state] law[.]"); *City of Arcata*, 629 F.3d at 991-92 (invalidating local ordinances that prohibited federal military recruiters from recruiting minors).

The Act's regulation of federal officers' use-of-force extends beyond federal standards. For example, the Connecticut Act excludes scenarios such as search warrants or other investigative actions, or protection assignments, from the scope of scenarios in which force may be permissible (*see* ECF 1-1, § 4(a)-(c)), thus automatically subjecting federal agents to potential liability for

16

much of their job duties, should they use force. Connecticut also imposes a long list of factors for an agent to consider prior to using force or deadly force, including, for example, whether the individual committed a felony that involved the infliction of serious physical injury, whether force may cause unreasonable risk to a third party, whether the agent's own actions may have contributed to the situation, whether deescalation is possible, and whether a warning about use of deadly force is feasible. *See id.* § 4(b), (c). Thus, Connecticut imposes additional restrictions and considerations beyond the federal agency use-of-force policies that inform whether, in Connecticut's view, the force was "justified." And all such restrictions lead to the same goal: mandatory state prosecution of federal officers carrying out their federal duties if their use of force is deemed unjustified by the state's officers, according to the state's investigation, under the state's law. *See* § 3(c); § 5(a)(2).

Even if the Act closely mirrored federal law or policies, however, that is irrelevant to the analysis. "A state or local law that directly regulates the conduct of the federal government or discriminates against it is invalid, even if it is no more restrictive than federal law." *City of Arcata,* 629 F. 3d at 991-92. And "Supreme Court case law compels the rejection of a *de minimis* exception to the doctrine of intergovernmental immunity." *United States v. California*, 921 F.3d 865, 883 (9th Cir. 2019). Even if the conduct is federally illegal, it is still an unconstitutional and burdensome regulation on the Federal Government to have its officers face an investigation and potential criminal liability from state officials. State officials have no authority to investigate and prosecute federal officers for actions taken in the performance of their duties. *United States v. California*, 173 F.4th at 1067-68 (law invalid because it "purports to override the federal government's power to determine whether, how, and when to publicly identify its officers" and thus "directly regulates inherently governmental conduct of federal officers carrying out their duties *under federal authority*") (emphasis original).

17

Each challenged section described above thus violates the Supremacy Clause.

By dictating if and when federal agents may wear facial coverings, what identification they must display while carrying out their official duties, and the manner and means of using force to carry out their federal duties in furtherance of the laws of the United States when effecting an arrest or preventing an escape from custody, the Act improperly seeks to regulate how federal officers accomplish their federal responsibilities and how the federal government carries out its criminal and immigration law enforcement functions. Accordingly, Sections 3, 4, 5, and 6 are facially invalid and unconstitutional as they pertain to federal law enforcement officers, and their enforcement against federal law enforcement officers should be enjoined.

Connecticut may argue that to prevail, the United States must show that enforcement of the Act would hinder Federal Government operations. Not so. Of course, hindering core Federal Government operations is one way to show that a state has engaged in impermissible direct regulation of the Federal Government, and Connecticut's statute does so, as explained further below. *See CoreCivic, Inc.*, 145 F.4th at 327 (finding that a state law "directly regulates the federal government by substantially interfering with a core federal function"); *California*, 921 F.3d at 880 (explaining that intergovernmental immunity is implicated when a state "burden[s] [the Federal Government] in some way"); *Pub. Utils. Comm'n of State of Cal. v. United States*, 355 U.S. 534, 543 (1958) (holding that a state law that barred federal officials from hiring shipping contractors without state approval violated intergovernmental immunity where the law would have delayed shipments, thereby hampering military missions). But as the Ninth Circuit recently explained, such a showing is not *required* when the statute on its face purports to regulate the Federal Government directly. "[I]f a state law directly regulates the conduct of the United States, it is void irrespective of whether the regulated activities are essential to federal functions or operations, and irrespective

18

of the degree to which the state law interferes with federal functions or operations." *United States v. California*, 173 F.4th at 1066; *see id.* at 1068 ("The district court asked the wrong question. By looking to the degree § 10 interfered with the activities of the United States, the district court applied a standard pertaining to States' regulation of federal contractors and third-party employers, not the standard applicable to direct regulation of governmental activities of the United States.").

### C.    The Tenth Amendment Does Not Justify the Challenged Law

Connecticut also may try to rely on the Tenth Amendment to salvage its new law by arguing it is a valid exercise of its police powers, but such an argument would fail. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Here, that amendment is inapposite because regulating the Federal Government is not "a power reserved to the states," *Arcata*, 629 F.3d at 992, Connecticut Attorney General Tong's statements that "[w]e are sovereign in this state, this is the sovereign state of Connecticut" notwithstanding. Compl. ¶ 33. The United States has the power to "take Care that the Laws be faithfully executed," U.S. Const. art. II § 3, an authority that "extend[s] over the whole territory of the Union, acting upon the States and upon the people of the States," *Davis,* 100 U.S. at 263. The Federal Government is "free from regulation by any state"; the State's police powers do not extend to the official conduct of federal officers. *Mayo*, 319 U.S. at 445; *Davis*, 100 U.S. at 262-63. Nor would invalidating the challenged provisions of the Act amount to commandeering Connecticut—quite the opposite, it would prevent Connecticut from controlling the Federal Government's lawful exercise of its own sovereign authority. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 473 (2018); *New York v. United States*, 505 U.S. 144, 156 (1992) ("If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that

power to the States ...”). In seeking this injunction, the United States is not forcing Connecticut to do anything; it simply demands that Connecticut refrain from unlawfully regulating the Federal Government and its agents. The Tenth Amendment has no applicability here.

### III.        The United States Faces Irreparable Harm Absent Preliminary Relief

The United States will suffer irreparable harm if the Act is enforced against the Federal Government. Irreparable harm necessarily results from the enforcement of a state law that violates the Supremacy Clause. *See New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans,* 491 U.S. 350, 366-67 (1989) (noting that irreparable injury may be established "by a showing that the challenged state statute is flagrantly and patently violative of ... the express constitutional prescription of the Supremacy Clause" (citation omitted)); *United States v. California,* 173 F.4th at 1069 (finding irreparable harm based on a Supremacy Clause violation); *United States v. Arizona,* 641 F.3d 339, 366 (9th Cir. 2011) (same), *aff'd in part, rev'd in part and remanded,* 567 U.S. 387 (2012). The automatic nature of the irreparable injury stems both from the constitutional violation and the sovereign injuries that result. *United States v. California,* 173 F.4th at 1069. Thus, the United States satisfies this element of the preliminary injunction standard. *See United States v. Connecticut,* 566 F. Supp. 571, 579 (D. Conn. 1983) (concluding "without hesitation that the United States has shown that it will be irreparably injured by the continuing violation of ... a Federal statute, that would result from failure to enjoin enforcement of the Connecticut statute."), *aff'd without opinion,* 742 F.2d 1443 (2d Cir. 1983), *aff'd without opinion,* 465 U.S. 1014 (1984).

In addition, Sections 3, 4, 5, and 6 of the Act pose several additional irreparable harms, including endangering federal officers and agents, impeding their functions, and chilling federal activities.

Section 6, on masks and IDs, by design, endangers federal officers and agents because it seeks to publicly expose their personal identities at a time of already escalating instances of violence against federal officers. *See, e.g.,* Egerton Decl. ¶ 6-12. The exposure would facilitate escalating instances of harassment against those officers by agitators seeking to disrupt their operations. *See* O'Brien Decl. ¶ 8-10; Allen Decl. ¶ 13, 15-18; Egerton Decl. ¶ 14-16; Cleveland Decl. ¶ 19-29, 35. ICE officers are facing an astounding increase in death threats and assaults, which are facilitated by doxxing websites that broadcast the identities and home addresses of officers and their families, encouraging retaliation against them. *See, e.g.,* Cleveland Decl. ¶ 21-29 (describing threats against DHS officers) ; Egerton Decl. ¶ 6-12 (statistics and threats).

Section 6 impedes federal functions because it fails to sufficiently account for instances in which agents may interact with the public when performing their official duties, but disclosure of their identity could place them or others at risk, including, for example, surveillance or protection assignments, which will jeopardize such operations. *See* O'Brien Decl. ¶ 12; Allen Decl. ¶ 15, 18, 20; Egerton Decl. ¶ 16; Cleveland Decl. ¶ 31. Agents in such situations face a risk of prosecution for merely doing their jobs in an inconspicuous manner as is called for by such scenarios. Further, the challenged provisions would enable suspects to identify officers who may be involved in future enforcement actions, including undercover operations. *See, e.g.*, O'Brien Decl. ¶ 12; Allen Decl. ¶ 15, 18; Cleveland Decl. ¶ 33. Because suspects who recognize officers may try to evade apprehension and obstruct enforcement efforts, facial covering is critical for maintaining operational effectiveness, especially in areas where repeat offenders or organized criminal networks are prevalent. *See, e.g., See* O'Brien Decl. ¶ 12; Allen Decl. ¶ 18; Egerton Decl. ¶ 16; Cleveland Decl. ¶ 33. And while there are limited exceptions to the challenged provisions of the Act, they are vague and it is unclear who determines whether they are met.

Section 6 and the danger it poses will deter federal agents and officers from effectively engaging in important federal enforcement operations. *See* Allen Decl. ¶ 20,22; Egerton Decl. ¶ 14-15; Cleveland Decl. ¶ 34-35. Moreover, because Section 6 carries criminal penalties, that threat of a state investigation and prosecution can chill officers from engaging in lawful conduct in the performance of their federal duties. *See New York v. Tanella*, 374 F.3d 141, 147 (2d Cir. 2004) (stating that the federal immunity defense provides "immunity from suit rather than a mere shield against liability," to "protect[] federal operations from the chilling effect of state prosecution").

Sections 3, 4, and 5, on use of force, also endanger federal officers and agents because they impose use-of-force considerations specific to Connecticut that differ from federal policies. Federal agents comply with, and are trained on, use-of-force policies that comply with federal law. *See* O'Brien Decl. ¶ 16; Allen Decl. ¶ 21; DuBan Decl. ¶ 10-11; Cleveland Decl. ¶ 17-18. By requiring them to learn and comply with a new state law with a multitude of requirements for use of force, which differ from the federal policies agents know, agents may hesitate in such situations. *See* O'Brien Decl. ¶ 17-18; Allen Decl. ¶ 21; DuBan Decl. ¶ 13; Cleveland Decl. ¶ 18. Such hesitation in a dangerous situation can, quite literally, be the difference between life and death.

Sections 3, 4, and 5 also impede federal operations because they do not account for federal functions that could require use of force including search warrants and other investigative actions or protection assignments, and it is not clear how Connecticut would address such situations, if at all. However, federal agents routinely engage in investigative activities when conducting official duties. *See, e.g.*, O'Brien Decl. ¶ 4, 5, 12; Cleveland Decl. ¶ 31. Thus, use of force in such situations may carry the threat of prosecution of federal agents merely for carrying out their official duties in Connecticut. For the same reason, Sections 3, 4, and 5 risk chilling federal activities in Connecticut by subjecting federal officers to criminal liability for noncompliance, particularly because

22

compliance will endanger officers and limit their federal functions. *New York v. Tanella*, 374 F.3d at 147.

For these reasons, the challenged provisions threaten to "destroy the federal function" of law enforcement in the State of Connecticut. *United States v. Fresno Cnty.*, 429 U.S. 452, 463 n.11, 464 (1977). Because the Framers of our Constitution "did not intend" for federal operations to "depend on the discretion of the state governments," *McCulloch*, 17 U.S. (4 Wheat.) at 327, 362, Connecticut cannot unilaterally impose its policy preferences on the Federal Government. A "concurrent power in the [S]tates" to regulate federal operations "would bring back all the evils and embarrassments, which the uniform rule of the [C]onstitution was designed to remedy." 2 J. Story, Commentaries on the Constitution § 1099 (3d ed. 1858).

Finally, if the Act were allowed to stand, there would be nothing to stop other states from imposing further unconstitutional restraints on the Federal Government. *See Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 373 (2008) (allowing a state to act unconstitutionally "would allow other States to do the same"). This could in turn create a "patchwork" system of laws, *id.*, under which federal agents would be subject to different regulations in each state, severely undermining the Federal Government's ability to uniformly enforce federal law. Indeed, Connecticut is not the only state to have passed such laws. *See, e.g.*, *United States v. California*, 2:25-cv-10999, 2026 WL 363346, at *2 (C.D. Cal. Feb. 9, 2026) (partially enjoining California law imposing facial covering ban and ID requirement for federal officers). The United States thus faces irreparable harm from the challenged Connecticut Act.

IV.     **The Balance of Hardships and the Public Interest Weigh in the United States' Favor**

The merged factors of the balance of equities and the public interest likewise favor the United States. First, as the Ninth Circuit held, a violation of the Supremacy Clause necessarily

23

means that "both the public interest and balance of the equities tip 'decisively in ... favor' of a preliminary injunction." *United States v. California*, 173 F.4th at 1069. The Ninth Circuit's reasoning was based, in part, on the fact that there is no public interest in enforcing an unconstitutional law. *Id.* As the Ninth Circuit explained, "all citizens have a stake in upholding the Constitution, meaning it is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* at 1060. That holds true in this Circuit as well. *A.H. v. French*, 985 F.3d 165, 184 (2d Cir. 2021) ("the public interest is well served by the correction of this constitutional harm"). Just as in *United States v. California*, there is no public interest in violating the Supremacy Clause. There is, however, significant public interest in protecting federal officers' safety, removing unlawful impediments to federal law enforcement operations, and avoiding potential conflict between state and federal agents. Indeed, "[f]rustration of federal statutes and prerogatives are not in the public interest." *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012); *see Am. Fin. Servs. Assn. v. Burke*, 169 F. Supp. 2d 62, 71 (D. Conn. 2001) (finding that "while the efforts of the Connecticut legislature to curb 'predatory lending' practices ... may be admirable and important, until Congress limits the enforceability of arbitration clauses in certain contexts, the Court must follow the FAA's broad mandate providing for the enforcement of such clauses."); *see Glidedowan, LLC v. New York State Dep't of Health*, 768 F. Supp. 3d 503, 525 (W.D.N.Y. 2025) (noting "public interest considerations associated with the performance of government functions possess a high value when balancing the equities.").

Further, it is not in the public interest to require federal agents to comply with varying state standards for use of force when the federal policy is designed to comply with federal law, particularly since hesitation in such situations can be fatal. Likewise, it is not in the public interest to subject federal agents to increased harassment, doxxing, and violence. Unfortunately, when

24

federal agents' identities are revealed, the resulting harm is not always limited to their official duties; it can impact their families as well, and thus the balance of equities weighs in favor of the United States. The aim of the Connecticut law is to hinder federal agents from participating in crucial law enforcement operations in the state and to chill effective enforcement of federal law. Such obstructionism is not in the public interests.

The public interest is also impaired by placing state and federal officials on a dangerous collision course as the Act seeks to regulate federal agents, including during the discharge of their duties. The risk of tension and conflict between these law-enforcement agencies strongly counsels in favor of an injunction that clearly lays out the respective spheres of authority. Moreover, while Connecticut may disagree with the United States' priorities, it has no legitimate interest in interfering with the enforcement of federal law or putting federal agents at risk. Thus, not only does the balance of equities support a preliminary injunction, but the public interest would be served by the issuance of such an injunction. *See Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010).

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court preliminarily enjoin the Defendants, the Defendants' officers, agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with any of the Defendants, from enforcing Sections 3, 4, 5, and 6 of the Act as to federal officers, agents, and employees.

DATED: May 22, 2026

Respectfully submitted,

STANLEY E. WOODWARD, JR.
Associate Attorney General

BRETT A. SHUMATE

25

Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General
Civil Division

ANNA EDWARDS
Counsel to the Associate Attorney General

CHARLES E.T. ROBERTS
Counsel to the Assistant Attorney General
Civil Division

ALESSANDRA FASO
Senior Litigation Counsel

*/s/Alexandra McTague Schulte*
ALEXANDRA MCTAGUE SCHULTE
Senior Litigation Counsel (NY Bar No. 4342911)
U.S. Department of Justice
Civil Division
Enforcement & Affirmative Litigation Branch
P.O. Box 386
Washington, DC  20044-0386
Tel: (202) 718-0483
Email: alexandra.schulte@usdoj.gov

*Attorneys for the United States of America*

26