**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | 3:26-CV-00758-SVN |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| STATE OF CONNECTICUT, ET AL. | : | |
| *Defendants.* | : | JULY 13, 2026 |

**OPPOSITION TO PLAINTIFF'S MOTION FOR
<u>PRELIMINARY INJUNCTION</u>**

President Trump's second term brought an unprecedented break from law enforcement norms. Connecticut prosecutors have always had authority to investigate and prosecute, if necessary, federal officers for crimes they commit in the line of duty. In the past, the federal government acknowledged and respected that authority and cooperated in those investigations. But no longer. Earlier this year, officials from the Federal Bureau of Investigation ("FBI") severed that relationship and told the Connecticut Office of the Inspector General ("OIG") that if a federal agent used deadly force against a person in Connecticut, it would hinder any attempts by the OIG to investigate the incident to determine whether the agent committed a crime. The FBI indicated it would do its own investigations and would complete them in only 1-2 weeks—which is to say, conduct virtually no investigation at all.

And for centuries, governments at all levels have required their officers to visibly identify themselves as police when performing their duties. Until recently, the federal government never authorized agents to conceal their identities on a routine basis. On the contrary, it insisted that visible identification was a basic necessity for constitutional policing, even in the face of threats to officer safety. But not this Administration. In early 2025, to satisfy demanding immigration arrest quotas, the federal government began deploying roving patrols of federal agents into cities

1

and towns across the country, many of whom wore masks, drove unmarked vehicles, and refused to display any visible form of identification.  This widespread use of unidentifiable agents—coupled with their often aggressive, militarized tactics—led to many incidents where civilians could not distinguish law enforcement officers from criminals, placing both the public and the officers' safety at risk.  It also led to a spike in dangerous criminal impersonations that the FBI and United States Marshals Service ("USMS") have since acknowledged.

Senate Bill No. ("SB") 397 prevents such impersonations and ensures that Connecticut civilians can identify law enforcement.  Section 6 requires law enforcement officers operating in Connecticut to identify themselves as police by not wearing a mask and by visibly displaying a badge and name tag—but provides numerous exemptions for when it may be appropriate or necessary for an officer to conceal their identities to perform their functions.  And §§ 3, 4, and 5 made modest changes to the statutes authorizing the OIG to investigate and, in appropriate cases, prosecute law enforcement officers for certain crimes they commit in the line of duty (Conn. Gen. Stat. §§ 51-277a and 51-277e), and to the statute conferring law enforcement with an affirmative defense to liability for justifiable use of force (Conn. Gen. Stat. § 53a-22).

To the apparent frustration of the federal government, SB 397 does not provide any special exemptions for federal officers, but applies to all "peace officers," broadly defined to include state, local, and federal agents.  The United States ("Plaintiff") brought this action claiming SB 397 violates the Supremacy Clause under the intergovernmental immunity doctrine because it impermissibly regulates the federal government, and now has sought the extraordinary relief of a preliminary injunction.

The Court should deny that motion.  First, Plaintiff has not shown a likelihood of success on the merits. It has failed to even plead standing let alone prove it at the preliminary injunction

phase.  And it has not demonstrated that any of the challenged provisions of SB 397 amount to  an impermissible burden on federal operations that courts have held to violate the Supremacy Clause, much less that they do so in all of their applications.  Plaintiff's challenge to §§ 3, 4 and 5 is especially perplexing, because those provisions do not regulate or prohibit *anyone's* conduct, but instead provide all peace officers with an affirmative defense to criminal liability for justifiable uses of force—no different from how virtually every other State in the country does it.

Second, because Plaintiff has declared that federal agencies "will not comply" with SB 397, its only alleged injury is the threat of a future prosecution—an injury the Supreme Court has held is not irreparable when unconnected with some ongoing impact or chilling effect on conduct. Regardless, Plaintiff's substantial delay in bringing this suit precludes any finding of irreparable harm under established Second Circuit precedent.

Third, the equities weigh heavily against an injunction.  Enjoining the challenged provisions of SB 397 would cause substantial and irreparable harm to the public interest.  It would entitle federal officers to continue to engage in aggressive tactics while masked and unidentifiable, putting public safety at risk and placing a strain on state and local law enforcement required to deal with the fallout.  And if a federal officer did use unlawful deadly force in Connecticut, an injunction against the OIG makes it unlikely that officer will ever be properly investigated— depriving Connecticut residents of the accountability they deserve and preventing the OIG from carrying out its statutory duties.  On the other hand, denying Plaintiff's motion poses minimal, if any, risks to its sovereign interests because it may vindicate those interests by asserting a Supremacy Clause immunity defense if an agent ever were prosecuted.

**BACKGROUND**

I.      **Until Very Recently, the Federal Government Followed Historical Norms of Requiring Police Officers to Identify Themselves.**

        A.      **For centuries, governments have universally required their law enforcement officers to be clearly identified.**

"Transparent and accountable law enforcement" is what "separates policing in democratically accountable regimes from the sort of policing that occurs in coercive totalitarian and authoritarian regimes." *Friedman Dec.* ¶ 12. When officers conceal their identities, it "undermines public safety" by making it "much more difficult to identify officers and hold them accountable when they engage in misconduct." *Id*. ¶ 13. It "reduces public trust in police, making it less likely [citizens] will cooperate in law enforcement investigations[.]" *Id.* And it "needlessly put[s] the lives of officers and members of the public at risk" because it makes it difficult for citizens (and other law enforcement officers) to distinguish between police officers conducting legitimate operations, and criminals against whom they have a fundamental right to defend themselves (or to intervene). *Id.* ¶ 14; *Schuchart Dec.* ¶¶ 11(a), 35; *see also McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (noting that "[s]elf-defense is a basic right").

These basic truths have been well-known and universally applied by governments for centuries. English common-law courts required sheriffs to "signify the cause of [their] coming" before forcibly entering a house to conduct an arrest or "other execution of the King's process[.]" *Wilson v. Arkansas*, 514 U.S. 927, 931 (1995) (*quoting Seymane's Case*, 77 Eng. Rep. 194, 195 (K.B. 1604)). That rule ensured "that the party hath notice, that the officer cometh not as a mere trespasser, but claiming to act under a proper authority." *Id.* (*quoting Curtis' Case*, 168 Eng. Rep. 67, 68 (Crown 1757)). Early Massachusetts and New York laws required law enforcement to carry

4

visually distinctive staffs when on duty, to denote their status.[1]  And throughout the 1800s and after, law enforcement agencies at all levels required their officers to visibly display a badge and/or name tag.  *Friedman Dec.* ¶¶ 7-11.

These principles still apply today.  "Federal law enforcement personnel" must "visibly display" their individual identifier and organization when "responding to a civil disturbance[.]" 10 U.S.C. § 723(a).  An immigration officer making an arrest must "[i]dentify [themselves] as an immigration officer who is authorized to execute an arrest" "as soon as it is practical and safe to do so."  8 C.F.R. § 287.8(c)(2)(iii).  And in Connecticut—as in many other states—uniformed officers authorized to make arrests must "affix and prominently display" their "badge and name tag[.]"  Conn. Gen. Stat. § 7-294ii; *Mello Dec.* ¶ 18 (Att. A).

Numerous laws treat law enforcement differently depending on whether they identify themselves.  Civilians may be justified in using force to defend themselves against federal officers who fail to identify.  *United States v. Feola*, 420 U.S. 671, 686 (1975).  In Connecticut, civilians may be "justified in using physical force to resist an arrest" if the officer is not "reasonably identifiable [as a] peace officer[.]"  Conn. Gen. Stat. § 53a-23; *see also State v. Woolcock*, 201 Conn. 605, 631 (1986) (statute designed to protect peace officers who "present themselves with the garb and indicia of their status").  It is a felony to assault a "reasonably identifiable peace officer" with intent to prevent them from exercising their duties.  Conn. Gen. Stat. § 53a-167c(a). And Conn. Gen. Stat. § 14-233(a) prohibits disobeying officer commands to stop, but only if the officer is "in uniform or prominently displaying the badge of his office[.]"

---

[1] *See Book of General Laws and Liberties Concerning the Inhabitants of Massachusetts* 13 (1648) (1648), https://perma.cc/3PJ9-ECN6; *Minutes of the Common Council of the City of New York*, 1784-1831, at 682 (Dec. 28 1807), https://perma.cc/8G75-XWRS.

**B.      Until recently, the federal government adhered to identification requirements, even during periods of acute civil unrest.**

"Consistent with the long tradition of officer identification in this country, until recently, officer masking was a rarity." *Friedman Dec.* ¶ 11; *see also Shuchart Dec.* ¶ 26 (masking was "extremely uncommon" for "federal officers and agents prior to 2025"). So was hiding credentials. ICE officers "would generally have a credential, bearing their badge and number, visible on their person[.]" *Shuchart Dec.* ¶ 26. Customs and Border Patrol ("CBP") required all agents to carry their credentials when on duty, except when undercover, and to wear badges and nameplates or unique identifiers that are "visible to the public" whenever practicable. *Id.* ¶ 18. That was true even despite threats of doxxing and harassment, which "are long-standing and predated 2025[.]" *Id.* ¶ 27.

And the Department of Justice ("DOJ")—encompassing the FBI and the Drug Enforcement Agency ("DEA")—has insisted that law enforcement officers identify themselves even during periods of active unrest. The shooting of Michael Brown in Ferguson, Missouri in 2014 prompted "large scale" protests and riots. *Lopez Dec.* ¶ 7. There were ongoing threats to officer safety, including instances of violence and doxxing. *Id.* ¶¶ 7-8. As a result, local officers began removing or covering the nameplates on their uniforms. *Id.* ¶ 9. When DOJ learned of this, it insisted they continue to display identification, which DOJ described as "a basic component of transparency and accountability," and "a near-universal requirement of sound policing practices[.]" *Id.* ¶ 13 & Att. A. DOJ argued that permitting officers to conceal their identities "contributes to mistrust and undermines accountability," and "conveys a message to community members that, through anonymity, officers may seek to act with impunity." *Id.* Such practices are "at odds with principles of constitutional policing" and "engender[] deep distrust among the very people whose trust police most need to effectively fight crime and protect public safety." *Id.* Att. A.

6

**C.      In 2025, the new Administration deploys masked and unidentified agents across the country, endangering public safety.**

President Trump's second term brought an unprecedented break from law enforcement norms.  In early 2025, federal officials announced quotas of thousands of immigration arrests per day.[2]  To comply with those orders, federal agents began conducting roving patrols all over the country, frequently employing aggressive militarized tactics against suspects, protesters, and other civilians. *Schuchart Dec.* ¶ 43.  Many of these agents wore masks, dressed in plain clothes, drove unmarked vehicles, and failed or refused to display any visible form of identification.  *Id.* ¶ 24. Federal agencies had apparently not implemented any actual policies prescribing when agents could wear masks or hide their name tags, instead informally permitting them to do so at their discretion on an ad hoc basis.  Agents "frequently" wore masks bearing "images of the 'Punisher' comic-book villain logo, skulls and other gang-related insignia, the 'thin blue line' flag, and images taken from horror and genre films." *Id.* at ¶ 25.  DHS endorsed the use of those images, responding to a press inquiry about whether it approved of agents wearing Chucky and Momo masks by saying, "Happy Halloween." *Id.*

These tactics made it difficult for civilians to identify federal agents as law enforcement. For example, in Connecticut, armed and masked ICE agents barged through security in New Haven Superior Court, without notifying the Judicial Branch they were coming.[3]  In California, the LAPD responded to reports of kidnappings and hit-and-runs, only to discover they were ICE operations.[4]

---

[2] Olivares, *Trump Administration Sets Quota to Arrest 3,000 People a Day in Anti-Immigration Agenda*, The Guardian (May 29, 2025), https://www.theguardian.com/us-news/2025/may/29/trump-ice-arrest-quota.

[3] Breen, *ICE arrests man inside CT Superior Court building in New Haven*, New Haven Independent (Jan. 20, 2026) ICE arrests man inside CT Superior Court building in New Haven.

[4]Stone, *Los Angeles Police Responded to a Kidnapping Call.  But Instead Found an ICE Operation.*    https://abcnews.com/US/los-angeles-police-responded-kidnapping-call-found-ice/story?id=123204661.

Another woman resisted an attempted arrest because she thought she was being kidnapped.[5] Federal prosecutors filed, then later moved to dismiss, charges against her for assaulting a federal officer. *See United States v. Velez*, No. 2:25-mj-03896, ECF Nos. 9, 32 (C.D. Cal.). In another case, unidentified ICE agents forced a car to stop and then fired shots at it when the driver attempted to pull away.[6] The driver later told police that "masked men had tried to pull him over, broke his car window, and shot at him," and that "he did not know who they were."[7]

The widespread use of masked agents also led to a rise in criminal impersonations. *Friedman Dec.* ¶ 15. People have allegedly posed as ICE agents to commit sexual assault, robbery, and kidnapping.[8] In October 2025, the FBI issued a Public Safety Awareness Report entitled, "Criminal Actors Impersonate ICE Agents to Commit Violent Crime." Ex. 10. The Report warned that "criminal actors are using ICE's enhanced public profile and media coverage to their advantage to target vulnerable communities and commit criminal activity." *Id.* It further noted that "[t]hese criminal impersonations make it difficult for the community to distinguish between legitimate officers . . . and imposters . . . which damages trust between the local community and

---

[5] Bennet & Adams, *Woman Wrongfully Detained in Immigration Raid Describes What She Endured*, https://www.pbs.org/newshour/show/woman-wrongfully-detained-in-immigration-raid-describes-what-she-endured

[6] Frias & Jeong, *Federal Agents Open Fire At Family Truck in San Bernadino*, NBC L.A. (Aug. 16, 2025), https://www.nbclosangeles.com/news/local/san-bernardino-family-claims-federal-agents-shot-at-truck-shattered-windows/3765321/.

[7] City of San Bernadino, Press Release (Aug. 18, 2025), https://www.sanbernardino.gov/m/newsflash/Home/Detail/630.

[8] *See e.g.* Moshtaghlan, *Multiple ICE Impersonation Arrests Made During Nationwide Immigration Crackdown*, CNN (Feb. 5, 2025), https://www.cnn.com/2025/02/04/us/ice-impersonators-on-the-rise-arrests-made-as-authorities-issue-national-warning; Olivares, *Rise of ICE Agents Wearing Masks Creates Opportunity for Imposters to Conduct Crimes*, PBS News Hour (July 7, 2025), https://perma.cc/B74E-ZTBC; Gentile, *Florida Woman Accused of Impersonating Ice Agent to Kidnap Ex-boyfriend's Wife*, USA Today (April 25, 2025) https://www.usatoday.com/story/news/nation/2025/04/25/ice-agent-impersonate-kidnapping-florida-woman/83271541007/.

law enforcement officers." *Id.*  The Report instructs "law enforcement personnel [to] adequately identify themselves during operations and cooperate with individuals who request further verification." *Id.* at 3.  USMS issued similar guidance on November 20, 2025, warning that "[r]eal officers will identify themselves, state their agency," and "carry both a badge and agency-issued ID," and to "[b]e cautious if they refuse" to provide that identification.  Ex. 11.

In one incident, ICE impersonators robbed immigrants at gun point in North Carolina, splitting one of the victim's head open with the butt of a gun.  *Friedman Dec.* ¶ 16.  One victim said they would not be able to tell the difference between impersonators and real ICE agents, "because now they all come hooded." *Id.*

## II. Historically, the Federal Government Cooperated with State Investigations of Federal Officers for Use of Force Incidents in Connecticut.

### A. For decades, federal officers have been subject to investigation and prosecution under Connecticut criminal laws, and could claim an affirmative defense for justifiable use of force.

Federal agents have long been subject to State-specific criminal laws for crimes they commit in the line of duty. *See In re Neagle*, 135 U.S. 1, 75 (1890).  Like Connecticut, every State has their own laws setting the standard for criminal liability, and nearly every State provides police officers with an affirmative justification defense.  *Stoughton Dec.* ¶ 13. Those justification laws do not themselves criminalize any conduct but instead function as affirmative defenses to liability for conduct that would otherwise violate an independent criminal statute, like murder, manslaughter, or assault. *Id.* ¶¶ 17-23.  Federal agencies have operated under these State-specific standards for centuries, without any interference to their operations.  *Id.* ¶ 36; *see also Shuchart Dec.* ¶¶ 58-59.  They apparently have not bothered training their agents on state criminal laws and justification defenses.  *Stoughton Dec.* ¶ 36; *Schuchart Dec.* ¶ 59.

In 1988, the General Assembly authorized the Connecticut Division of Criminal Justice ("DCJ") to investigate and potentially prosecute "peace officer[s]" for violation of criminal law stemming from uses of force in the line of duty.  *See* Conn. Gen. Stat. § 51-277a (rev. to 1989); Public Act No. 88-199.  A peace officer charged with a crime could claim an affirmative defense under Conn. Gen. Stat. § 53a-22, which prescribes the circumstances in which "peace officer[s]" are "justified" in using deadly and non-deadly force upon another person.  In 1991, the General Assembly amended the definition of "peace officer" in Conn. Gen. Stat. § 53a-3(9) to include "any special agent of the federal government authorized to enforce the provisions of Title 21 of the United States Code[.]" *See* Public Act No. 91-171 § 1.  That includes agents in the FBI and DEA, among others.

Until 2021, Connecticut vested the authority to investigate and prosecute peace officers in the DCJ.  *Prescott Dec.* ¶ 15.  In 2020, in the wake of the George Floyd murder, the General Assembly passed An Act Concerning Police Accountability ("ACPA"), July Sp. Sess. Public Act No. 20-1. To increase public trust, accountability, and transparency in the investigations of police misconduct, the ACPA established the OIG as a distinct office within the DCJ that would be primarily responsible for investigating, reporting, and in appropriate cases prosecuting peace officers—then defined to include federal agents with Title 21 authority—for violent crimes committed in the line of duty.  Public Act No. 20-1 §§ 33-34; Conn. Gen. Stat. §§ 51-277a and 51-277e.  Section 34 of the ACPA required the OIG to investigate incidents in which a peace officer uses either deadly force on another person, or nondeadly force and someone dies as a result.  *See* Conn. Gen. Stat. § 51-277a(a)(1).  "Deadly physical force" is defined as "physical force which can be reasonably expected to cause death or serious physical injury."  Conn. Gen. Stat. § 53a-3(5).

Like other States' laws, § 53a-22 is an affirmative defense to, not a basis for, liability.  *Prescott Dec.* ¶ 18.

> **B.    For years, the federal government cooperated with Connecticut's investigations into federal officers.**

Until this lawsuit, the federal government "work[ed] with" State officials to investigate use of force cases involving federal agents.  *Griffin Dec.* ¶ 19.  In January 2021, the DCJ investigated an FBI agent and a federal task force officer ("TFO") involved in a deadly shooting in Hartford. *Id.* ¶ 20. The DCJ "worked collaboratively" with the FBI in "securing the scene, collecting evidence, and investigating the incident."  *Id.* ¶ 21.  After the OIG was established, "there was consistent cooperation and collaboration" with the federal government.  *Devlin Dec.* ¶ 12.  In 2021 and 2022, the OIG investigated two deadly force incidents involving the FBI and USMS, "without interference or objection" from either agency.  *Id.* ¶¶ 22, 23.

In early 2025, then-Inspector General ("IG") Robert Devlin met with representatives from the FBI, DEA, USMS, and ATF to discuss investigatory protocols if a federal officer were investigated for using deadly force in Connecticut.  *Id.* ¶ 13.  These officials acknowledged the OIG's statutory authority to investigate such incidents, and none objected to the OIG's involvement. *Id.* ¶ 14.  The FBI "expressed a willingness" to collaborate, and other agencies such as the DEA and USMS indicated they believed the OIG's involvement "would be useful" because the OIG was better equipped to conduct the investigations expeditiously.  *Id.*  Based on these meetings, IG Devlin believed that these federal agents "agreed to" accept the OIG's assistance and that there was a "clear understanding" they would work together in investigating incidents involving a federal agent or TFO.  *Id.* ¶ 18.

This cooperation aligns with Plaintiff's own policies, some of which "expressly note that state and local authorities may investigate and prosecute excessive-force incidents."  *Shuchart*

*Dec.* ¶ 55.  ICE's policy explains that "[l]ocal law enforcement agencies may investigate use of force incidents occurring within their territorial jurisdictions," and that ICE officers involved in such incidents "should anticipate an investigation by local authorities."  Ex. 12 at 28-29.  CBP's policy likewise contemplates that a "state or local law enforcement agency [may] take action" in response to misconduct.  Ex. 13 at 43.

By Spring 2025, the OIG and the FBI had nearly finalized a memorandum of understanding ("MOU") detailing each office's respective roles in such investigations.  *Id.* ¶ 19.  IG Devlin exchanged numerous iterations of the MOU with the FBI Special Agents in Charge ("SAC") Robert Fuller and Anish Shuckla.  *Id.* ¶ 20 and Att. A.  When Eliot Prescott became IG in July 2025, he reached out to the FBI to continue those efforts.  *Prescott Dec.* ¶ 40.  But after receiving an initial response from Assistant SAC Anish Shukla, his communications went ignored.  *Id.*

### C.     In early 2026, the FBI declares it will no longer permit the State to investigate federal officers

By early 2026, federal agents' tactics had led to widespread protests and unrest across the country, culminating in the deadly shootings of Alex Pretti and Renee Good by federal agents in Minneapolis, Minnesota.  *Id.* ¶ 41.  Seeing reports that federal agencies were not cooperating with the ensuing state investigations and that the federal investigations were cursory at best,[9] the OIG became concerned about how such an incident would be handled if one occurred in Connecticut.  *Id.*  The OIG issued a Guidance Letter to state and local police on February 6, 2026, outlining best practices for securing the scene, preserving evidence, and responding to civil unrest.  *Id.* ¶ 41 and Att. D; *Cain Dec.* ¶ 12.  The letter warned that federal cooperation in deadly force incidents was

---

[9] See ABC News, *Former officials say DHS tactics undermine public trust after series of contradictory statements* https://abcnews.com/US/former-officials-dhs-tactics-undermine-public-trust-after/story?id=129717921 (noting DHS officials declared Alex Pretti shooting justified within days of the shooting).

no longer expected, but emphasized the OIG's continued position that "a federal agency cannot lawfully prohibit" Connecticut law enforcement agencies from investigating deadly use of force incidents involving federal officers, and that such incidents "can and will be investigated by the appropriate law enforcement agencies of this State." *Prescott Dec.* Att. D at 1.

IG Prescott and OIG Chief Inspector ("CI") Rachael Cain discussed that Guidance Letter at a law enforcement council meeting on February 11, 2026. *Prescott Dec.* ¶ 41; *Cain Dec.* ¶ 14. In attendance was P.J. O'Brien, the SAC of FBI's New Haven office.  *Id.*  Later that day, SAC O'Brien e-mailed IG Prescott asking to schedule a meeting to "ensure the long-standing cooperation between our offices continued."  *Prescott Dec.*, Att. C. IG Prescott and CI Cain attended the meeting and brought the draft MOU with them.  *Cain Dec.* ¶ 15.

In reality, SAC O'Brien had no intention of ensuring continued cooperation.  During the meeting on February 9, 2026, SAC O'Brien told IG Prescott and CI Cain in no uncertain terms that the FBI would not cooperate with any State investigation into the use of force by an FBI agent. *Prescott Dec.* ¶ 43; *Cain Dec.* ¶ 15.  Instead, he indicated that federal officials would conduct those investigations themselves, without OIG involvement.  *Prescott Dec.* ¶ 43; *Cain Dec.* ¶ 15. Concerningly, SAC O'Brien also indicated that federal officials would complete their investigation in only 1-2 weeks.  *Id.*  That struck both IG Prescott and CI Cain as wholly inadequate to conduct a legitimate, thorough, and fair investigation, since the OIG's investigations typically take many months to complete. *Prescott Dec.* ¶ 43; *Cain Dec.* ¶ 18.  SAC O'Brien also indicated that federal authorities would refuse to provide the OIG with information it is statutorily required to share with the public, including the name of the officer involved. *Prescott Dec.* ¶ 44; *Cain Dec.* ¶¶ 16, 19. SAC O'Brien and his staff refused to negotiate these terms, and the MOU was never finalized. *Prescott Dec.* ¶ 45.

13

To IG Prescott, this meeting with SAC O'Brien reflected a "drastic change of course by federal officials in terms of their willingness to participate and cooperate in State investigations." *Prescott Dec.* ¶ 46. If the OIG could not investigate federal officials who use deadly force against Connecticut residents, it "would cause permanent and likely irreparable injuries" to the OIG, and make it virtually impossible to conduct any investigation into a federal officer who kills a Connecticut resident in the line of duty. *Id.* ¶ 48; *see also id.* ¶¶ 49-51; *Cain Dec.* ¶ 18-23.

**III.    SB 397**

On May 4, 2026, Connecticut enacted SB 397. As relevant to this lawsuit, the law does three things.

*a. The IG's authority.* With respect to the IG's authority to investigate and prosecute peace officers, § 3 of SB 397 expanded the definition of "peace officer" in § 51-277a to include "any federal law enforcement officer as defined under 18 U.S.C. [§] 115(c)(1) and 34 U.S.C. [§] 50301(5)," not just those with Title 21 authority.

Beyond that, SB 397 changed little. The OIG's primary authority to investigate and prosecute peace officers remains limited to those instances in which a peace officer uses deadly physical force on another person, or nondeadly force and a person dies as a result. SB 397 § 3(a)(2). The OIG does not have jurisdiction over cases in which a peace officer uses nondeadly force that does not result in a death. *Prescott Dec.* ¶ 12.

Further, § 4 did not materially change the standard set forth in § 53a-22, as amended by the ACPA, for determining whether a peace officer's use of force is justifiable. And § 53a-22 continues to serve as a defense to, not a basis for, criminal liability. Thus, as under all prior versions of these statutes, if the IG were to charge a peace officer for a crime, it would be under a generally applicable criminal statute, such as assault, manslaughter, or murder. *Id.* ¶¶ 18-19.

14

SB 397 § 3(c) retained the language from the 2020 ACPA that the IG "shall prosecute any case in which the [IG] determines that . . . the use of force by a peace officer was not justifiable under section 53a-22[.]"  That language remains directory, not mandatory.  It authorizes but does not obligate OIG to prosecute peace officers who use force that violates a criminal statute and is not justified.  *Prescott Dec.* ¶ 19.  Like every other prosecutor, the IG has wide discretion to consider all relevant factors when deciding whether to initiate a prosecution.  *Id.* ¶ 20.  Whether a peace officer has a valid justification defense under § 53a-22 is one of many factors the IG considers when deciding whether to prosecute.  *Id.* ¶¶ 20-21.

The IG's investigatory and reporting authority also remained largely the same.  SB 397 §§ 3 and 5.  Section 3 added provisions to § 51-277a providing that (1) the DCJ and IG "shall have the unrestricted right to access the scene and collect evidence" whenever a peace officer uses deadly force or nondeadly force that results in a death, and (2) the DCJ and IG may bring an action in Superior Court for injunctive relief if any person "restricts" that right of access.  SB 397 § 3(a)(5)(A) and (B).

*b. The mask restriction.*  Section 6(b) of SB 397 provides that peace officers operating in Connecticut—including state, local, and federal officers—"shall not wear any facial covering or personal disguise while interacting with the public in the performance of [their] duties[.]"  It includes numerous exemptions for when wearing a mask may be necessary for the officer's performance of their duties, such as "during an active undercover operation or assignment" (§ 6(b)(7)), in various circumstances when necessary to protect the officer's safety, and not merely their identity (§ 6(b)(1)-(6)), or during bomb squad or specialized weapons or tactical operations.  A violation of § 6(b) is a class D misdemeanor.

*c. The visible-identification requirement.* In 2020, as part of the ACPA, the General Assembly enacted Conn. Gen. Stat. § 7-294ii(a), which requires "any police officer" who is "authorized to make arrests or who is otherwise required to have daily interactions with members of the public" to "affix and prominently display on the outer-most garment of such officer's uniform the badge and name tag" issued by their law enforcement unit, "[e]xcept as specified in the model policy" adopted by the Commissioner of Emergency Services and Public Protection and the Police Officer Standards and Training Council. That model policy provides (1) that uniformed police officers must prominently display their badge and name tags; (2) that "plain clothes" officers interacting with the public must visibly display their badge and name plate on their "outer uniform garment" if they are wearing one; and (3) that these requirements do not apply if they would place the officer's or any member of the public's "personal safety in jeopardy" or "compromise the integrity of a sensitive investigation." *Mello Dec.*, Att. A (C)(1) and (2).

Section 6(c) of SB 397 extends these requirements to all peace officers, now including federal agents. It provides that "[i]n accordance with [§] 7-294ii," peace officers who are "conducting a planned arrest or interacting with the public in [their] official capacity and [are] authorized to make arrests, shall be clearly identified by [their] badge and name tag on [their] uniform[.]" There are numerous exceptions for (1) undercover assignments, (2) when "compliance is excused pursuant to the model policy adopted pursuant to [§] 7-294ii," i.e., when wearing a badge or name tag would place the officer's or the public's safety in jeopardy or compromise a sensitive investigation; (3) when excused pursuant to a court order, or (4) when weather-related or traffic safety issues prevent the officer from complying. An intentional violation of § 6(c) is a class D misdemeanor.

16

**IV.     The Federal Government Sues, Declaring that it "Will Not Comply" With SB 397.**

Plaintiff filed this lawsuit for declaratory and injunctive relief against Governor Ned Lamont, Attorney General William Tong, Chief States Attorney Patrick Griffin, IG Prescott, and the State of Connecticut.  ECF No. 1.  Plaintiff claims that §§ 3, 4, 5, and 6 of SB 397 violate the Supremacy Clause as applied to all federal officers under the intergovernmental immunity doctrine because they impermissibly "regulate the Federal Government's operations." *Id.* at ¶ 1.  Plaintiff alleged "[f]ederal law enforcement agencies *cannot and will not comply* with the challenged Act," and that federal officers are therefore under threat of being prosecuted for violating it.  *Id.* ¶ 38 (emphasis added).  Plaintiff later moved for a preliminary injunction.  ECF No. 12.

## ARGUMENT

"The preliminary injunction is one of the most drastic tools in the arsenal of judicial remedies." *Grand River Enter. Six Nations v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks omitted).  "To obtain a preliminary injunction against government enforcement of a statute, the [movant] must establish (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm if the injunction is not granted, (3) that the balance of the equities tips in its favor, and (4) that the injunction serves the public interest." *Sam Party of N.Y. v. Kosinski*, 987 F.3d 267, 273-74 (2d Cir. 2021).  Plaintiff has shown none of these requirements.

**I.     Plaintiff Is Not Likely to Succeed on the Merits**

Plaintiff has failed to demonstrate it is likely to succeed on the merits of its claims.  First, it failed to prove it has standing to challenge §§ 3, 4, 5, or 6 of SB 397.  Second, it has not demonstrated that the challenged provisions violate the intergovernmental immunity doctrine, much less that they do so in all of their applications.

17

### A.    Plaintiff failed to establish standing

The federal government must demonstrate standing to sue just like any other plaintiff. *United States v. California*, No. 2:25-cv-06230-MCS-AGR, 2026 U.S. Dist. LEXIS 61221, at *6 (C.D. Cal. Mar. 18, 2026) (*citing United States v. San Jacinto Tin Co.*, 125 U.S. 273, 285 (1888)). That requires proof of "(1) injury-in-fact, which is a 'concrete and particularized' harm to a 'legally protected interest'; (2) causation in the form of a 'fairly traceable' connection between the asserted injury-in-fact and the alleged actions of the defendant; and (3) redressability, or a non-speculative likelihood that the injury can be remedied by the requested relief." *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 70 (2d Cir. 2019). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Spokeo v. Robins*, 578 U.S. 330, 338 (2016).

Defendants have simultaneously moved to dismiss this suit, asserting that Plaintiff failed to establish standing even at the pleading stage. The Court should grant that motion for the reasons set forth therein. But even if the Court denied it, that would not be controlling here because the burden of proof is "more onerous" at the preliminary injunction stage. *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 119 (2d Cir. 2025); *Chamber of Commerce of United States v. Bartolomeo*, No. 3:22-CV-1373 (KAD), 2026 U.S. Dist. LEXIS 30106, at *12 n.6 (D. Conn. Feb. 13, 2026) (granting defendants' motion for summary judgment for lack of standing, despite having denied motion to dismiss). At that stage, plaintiffs can no longer rest on general factual allegations of injury, but "must set forth by affidavit or other evidence specific facts" to establish each element of standing. *Cacchillo v. Insmed, Inc.* 638 F.3d 401, 404 (2d Cir. 2011). "[I]nferences appropriate when considering [a] motion to dismiss may be inappropriate" under this heightened burden. *Cerame v. Slack*, 123 F.4th 72, 88 n.16 (2d Cir. 2024).

18

Defendants incorporate their standing arguments from their motion to dismiss and will not repeat them at length here.  In short, Plaintiff lacks standing to challenge the mask and identification provisions in § 6 because the Governor, Attorney General, Chief State's Attorney, and IG are not proper defendants with sufficient connection to enforcement of § 6.  So even if Plaintiff has shown an imminent threat § 6 will be enforced against a federal agent, that future injury is not caused by these Defendants and would not be redressed by an injunction against them. Indeed, the Governor, Attorney General, Chief State's Attorney, and the State of Connecticut are not proper parties for any claim in this suit.

Plaintiff also lacks pre-enforcement standing to challenge §§ 3, 4, and 5 of SB 397 because it has not demonstrated "(1) an intention to engage in a course of conduct arguably affected with a constitutional interest; (2) that the intended conduct is proscribed by the challenged law; and (3) that there exists a credible threat of prosecution thereunder." *Vitagliano v. Cnty. of Westchester*, 71 F.4th 130, 136 (2d Cir.), *cert. denied*, 144 S. Ct. 486 (2023) (internal quotation marks omitted).

First, as Defendants explained in their motion to dismiss, Plaintiff cannot establish pre-enforcement standing because §§ 3, 4, and 5 do not proscribe any conduct.

Second, even setting aside the fact that the claims here cannot establish pre-enforcement standing, any other injury from §§ 3, 4, or 5, are purely speculative.  As a general matter, it is typically "no more than conjecture" to try to predict when "police will act unconstitutionally and inflict injury without provocation or legal excuse." *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983).  That is certainly true here.  Even at the pleading stage, Plaintiff failed to allege any "concrete plans" to engage in conduct that the OIG would have authority to prosecute. *Gazzola v. Hochul*, 88 F.4th 186, 203 n.9 (2d Cir. 2023) ("[s]omeday intentions" to engage in proscribed conduct are insufficient).  Plaintiff's declarations did not change this.  They provide no information

19

about their agents' intended activities at all.  They merely allege, in general and conclusory terms, that their agents follow the federal use of force standards and requiring them to comply with § 53a-22 might cause them to hesitate if they were to find themselves in a situation where they needed to use force.  *Cleveland Dec.* ¶¶ 18-20; *O'Brien Dec.* ¶¶ 16-19; *Duban Dec.* ¶¶ 7, 12-13; *Allen Dec.* ¶¶ 21-22.  Those general assertions do not even demonstrate a likelihood that a federal officer is likely to use force in the imminent future, much less commit a crime like murder, manslaughter, or assault that the OIG can or would prosecute them for.

Third, Plaintiff has not alleged nor presented any evidence to demonstrate an injury from the IG's investigatory duties.

Finally, Plaintiff's challenges to the OIG's authority are not redressable through this suit: even if the OIG's authority were enjoined, the DCJ, through its thirteen State's Attorneys, retains authority to investigate and prosecute federal law enforcement who commit crimes in the state while using force. None of Plaintiff's evidence at the preliminary injunction stage have or can change these fundamental flaws in the case.

Plaintiff's primary standing argument is extraordinarily sweeping:  that it need not demonstrate any actual or imminent injury because "the very fact that a state is attempting to regulate" the federal government "inflicts a 'sovereign injury' on the United States."  *Br.* at 10. But courts have rejected the proposition that "the mere *existence* of a preempted state law creates a sovereign injury to the federal government." *United States v. California*, No. 2:25-cv-06230-MCS-AGR, 2026 U.S. Dist. LEXIS 61221, at *8 (C.D. Cal. Mar. 18, 2026) (emphasis in original); *see also United States v. City of Boston*, No. 25-12456-LTS, 2026 U.S. Dist. LEXIS 117779, at *25-26 (D. Mass. May 28, 2026) (rejecting this "essentially limitless view of sovereign injury"). And for obvious reason:  that would effectively nullify Article III as it relates to the federal

government and challenges to State laws under the Supremacy Clause.  The federal government could compel federal courts to address novel constitutional questions whenever it believed a state law or policy violated the Supremacy Clause.  *California*, 2026 U.S. Dist. LEXIS 61221, at *8.  That would allow it to "initiate a campaign of preemption suits under the aegis of its sovereignty" whenever a particular administration wished to "bring state laws in line with its own political agenda."  *Id.* *11-12.

Article III does not permit that result.  Instead, the Supreme Court has "consistently spoken of the need to assert an injury that is the result of a statute's actual or threatened *enforcement*, whether today or in the future."  *California v. Texas*, 593 U.S. 659, 670 (2021) (emphasis in original).  That is no less true in Supremacy Clause cases when the federal government is the plaintiff.  *California*, 2026 U.S. Dist. LEXIS 61221, at *11-12; *e.g. United States v. King County*, 122 F.4th 740, 751 (9th Cir. 2024) (finding United States demonstrated injury in fact where there was a "substantial risk that the county will formally prohibit" entities from servicing ICE charter flights).  Because Plaintiff has not established standing, its motion to preliminarily enjoin §§ 3, 4 and 5 of SB 397 should be denied.

**B.    Plaintiff is unlikely to succeed in its claim that SB 397 violates the Supremacy Clause**

The Supremacy Clause does not displace the sovereign rights of States to protect their citizens from harm.  The whole point of "[f]ederalism," a concept "central to the constitutional design," is that "both the National and State Governments have elements of sovereignty the other is bound to respect."  *Arizona v. United States*, 567 U.S. 387, 398 (2012).  And there is "no better example of the police power, which the Founders denied the National Government and reposed in the States," than laws designed to suppress "violent crime" and protect public safety.  *United States v. Morrison*, 529 U.S. 598, 618 (2000).  Of States' "perfect right" to pass laws affecting "the lives,

21

limbs, health, comfort, and quiet of all persons," "no question ever was, or . . . ever can be made." *Slaughter-House Cases*, 83 U.S. 36, 62 (1872).

That is exactly what SB 397 is. Sections 3, 4, and 5 ensure that peace officers are held accountable when they commit violent crimes against citizens involving use of force. And § 6 ensures that all law enforcement operating in Connecticut are identifiable as police, reducing the risk of violent encounters with civilians, deterring impersonators, and ensuring oversight and accountability for any officers who abuse their authority.

Plaintiff has not shown a likelihood it will meet its high burden of showing that these provisions violate the Supremacy Clause under the intergovernmental immunity doctrine, much less that they do so in all of their applications. Properly understood, the intergovernmental immunity doctrine only bars generally applicable State laws that impermissibly control or burden federal operations. None of the challenged provisions do that. Sections 3, 4, and 5 do not regulate the conduct of anyone—which is dispositive—and in any case do not impose the type of restrictions on federal operations that raise Supremacy Clause concerns. And § 6 imposes generally applicable mask and identification requirements that at most impose incidental burdens on federal operations. Plaintiff has offered no credible evidence that complying with § 6—which provides numerous exemptions for operational need and extends no further than longstanding law enforcement norms that Plaintiff itself had wholeheartedly endorsed until just recently—is likely to impair federal operations.

> **1.    The intergovernmental immunity doctrine only bars nondiscriminatory State laws that impermissibly burden federal operations**

The Supremacy Clause does not entitle federal agents to special exemptions from generally applicable public safety laws. It instead ensures "a healthy *balance of power* between the States

and the Federal Government" to "reduce the risk of tyranny and abuse from *either* front." *United States v. Lopez*, 514 U.S. 549, 552 (1995) (emphasis added). It is not "a shield for 'anything goes' conduct by federal law enforcement officers." *Kentucky v. Long*, 837 F.2d 727, 746 (6th Cir. 1988). Although federal agencies "cannot be made to tolerate undue interference from the states in the enforcement of federal law," "neither should any state be made to tolerate unwarranted interference with its duty to protect the health and welfare of its citizens." *Id.* at 749.

The intergovernmental immunity doctrine is no different. It is "based on the need to protect each sovereign's governmental operations from undue interference by the other." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 814 (1989). Evaluating claims of intergovernmental immunity thus requires "a functional approach" that is "accommodating of the full range of each sovereign's legislative authority and respectful of the primary role of Congress in resolving conflicts between the National and State Governments." *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality op.).

The intergovernmental immunity doctrine thus displaces State law in the absence of a federal statute only in narrow circumstances. The concern "[a]t the heart" of the doctrine is "preventing discrimination against the Federal Government[.]" *United States v. Washington*, 596 U.S. 832, 841 (2022). Thus, many cases striking down State laws on intergovernmental immunity grounds—including the seminal decision in *McCulloch v. Maryland*, 17 U.S. 316, 425-37 (1819)—involved improper discrimination against federal entities or federal officers. *E.g. Washington*, 596 U.S. at 835; *Davis*, 489 U.S. at 817; *Dawson v. Steager*, 586 U.S. 171, 180 (2019); *Barker v. Kansas*, 503 U.S. 594, 599 (1992).

A distinct prong of intergovernmental immunity, however, prohibits certain direct regulations of the federal government. But the direct regulation prong only "prohibit[s] States

23

from interfering with or controlling *the operations* of the Federal Government." *Washington*, 596 U.S. at 838 (emphasis added).  Federal agencies "are only exempted from State legislation, so far as that legislation may interfere with, or impair their efficiency in performing the[ir] functions," because otherwise the doctrine would be "convert[ed]" "into an unauthorized and unjustifiable invasion of the rights of the States." *National Bank v. Commonwealth*, 76 U.S. 353, 362 (1869).

Thus, the direct regulation prong does not bar "all state regulation which may touch the activities of the Federal Government." *Hancock v. Train*, 426 U.S. 167, 179 (1976).  Nor does it provide federal officers with "a general immunity from state law while acting in the course of [their] employment." *Johnson v. Maryland*, 254 U.S. 51, 56 (1920).  "[T]he key question" is instead whether the law "seeks to improperly 'control' the employee's federal duties, or whether the law only 'might affect incidentally the mode of carrying out the employment—as, for instance, a statute or ordinance regulating the mode of turning at the corners of streets.'" *State v. United States Dep't of Homeland Sec.*, 123 F.4th 186, 206 (5th Cir. 2024) (*quoting Johnson*, 254 U.S. at 56-57).  Only when the law "crosses that line" between "legitimately burden[ing] the federal government" and "interfering directly with federal policy or destroy[ing] it" is it barred by the Supremacy Clause.  *CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 319 (3d Cir. 2025); *see also Geo Grp. v. Inslee*, 151 F.4th 1107, 1118 (9th Cir. 2025) (upholding law that did not prevent federal detention operations); *United States v. California*, 921 F.3d 865, 880 (9th Cir. 2019) (rejecting "the United States' position that no obstruction is required in intergovernmental immunity cases").

Consistent with that standard, the Supreme Court struck down a State environmental law prohibiting federal facilities to operate without a permit because absent a permit the facilities were "forbidden to operate," but suggested the law would have been constitutional if it merely

"regulate[d] the amount of pollutants" the facility could discharge. *Hancock*, 426 U.S. at 180. It recognized the history of state tort law being used to "address[] abusive conduct by federal officers." *Hernandez v. Mesa*, 589 U.S. 91, 110 (2020). It upheld nondiscriminatory state taxes on the salaries of federal officials. *Graves v. New York ex. rel. O'Keefe*, 306 U.S. 466, 487 (1939). And with respect to criminal laws, it made clear that "[f]ederal officers and employees are not, merely because they are such, granted immunity from prosecution in state courts for crimes against state law." *Colorado v. Symes*, 286 U.S. 510, 518 (1932). Instead, claims of Supremacy Clause immunity from criminal prosecutions are addressed on a case-by-case basis, where the federal officer may remove the prosecution to federal court and assert immunity if his or her conduct was necessary for the performance of their federal duties. 28 U.S.C. § 1442(a)(1); *New York v. Tanella*, 374 F.3d 141, 147 (2d Cir. 2004).

By contrast, courts have found impermissible direct regulations when the law substantially burdens federal operations. *E.g. Mayo v. United States*, 391 U.S. 441, 447 (1943) (invalidating state law requiring fertilizer distributors to pay inspection fees because payment "would be required before executing a function of government" and was thus "like a tax upon the right to carry on the business"); *Johnson*, 254 U.S. at 57 (striking down law requiring U.S. postal workers to pass state competency exam because it imposed a "requirement that [federal workers] desist from performance" until satisfying state standards, and did not "merely touch the Government servants remotely by a general rule of conduct"); *GEO Group, Inc. v. Newsom*, 50 F.4th 745, 750 (9th Cir. 2022) (en banc) (invalidating state law banning private detention facilities because it would have required the federal government "to entirely transform its approach to detention [or] abandon its California facilities"); *United States v. City of Arcata*, 629 F.3d 986, 988 (9th Cir.

25

2010) (striking down ordinances that "prohibit[ed] military recruiters from recruiting or attempting to recruit" minors).

The challenged provisions of SB 397 are nothing like the laws in those cases.

### 2.    Sections 3, 4, and 5 do not regulate any conduct, and certainly do not impermissibly regulate federal operations

Sections 3, 4, and 5, which make only minor adjustments to the OIG's statutory authority, are not invalid under the intergovernmental immunity doctrine because they do not directly regulate the conduct of anyone, whether state, local, or federal officers. Like other justification or authorization statutes around the country, § 4 (§ 53a-22) confers an affirmative defense against criminal liability; it "does not provide a basis for a criminal charge" or "*criminalize* any uses of force." *Prescott Dec.* ¶¶ 18, 25 (emphasis in original); *see also Stoughton Dec.* ¶ 24 (§ 53a-22 "follows every other state by creating a justification defense"). If the OIG were to charge a peace officer with a crime, it would do so under an independently enforceable criminal statute. *Prescott Dec.* ¶ 18. Plaintiff does not claim that those criminal statutes violate intergovernmental immunity. Nor could it. *See Colorado*, 286 U.S. at 518 (federal officers lack a general "immunity from prosecution [under] state law"). Plaintiff cites no authority whatsoever for the proposition that an affirmative defense can be challenged under the intergovernmental immunity doctrine as an impermissible direct regulation on the federal government. None exists.

Plaintiff argues that §§ 3(c) and 5(a)(2) provide for "mandatory state prosecution of federal officers" if a "use of force is deemed unjustified." *Br.* at 23. But that is wrong. The language in §§ 3(c) and 5(a)(2) authorizes, but does not require, the IG to prosecute cases. The word "shall" is directory rather than mandatory because neither provision imposes any negative consequences for failing to comply. *Compare Statewide Grievance Committee v. Rozbicki*, 219 Conn. 473, 481 (1991) (use of "shall" is directory when intended to "secure order, system and dispatch in the

26

proceedings," "especially where the requirement is stated in affirmative terms unaccompanied by negative words"), *with Butts v. Bysieicz*, 298 Conn. 665, 678-79 (2010) ("shall" was mandatory where accompanied by consequences for noncompliance). As IG Prescott explains, §§ 3(c) and 5(a)(2) do not limit his discretion to decide whether to initiate a prosecution in a given case, "even if [he has] concluded that a use of force incident falling within [his] jurisdiction was not justified." *Prescott Dec.* ¶ 19. Whether the force is justifiable is only one factor he considers when determining whether to initiate a prosecution. *Id.* ¶ 20. He "consider[s] all factors that might make a successful prosecution more or less likely," including whether the conduct violates an independent criminal statue, the policies of the law enforcement agency, whether the conduct was directed by a supervisor, whether the law is clear that the force amounts to "deadly force," and—in the case of federal officers—whether the prosecution could be barred by Supremacy Clause immunity. *Id.* ¶¶ 20-24. Indeed, in multiple cases, the OIG has declined to prosecute even after determining the use of force was unjustified.[10] *Id.* ¶ 28.

Plaintiff is also wrong to suggest that peace officers prosecuted by the OIG will be charged with unjustified force. No such charge exists. If the OIG prosecutes a peace officer, he will charge them with a crime such as murder, manslaughter or assault. To be prosecuted by the OIG, a federal officer needs to commit a criminal violation, their conduct must be unjustified, *and* the OIG must exercise his broad discretion in deciding whether to initiate a criminal charge after evaluating all of the available factors. Plaintiff also argues Connecticut's laws control the federal government

---

[10] To the extent the ultimate question here hinges on whether the "shall prosecute" language is directory rather than mandatory and the Court believes the statutes to be ambiguous—and Defendants disagree on both counts—the Court cannot decide the issue. Instead, it should abstain under *Railroad Comm'n v. Pullman*, 312 U.S. 496 (1941), certify that question of statutory interpretation to the Connecticut state courts, and then resolve Plaintiff's intergovernmental immunity claim after receiving an answer. *See United Fence & Guard Rail Corp. v. Cuomo*, 878 F.2d 588, 594 (2d Cir. 1989).

because using force "may carry the threat of prosecution." *Br.* at 22. Of course it does. Every law enforcement officer may face prosecution if they violate criminal law when using force—that is nothing new or controversial and certainly provides no basis to invalidate Connecticut's laws.

Plaintiff essentially seeks to bar the State from *ever* prosecuting a federal law enforcement official for murder or any other criminal charge through this suit: it makes the startling claim that "State officials have no authority to investigate and prosecute federal officers for actions taken in the performance of their duties." *Br.* at 23. But that is patently false.  States have prosecuted federal officers for crimes committed in the line of duty for centuries.  *See e.g. Whitehead v. Senkowski*, 943 F.2d 230, 236 (2d Cir. 1991) ("the state is not without power to prosecute federal officials"). Plaintiff tries to exploit the legislature's use of the phrase "shall prosecute"—which is plainly directory—to obtain blanket criminal immunity for federal law enforcement. If that were the case, then no state criminal law would ever be enforceable against federal officials. But it is black letter law that federal officers do not have a general absolute "immunity from prosecution [under] state law." *Symes*, 286 U.S. at 518.  Ultimately, the fact that §§ 3, 4, and 5 do not actually regulate or prohibit the conduct of anyone is fully dispositive of Plaintiff's intergovernmental immunity claim.

But even beyond that, Plaintiff has not shown that conferring federal officials with a justification defense to otherwise unlawful conduct would "interfere with, or impair" their operations. *Nat'l Bank*, 76 U.S. at 362. Plaintiff's argument that Connecticut's statutory scheme creates "fragmented" standards for use of force and in that way it impedes federal operations fails. Justification or authorization statutes have existed nationwide for decades, and at common law before that. Like § 53a-22, those statutes provide state law standards for state officials to apply in state criminal prosecutions, regardless of who the criminal defendant is. Many apply to federal officials—indeed, Connecticut's own statutory scheme challenged here has applied to federal

28

officials for more than 30 years, and has never impeded, obstructed, or injured the federal government in any way. Plaintiff has presented no evidence to explain why these long existing statutes somehow now impede core law enforcement functions. And because justification or authorization statutes are generally asserted as affirmative defenses in criminal prosecutions and must be disproved beyond a reasonable doubt, nearly every state prosecutor should consider those statutes in determining whether to prosecute a law enforcement official who commits a crime— just like the OIG must pursuant to §§ 51-277a, and 51-277e. Federal agents have operated under State-specific standards for many years, and there is not a shred of evidence that had any impact on their ability to perform their functions, or even that they thought twice about it. *Stoughton Dec.* ¶ 36 ("there is no evidence any federal law enforcement agency has, any point, trained" its agents on "idiosyncrasies" of each State's laws); *Shuchart Dec.* ¶ 59 ("as far as I know . . . federal personnel are simply not trained" on State laws). Indeed, the ICE and CBP polices Plaintiff disclosed in this lawsuit "expressly note that state and local authorities may investigate and prosecute excessive-force incidents." *Shuchart Dec.* ¶ 55; *see* Ex. 12 at 28-29; Ex. 13 at 43.

Finally, §§ 3, 4, and 5 do not violate intergovernmental immunity for another independent reason: they are valid exercises of Connecticut's Tenth Amendment right to control its criminal justice system and dictate the authority and duties of its prosecutors. Connecticut's sovereignty is at its apex in the realm of criminal justice. *Screws v. United States,* 325 U.S. 91, 109 (1945) (plurality opinion). Because "the regulation of crime is pre-eminently a matter for the States," the Supreme Court has repeatedly recognized "a strong judicial policy against federal interference with state criminal" processes and laws. *Arizona v. Manypenny*, 451 U.S. 232, 243 (1981).

Sections 3 and 5 authorize the OIG to prosecute certain uses of force and in custody deaths. The plain language of these sections only control the activities, duties, and role of the OIG—not

federal law enforcement. They dictate how the OIG carries out its duties, what factors OIG considers when investigating and deciding who to prosecute, what information OIG must share with the public, how many staff members OIG has, and the like. These provisions clearly regulate, if anything, the conduct of state prosecutorial officials. "[T]he right to set the duties of office for state-created officials and to regulate the internal affairs of governmental bodies" is "surely" within a State's sovereign powers. *City of New York v. United States,* 179 F.3d 29, 36 (2d Cir. 1999). The federal government cannot "require the States to govern according to [its] instructions." *New York v. United States*, 505 U.S. 144, 162 (1992).

In line with this principle, courts around the nation have rejected Plaintiff's attempts to invalidate, under the Supremacy Clause, state laws that control the activities of state officials.[11] Similarly, here, by attempting to invalidate the statutes outlining the duties and authority of the OIG, Plaintiff seeks to control how Connecticut's criminal justice officials do their jobs. Connecticut has the sovereign right to establish the rules for its own prosecutors, and what those rules are is not the prerogative of the federal government.

Likewise, Connecticut's decision to confer a justification defense is an appropriate exercise of its sovereign rights. "[A]dministration of a discrete criminal justice system is among the basic sovereign prerogatives States retain." *Oregon v. Ice,* 555 U.S. 160, 161 (2009). "Foremost among the prerogatives of sovereignty is the power to create and enforce a criminal code" including defenses. *Heath v. Alabama*, 474 U.S. 82, 93 (1985). "[I]t is normally within the power of the State

---

[11] *See, e.g., California,* 921 F.3d at 890; *City of El Cenizo*, 890 F.3d at 178; *Galarza v. Szalczyk,* 745 F.3d 634, 644 (3d Cir. 2014); *United States v. New York*, 810 F. Supp. 3d 329, 354 (N.D.N.Y. 2025); *Illinois,* 796 F. Supp. 3d at 530-531 (E.D. Ill. 2025); *City of Philadelphia,* 309 F. Supp. 3d at 329; *City of San Francisco v. Sessions,* 349 F. Supp. 3d 924, 951 (N.D. Cal. 2018); *City of Chicago v. Sessions,* 321 F. Supp. 3d 855, 872 (N.D. Ill. 2018), *aff'd and remanded,* 957 F.3d 772 (7th Cir. 2020); *Cty. of Santa Clara v. Trump, 2*50 F.Supp.3d 497, 534 (N.D. Cal. 2017).

to regulate procedures under which its laws are carried out," including establishing criminal defenses like justification. *Patterson v. New York*, 432 U.S. 197, 201 (1977) (considering whether state's required evidence for justification defense was unconstitutional). Section 53a-22 is a quintessential exercise of Connecticut's right to administer its own criminal justice system. Connecticut has the sovereign right to establish standards for criminal defenses and determine who those rules apply to. The federal government has no right to control, alter, or dictate how Connecticut defines its criminal code. But that is exactly what it seeks to do by invalidating § 53a-22 as to federal agents.

### 3.    The mask and identification provisions do not impermissibly regulate federal operations

Neither is § 6 barred by the Supremacy Clause.  The identification provision requires all peace officers operating in Connecticut to be "clearly identified by [the] badge and name tag on [their] uniform" in certain specified circumstances.  SB 397 § 6(c).  The requirement is limited in scope.  It only applies when officers are "conducting a planned arrest" or "interacting with the public in [their] official capacity and [are] authorized to make arrests"—the very circumstances where it is most critical that officers be readily identifiable so members of the public can tell whether to respect their commands and refrain from defending themselves against uses force.  And § 6(c) includes broad exemptions for circumstances where concealment may be necessary to an officer's duties, including exceptions for (1) undercover operations; (2) where compliance is excused under the model policy, e.g., when visible identification would place the officer's or member of the public's "personal safety in jeopardy" or "compromise the integrity of a sensitive investigation," *Mello Dec.*, Att. A; and (3) where practical limitations, such as weather or traffic conditions, prevent the officer from complying.

31

The masking restriction is similarly limited.  It prohibits all peace officers operating in Connecticut from wearing "any facial covering or personal disguise," but only "while interacting with the public in the performance of [their] duties."  SB 397 § 6(b).  And like the identification requirements, it is carefully tailored to permit masking under circumstances when it may be necessary for operations, such as (1) active undercover operations, and (2) in various prescribed circumstances where masking may be necessary "to protect the health and safety of the peace officer," and not merely their identity.

The federal government cannot show that these modest requirements impermissibly burden federal agencies' operations, much less that they do so in every application.  They do not "control[] the operations" of federal agencies, *Washington*, 596 U.S. at 838, require federal agents to "desist from perform[ing]" their duties, *Johnson*, 254 U.S. at 57, or give the States "a level of control over federal operations that the Supremacy Clause does not tolerate."  *GEO Grp., Inc.*, 50 F.4th at 757. Federal agents remain as free as they ever were to decide whether, when, and how to perform their federal functions.  At most, § 6 "affect[s] incidentally the mode of carrying out" those functions by requiring officers to identify themselves as police while they are performing them, except in situations when concealment may be operationally necessary.  *Texas*, 123 F.4th at 206 (*quoting Johnson*, 254 U.S. at 56-57).

And whatever incidental burden § 6 imposes is "nowhere near the burden courts have, in the past, found sufficient to trigger intergovernmental immunity."  *Texas*, 123 F.4th at 207. Section 6 imposes nothing more than the requirements that governments have uniformly required of their law enforcement agencies since the common-law era.  *See* Background, Part I, *supra*.  No one had ever suggested that identification requirements burden operations.  On the contrary, they have uniformly been viewed as essential to operations.  They make it "much more likely" civilians

will obey their commands rather than resist. *Friedman Dec.* ¶ 13. They are enshrined in State and federal laws. *See* Background, Part I, *supra*. Officers may be *constitutionally required* to identify themselves in certain contexts. *Doornbos v. City of Chicago*, 868 F.3d 572, 58 (7th Cir. 2017) (stops); *Hudson v. Michigan*, 547 U.S. 586, 594 (2006) (search warrants). And Plaintiff itself adhered to these requirements for many years and demanded that other law enforcement agencies do so, even during periods of acute civil unrest or while officers were being doxxed or harassed online. *Lopez Dec.* ¶ 13; *Shuchart Dec.* ¶ 6. The suggestion that § 6's requirements "interfere with" or "impair the[] efficiency" of federal operations simply cannot be squared with the facts. *National Bank*, 76 U.S. at 362.

Plaintiff tries to make that case, but its submissions are unconvincing. For starters, Plaintiff's complaints about operational burdens misconstrue § 6. Nearly every agency declarant asserts that § 6 might impede agents' ability to conduct surveillance or undercover operations by alerting suspects to their presence. *Cleveland Dec.* ¶ 33; *Allen Dec.* ¶¶ 15, 18, 20; *O'Brien Dec.* ¶ 12; *Egerton Dec.* ¶¶ 13, 16. But § 6(b)(7) and (c)(1) exempt "undercover" operations from the masking and identification provisions. And § 6(b) only prohibits masking "while interacting with the public"—not during surveillance operations. The same is true of the identification requirements. SB 397 § 6(c) (applying to any peace officer "who is conducting a planned arrest or interacting with the public"). Moreover, § 6(c)(2) incorporates the model policy which excuses officers from displaying identification when it would "compromise the integrity of a sensitive investigation." *Mello Dec.*, Att. A. ICE also asserts that displaying identification could pose safety risks when officers are attempting to apprehend dangerous criminals. *Cleveland Dec.* ¶¶ 30, 34. But the model policy covers that situation by excusing officers from the requirements if doing so would put their "personal safety in jeopardy[.]" *Mello Dec.*, Att. A. And to the extent the federal

33

government complains of being unable to conduct plainclothes operations, *Cleveland Dec.* ¶ 33; *Egerton Dec.* ¶¶ 13, 15, neither § 6(c) nor the model policy prohibit peace officers from wearing plain clothes.

Plaintiff also argues that complying with § 6 could put officers at greater risk of being doxxed or harassed. *Br.* at 21. Certainly Plaintiff has a legitimate interest in protecting officer safety and doxxing is never an appropriate manner of opposing law enforcement conduct. Indeed, it is a crime in Connecticut to post someone's personal identifying information without their consent for purposes of harassing them. Conn. Gen. Stat. § 53a-181d(b)(3).

But Plaintiff has not explained how discretionary masking or identification polices are necessary or even materially helpful in preventing officers from being doxxed or harassed. The agency declarants speculate about the potential utility of anonymity in preventing those harms, but fail to identify any doxxing incidents that are attributable to an officer displaying identification or not wearing a mask while conducting an operation.[12] *Egerton Dec.* ¶ 14; *Cleveland Dec.* ¶¶ 24-28. "[M]otions for preliminary injunctions are frequently denied if the [supporting] affidavits are too vague or conclusory to demonstrate a clear right to relief under Rule 65." *Southerland v. N.Y.C. Hous. Auth.*, No. 10-CV-5243(SLT), 2011 U.S. Dist. LEXIS 2074, at *9 (E.D.N.Y. Jan. 7, 2011).

In addition, Plaintiff's asserted threats to officer safety are questionable. Some federal courts have rejected the safety justification for masking as unconvincing or outright pretextual. *See Molina v. United States Dep't of Homeland Sec.*, 811 F. Supp. 3d 1, 64 (D.D.C. 2025); *Am.*

---

[12] Many doxxing incidents involving ICE and CBP agents apparently stem from a massive January 2026 data leak in which a whistleblower leaked the personal information of approximately 4,500 DHS employees. https://www.police1.com/Officer-Safety/ice-list-doxxing-site-alleges-dhs-whistleblower-leaked-identities-of-4-500-agents.

*Ass'n of Univ. Professors v. Rubio*, No. 25-cv-10685 (WBY), 2025 U.S. Dist. LEXIS 193069, 2025 WL 2777659, *40 (D. Mass. Sept. 30, 2025).  It is certainly hard to believe, for example, that ICE officers who disguise themselves in Punisher and horror-movie masks are motivated by safety concerns.  *Shuchart Dec.* ¶ 25.  And if ICE believes that masking is necessary for officer-safety, it should explain why it is filming unmasked ICE officers conduct operations, sometimes identifying them by name, and posting the videos online for anyone to view.[13]

Moreover, if anonymity were necessary for officer safety, one would expect federal agencies to implement actual policies or procedures governing when masking is appropriate or mandated.  *Shuchart Dec.* ¶ 40.  But there is no evidence they have any such policies, *id.* ¶ 20, and Plaintiff did not disclose any such policies to Defendants.  One would also expect agencies to provide standard-issue masks as they do with other officer-safety equipment.  *Id.* ¶ 40.  Indeed, they are arguably required to do so under 29 U.S.C. § 668(a)(2), which mandates all agency heads to "acquire, maintain, and require the use of safety equipment, personal protective equipment, and devices reasonably necessary to protect employees[.]"  But federal agencies have apparently not bothered with any of that, instead informally allowing officers to remove their name plates at their discretion and wear ad hoc masks with comic-book logos.  That "undermines the suggestion that wearing those masks is necessary to officer safety."  *Shuchart Dec.* ¶ 41.

Nor does Plaintiff explain why, if protecting against doxxing is the primary motivation for officers concealing their identities, federal agents only began doing so on routine enforcement operations recently.  The threats Plaintiff cites here "are long-standing and predated 2025[.]"  *Shuchart Dec.* ¶ 27.  Yet federal agents rarely wore masks.  *Id.* ¶ 26; *Friedman Dec.* ¶ 11.  DOJ

---

[13]*See e.g.* https://www.youtube.com/watch?v=fAZr6Wgxisg;
https://www.facebook.com/ReadTheLion/videos/ice-releases-new-ice-to-nice-promo-video-sparking-online-reaction/1704515947209392/;

had previously demanded local police display their identifiers, even in the face of threats to officer safety. *Lopez Dec.* ¶ 13. And there is no evidence any other law enforcement agencies authorize individual officers to decide when to remove their name badges or wear a mask as a matter of ad hoc discretion during routine enforcement operations. *Shuchart Dec.* ¶¶ 22-23. Ultimately, none of Plaintiff's submissions here establish that Connecticut's modest masking and identification requirements impose anywhere near the type of restrictions on operations that trigger intergovernmental immunity.

    **4.**     **Plaintiff is wrong that it need not demonstrate an operational burden, but the use of force provisions must be upheld in any event**

Plaintiff would rather not have to demonstrate that the challenged restrictions "would hinder Federal Government operations." *Br.* at 18. But the very purpose of the intergovernmental immunity doctrine is to prohibit States from "interfering with or controlling *the operations* of the Federal Government." *Washington*, 596 U.S. at 838 (emphasis added). Rather than reconciling with that principle, Plaintiff relies overwhelmingly on the Ninth Circuit's preliminary decision in *United States v. California*, 173 F.4th 1060 (9th Cir. 2026), granting the federal government's motion for an injunction pending appeal. That case held that a California law requiring law enforcement to display a badge or name tag likely constituted an impermissible direct regulation of federal agents because it "does not regulate conduct that any ordinary citizen could perform," but rather "applies exclusively to law enforcement agencies and their officers, including federal law enforcement agencies and federal law enforcement officers" *Id.* at 1068.

The Ninth Circuit's preliminary analysis is not persuasive. By treating the fact that the California law applied only to law enforcement as proof of an impermissible direct regulation, the court improperly conflated the direct regulation prong of intergovernmental immunity with the discrimination prong. The discrimination prong deals with State laws that are underinclusive

because they regulate federal entities but not "similarly situated" other entities. *Dawson*, 586 U.S. at 177. Therefore, a law's application only to law enforcement would raise concerns, if at all, under the discrimination prong of governmental immunity—as the District Court rightly recognized. *United States v. California*, 819 F. Supp. 3d 1109, 1129 n.7 (C.D. Cal. 2026). The Supreme Court has explained, for instance, that whether a law "regulates [federal agencies or contractors] unfavorably *on some basis related to their governmental 'status'*" is appropriately analyzed under the discrimination prong. *Washington*, 596 U.S. at 839 (*quoting North Dakota*, 495 U.S. at 438 (plurality op.)) (emphasis added). But California's law was not discriminatory, and Plaintiff does not claim that § 6 is either, because private citizens are not similarly situated to law enforcement when it comes to the concerns about officer anonymity that identification and masking requirements are designed to address. Nonetheless, the Ninth Circuit relied on the law's application only to law enforcement as dispositive proof of an impermissible direct regulation. That was error.

Moreover, the Ninth Circuit's conclusion that operational burdens do not matter does not reconcile with other Supremacy Clause doctrine. It is settled law that the Supremacy Clause provides a fact-specific immunity from prosecution, but only if the officer's conduct was authorized by federal law and "necessary and proper" under the circumstances. *Tanella*, 374 U.S. at 147 (*quoting In re Neagle*, 135 U.S. at 75). The requirement that the conduct be necessary and proper is based on principles of federalism: it avoids "undue interference from the states in the enforcement of federal law," while ensuring the State is not "made to tolerate unwarranted interference with its duty to protect the health and welfare of its citizens." *Long*, 837 F.2d at 749. The intergovernmental immunity doctrine also arises from the Supremacy Clause and is modeled around the same federalism principles. *Davis*, 489 U.S. at 814. Therefore, it is anomalous to say

that officers are entitled to immunity from prosecution only upon a showing of operational impact, but that operational impact is irrelevant when the government is seeking the even-more-drastic remedy of an *ex-ante* invalidation of entire laws before any prosecution is ever brought (or even threatened). *See United States v. New York*, 810 F. Supp. 3d 329, 351 n.12 (N.D.N.Y. 2025) ("[b]ecause intergovernmental immunity is such a powerful constraint on states, basic federalism and separation-of-powers principles limit its application to the clearest intrusions on federal sovereignty"). By dispensing with the requirement that the federal government show that the "legislation may interfere with, or impair their efficiency in performing the[ir] functions," the Ninth Circuit rule threatens to "convert" the intergovernmental immunity doctrine "into an unauthorized and unjustifiable invasion of the rights of the States" to enact generally applicable criminal laws designed to protect public safety. *National Bank*, 76 U.S. at 362.

Lastly, the Ninth Circuit improperly discounted several cases explicitly requiring a showing of operational impact because the laws in those cases regulated federal contractors rather than federal officers. It may be more difficult to show an operational burden in such cases, but that does not change the fact that the Supremacy Clause requires a showing of operational burdens. Indeed, contractors carry out critical federal functions, so it makes little sense that an entirely different standard would apply to restrictions on contractors. Intergovernmental immunity is "not a formalistic doctrine" and does not depend on such bright-line distinctions. *CoreCivic, Inc.*, 145 F.4th at 322.

Plaintiff was therefore required to demonstrate that SB 397 interfered with federal operations. Because it has not, its Supremacy Clause challenges fail. But even if this Court were to adopt the standard announced by the Ninth Circuit, Plaintiff still could not show a likelihood of prevailing on its challenges to §§ 3, 4, and 5 because, as already explained, those sections impose

no direct regulations on anyone, whether or not they are law enforcement. There is no basis for enjoining those provisions no matter what standard applies.

### 5.      Plaintiff's facial challenge fails.

Plaintiff's pre-enforcement challenge is facial. "A facial challenge is the most difficult challenge to mount successfully." *Nat'l Shooting Sports Found., Inc. v. James*, 144 F.4th 98, 108 (2d Cir. 2025). To win, Plaintiff must show that "no set of circumstances exists under which" these provisions "would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). This is true even where a plaintiff asserts a law is barred by the Supremacy Clause or intergovernmental immunity doctrine. *E.g. Rest. L. Ctr. v. City of New York,* 90 F.4th 101, 117-18 (2d Cir. 2024); *GEO Grp., Inc. v. City of Tacoma*, No. 3:18-cv-05233-RBL, 2019 U.S. Dist. LEXIS 196858, at *16 (W.D. Wash. Nov. 13, 2019) (applying *Salerno* to intergovernmental immunity claim), *appeal dismissed*, 2020 U.S. App. LEXIS 1805 (9th Cir. 2020).

As to the mask and identification provisions, even if Plaintiff could show that they imposed impermissible burdens on operations in some cases, that is plainly not always true—such as those cases in which agents are wearing masks to conceal wrongdoing or, as some judges have put it, to "terrorize Americans into quiescence." *Molina*, 811 F. Supp. 3d at 64.

Likewise, there are many applications of Connecticut's justification defense and the OIG's authority that are plainly constitutional. For example, in *Drury,* 200 U.S. at 1, state officials arrested United States Army personnel for shooting and killing a man suspected of looting a federal arsenal. It was unclear there whether the suspect was attempting to escape or was attempting to surrender when he was shot by federal officials. *Id.* at 8. If the latter, the killing would have violated both state criminal law and federal policy. In *Idaho v. Horiuchi,* 253 F.3d 359, 377 (9th Cir. 2001), the state charged an FBI agent with involuntary manslaughter during the infamous

Ruby Ridge incident, in which he mistakenly shot a woman without determining whether any person other than his intended target was present on the other side of the door at which he aimed. The en banc Ninth Circuit determined that the FBI agents involved formulated new "rules of engagement" that were not consistent with FBI policies and which the FBI renounced immediately after the incident, disciplining the officers. *Id.* The conduct there thus violated both state law and federal policy and the prosecution was not unconstitutional.

The same may be true for potential incidents in Connecticut, and facially barring the OIG from prosecuting any crimes federal law enforcement might commit is not appropriate. If a federal agent kills, injures, or harms a Connecticut resident in a way that violates both federal policy and state law, it is the OIG's statutory duty to investigate and potentially prosecute those incidents. Plaintiff has not and cannot show that such investigations and prosecutions—which would be completely appropriate under federal law—are unconstitutional and should be facially enjoined.

## II.     The Remaining Equitable Factors Do Not Support a Preliminary Injunction

A preliminary injunction is "'an extraordinary remedy never awarded as of right,'" and it "does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits." *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008)). The Second Circuit recently revisited these additional equitable factors in light of the Supreme Court's recent emphasis on the limits of federal courts' equitable powers in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), and reemphasized that an injunction does not automatically follow upon a showing of likelihood of success on a constitutional challenge to a state law:

> An injunction does not follow from [a likelihood of] success on the merits as a matter of course. . . . Rather, plaintiffs must make a clear showing on the remaining factors, which have persisted as commonplace considerations in awarding injunctive relief throughout several hundred years of history. As we have been recently reminded, our power to grant equitable relief encompasses only those sorts of equitable remedies traditionally accorded by courts of equity at our country's

inception. Accepting Plaintiffs' argument [that an injunction is required after a showing of likelihood of success] and concluding that these factors are essentially superfluous when a constitutional harm is alleged would be the sort of major departure from the long tradition of equity practice that should not be lightly implied.

*Nat'l Ass'n for Gun Rights v. Lamont*, 153 F.4th 213, 247 (2d Cir. 2025).

## A.   The Federal Government Has Not Shown It Will Be Irreparably Harmed if an Injunction Were Denied

"For Plaintiffs to satisfy the irreparable harm requirement," they have to "demonstrate" that absent a preliminary injunction they will suffer an injury "that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id.* at 248. Plaintiff has not made that showing.

### 1.   Plaintiff's undue delay in challenging the use of force provisions precludes any finding of irreparable harm

In 1991, the General Assembly amended § 52a-3(9)'s definition of "peace officer" to include "any special agent of the federal government authorized to enforce" Title 21. PA 91-171 § 1. At that point, federal agents were subject to investigation and potential prosecution by the DCJ under the then-existing version of § 51-277a for crimes involving uses of force and could assert § 53a-22 as a defense. Thus, if Plaintiff believes that prosecuting federal agents or conferring them with a statutory justification defense violates the intergovernmental immunity doctrine, it could have brought this lawsuit to vindicate those interests decades ago.

That egregious delay "standing alone" "preclude[s] preliminary injunctive relief" as to the IG and justification provisions in this case. *Majorica, S.A. v. R.H. Macy & Co., Inc.*, 762 F.2d 7, 8 (2d Cir. 1985) (per curiam). In this circuit, any "'presumption of irreparable harm is inoperative if the plaintiff has delayed' in moving for temporary injunctive relief." *Carter v. Sewell*, No. 1:23-cv-01139 (JLR) (RWL), 2023 U.S. Dist. LEXIS 194682, at *3 (S.D.N.Y. Oct. 31, 2023) (*quoting Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995)). That is true even in

41

cases involving alleged constitutional injuries. *See e.g. Succow v. Bondi*, No. 3:25-CV-250 (SVN), 2025 U.S. Dist. LEXIS 46770, at *10-11 (D. Conn. Mar. 14, 2025).

And courts have frequently denied preliminary relief based on delays far less substantial than Plaintiff's decades-long delay here. "[M]onths-long delays in seeking . . . injunctions have repeatedly been held by courts in the Second Circuit" to be sufficient grounds for denying preliminary relief. *Silber v. Barbara's Bakery, Inc.*, 950 F. Supp. 2d 432, 439 (E.D.N.Y. 2013) (collecting cases). Indeed, "delays of as little as ten weeks" have been found "sufficient to defeat the presumption of irreparable harm that is essential to the issuance of a preliminary injunction." *Weight Watchers Int'l., Inc. v. Luigino's Inc.*, 423 F.3d 137, 144 (2d Cir. 2005); *see also Goldstein v. Hochul*, No. 22-CV-8300 (VSB), 2022 U.S. Dist. LEXIS 243665, at *6 (S.D.N.Y. Sep. 30, 2022) (several months); *Wallikas v. Harder*, 78 F. Supp. 2d 36, 42-43 (N.D.N.Y. 1999) (ten-month delay in seeking preliminary injunction based on First Amendment claim weighed against finding of irreparable harm); *Perry v. Judd*, 840 F. Supp. 2d 945, 954055 (E.D. Va. 2012) (6-month delay barred request for injunctive relief).

Plaintiff offers no legitimate explanation for—and does not even acknowledge—its failure to sue earlier. And there is none to give. It would "strain[] one's credulity to argue" that the federal government, "with all its resources and information sources," could not have brought this suit long ago if it believed its sovereign interests were truly in jeopardy. *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 277 (2d Cir. 1985).

And clearly Plaintiff knew about Connecticut's criminal justification defense and the statutes authorizing the State to investigate and prosecute federal officers. The State conducted numerous investigations into use of force incidents by federal officers between 2021-2022, and the federal government cooperated in those investigations. *Griffin Dec.* ¶¶ 20-21; *Devlin Dec.* ¶¶

42

22-23.  By Spring 2025, the FBI and OIG were even actively negotiating—and had nearly finalized—an MOU that contemplated both offices working together in investigations into certain use of force incidents involving federal officers.  *Devlin Dec.* ¶¶ 19-20.  Earlier this year, the federal government broke sharply from that past practice and took an obstructive stance toward the OIG's involvement in those investigations, and soon after filed this suit challenging a justification defense that has been on the books for decades.  *Prescott Dec.* ¶ 43; *Cain Dec.* ¶ 15.  That reflects a new Administration's peculiar hostility toward State involvement in federal investigations, not any genuine irreparable harm.

Plaintiff may try to excuse its delay by arguing that § 3 of SB 397 expanded the scope of § 51-277a so the OIG may now investigate "any federal law enforcement officer," not just those with Title 21 authority.  That does not matter.  Plaintiff in this case is the federal government, which obviously encompasses agents with Title 21 authority who were long subject to these laws.  Indeed, Plaintiff submitted declarations from agencies with such authority (the DEA and FBI) in support of the present motion.  *See O'Brien Dec*; *Allen Dec.*  Plaintiff could have brought this very lawsuit, asserting the same challenges to Connecticut's use of force laws, decades ago.

Plaintiff may also point to the language in §3(c) stating that the OIG "shall prosecute any case" in which it determines that a use of force was not justified.  But that language existed in § 51-277a since the General Assembly passed the ACPA in 2021.  That five-year delay would itself be inexcusable and undermine any claim of irreparable injury.  *E.g. Succow*, 2025 U.S. Dist. LEXIS 46770, at *10 (D. Conn. Mar. 14, 2025) (finding no irreparable harm where plaintiffs "could have brought suit months ago").  In any case, the "shall prosecute" language does not make a prosecution any more imminent because it is directory rather than mandatory, and the IG continues to exercise the same discretion as any DCJ prosecutor would have had under prior

43

versions of the law to determine when to initiate prosecutions.  The Court should deny Plaintiff's motion to preliminarily enjoin §§ 3, 4 and 5 on this basis alone.

### 2. Because Plaintiff's only asserted harm is the threat of prosecution, its injury is not irreparable

Plaintiff has never asserted in this case, much less proven, that SB 397 is currently impacting federal agencies or operations.  It does not allege that it trained its officers on the mask, identification, or justification defense standards, that it altered its behavior in response to SB 397 being enacted, or that a single one of its agents has been chilled or deterred from engaging in any law enforcement activities out of fear of enforcement.  Plaintiff has instead declared through this case—in its Complaint, memorandum of law, and in its declarations—that it will not and is not complying with SB 397, and is conducting itself as if it had never been passed.[14]  Agents have apparently gotten the message.  Media reports show ICE agents in Connecticut continuing to wear masks during operations, even taunting bystanders who remind them about the law.[15]

Therefore, the only injury the federal government is asserting is that "federal officers are threatened with criminal prosecution."  *Br.* at 10.  But absent evidence of an ongoing operational burden or chilling effect on behavior, "'the mere threat of potential future prosecution is

---

[14] *See Compl.* ¶ 38 ("Federal law enforcement agencies cannot and will not comply with the challenged Act"); *Br.* at 10 ("To be clear, the United States will not direct its law enforcement agencies to adopt the policies that Connecticut demands or require its officers to comply with these provisions of Connecticut law . . . .  In consequence, federal officers are threatened with criminal prosecution.") (citations and footnotes omitted); *Obrien Dec.* ¶ 20 ("FBI Special Agents under my command will disregard this state law where they deem it appropriate to do so); *Allen Dec.* ¶ 22 ("DEA does not intend to require Special Agents to comply with these provisions"); *Cleveland Dec.* ¶ 15 ("DHS does not intend to comply with the requirements imposed on the Federal Government by SB 397").

[15] Eaton, *'Who's going to arrest me?' ICE agents defy Connecticut law on mask ban*, CT Insider, June 14, 2026 (quoting ICE agent as saying, "Tell them to arrest me," and "Tell them.  I dare you. Who's going to arrest me?").

insufficient to establish irreparable harm[.]'" *Coal. for Humane Immigrant Rts. v. United States Dep't of Homeland Sec.*, 795 F. Supp. 3d 7, 14 (D.D.C. 2025) (*quoting Lindell v. United States*, 82 F.4th 614, 620 (8th Cir. 2023)); *Steffel v. Thompson*, 415 U.S. 452, 463 n.12 (1974) (distinguishing between "an imminent but not yet pending, prosecution *for past conduct*," which is not irreparable, and being "required to *forgo* constitutionally protected activity in order to avoid arrest," which may be irreparable); *Hess v. Oakland Cnty.*, 174 F.4th 981, 995 (6th Cir. 2026) ("threat of prosecution" for protected speech was not irreparable absent evidence the law "will chill his future speech"); *William L. Huntress v. United States DOJ*, No. 12-CV-1146S, 2013 U.S. Dist. LEXIS 73805, at *13-14 (W.D.N.Y. May 24, 2013) (rejecting argument that "[p]laintiffs' fear of future prosecution constitutes irreparable harm"). Unlike plaintiffs who forgo engaging in constitutionally protected conduct to avoid prosecution, plaintiffs whose only injury is the threat of future prosecution can vindicate their interests by raising their constitutional claim as a defense in those proceedings. *Hess*, 174 F.4th at 995.

And here, the Supremacy Clause provides federal agents who believe their actions were necessary to perform their jobs with just such a defense that would allow them to vindicate their constitutional concerns: they can remove the case to federal court and claim immunity from prosecution. *Tanella*, 374 F.3d at 146-47; 28 U.S.C. § 1442(a)(1); *see Stoughton Dec.* ¶¶ 37-45. And because this is an "immunity from suit rather than a mere shield against liability," it "protects federal operations from the chilling effect of state prosecution" by allowing the agent to have the immunity question "decided early in the proceedings" and avoid "requiring [him or her] to run the gauntlet of standing trial[.]" *Tanella*, 374 F.3d at 147. Plaintiff does not explain why this immunity would be insufficient to protect whatever sovereign interests it believes is implicated by SB 397.

45

Plaintiff argues that if it were required to comply with SB 397, then it would suffer "additional irreparable harms" in the form of risks to officer safety, impeding federal functions, and chilling federal activities. *Br.* at 20-23. None of that is relevant because those are not the injuries Plaintiff is claiming in this case. Its position all along has been that it is *not* currently impacted by SB 397 because it is doing nothing to comply with it. *See* fn. 14, *supra*. The only actual injury Plaintiff is asserting is the risk that a federal officer may be prosecuted in the future because he or she violated SB 397. In any case, Plaintiff has presented no evidence of a single instance in which an officer's conduct has been chilled as a result of any of the provisions it is now challenging.

Plaintiff is also wrong that courts must presume an irreparable injury in every Supremacy Clause case no matter the circumstances. *Br.* at 20. The Second Circuit recently rejected as "incorrect" the general assertion that a "a violation of constitutional rights per se constitutes irreparable injury." *Nat'l Ass'n for Gun Rights*, 153 F.4th at 248. The court emphasized that treating the remaining injunction factors "as essentially superfluous when a constitutional harm is alleged" would be a "major departure from the long tradition of equity practice." *Id.* (*quoting CASA, Inc.*, 606 U.S. at 831). Thus, the court emphasized that "the Supreme Court has never applied this presumption [of irreparable harm] outside the First Amendment context," and the "recent emphasis on the limits of our equitable powers caution against extending the presumption to new contexts." *Id.* That decision is controlling here. *See also Weisshaus v. Cuomo*, 512 F. Supp. 3d 379, 389 (E.D.N.Y. 2021) ("an alleged violation of the Supremacy Clause does not trigger[] irreparable harm per se because the Supremacy Clause is a structural provision of the Constitution that does not confer personal rights").

46

None of the cases Plaintiff cites are to the contrary.  Plaintiff cites *New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*, 491 U.S. 350 (1989), for the proposition that irreparable harm "necessarily" results from enforcement of a state law that violates the Supremacy Clause. *Br.* at 20.  But that case says the exact opposite:  that "[i]rreparable injury *may possibly* be established . . . by a showing that the challenged state statute is *flagrantly and patently violative* of express constitutional prohibitions[.]"  *New Orleans Pub. Serv., Inc.*, 491 U.S. at 366 (emphasis added).  Plaintiff also cites non-binding Ninth Circuit cases, but they relied on the principle that irreparable harm automatically follows when a plaintiff demonstrates that the challenged law is likely unconstitutional.  *Br.* at 20 (*citing California*, 173 F.4th at 1069, and *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011), *aff'd in part, rev'd in part and remanded*, 567 U.S. 387 (2012)).  The Second Circuit rejected that approach in *Nat'l Ass'n for Gun Rights*.

**B.       The Balance of the Equities Weigh Heavily Against an Injunction**

Before granting a preliminary injunction, the Court must also "balance the competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief," with "particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Nat'l Ass'n for Gun Rights*, 153 F.4th at 248-49.

The equities weigh heavily against an injunction.  On the one hand, enjoining the challenged provisions would cause substantial, irreparable harm to the public interest.  "[T]he Supreme Court has long held that, any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."  *Öztürk v. Hyde*, 155 F.4th 187, 196-97 (2d Cir. 2025).  That is especially true of the provisions in this case.

Enjoining §§ 3, 4, and 5 would prohibit the OIG from investigating and holding accountable federal officers who commit violent and potentially deadly crimes against Connecticut

47

residents.   If such an incident occurred while a temporary injunction was in place, it would "severely frustrate if not entirely prohibit" the OIG from ever investigating that incident.  *Cain Dec.* ¶ 21; *Prescott Dec.* ¶ 48.  Evidence has to be collected as soon as possible.  *Prescott Dec.* ¶ 48; *Cain Dec.* ¶ 23.  Trace and biological evidence, including gunshot residue, spoil easily.  *Cain Dec.* ¶ 23.  Witness statements are more reliable when collected closer to the event.  *Id.*  Video evidence can be destroyed or overwritten.  *Id.*  If the Court were to temporarily enjoin the OIG from investigating use of force incidents by federal officials and a deadly incident occurred, the OIG "would lose access to essential information that would be nearly impossible to recover." *Prescott Dec.* ¶ 50.  That would cause substantial harm not only to the victim who may be denied the justice they deserve, but also to the OIG as an institution, which the General Assembly established in the wake of the George Floyd killing to bring transparency and accountability to investigations of police who misuse their authority.  *Id.* ¶ 51.  And these harms are magnified by the fact that State and local officers are often designated as federal TFOs.  *Id.* ¶ 49.  If the OIG were enjoined from investigating or prosecuting "federal law enforcement officers," that injunction would prohibit it from investigating or prosecuting its own officers.  *Id.*

And enjoining the mask and identification provisions in § 6 would permit secret policing practices to continue unchecked throughout Connecticut.  That would make investigating claims of officer misconduct "effectively impossible"—depriving the public of a critical check on police who might abuse their authority and emboldening officers to act with impunity.  *Shuchart Dec.* ¶¶ 32, 34; *Friedman Dec.* ¶ 13 (noting study where "officer misconduct declined by 65%" when they wore name tags).  An injunction would also undermine public safety because when civilians cannot tell the difference between police officers and criminals, they are more likely to either respond with force in self-defense, substantially increasing the likelihood of a violent encounter, *Shuchart*

48

*Dec.* ¶ 35; *Friedman Dec.* ¶ 14, or submit to illegitimate criminal imposters they might have lawfully resisted. The recent widespread use of masking and unidentifiable agents has already allowed criminal impersonators to prey on innocent civilians—as the FBI and USMS have warned—and caused widespread confusion about the legitimacy of the law enforcement operations people are encountering. Ex's 10, 11. Finally, an injunction would burden State and local law enforcement agencies. Anonymous policing fosters a general fear and mistrust of law enforcement generally, "making it less likely that members of the public will cooperate [with] investigations in the future" and inhibiting crime prevention. *Friedman Dec.* ¶ 13. And local police have often expended resources responding to mistaken reports of criminal activity, only to discover they were federal operations. *See* Background, Part I-C, *supra*.

"[T]hese considerations—implicating both the government's interest in enforcing laws enacted by duly-elected legislators and in protecting the lives of its citizens—weigh heavily in the balance." *Nat'l Ass'n for Gun Rights*, 153 F.4th at 248-49.

On the other hand, denying the preliminary injunction would impose little harm on Plaintiff. As stated, an injunction is not necessary to prevent an ongoing impact on federal operations because Plaintiff's position is that it need not worry about Connecticut's laws. And whatever legitimate interests Plaintiff has in permitting officers to hide their identities or avoid investigation and potential prosecution for conduct that violates Connecticut's criminal laws may be vindicated in Supremacy Clause removal proceedings if any federal agent ever actually is prosecuted.

Plaintiff has no legitimate response to this. Again relying on Ninth Circuit case law, it argues that once a likelihood of success on the merits is shown, an injunction automatically follows and no further inquiry is appropriate. *Br.* at 23-24. That approach exceeds the limit on federal

courts' equitable authority, as the Second Circuit recently emphasized . *Nat'l Ass'n for Gun Rights*, 153 F.4th at 248-49. Nor is there any merit to Plaintiff's suggestion that an injunction is necessary to avoid "placing state and federal officials on a dangerous collision course[.]" *Br.* at 25. If SB 397 creates any tension between State and federal law enforcement, that is solely attributable to Plaintiff's refusal to comply with Connecticut's duly enacted laws. That should not run to Plaintiff's benefit.

## CONCLUSION

Plaintiff's motion for preliminary injunction should be denied.

Respectfully submitted,
DEFENDANTS

WILLIAM TONG
ATTORNEY GENERAL

By: /s/ *Timothy J. Holzman*
  Janelle Medeiros (ct30514)
  Timothy Holzman (ct30420)
  Edward Rowley (ct30701)
  Assistant Attorneys General
  Office of the Attorney General
  165 Capitol Avenue, Suite 5000
  Hartford, CT 06106
  Tel:  (860) 808-5020
  Fax: (860) 808-5347
  E-mail: Janelle.Medeiros@ct.gov
  Timothy.Holzman@ct.gov
  Edward.Rowley@ct.gov

50

**CERTIFICATION**

I hereby certify that on July 13, 2026, a copy of the foregoing was electronically filed and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's system.

U.S. DOJ-Civil Rights Dept.
Alexandra Schulte
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Alexandra.Schulte@usdoj.gov

/s/ *Timothy J. Holzman*
Timothy J. Holzman (ct30420)
Assistant Attorney General