# Exhibit 1

*Declaration of Eliot Prescott with Attachments A, B, C, and D*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA    :        3:26-CV-00758-SVN
   *Plaintiff*           :
                   :
   v.               :
                   :
STATE OF CONNECTICUT, ET AL.  :
   *Defendants.*         :        **JULY 7**, 2026

## DECLARATION OF ELIOT PRESCOTT

I, ELIOT PRESCOTT, DO DECLARE (OR CERTIFY, VERIFY, OR STATE) UNDER PENALTY OF PERJURY THAT THE FOLLOWING IS TRUE AND CORRECT AND IS BASED UPON MY PERSONAL KNOWLEDGE:

### Introduction

1.     I am over the age of eighteen years old and believe in the obligations of an oath.

2.     I am an attorney licensed to practice law in the State of Connecticut, and I have been practicing law in Connecticut for over thirty years.

3.     I am employed by the State of Connecticut Division of Criminal Justice ("DCJ"). I currently serve as the Inspector General for the State of Connecticut.  I have served as the Inspector General since July 1, 2025.

4.     Prior to becoming the Inspector General, I worked as an attorney in various legal positions in both private practice and public service. In 2004, I was appointed to be a judge of the Connecticut Superior Court by Governor Rowland. I served as a superior court judge for ten years. In 2014, I was appointed to the

Connecticut Appellate Court by Governor Malloy. During my time on the Appellate court, I served on the Advisory Committee on the Appellate Rules, and, on numerous occasions, I served as faculty on the annual Connecticut Judges' Institute. I am also the author of two legal treatises: Connecticut Appellate Practice and Procedure (ALM), and Tait's Handbook of Connecticut Evidence (Wolters Kluwer). I also served for fourteen years as an adjunct professor of law at the University of Connecticut School of Law.

5.      I served on the Appellate Court until I began my term as Inspector General in July of 2025. Through the various roles I have held, I have become familiar with Connecticut's criminal statutes, criminal procedure, and constitutional law.

## My Role and Duties as Inspector General

6.      Following the murder of George Floyd in Minnesota, the Connecticut General Assembly established the Office of the Inspector General in 2021 with the enactment of the Police Accountability Act, Public Act No. 20-1, which amended Conn. Gen. Stat. § 51-277a and other provisions of the General Statutes.

7.      The intent and purpose behind the creation of the OIG was to create an independent office within the Division of Criminal Justice responsible for investigating, reporting, and when appropriate, prosecuting, certain law enforcement incidents, primarily those involving a peace officer's use of deadly physical force or the use of non-lethal force that results in a death.

8.      The OIG was designed to establish and build trust with the public that law enforcement use of force incidents falling within the OIG's jurisdiction would be

2

investigated fairly, independently, and transparently. My duties and requirements advance these goals by protecting the public's right to know and ensuring transparency in investigation of certain police use of force incidents and "in custody" deaths in Connecticut.

9.    Conn. Gen. Stat. § 51-277e sets out my authority, establishes a term of office, vests me with the power to issue investigatory subpoenas, authorizes other law enforcement to refer incidents to my office for investigation, and delineates administrative requirements like staffing and office locations.

10.    Pursuant to § 51-277e(a), I am authorized, among other things, to conduct criminal investigations and issue reports regarding certain incidents in accordance with § 51-277a, prosecute, if appropriate, any unjustified uses of deadly force or uses of non-deadly force that result in a death. I also have the authority to investigate failures by peace officers to intervene in or report unjustified uses of force by law enforcement officers, and to investigate peace officers' failure to report certain deaths. I am also statutorily empowered to make recommendations to Connecticut's Police Officer Standards and Training (POST) Council.

11.    Conn. Gen. Stat. § 51-277a outlines my authority to investigate peace officers and provides guidelines and requirements for fulfilling my duties. Subsection (2) requires me to investigate and determine whether a use of physical force is justified whenever 1.) a peace officer uses non-deadly physical force upon a person and the person dies as a result, or 2.) when a peace officer uses deadly physical force, regardless of injuries or death.

3

12.     I generally do not have authority to investigate or prosecute uses of non-deadly physical force that do not result in a death. I would not investigate such an incident beyond a preliminary determination of whether the force resulted in death. In some situations when it is not initially clear whether a use of force incident is within my jurisdiction, e.g., when it is unclear whether a peace officer used force that rises to the level of deadly force as defined by statute, I may conduct a preliminary investigation to determine whether I have jurisdiction. If I determine that I do not have jurisdiction, I proceed no further. Any further action on the case would be taken by the State's Attorney for the judicial district in which the incident occurred.

13.     I am also required to issue a final report after an investigation under either Subsection (2) or (3) of § 51-277a is concluded. Final reports of the OIG are available on our website: https://portal.ct.gov/dcj/about/inspector-general/use-of-force-reports?language=en_US

14.     Finally, subsection (c) of § 51-277a vests prosecutorial authority in my office for any incidents in which I determine a certain use of force was not justified or if there was a failure to intervene or report an incident of excessive force.

15.     Before the creation of the specific role of the Inspector General, Conn. Gen. Stat. § 51-277a vested investigatory, reporting, and prosecutorial authority for use of force incidents by law enforcement in the DCJ generally. Connecticut's statutory scheme required the Chief State's Attorney to designate a prosecutorial official from a judicial district other than the district in which certain use of force

4

incidents occurred or appoint a special assistant or special deputy assistant state's attorney to conduct the investigation or prosecution.

16.    Conn. Gen. Stat. § 51-277a has existed in some form since 1988. Under all prior versions of the statute, Connecticut prosecutorial authorities had authority to investigate and prosecute use of force incidents by peace officers in Connecticut.

17.    Just like the current version of § 51-277a, all prior versions of the law have required the applicable prosecuting authority to determine whether a use of force was legally justified pursuant to the justification defense enacted by the State of Connecticut as set forth in Conn. Gen. Stat. § 53a-22.

18.    Conn. Gen. Stat. § 53a-22 provides a statutory affirmative justification defense. It is available to any person charged with a criminal offense involving use of force. Some provisions of the defense apply solely to peace officers, while others apply generally to members of the public. This statute defines when a person subject to criminal prosecution can assert the defense, but § 53a-22 itself does not provide a basis for a criminal charge. Rather, it may be asserted by a criminal defendant as a defense to a criminal charge like murder, manslaughter, or assault.

19.    The statutes establishing my prosecutorial authority do not abrogate my prosecutorial discretion to refrain from initiating a prosecution even if I have concluded that a use of force incident falling within my jurisdiction was not justified. For example, I retain the discretion to decline to prosecute an unjustified force of use incident if I conclude that I would not be able to disprove beyond a reasonable that the use of force was justified.

5

20.     The § 53a-22 standard and whether I could disprove the elements of that defense beyond a reasonable doubt at trial are not the only factors I consider when deciding whether to prosecute. In exercising my prosecutorial discretion on whether to prosecute an incident, I consider a confluence of factors that might vary from case to case. I consider all factors that might make a successful prosecution more or less likely. In addition to whether the force was justified, I also consider factors like the policies of the law enforcement agency employing the officer. For example, if the officer's actions were clearly authorized by the agency's policy or expressly authorized by or even directed by a supervisor, I might decline to prosecute. I would also consider whether the law is unsettled as to whether a particular use of force qualifies as "deadly force."

21.     If I were considering a potential prosecution of a federal law enforcement officer, I would also consider whether the prosecution could be barred by Supremacy Clause immunity under existing case law. That question may entail consideration of whether the federal officer's actions were authorized and considered to be justified under the applicable federal use of force standard. Ultimately, in exercising my prosecutorial discretion, I consider numerous factors, whether legal or factual, that might impact the success of the prosecution. I would not commence a prosecution against a federal law enforcement officer, or any other peace officer, if I did not believe I had a valid basis for doing so and could not prove the case beyond a reasonable doubt at trial.

6

22. In addition to the considerations above, I also consider what charges might be brought against a law enforcement officer who engaged in a criminal and unjustified use of force falling within my jurisdiction.

23. Any law enforcement officer I prosecute would be charged under an independent criminal statute, such as murder, assault, or manslaughter. Accordingly, when deciding whether to prosecute, I also consider what charges I could bring, and whether the use of force violates an independent criminal law. If I concluded that I could not prove the elements of a criminal charge beyond a reasonable doubt, I would decline to prosecute.

24. Ultimately, in deciding whether to prosecute, I consider all legal and factual circumstances that may impact the appropriateness or success of the prosecution.

25. Conn. Gen. Stat. §§ 53a-22, 52-277a, and 51-277e are not "enforceable" statutes nor do they provide the basis for criminal charges. They do not, themselves, proscribe any conduct. For instance, § 53a-22 does not *prohibit* the use of force in any situation, nor does it *criminalize* any uses of force. It creates a defense under state law and sets forth the standards under which the defense may be asserted in a criminal prosecution. No law enforcement official, state or federal, can be charged with "violating" § 53a-22, just like they could not "violate" any of Connecticut's other justification defenses.

26. Conn. Gen. Stat. §§ 52-277a and 52-277e set forth the bounds of my authority as well as my duties and responsibilities in my role as Inspector General.

7

Like § 53a-22, these statutes cannot be "violated", and they do not criminalize or proscribe the conduct of any officials, state or federal.

27.    The primary focus of my duties is investigating, reporting, and ensuring there is transparency and awareness of the incidents falling within my jurisdiction. Investigations typically take, on average, six to twelve months, after which I prepare a final report as required by statute.

28.    More than 95% of the approximately 100 investigations conducted by my office since the creation of the OIG in 2021 have resulted in a decision not to prosecute. Only three prosecutions have been brought the Inspector General.  In most of these investigations, either my predecessor (Judge Robert Devlin) or I declined to initiate a prosecution for various reasons. In most, we have determined the use of force was justified and declined to prosecute. In others, we declined to prosecute even if the use of force was legally unjustified because of other considerations, including those mentioned previously.

29.    Although I have specific prosecutorial jurisdiction over the types of incidents described in §§ 52-277a and 51-277e, the Chief State's Attorney would have the authority to refer an investigation to a State's Attorney if I needed to recuse myself from a such a case. Moreover, the individual State's Attorneys retain jurisdiction to investigate and prosecute use of force incidents not falling within my jurisdiction.

### Investigations and Prosecutions of Incidents Involving Federal Officials

8

30. It is my understanding that the federal government has sued to enjoin application of §§ 53a-22, 51-277a and 51-277e to federal law enforcement officials.

31. Connecticut's justification defense has been codified in § 53a-22 for decades and has been available to a subset of federal law enforcement officials if prosecuted in Connecticut since at least 1991. If the federal government obtained an injunction preventing the application of § 53a-22 to federal officers, such an order could deprive their officers from asserting the defense of justification if they are ever criminally prosecuted.

32. Until the recent statutory amendments set forth in Public Act 26-14, the term "peace officer" as used in §§ 53a-22, 51-277a and 51-277e was defined by Conn. Gen. Stat. § 53a-3(9). Since 1991, § 53a-3(9) defined "peace officer" to include "any special agent of the federal government authorized to enforce the provisions of Title 21 of the United States Code." My understanding is that this definition encompassed many federal law enforcement officials, including agents employed by the FBI, ATF, USMS, and DEA.

33. Before the creation of the OIG in 2021, § 51-277a, which vested similar investigatory and prosecutorial authority in the DCJ generally, also used the definition of "peace officer" that encompassed certain federal law enforcement officers. That authority also existed and applied to certain federal law enforcement officers since at least 1991.

34. Since 2021, Connecticut has investigated federal law enforcement officers at least three times. None of those occasions resulted in prosecutions, but a

9

thorough investigation was conducted, and a final report was issued pursuant to the statutes in each case. See Attachments A, B.

35.    It is my understanding that in each of these three investigations of federal officials, federal law enforcement officials cooperated with the investigation and did not object to consideration of § 53a-22—or any other standards by which Connecticut investigated and decided whether the force used in each case was justified under state law.

36.    To my knowledge, DCJ's longstanding authority to investigate and prosecute federal law enforcement officials, and longstanding application of § 53a-22 has never restricted federal agents' willingness or ability to carry out their requisite law enforcement functions in Connecticut. To my knowledge, before the current administration, the federal government did not dispute Connecticut's authority to investigate and potentially prosecute criminal violations by federal law enforcement officers, and in fact, cooperated with prior investigations.

37.    The state-federal government interactions have changed significantly in Connecticut in this area since 2025. The current administration's objection to the State's power to investigate and prosecute federal officials was made clear to me shortly after I took office in July of 2025. When I took office, my predecessor, Judge Devlin, had reported a cooperative relationship with federal law enforcement in prior investigations. It is my understanding that Judge Devlin was working towards an agreed upon Memorandum of Understanding ("MOU") with federal law enforcement

10

to delineate how an investigation would proceed in a use of force incident involving a federal law enforcement officer in Connecticut.

38.    In particular, because state or local law enforcement officials are often involved in joint State and federal task force operations, they often work cooperatively with federal officials who are working in the state of Connecticut. When doing so, local or state officers are often designated as federal officers for such operations.

39.    The fact that the federal government was working with the OIG towards the MOU indicates to me that the federal government acknowledged Connecticut's right to investigate and prosecute, if appropriate, and understood the duties of the Inspector General as applied to them.

40.    In July of 2025, I reached out to the FBI to try to continue those efforts. See Attachment C, p 2-3. After I received an initial response from FBI Assistant Special Agent in Charge Anish Shukla, my communication was not responded to for months thereafter. Id.

41.    In January of 2026, Renee Good and Alex Pretti were shot and killed by federal law enforcement officials in Minneapolis, Minnesota. After observing those incidents and the reports that federal agencies were not cooperating with the ensuing state investigations, I became concerned about the possibility of such an incident occurring in Connecticut. To help prepare the State for such an incident if it occurred in Connecticut, my office released, on February 6, 2026, guidance to state and local law enforcement as to how they may wish to respond to a use of force incident

11

involving a federal law enforcement officer. A true and accurate copy of the guidance letter is attached hereto as Attachment D, On February 11, 2026, I attended a Law Enforcement Council ("LEC") meeting at which we discussed the possibility of such incidents and the guidance. My understanding is that FBI Special Agent in Charge P.J. O'Brien was in attendance.

42. Following the LEC meeting, I received a communication from SAC O'Brien responding to my email from months earlier, inviting us to meet with him regarding the ongoing relationship between our two offices. Shortly thereafter, my Chief Investigator Racheal Cain and I attended a meeting with SAC O'Brien and his staff.

43. In the meeting, SAC O'Brien expressed to me and Chief Investigator Cain that the FBI would not cooperate with any state-based investigation into the use of force by an FBI agent. He indicated that federal officials would conduct such investigations, not the State. He also indicated that federal officials would conduct the entire investigation within 1-2 weeks. That struck me as a wholly inadequate period of time to conduct a thorough and legitimate investigation, because OIG's typical investigation typically take many months to complete. Finally, while SAC O'Brien indicated he would consider allowing the OIG to review the investigatory reports prepared by federal officials, the shared version would be heavily redacted, and we could only view them at his discretion, in the FBI's office and could not retain copies.

12

44.    SAC O'Brien also indicated that the federal authorities would refuse to provide the name of the officer who engaged in a deadly use of force and injured a Connecticut resident, and would not share any of the remaining information I am statutorily required to share with the public by Conn. Gen. Stat. § 51-277a.

45.    SAC O'Brien and his staff were not willing to negotiate these terms.

46.    This meeting with SAC O'Brien reflected to me a drastic change of course by federal officials in terms of their willingness to participate and cooperate in State investigations into certain use of force incidents involving federal officers.

47.    Based on this meeting, I was even further concerned about the outcome of a potential killing like that of Renee Good or Alex Pretti, should it occur in Connecticut. In my view, this meeting highlighted the sovereign interests of CT being able to conduct its own investigations, given that the federal government would not be willing to share significant and important evidence if such an incident occurred.

## Impact of this Suit

48.    If the State's authority to investigate and prosecute federal officials were enjoined, it would cause permanent and likely irreparable injuries to my office that likely could not be remedied. If the State were preliminarily enjoined from investigating and prosecuting federal law enforcement, and an incident requiring OIG's involvement were to occur during the pendency of the injunction, proper investigations of those incidents would be nearly impossible to resume or commence once the State ultimately prevailed on the merits. Investigations into these matters require immediate  action to secure an incident scene and preserve and collect

13

evidence. If there is any delay, valuable evidence will likely be spoiled or lost.  The passage of time from an incident could, as a practical matter, severely frustrate my office from investigating and ever holding accountable a federal official who may have committed a criminal act like murder or manslaughter.

49.    Further, state and local officers are often designated as federal Task Force Officers ("TFO's"). If the OIG were enjoined from investigating or prosecuting "federal law enforcement officers," that would include state and local police designated as TFOs. The State would thus be enjoined from investigating and prosecuting its own officers. Investigations are critical because they can lead to evaluation of policies, practices, and procedures that ultimately make law enforcement and the public safer. If the federal government is provided with the relief they seek, I will be prevented from carrying out this essential duty in regard to some of Connecticut's state and local law enforcement designated as TFOs.

50.    Immediate evidence collection and preservation is critical to an effective investigation. If my office was enjoined from investigating and prosecuting federal officials and a federal official killed a Connecticut resident while operating in Connecticut, we would lose access to essential information that would be nearly impossible to recover. If not preserved and collected immediately, evidence can be deemed unreliable or lost entirely. For example, there have been incidents where statements and physical evidence conflict, like where officers may believe the victim discharged a weapon, but shell casings show all shots were fired from law

14

enforcement weapons. If physical evidence is lost or unavailable to us, it could be difficult, if not impossible, to determine what happened.

51.    If we are denied access to the name of the officer involved as the federal government wishes, I will be unable to comply with my duties under state law, the public will be denied the transparency §§ 51-277a and 51-277e were intended to provide, and a person who commits a crime in Connecticut could avoid any accountability.

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

I, Eliot Prescott, declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct to the best of my belief and based upon my personal knowledge.  Executed on July 7, 2026.

Eliot Prescott, *Esq.*,
Inspector General

15

# Attachment A

# State of Connecticut
## OFFICE OF INSPECTOR GENERAL



Report Concerning
Use of Deadly Force by the United States Marshals Service on January 13, 2022

Robert J. Devlin, Jr.
Inspector General

**TABLE OF CONTENTS**

ACKNOWLEDGMENTS ................................................................................................. 3

INTRODUCTION.......................................................................................................... 4

SUMMARY ................................................................................................................. 5

INVESTIGATION ........................................................................................................ 6

    STATEMENTS............................................................................................................  6

    SCENE ...................................................................................................................  15

    SURVEILLANCE CAMERAS .........................................................................................  30

FINDINGS ................................................................................................................. 32

LEGAL STANDARD .................................................................................................... 35

ANALYSIS.................................................................................................................. 38

CONCLUSION ........................................................................................................... 40

ADDENDUM.............................................................................................................. 40

    DEPARTMENT OF JUSTICE POLICY RE: BODY WORN CAMERAS ......................................  40

*Acknowledgments*

*The Office of Inspector General acknowledges the assistance provided to this investigation by the following:*

*United States Marshals Service, Violent Fugitive Task Force*
*Department of Emergency Services and Public Protection, Division of State Police, Western District Major Crime Squad*
*Bridgeport Police Department*
*New Haven Police Department*
*Chief State's Attorney Patrick J. Griffin, Former New Haven Judicial District State's Attorney*

**INTRODUCTION**

On January 13, 2022, at approximately 11:43 a.m., at or near 35 Wheeler Street, New Haven, Connecticut, Deputy United States Marshal (DUSM) James Masterson[1] discharged his firearm five times at a box truck being driven by Marvin Owens[2]. New Haven State's Attorney Patrick J. Griffin notified the Office of Inspector General of the incident. The Office of Inspector General requested the assistance of the Connecticut State Police Western District Major Crime Squad to conduct an investigation. The results of that investigation are summarized in this report.[3]

Briefly stated, the investigation establishes that, in connection with an attempt to serve three arrest warrants on Owens, DUSM Masterson fired his weapon at the front tire of the box truck and not at Owens. The DUSM's intent was to prevent imminent serious physical injury to other task force officers by disabling the truck. The DUSM fired his weapon to eliminate the threat to federal and municipal officers endangered by Owens' efforts to flee the scene to avoid arrest. Accordingly, I find such use of deadly force to be justified under Connecticut law.

---

[1] On January 13, 2022, DUSM Masterson was a Caucasian male age 52.

[2] On January 13, 2022, Marvin Owens was an African-American male age 54.

[3] The timeline for this investigation is as follows:

January 13, 2022 – date of incident

January 13, 2022 – Office of Inspector General notified and requests assistance from the Connecticut State Police

January 13, 2022 – Connecticut State Police Western District Major Crime Squad (WDMCS) commences its investigation

July 13, 2022 – WDMCS submits its completed report to the Office of Inspector General.

**SUMMARY**

On November 15, 2021, a judge issued an arrest warrant for Marvin Owens charging him with five counts of violation of a protective order in violation of General Statutes §53a-223, and one count of assault in the third degree in violation of General Statutes §53a-61. The court set bond at $250,000. On January 12, 2022, a judge issued an arrest warrant for Owens charging him with five counts of violation of a protective order, reckless endangerment in the first degree in violation of General Statutes §53a-63, and assault in the third degree in violation of General Statutes §53a-61. The court set bond at $150,000. On that same date of January 12, 2022, a judge issued a second arrest warrant for Owens. That warrant charged him with five counts of violation of a protective order, assault in the second degree in violation of General Statutes §53a-60, unlawful restraint in the first degree in violation of General Statutes §53a-95, reckless endangerment in the first degree in violation of General Statutes 53a-63, and threatening second degree in violation of General Statutes §53a- 62. The court set bond on this warrant at $300,000. All three warrants were based on incidents of alleged domestic violence and involved the same alleged victim.

The apprehension responsibility for the three warrants was delegated to the United States Marshals Service Violent Crime Task Force. Task Force Officers (TFOs) contacted Bridgeport Police Detective Lynn Henschel. Henschel was the affiant on the January 12, 2022, arrest warrants. She reported that Owens had a history of weapons possession and was known to carry a firearm in his vehicle. In addition, Henschel stated that Owens was aware of the arrest warrants and might try to run.

In preparing to serve the warrants, TFO Adam Roscoe discovered a Bridgeport Police Department report that listed Owens' current employer as Onofrio Ultimate Foods in New Haven. On January 13, 2022, Roscoe contacted Detective Elizabeth White of the New Haven Police Department who offered to respond to Onofrio's to gain further information. A short time later, White advised Roscoe that Owens' personal vehicle, a 2015 Chevy Cruz, was parked in the Onofrio's parking lot. White also contacted Onofrio's shipping manager who confirmed Owens' employment. The shipping manager indicated that Owens was currently operating an Onofrio-owned box truck in New Jersey and should be on his way back to Connecticut.

TFOs responded to New Haven and took up positions near Onofrio's parking lot. Detective Robert Winkler and Roscoe met with White and took a position with a view of the loading dock and driveway. Masterson and Detective Nicholas Grasso arrived and positioned themselves on the opposite side of the parking lot. Detective Matthew Szymczak and Detective Jesse Meade also arrived and parked a short distance away. Finally, Officer Angel Rivera arrived operating a marked Bridgeport police vehicle.

5

At approximately 11:40 a.m., Masterson and Grasso observed Owens enter the parking lot operating the white box truck. He parked the truck facing a wall. He opened the driver's door. Masterson and Grasso followed the truck into the lot. Winkler and Roscoe followed them. The two TFO vehicles parked on the left side of the truck. Grasso exited the front passenger door of Masterson's vehicle and approached Owens who closed the truck's door. Grasso was wearing a police tactical vest marked "POLICE" on the front and back. He climbed onto the truck's side running board announcing "Police" and for Owens to open the truck's door. Masterson also exited his vehicle and took a position at the front of the box truck. At this time, Winkler exited the TFO vehicle parked behind Masterson's vehicle and was standing at the driver side rear of the truck.

Owens ignored Grasso's commands, started the truck's engine, and started traveling in reverse. Grasso was still on the running board and Winkler was to the rear. As the truck moved rearward, Masterson fired five rounds at the left front tire of the box truck.

Owens quickly drove from the parking lot and was able to get onto I-95 southbound. TFOs pursued. Ultimately, the Connecticut State Police took over the pursuit. At one point, the front tires of the box truck shredded off. The truck continued south exiting I-95 in Bridgeport. While being pursued on Bridgeport streets, Owens collided with two vehicles near the intersection of Boston Avenue and Seaview Avenue. Following the collision, Owens fled on foot. Stratford police officers, who had responded to assist, quickly apprehended him.

**INVESTIGATION**

**STATEMENTS**

**Detective Adam Roscoe**

Task Force Detective Adam Roscoe was with Detective Robert Winkler in an unmarked police vehicle. They positioned their vehicle to have a clear view of Onofrio's parking lot. Roscoe's statement continues:

"Approximately 1100 hours, Deputy Masterson and Detective Grasso observed OWENS, operating the Onofrio's white colored box truck, enter the Onofrio's lot, subsequently parking. Deputy Masterson and Detective Grasso followed the box truck into the lot. Detective Winkler and Detective Roscoe followed parking our vehicles to the left side of the truck. Detective Grasso exited the front right door of Masterson's vehicle and approached OWENS, who was now exiting the vehicle. I observed Detective Grasso approaching OWENS, who quickly re-entered the box truck. Detective Grasso climbed onto the side running board, now at the driver's side window, announcing "Police" and for OWENS to open the door of the vehicle.

6

"I then heard the vehicle's engine start, at which time I returned to my vehicle. Detective Grasso was still on the running board of the truck and Detective Winkler was still outside of my vehicle, when OWENS started traveling in reverse.  Detective Winkler was now in the path of travel of this box truck but was able to retreat into my vehicle's right front seat, just as the truck reversed, nearly striking the right side of my vehicle.  Deputy Masterson fired an unknown number of shots at the left front tire of this vehicle while it was in motion.

"Detective Szymczak and Detective Meade were just entering the parking lot when OWENS was fleeing for the exit.  Detective Winkler and I followed, out another exit and immediately located the box truck, activated our emergency apparatus and followed onto I-95 Southbound."

**Detective Robert Winkler**

In his statement, Winkler described the events leading up to the attempted apprehension of Owens in the Onofrio parking lot.  In relevant part, the statement provides:

"Sometime after 11:00 hours, U.S. Marshal Masterson and TFO Grasso observed the delivery vehicle exiting I-95 and surreptitiously followed it to 35 Wheeler Street. U.S. Marshal Masterson and TFO Grasso informed TFO Roscoe and I that they would follow the delivery truck to its final resting spot and apprehend OWENS as he exited the vehicle.  All communications were conducted via police department radios and cellular phones.

"TFO Roscoe and I observed the delivery truck enter the parking lot.  U.S. Marshal Masterson and Grasso were following the truck as it began to park in front of a building.  TFO Roscoe and I fell in line behind them as the delivery truck came to a complete stop.  I observed TFO Grasso approach the driver's side of the delivery truck as the driver was exiting.  The driver observed TFO Grasso and quickly returned to the cab, shutting the door.  TFO Grasso then climbed onto the truck's running board steps, yelling several commands for OWENS to open the door, but OWENS had placed the vehicle in reverse, with TFO Grasso still holding onto the driver's door handle.  As the vehicle was heading in reverse, and directly at me, I quickly retreated to TFO Roscoe's vehicle.  As this was occurring, U.S. Marshal Masterson fired several rounds toward the delivery truck.

"OWENS drove out of the parking lot and onto I-95 southbound, disregarding the lights/sirens of investigators' vehicles…"

7

**Detective Nicholas Grasso**

In his statement, Grasso describes his investigative efforts to locate Owens to arrest him on the three warrants.  He reported that he and Masterson positioned their task force vehicle near the exit 50 off-ramp for I-95.  From that position, they were able to observe the Onofrio's delivery truck on Forbes Avenue and ultimately saw it turn into the Onofrio's parking lot.  The statement continues:

"Deputy Masterson then pulled alongside the vehicle once Task Force Officer Roscoe and Detective Winkler arrived to the location and positioned themselves behind the Onofrio's delivery truck.  At the approximate time of 11:35 hours, Task Force members observed and immediately identified the operator of the Onofrio's delivery truck as Marvin Owens … as he began to exit the delivery truck by way of the front operator door.  At this time, I, Task Force Officer Grasso, exited the front passenger seat of my Task Force vehicle wearing my U.S. Marshal Tactical Ballistic Vest with the words POLICE labeled on the front and back as Deputy Masterson exited the front operator's seat of the same Task Force vehicle.

 

Detective Nicholas Grasso

Being the closest to the operator's seat of the Onofrio's delivery truck, I approached Marvin Owens and called him by his name addressing Mr. Owens by name while pointing by (sic) department issued firearm directly at Marvin Owens based on the said knowledge collected by Bridgeport Police Detective Gorman that Marvin Owens was in possession of a firearm at all times. I then began to give verbal commands to Marvin Owens stating: "Police," "Get out of the vehicle" as the vehicle door was half opened during his exit. At this point, Task Force members observed Owens reenter the Onofrio's delivery truck. I then attempted to open the truck's operator door which is where Owens positioned himself. At this time, I was positioned on the exterior of the truck as I was standing on the step bar of the vehicle. I then observed Owens lock the operator door preventing me from opening it from the outside of the vehicle. At this point, Marvin Owens started the engine of the delivery truck as I was positioned on the exterior of the vehicle. I then continued to give verbal commands to Owens stating, "Get out of the vehicle," however, Owens disregarded my commands and began to back the vehicle out of the parking space into the parking lot. At this time, Deputy Masterson was also yelling verbal commands to Owens to stop the vehicle. It should be noted that Bridgeport Police Detective Winkler was standing directly in the rear path of the delivery truck as Owens continues to back up the vehicle ignoring the verbal commands to stop. I, Task Force Officer Grasso, continued to hold onto the vehicle's outer door handle as Owens accelerated rearward during which time I was looking for a safe landing place to jump off of the vehicle into the parking lot. During this time, however, Deputy Masterson attempted to stop the vehicle from moving any further in fear for my safety as well as Detective Winkler's safety who was standing behind the delivery truck as it was backing. Deputy Masterson then fired his assigned duty weapon at the front end of the vehicle numerous times; however Owens did not stop and continued to back away. Task Force Officers then observed Owens place the said delivery truck into drive and speed out of the parking lot engaging officers in pursuit."

**Detective Matthew Szymczak**

TFO Szymczak and Detective Meade were among the officers involved in the attempted apprehension of Owens in New Haven. They were in an unmarked Bridgeport police vehicle. TFO Grasso directed Szymczak and Meade to stage a short distance away from 35 Wheeler Street. Once TFO Grasso confirmed that Owens was at 35 Wheeler Street operating a white box truck, he advised Szymczak and Meade to move in.

Szymczak's statement continues:

"I drove into the southernmost entrance for 35 Wheeler Street. As I entered the parking lot, I began to hear gunshots and I observed Task Force Officers, marked by Police vests, running toward the east side of the building. There were multiple civilians running toward the Officers. As we came further into the lot, I could see U.S. Marshal James Masterson discharging his handgun towards the front end of a white, medium duty, box truck.

9

"The truck was coming head-on towards us as we rounded the building.  I had to pull our vehicle to the left behind a dumpster to avoid being hit.  The box truck passed us on the right and we circled the building exiting the parking lot at the northern entrance/exit on Wheeler Street.

"Owens fled from 35 Wheeler Street out of the southernmost entrance/exit onto Wheeler Street southbound."

.     .     .

"At approximately 11:48 hrs Owens passed I-95 southbound rest stop at exit 40.  The left front tire of the vehicle shredded, and the truck was now running on the front rim."

Szymczak goes on to describe Owens' exit from I-95 at exit 29, his flight from the police on Bridgeport streets, his collision with a civilian vehicle, and apprehension in the parking lot of Yankee Discount Muffler at 1290 Boston Avenue.

**Deputy United States Marshal James Masterson**

Deputy United States Marshal (DUSM) James Masterson provided a statement in which he described the information that he and other task force officers developed about Owens. The United States Marshals Service Violent Fugitive Task Force had responsibility to apprehend Owens and arrest him on the three warrants.  Masterson was aware of Owens' history of weapons possession and that he was known to carry a firearm in his vehicle.  Masterson also had information that Owens likely was aware of the warrants and might try to run.

On January 13, 2022, after learning that Owens' car was in the Onofrio's parking lot and that he was returning to Onofrio's from making a delivery in New Jersey, Masterson and others proceeded to New Haven.  Masterson and TFO Grasso positioned themselves near the I-95 exit 50 off ramp. At 11:30 a.m., Masterson saw a truck matching the description of Owens' work truck come down the exit 50 off ramp.  The truck stopped at the bottom of the off ramp.  Using binoculars, Masterson positively identified Owens as the driver.  The truck proceeded to Wheeler Street and turned right into the work yard/parking lot of Onofrio's at 35 Wheeler Street.  Masterson and Grasso pulled into the work yard after the truck.  Masterson advised other officers that, once the truck parked, all units would move in and surround the truck.

Masterson's statement continues:

"Once the truck parked, this DUSM called over the radio to move in.  TFO Grasso and this DUSM's vehicle pulled along the side of the truck (parallel to it).  TFO Roscoe and Detective

10

Winkler's vehicle pulled in behind the truck and this DUSM's vehicle.  At that time, task force members and Detective Winkler exited their vehicles.  NOTE:  All task force members and detectives were wearing tactical vests clearly marked "police" on the front and rear of the vests.



DUSM James Masterson

"TFO Grasso was the closest to the driver side of the cab of the truck.  This DUSM observed the driver side door of the truck open and the subject began to step down out of the truck cab.  Upon exiting the vehicle, TFO Grasso announced "police" and ordered the subject not to move.  At that time, this DUSM observed the subject get back into the truck and close the door.  This DUSM observed TFO Grasso jump onto the running board located below the driver's door and attempted to open the door.  This DUSM observed TFO Grasso attempt to open the door, but the subject locked the driver side door.  This DUSM could also hear TFO Grasso giving commands to the subject to stop and open the door.   The subject was ignoring TFO Grasso's commands.  This DUSM heard the truck start up and was put into gear.  This DUSM observed the truck start to back up and accelerate rearward.  At that time, TFO Grasso was still located on the running board of the truck as it moved rearward.  This DUSM could also observe TFO Roscoe and Detective Winkler towards the rear of the vehicle.  At no time did the subject stop the vehicle or obey TFO Grasso or any law enforcement officers' commands.  At that time, this DUSM determined that the subject and truck were an imminent serious threat to TFO Grasso,

11

TFO Roscoe, and Detective Winkler. This DUSM drew his duty weapon and discharged the weapon towards the front left tire of the truck in an attempt to stop the imminent threat to task force members and other officers.  This DUSM didn't shoot at the operator of the truck (OWENS) because of concerns of a friendly fire situation regarding TFO Grasso's close proximity to the driver's cab.  TFO Grasso located on the running board of the driver side and the possibility of erratic driving from Owens this DUSM didn't want to engage the operator.  This DUSM chose an alternate aiming point, which was the front left tire to stop the imminent threat to task force members and other officers.  The subject ignored all orders to stop and instead kept operating the truck rearward, narrowly missing TFO Roscoe's vehicle and officers. The truck made a quick pivot turn, exited the yard, and accelerated onto Wheeler Street."

**Stacy Rouleau**

Stacy Rouleau was at Onofrio's on the morning of January 13, 2022, to repair a refrigeration container.  He stated:

"At approximately 11:00 a.m., I was sitting in my truck looking at my phone; a refrigerated box truck came into the lot pretty fast.  The truck was white in color.  The driver of the truck was sitting inside the truck for two to three minutes.  I heard somebody say something, but I was not sure what was said.  The truck began to reverse erratically.  I saw a white male, with light colored hair, jeans, a black vest with "Police" in white writing.  The writing was easily identifiable.  The officer yelled something, it was a command to the driver of the truck.  I observed a second officer that had darker hair, he was behind the first officer.  The second officer had a vest that said police on the rear in white writing.  As I observed the first officer come around the container, I saw his weapon drawn.  The weapon was a blue or black handgun.  The truck was perpendicular to the officer and was trying to evade the police officer. The officer fired four or five rounds at the front driver side tire of the truck.  The weapon was pointed at the driver side tire the entire time.  It appeared that the officer never made it to the driver side door.  The truck went out of the lot towards Wheeler Street.  The truck turned left out of the lot onto Wheeler Street."

**Marvin Owens**

The Office of Inspector General advised Marvin Owens of its investigation into the January 13, 2022, incident.  Owens, thereafter, mailed several pieces of written correspondence to the IG office.  In his hand-written letter dated February 8, 2022, Owens provided what he described as his "full statement of account."  This statement provides:

12

on January 13, 2022 as I Just finished my days work, I pulled my truck into the companies parking lot. As i parked my work truck facing toward the company building. Applied air brake's to truck. Then started to fill out daily work log's aswell trucking log's as I was writing, Head looking downward I was then surprised by person Attempting to enter my work Vehicle. being that Vehicle door was locked, the person in all Black fully covered face mask starts to yell. OPEN THE DOOR, OPEN THE FUCKING DOOR. he then steps back pulled out Gun started firing Toward's driver side door, of Truck in total shock Scared for my life, reversed truck and exited parking Lot. didnt Know any officer involved until police cars started persuing me. only person or officer I seen while parked was the one who fired his Gun at me he never Stated or attempted to state he was united states Marshal. Marvin Owens did not have any TYPe weopon, just coming in from work. he didnt need to draw or Fire his weopon

END STATEMENT:                              THANK YOU; 314066

13

In subsequent correspondence received by the Office of Inspector General on May 18, 2022, Owens asserted that an incident report filed concerning the January 13, 2022, incident was fabricated and misleading.  The relevant portion of the letter provides:

The following is The incident Report filed of January 13, 2022 police involved shooting. in which Clearly, Clearly by viewing video of incident, Report is fabricated, misleading, adding of Supplemented Statements

EXZAMPLE: january 13, 2022 Report

A multi-jurisdictional Task force attempted to secue Marvin Owens with the Three open domestic violence warrants previously mentioned.

The Task force operated with information that Owens was most likely armed with a firearm (GUN). Task force was able to locate Owens with, with help from his employer, via the G.P.S systems installed on his work Truck. Owens wass approached by members of the task force, WITH THERR FIREARMS DRAWN" ORDERING Owens to exit the vehical. Owens initially began to comply. HALFWAY EXITING THE VEHICLE. AT WHICH point get got back into the Truck and SHUT/LOCKED the doors. Owens proceeded to drive away with a Member of the task force hanging on to the truck. I Fear for the safety of fellow officers and the public. one of the members of the Task force fired his firearm at the front end of the vehical. This did not stop Owens and he drove away.

FACT: (A) it was only U.S Marshal in whom attempted to Arrest Me for fabricated incident jan. 10. 2022 = (B) when Marshal approached his firearm was not drawn Marshal on Truck started reaching for firearm (C) Owens never came out, Exited or opened door of truck. (D) Owens never Got back in Truck And SHUT/Locked doors (E) AS OFFICER Jump on TRUCK Screaming, Cursing in all

black, not identifying him-self as U.S Marshal. As Owens scared Simotaniusly officer reaching for weapon & jumping down from truck Owens vehical in reverse. officer fires weapon. There was Zero THREAT

14

Based on this letter, it appears that Owens' claim that the report is misleading is based on the following assertions:

A. It was only a U.S. Marshal who attempted to arrest him and not a task force;

B.  When the Marshal approached, his firearm was not drawn.  It was only when the Marshal got onto the truck that he started reaching for his gun;

C.  Owens never came out of, exited, or opened the door of the truck;

D.  Owens never got back into the truck and shut/locked the doors; and

E.  The officer jumped onto the truck screaming and cursing wearing all black and not identifying himself as a U.S. Marshal.  Owens was scared.  When the officer reached for a weapon and jumped down from the truck, Owens put the vehicle in reverse and the officer fired his weapon.  There was zero threat.


**SCENE**

**35 Wheeler Street[4]**

On January 13, 2022, at approximately 2:00 p.m., Western District Major Crime Squad (WDMCS) detectives were called to process the scene located at the parking lot of 35 Wheeler Street, New Haven.  Detectives documented the scene through video, image photography, and FARO CD laser scan.  In addition, detectives seized five shell casings and one spent bullet.

The scene was located at the rear parking lot behind 35 Wheeler Street.  Onofrio Ultimate Foods owns the building and property.  The parking lot is accessible from Wheeler Street via two driveways and via a single driveway on 44 Laura Street.  There were metal gates that closed across these driveways.  These gates are open during business hours to allow employees to park their cars.

Three buildings surrounded the parking lot that were part of Onofrio Ultimate Foods.

---

[4] During the investigation, detectives learned that the building utilized by Onofrio Ultimate Foods was located at 35 Wheeler Street, but the parking lot where the incident occurred was designated as 55 Wheeler Street.  The reports reference both addresses.

15



Onofrio Ultimate Foods Parking Lot



Detectives located Owens' 2015 Chevy Cruz parked near the Laura Street entrance.

There were several Conex storage boxes along the west side of one of the buildings.  A red Dodge Ram pickup truck was parked next to one of the Conex boxes.  The owner, Stacy Rouleau, was seated in the vehicle.  He later provided a statement regarding what he saw.



The building at 35 Wheeler Street was along the west side of the parking lot.  There were surveillance cameras mounted on either corner of the east side of the building.  Detectives seized video recordings from these cameras.



Detectives located five shell casings within the center of the parking lot designated as Exhibits 1,2,3,4, and 5.





















All five casings were Hornaday 9mm Luger R+P.  A copper-jacketed projectile was located next to pallets in the parking lot and designated as Exhibit 8.







Detectives placed a FARO Focus at four locations in the parking lot to document the scene. FARO Scene software merged the coordinates into a common coordinate system. From that data, detectives created a detailed scene diagram.



**Boston Avenue, Bridgeport**

Detectives also photographed the Onofrio Ultimate Foods truck at the scene where it was involved in a motor vehicle accident near the intersection of Boston Avenue and Seaview Avenue in Bridgeport.

25





26





27



The truck was towed to Troop G in Bridgeport where it was searched pursuant to a search warrant.







Given the damage to the exterior of the vehicle, detectives located nothing of evidentiary value. Detectives searched and inventoried the contents of the truck. This search of the interior also revealed nothing of evidentiary value.

**ONOFRIO'S SURVEILLANCE CAMERAS**

The officers involved in the attempted arrest of Owens at 35 Wheeler Street were not wearing body-worn cameras and their vehicles were not equipped with dash cameras. The Onofrio building at 35 Wheeler Street did have surveillance cameras covering different sections of the parking lot. Three of those cameras provided relevant information.

**Camera 10**

This camera was located in the northeast area of the building and faced east. As relevant to this investigation, the video depicts the following:

January 13, 2022

11:22:55 – Owens pulls white box truck into parking spot in Onofrio's lot.

11:23:14 – Owens opens driver's door.

11:23:18 – DUSM Masterson and TRO Grasso pull next to Owens' truck.

11:23:22 – TFO Roscoe and Detective Winkler park their vehicle to the rear of the truck.

11:23:27 – Masterson and Grasso exit their vehicle.

11:23:29 – Owens closes driver's door.

11:23:30 – Grasso attempts to open door.

11:23:33 – Winkler is outside of his vehicle to the rear of the truck.

11:23:37 –Grasso, holding driver door handle, steps onto running board of truck. Back-up lights of truck illuminate.

11:2:38 – Masterson points his gun toward truck.

11:23:39 – Truck starts to back up.

30

11:23:41 – Grasso jumps off running board and runs alongside of the truck as it moves rearward.

11:23:42 – Masterson runs toward the front of the truck as it pivots to drive ahead.

11:23:48 – Truck drives away.  Grasso runs behind.

11:23:53 – TFO Matthew Szymczak and Detective Jesse Meade drive near the truck as it pulls away.  Roscoe and Winkler start to drive out of parking lot.

11:24:06 – Masterson and Grasso return to their vehicle and leave parking lot.

To view this portion of the video recording from Camera 10 [11:22:50 to 11:24:22], click here.

**Camera 11**

This camera was located at the southeast corner of the building facing east.  As relevant to this investigation, the video depicts the following:

January 13, 2022

11:22:46 – Owens drives white box truck into parking lot.

11:23:05 – Owens parks truck.

11:23:09 – Masterson and Grasso drive into parking lot.

11:23:17 – Roscoe and Winkler drive into parking lot.

11:23:27 – The two task force cars pull to the driver side and to the rear of the truck.

11:23:29 – Winkler exits passenger side of his vehicle.

11:23:39 – Truck stars to back up.

11:23:43 – Truck moves quickly in reverse.  Masterson in view at front of truck.

11:23:44 – Truck in process of turning and starting to go forward.  Masterson aiming in vicinity of front driver side tire.

31

11:23:40 – Flashes seen coming from Masterson's gun.  Szymczak and Meade enter parking lot in a blue vehicle.

11:23:50 – Owens drives truck out of parking lot.  Masterson and Grasso follow for a short distance.

11:24:21 – Masterson and Grasso drive out of lot in pursuit of Owens.

To view this portion of the video recording from Camera 11 [11:22:44 to 11:24:23], click here.

**Camera 15**

This camera recorded the south entrance to the parking lot.  As relevant to this investigation, the video depicts the following:

January 13, 2022

11:23:40 – Szymczak and Meade drive into parking lot in a blue vehicle.

11:23:58:  Owens drives truck out of parking lot.

11:24:21 – Masterson and Grasso drive out of the lot in pursuit of Owens.

To view this portion of the video recording from Camera 15 [11:23:35 to 11:24:25], click here.


**FINDINGS**

1.  On January 13, 2022, three arrest warrants were outstanding charging Marvin Owens with various offenses, including multiple counts of violation of a protective order, assault in the third degree, reckless endangerment in the first degree, and assault in the second degree.  The warrants were based on incidents of alleged domestic violence and involved the same alleged victim.

2.  The apprehension responsibility for the three warrants was delegated to the United States Marshals Service Violent Crime Task Force.

3.  Bridgeport Police Department Detective Lynn Henschel advised task force officers (TFOs) that Owens had a history of weapons possession and was known to carry a firearm in his vehicle.  Henschel also reported that Owens was aware of the arrest warrants and might try to flee.

32

4. TFOs learned that Onofrio Ultimate Foods in New Haven employed Owens.

5. On January 13, 2022, Detective Elizabeth White determined that Owens' personal vehicle was parked in the Onofrio's parking lot and that Owens was on the job making a delivery out of state.

6. TFOs responded to New Haven and took up positions near Onofrio's business premises at 35 Wheeler Street, New Haven.

7. At approximately 11:40 a.m., Owens drove a white Onofrio Ultimate Foods box truck into the parking lot and parked the truck facing a wall. He opened the driver's door. DUSM James Masterson and TFO Nicholas Grasso followed Owens into the parking lot stopping next to the driver's side of the truck. TFO Adam Roscoe and Bridgeport Police Detective Robert Winkler also drove into the lot and stopped behind Masterson's vehicle.

8. Grasso exited his vehicle and approached Owens who closed the truck's door. Grasso was wearing a police tactical vest with "POLICE" on the front and back. Grasso attempted to open the driver's door but it was locked. Grasso stepped onto the truck's running board. He announced "Police" and for Owens to open the door.

9. Masterson exited his vehicle and was at the front of the truck. Winkler also exited his vehicle and was at the rear of the truck on the driver's side.

10. Owens ignored Grasso's commands, started the truck's engine, and began rapidly moving in reverse. Grasso was still on the running board and Winkler was to the rear.

11. As the truck reversed, Masterson determined that the moving truck presented an imminent risk of serious injury to Grasso, Winkler, and Roscoe. To eliminate the threat, he fired five rounds at the truck's driver side front tire.

12. Owens drove out of the parking lot and onto I-95 southbound. The Connecticut State Police took over the pursuit. Owens did not comply with police efforts to pull him over. During the chase, the tires on the truck's two front wheel shredded off.

13. Owens exited I-95 at exit 29 in Bridgeport. The pursuit ended when Owens collided with two vehicles near the intersection of Boston Avenue and Seaview Avenue. Owens fled on foot but was quickly apprehended.

16. In his two handwritten submissions to the Office of Inspector General, Owens made the following assertions:

33

a.  A person in black attempted to enter his truck yelling for Owens to open the door. He then stepped back pulled out a gun and started firing towards the driver side door of the truck.

b.  Owens did not know that any officer was involved until the police pursuit.

c.  The person who fired at Owens never stated or attempted to state that he was a United States Marshal.

d.  When the Marshal approached the truck, his firearm was not drawn. It was only when the Marshal got onto the truck that he reached for his firearm.

e.  Owens never came out, exited, or opened the door to the truck.

f.  Owens never got back into the truck and shut or locked the door.

g.  The officer who jumped onto the truck never identified himself as a United States Marshal.  While on the truck, he reached for a weapon and jumped down.  Owens then put vehicle in reverse and the officer fires his weapon.

h.  There was zero threat.

The import of these assertions are that (1)  none of the officers involved in the attempted arrest of Owens were identifiable as police officers, (2)  Owens never opened, closed or locked the door to the truck, (3) TFO Grasso fired at the truck's driver door, and (4) Owens' action posed "zero threat."  I reject these assertions for the following reasons:

IDENTIFICATION AS POLICE

The credible evidence supports Grasso's statement that he wore a tactical vest labeled POLICE on the front and back.  Detectives photographed Grasso wearing such vest and it is visible on the video recordings.

The video also shows Grasso at the door of the truck gesturing.  I find credible his statement that he verbally identified himself as a police officer at that time.

DOOR

The video from Camera 10 shows Owens opening the door shortly after parking the truck.  As Grasso and Masterson approach the truck, the video shows Owens pulling the door

34

closed.  That the door was locked is demonstrated by Grasso's repeated unsuccessful efforts to open it.

ACTIONS OF TFO GRASSO

Grasso never fired his gun.  The video from Camera 10 shows his efforts to open the truck's driver door and his jumping from the truck's sideboard as it moves in reverse.  At no time, does he fire his weapon.  To the contrary, both videos show that Masterson was the only person who fired his weapon.

ZERO THREAT

Task force officers had intelligence that Owens was aware that the police had warrants for his arrest and that he might run.  His actions in rapidly backing the truck up while TFOs were either on the truck or in close proximity, posed a grave threat of injury to them.

The desperation of Owens' efforts to avoid arrest at all costs is evident from his flight from police during a twenty-mile pursuit from New Haven to Bridgeport.  The shredding of the tires on both front wheels and having to drive on bare rims did not make him stop.  It took a motor vehicle collision in Bridgeport to stop the truck.  Even then, Owens attempted to flee on foot.

Owens' general assertion is that his flight was due to fear from an unexpected encounter with a man in all black who fired at the truck's door and had nothing to do with the police trying to arrest him.  I find that not to be credible.

**LEGAL STANDARD**

The use of force by a police officer is governed by General Statutes §53a-22.  The version of that statute in effect on January 13, 2022, in relevant part, provides:

"(a)(1)  For purposes of this section, a reasonable belief that a person has committed an offense means a reasonable belief in facts or circumstances which if true would in law constitute an offense.  If the believed facts or circumstances would not in law constitute an offense, an erroneous though not unreasonable belief that the law is otherwise does not render justifiable the use of force to make an arrest or prevent an escape from custody.

(2) A peace officer … who is effecting an arrest pursuant to a warrant or preventing an escape from custody is justified in using the physical force prescribed in subsections (b), (c), and (d) of this section unless such warrant is invalid and known by such officer to be invalid.

35

(b) Except as provided in subsection (a) … of this section, a peace officer … is justified in using physical force upon another person when and to the extent that he or she reasonably believes such use to be necessary to:  (1) Effect an arrest or prevent the escape from custody of a person whom he or she reasonably believes to have committed an offense, unless he or she knows that the arrest or custody is unauthorized; or (2) defend himself or herself or a third person from the use or imminent use of physical force while effecting or attempting to effect an arrest or while  preventing or attempting to prevent an escape.

(c) (1) … a peace officer … is justified in using *deadly physical force* upon another person for the purposes specified in subsection (b) of this section only when his or her actions are objectively reasonable under the circumstances, and:

(A) He or she reasonably believes such to be necessary to defend himself or herself or a third person from the use or imminent use of deadly physical force …" (Emphasis added).

The statute further provides:

"For the purpose of evaluating whether the actions of a peace officer … are reasonable under subdivision (1) of this subsection, factors to be considered include, but are not limited to, whether (A) the person upon whom deadly force was used possessed or appeared to possess a deadly weapon, (B) the peace officer … engaged in reasonable de-escalation measures prior to using deadly physical force, and (C) any conduct of the peace officer … led to an increased risk of an occurrence of the situation that precipitated the use of force,"  §53a-22 (c)(2).

Accordingly, a police officer is justified in using deadly physical force upon another person when the officer reasonably believes such force to be necessary to defend the officer or a third person from the use or imminent use of deadly physical force.[5]  "Deadly physical force" means "physical force that can be reasonably expected to cause death or serious physical injury." General Statutes § 53a-3(5).  "Serious physical injury" means "physical injury which creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ."  General Statutes §53a-3(4).

The reasonableness of a police officer's belief under § 53a-22 is evaluated pursuant to a subjective-objective formulation. *State v.* Smith, 73 Conn. App. 173, 185, 807 A.2d 500, cert. denied 262 Conn. 923, 812 A.2d 865 (2002).  Under this test, the first question is whether, on the basis of all of the evidence, the police officer in fact honestly believed that deadly force was necessary to defend himself/herself or a third person. *Id.*  If it is determined that the police

---

[5] It is arguable that §53a-22 should not apply to Masterson's use of force.  As noted above, that statute applies to the use of force against another *person*.  Masterson, the TFOs, and civilian witness all agree that the shots were fired at the truck's front tire.  Whether the use of force directed to a truck is also a use of force against the occupant of the truck, is an issue that I need not address.  Masterson's use of force is justified either way.

officer honestly believed that deadly force was necessary, the second part of the test asks whether the police officer's honest belief was reasonable from the perspective of a reasonable police officer in the officer's circumstances. *Id.* at 198.

The United States Supreme Court has explained this test in a civil rights case: "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on scene rather than with the 20/20 vision of hindsight. … [T]he calculus of reasonableness must embody allowance of the fact that police officers are often forced to make split-second decisions—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396-97, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).

## UNITED STATES MARSHALS SERVICE (USMS) POLICY

The United States Marshals Service Policy Directives pertaining to the use of force in effect on January 13, 2022, set forth the following directives:

A**. Policy Statements:**  The use of force by USMS personnel must be objectively reasonable and may range from verbal commands to the use of deadly force.

.    .    .

2.  **Deadly Force:** USMS personnel may use deadly force only when necessary; that is, when there is an objectively reasonable belief that the subject of such force poses an imminent danger of death or serious physical injury to USMS personnel or to another person.

a.  If feasible, and if doing so would not increase the danger to USMS personnel or others, a verbal warning to submit to the authority of USMS personnel shall be given prior to the use of deadly force.

b.  Deadly force may not be used solely to prevent the escape of a fleeing subject or prisoner.

c.  Firearms may not be fired solely to disable moving vehicles or prevent a fugitive's escape.

d.  Warning shots are not authorized.

**POSTC STANDARD**[6]

The State of Connecticut Police Officer Standards and Training Council (POSTC), on November 19, 2019, adopted an updated Model Policy regarding motor vehicle pursuits. As relevant here, Section 8 of the Model Police provides:

"1. Officers shall not discharge their firearms at a moving vehicle or its occupants unless the occupants are using, or threatening the use of, deadly physical force against the officer or another person by means other than the vehicle.

a. This does not preclude exigent circumstances such as, but not limited to, where the officer reasonably believes that there are no other means available to avert the threat of the vehicle, or if such vehicle is being utilized as a weapon against the officer(s), or another person such as in a vehicle ramming attack.

c. No officer should intentionally position his or her body into a path of a fleeing motor vehicle unless such tactic is approved by the law enforcement unit that employs such police officer and in accordance with an established written policy. Wherever possible, the involved officer should make an effort to move to an area of safety if the vehicle becomes a threat, including retreating from the threat if practical."

This policy expresses the general proposition that police officers should not discharge their firearms at moving vehicles. The policy, however, authorizes the use of a firearm in certain exigent circumstances. One such circumstance is where the officer reasonably believes that there are no other reasonable means available to avert the threat posed by the vehicle.

**ANALYSIS**

Under Connecticut law as applicable here, a determination as to whether a police officer's use of deadly force was objectively reasonable requires, in part, consideration of four questions:

1. Did the officer, as a matter of fact, actually – that is honestly and sincerely – believe that he/she or a third person was facing either the actual or imminent use of deadly force when the officer used deadly force?

2. Was that actual belief reasonable in the sense that a reasonable police officer in the officer's circumstances at the time of the officer's actions, viewing those circumstances from the officer's point of view, would have shared that belief?

---

[6] The statutory definition of "police officer" does not include United States Marshals. See General Statutes §7-294a(9). POSTC Standards, therefore, do not apply to them. The POSTC Standards are included in this report as an example of best practices.

38

3. Did the officer, as a matter of fact, actually – that is honestly and sincerely – believe that the use of deadly force was necessary to defend himself/herself or a third person from such threat?

4. Was that actual belief reasonable, in the sense that a reasonable police officer in the officer's circumstances at the time of the officer's actions, viewing those circumstances from the officer's point of view, would share the belief that deadly force was necessary?

Additionally, the reasonableness of the officer's conduct also turns on whether (1) the other person possessed a deadly weapon (or appeared to), (2) the officer attempted reasonable de-escalation measures, and (3) the situation was not precipitated by the officer's own conduct.

The credible evidence supports Masterson's statement that he actually believed that other task force officers were facing death or serious physical injury had they been hit or run over by the accelerating box truck moving rearward toward them.  Such actual belief was not exaggerated or unfounded and a reasonable police officer in the same circumstances at the time would have felt the same way. The credible evidence further supports Masterson's stated belief that discharging his firearm at the reversing truck was the only readily available feasible means to defend other officers from the threat that they faced.  Such belief was reasonable because a reasonable police officer in the same circumstances at the time would have shared that belief.  Moreover, the exigencies of the situation did not permit the utilization of any de-escalation techniques, and the use of deadly force was not precipitated by police conduct.

It is arguable that, at the time Masterson fired his last shot, the moving truck no longer posed a threat to other officers.  See Camera 11 at time 11:23:45 (elapsed time 8:45).  For several reasons, I do not see this possibility as undermining my conclusion that Masterson's use of force was justified.  First, Masterson's discharge of his firearm lasted only about four seconds. Second, Owens' erratic driving posed a continuing threat to others.  Third, the video does not show Grasso's exact location with respect to his proximity to the truck at the time of the last shot.  Fourth, Masterson's actions to stop the threat posed by the truck were one continuous unit.  Fifth, the situation presented a classic need for split-second decision-making. This was not a situation where shots were fired as the truck drove away from the officers and out of the parking lot.  It is also relevant that Masterson's shots were directed at the truck's tire.

I would note that I fully endorse the general prohibition against shooting at moving vehicles contained in federal, state and local police standards.  Masterson's conduct, however, falls within the exception for situations in which moving vehicles pose an imminent danger to others.

39

**CONCLUSION**

The investigation establishes that DUSM James Masterson used deadly force to protect other officers who were in imminent danger from Owens' efforts to avoid arrest.  I therefore conclude that such use of force was justified under Connecticut law.  The Office of Inspector General will take no further action on this matter.

Submitted this  17th  day of November, 2022.


_____
ROBERT J. DEVLIN, JR.
INSPECTOR GENERAL

**ADDENDUM**

**Recommendations**

On January 13, 2022, Connecticut law did not require the use of body worn cameras (BWCs).  Such use was mandated by statute effective July 1, 2022.  Had the TFOs in the present case worn cameras, it would have provided a real time account of what transpired in the parking lot of Onofrio Ultimate Foods.

The United States Department of Justice (DOJ) addressed the subject of BWCs in two memos issued by Deputy Attorney General Lisa Monaco.  On October 29, 2020, Monaco announced that the DOJ would *permit* federally deputized officers, that is task force officers,  to activate BWCs while serving arrest warrants, during planned arrest operations, and during the execution of search warrants.  On June 7, 2021, Monaco announced a change in DOJ policy to *require* federal agents and task force officers to wear and activate BWC recording during (1) a pre-planned attempt to serve an arrest warrant and other pre-planned arrest operations, including the apprehension of fugitives sought on state and federal warrants; or (2) the execution of a search or seizure warrant or order.  The memo directed federal law enforcement agencies to submit to the DOJ their own BWC policies and name a senior official with responsibility to implement such BWC policy.

As of the time of this report, there are ongoing and productive discussions about the use of BWCs by TFOs and the availability of such recordings to non-federal agencies.  My recommendation is that TFOs should wear cameras during the preplanned activities noted in the DOJ memo, as well as unplanned vehicle stops, arrests, and searches, provided such actions are reasonably foreseeable.

41

# Attachment B

# State of Connecticut

## OFFICE OF INSPECTOR GENERAL



Report Concerning the
Use of Deadly Force against Aaron Freeman
by the West Haven Police Department and the
Waterbury Police Department
on January 29, 2025

Eliot D. Prescott
Inspector General

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................4

INVESTIGATION ................................................................................................5

    SCENE................................................................................................................ 5

    STATEMENTS.................................................................................................... 17

    DIGITAL EVIDENCE............................................................................................ 21

    MEDICAL RECORDS AND AUTOPSY REPORT................................................................ 24

    FIREARM AND BALLISTIC EVIDENCE ...................................................................... 25

FINDINGS ......................................................................................................27

LEGAL STANDARD............................................................................................28

ANALYSIS......................................................................................................30

CONCLUSION..................................................................................................31

*Acknowledgements*

*The Office of Inspector General acknowledges the assistance to this investigation provided by:*

*New Haven Police Department*

*Waterbury Police Department*

*State Police Central District Major Crime Squad*

*The New Haven State's Attorney's Office*

*Office of the Chief Medical Examiner*

*Connecticut Forensic Laboratory—Firearms Unit*

*United States Drug Enforcement Agency*

**INTRODUCTION**

On January 29, 2025, at approximately 5:36 a.m. and 6:20 a.m., respectively, Detective Martin Scanlon of the Waterbury Police Department,[1] and Sergeant Joseph Riehl of the West Haven Police Department,[2] discharged their department-issued firearms at Aaron Freeman,[3] who died as a result of being struck by gunfire. As required by statute,[4] the Office of Inspector General (OIG) investigated this incident. The results of that investigation are summarized in this report.

More specifically, on January 29, 2025, at approximately 5:30 a.m., law enforcement officers assigned to a Drug Enforcement Agency (DEA) Task Force, including police officers from the Waterbury, West Haven, and New Haven police departments, arrived at 719 Grand Avenue, Apartment #105, New Haven to execute a search and seizure warrant for the premises and an arrest warrant for Aaron Freeman on narcotics charges.  Apartment #105 is a two-story townhouse style apartment.  The officers assembled outside, knocked on the apartment door, and announced their presence.  After hearing no response, the officers entered the apartment by using a master key provided by the landlord. Inside, they encountered an adult female standing unclothed near a bedroom door adjacent to the kitchen area.  Officers subsequently observed Aaron Freeman standing inside the bedroom near the partially opened door. After being ordered to show his hands, Aaron Freeman opened fire on the officers.  One bullet struck West Haven Officer Robert Rappa in the calf, who then sought cover in a nearby bathroom. Martin Scanlon, a Waterbury detective, took cover in the stairwell leading to the apartment's second floor.  Officer Scanlon and Freeman exchanged gunfire.

After a few minutes, Officer Rappa attempted to escape from the bathroom so that he could obtain medical treatment for his gunshot wound. To do so, however, he needed to pass through Freeman's line of fire from the bedroom. As Officer Rappa sprinted past the door,

---

[1]Detective Scanlon is a white male, who, at the time of the incident, was  forty-one years old and had been a Waterbury Police officer for eighteen years. He had no prior disciplinary history.

[2]Sergeant Riehl is a white male, who, at the time of the incident, was thirty-one years old and had been a West Haven Police Officer for eleven years. He had no prior relevant disciplinary history.

[3]Aaron Freeman was a thirty-five-year-old black male.

[4]General Statutes §51-277a(a)(1) provides:  "Whenever a peace officer, in the performance of such officer's duties, uses physical force upon another person and such person dies as a result thereof or uses deadly force, as defined in section 53a-3, upon another person, the Division of Criminal Justice shall cause an investigation to be made and the Inspector General shall have the responsibility of determining whether the use of force by the peace officer was justifiable under section 53a-22."

4

Freeman fired at least one additional round at him, but Rappa was not struck. A few moments after Rappa escaped the bathroom, Scanlon fired four additional rounds at Freeman.

DEA Task Force officers then awaited the arrival of the West Haven Police Department Special Response Team (SRT).  The SRT, including West Haven Police Sergeant Joseph Riehl, were equipped with bullet-proof safety shields and several of them entered the apartment.  As Sergeant Riehl proceeded into the living room of the apartment and moved toward Freeman's bedroom, he was struck in the upper leg by a bullet fired by Freeman through the bedroom wall.  Sergeant Riehl returned fire, immediately retreated, and then was assisted out of the apartment by other officers who rendered him medical aid.

Thereafter, the SRT attempted to communicate with Freeman to negotiate an end to the stand-off, but he failed to respond. Tear gas was deployed into the bedroom and a drone with an attached camera was flown into Freeman's bedroom. Video from the drone revealed that Freeman appeared to be deceased. Officers then entered the bedroom and medical personnel from the SRT declared him dead at 7:52 a.m.  The scene was then secured.

After reviewing the facts revealed by my office's investigation of this incident, I have determined that both Detective Scanlon and Sergeant Riehl honestly and sincerely believed that Freeman had attempted to kill or inflict serious physical harm on them and/or other officers at the scene. They also sincerely and honestly believed that it was necessary to use deadly physical force to protect themselves and their fellow officers from serious physical injury or death. Under the totality of the circumstances, the officers' beliefs were reasonable. Accordingly, their use of deadly physical force was legally justified.

## INVESTIGATION

### Scene

The scene was secured by the New Haven Police Department and subsequently processed by the State Police Central District Major Crime Squad (CDMCS).  The scene is located in and around Apartment #105 at 719 Grand Avenue in New Haven, CT.



[Apartment #105, 719 Grand Avenue]

The apartment can be accessed directly from the outside through a rear door into the apartment's living room.  The apartment's kitchen is located at the far end of the living room. The first floor also contains a bedroom, a bathroom, stairwell access to the second floor, and a foyer that leads to a front door, which provides access to a common hallway inside the apartment building.



[Living room with bullet-proof shield]

6

More specifically, a short hallway from the living room permits access to the kitchen on the right and then takes a jag to the left. The sole first-floor bedroom can then be accessed immediately to the left. The hallway ends at a front door that provides access to the apartment building's common hallway. A Target bag can be seen hanging from the handle of the front door.



[Hallway from living room to kitchen and first floor bedroom]



[Kitchen]

7

The bathroom door is further down the hallway on the left side.



[Hallway and entrance to first-floor bathroom]



[First floor bathroom]

The stairwell to the second floor is on the right at the end of the hallway, just past a small utility closet. There is also a second hallway closet next to the bathroom door.



[Staircase and first-floor closet]

The second floor of the apartment contains two additional bedrooms, a laundry room, and a bathroom. No items of evidentiary value were located on the second floor.

9



[View from bottom of stairwell into Freeman's bedroom]



[Spent shell casings and a projectile (Evidence marker #4)]

10



[Spent shell casings near stairwell and bathroom door]



[Spent shell casings in bathroom]

11



[Spent shell casing in bathroom]

The bedroom occupied by Freeman on the first floor contained numerous items of evidentiary value.  I have not included in this report photographs of a number of these items because many of the photographs contain highly graphic and disturbing images of Freeman's body and a substantial amount of blood. When the crime scene was processed, Freeman's body was located on the floor near the foot of the bed and close to the bedroom door. A firearm was located on the bed just above where Freeman lay. Numerous shell casings were strewn on the floor. Additionally, two rounds of live ammunition were found in the bedroom.



[Glock found near Freeman's body]

12



[Live round found on bedroom floor]



[Spent shell casing in Freeman's bedroom]

13



[Spent shell casing located under Freeman's bed]



[Spent shell casings on floor of closet across from the bottom of the stairwell]

14



[Spent shell casing on bedroom floor]

Twenty-one bullet strikes in the apartment were located, photographed and documented with evidence markers.  They were located in various places on the first floor of the apartment, including but not limited to, on the ceiling and walls of the kitchen, the door to the refrigerator, the wall separating the living room from Freeman's bedroom, the wall of the hallway separating the hallway from the kitchen, the inside wall of Freeman's bedroom, the doorjamb and door of Freeman's bedroom, and the exterior wall of the apartment just outside Freeman's bedroom. Two representative photographs of the bullet strikes are immediately below.

15



[Bullet strikes with trajectory rods]



[Bullet strikes on Freeman's bedroom door]

**Statements**

### Officer Robert Rappa

Officer Robert Rappa filed a written sworn report on March 17, 2025. It states in relevant part: "I have been employed by the West Haven Police Department since July 11, 2012. I currently hold the rank of Officer and am assigned to the Drug Enforcement Administration (DEA) New Haven District Office's (NHDO) Federal Drug Task Force as well as the West Haven Police Department's Street Crime Unit.

"On Wednesday, January 29, 2025, I was working extra duty for the purpose of executing a State search and seizure warrant at 719 Grand Avenue, Apartment 105, New Haven, Connecticut and to attempt to take Aaron Freeman, . . . a resident of this apartment and the target of this investigation into custody on a felony State arrest warrant. On this date I was wearing a Department approved outer carrier ballistic vest[,] which has patches on the front and rear that read 'POLICE' and also has my name, badge number, and an embroidered West Haven Police Badge on the front, all of which clearly identify me as a Police Officer.

"Upon arrival at the apartment complex NHDO members and Street Crime Unit members assembled by the rear outside entrance door to Apartment 105, which is adjacent to the parking lot. At approximately 0536 hours, I loudly knocked and announced Police with a search warrant and to come to the door multiple times. After knocking for a reasonable amount of time without receiving an answer, fearing evidence that could prove to be crucial in the prosecution of this case may be destroyed, and for the safety of the Officers involved, entry was gained into the apartment using a key which had previously been provided to Officers by the property management company.

"While entering and once inside the apartment, I continued to verbally identify myself as a Police Officer and immediately observed a naked black female inside the residence towards the front of the apartment. I ordered the female to come out towards me and provided her with a clothing item that was laying on the couch to cover herself with. The female took the item but did not obey my commands and instead walked backwards away from me towards the front of the apartment. At this time Officer Brandon Butler yelled that he saw someone else come out of a room and then retreat back into the room. I then walked towards the now covered female and pulled her arm to direct her back towards the rear of the apartment where other Officers were. I then attempted to locate the individual Officer Butler had just observed.

"As I looked to my left, I saw a black male, who appeared to be Freeman, standing partially behind a door. Freeman appeared to be naked and was staring directly at me with his eyes wide open while I yelled for him to show me his hands. Freeman did not comply, and I pushed the door open in an attempt to get a better view of him and make sure he was not holding a weapon and to also see inside the room. As I pushed the door open, I immediately

17

heard a gunshot and felt pain in my lower left leg as I observed Freeman backing up into the dark room away from me. I immediately took cover to my right entering a bathroom which was the next room over from the bedroom Freeman was in. I then heard what I believed to be Task Force Officer Scanlon firing multiple rounds towards where Freeman had been.

"Shortly after this I heard a single gunshot which sounded like it came from the room Freeman was in and seemed directed towards my position in the bathroom. Fearing he would fire through the wall I crouched down. I then notified other Officers that I was hit and that the target was still in the room he was initially observed in. I proceeded to place a tourniquet that was on my vest on to my left leg as Officer Scanlon was giving verbal commands for Freeman to show himself and come out with his hands up. During this time there was a male tenant upstairs yelling loudly. From my position in the bathroom, I was unable to see into the bedroom without exposing myself.

"After a short time being inside the bathroom, I notified Officer Scanlon that I was going to attempt to exit back towards the rear of the apartment. I then ran back towards the rear of the apartment and as I crossed past the open bedroom door heard a gunshot which sounded as if it had come from the bedroom Freeman was in. I then exited the apartment and was transported to Yale New Haven Hospital by Task Force Officers . . . ."

### Detective Martin Scanlon

Detective Martin Scanlon filed a written sworn report on March 3, 2025. It states in relevant part: "[I am] a regular sworn member of the Waterbury Police Department [with] over 19 years of police training and experience. . . . I have conducted numerous investigations which have led to the issuance of search warrants as well as the seizure of illegal contraband and the convictions of those involved. I am currently assigned to The Waterbury Police Vice and Intelligence Unit and The Drug Enforcement Agency New Haven District Office (DEA NHDO) as a Task Force Officer (TFO). . . .

"A recent narcotics investigation by the West Haven Police Department and TFO Robert Rappa resulted in an Arrest Warrant being issued for Aaron Freeman, . . . and a Search and Seizure Warrant being issued for his residence/vehicle, located at 719 Grand Avenue Apt 105 New Haven, CT 06511.

"On 1/29/2025 I, along with members of the DEA NHDO, and West Haven Police Department gathered for the purpose of executing the warrants. All officers were wearing tactical bullet proof vests with 'Police' clearly visible. We approached the rear door of 719 Grand Avenue Apartment 105. Officer Robert Rappa loudly knocked on the door and announced police with a search warrant several times and waited a reasonable amount of time before making entry. A male immediately recognized by me as Aaron Freeman was observed opening the blinds to what was later determined to be his bedroom. I gave clear commands for him to

18

'come to the door' as Officer Rappa entered the apartment. I entered the apartment behind Officer Rappa, and we were met in the kitchen area by Aaron Freeman's Girlfriend. The female was not wearing clothes, so Officer Rappa handed her a coat to cover herself up. She was instructed to move away from the kitchen area, and she did.  Officer Rappa made contact with Aaron Freeman at the threshold of[] the first floor bedroom. Aaron Freeman stepped back into the bedroom and another West Haven Officer ordered him to come out. I announced, 'Aaron come on out, hands up.' Officer Rappa who was still directly in front of this writer told Freeman to show his hands as Freeman was observed partially behind the first-floor bedroom door. Freeman was not complying with our verbal commands, and I heard him say, 'what's the problem?'

     "I observed Freeman's left hand empty, but his right hand was blocked by the bedroom door. I heard one gunshot and turned to see Freeman still in the bedroom with a gun in his right hand as the bedroom door was now open. I heard Officer Rappa yell in pain then seek cover in a small bathroom directly next to the bedroom. It should be noted that I was still behind Officer Rappa and in the direction of where Aaron Freeman fired the shot. While I was seeking cover towards a stairwell that led to second floor bedrooms, I observed Freeman standing in the bedroom pointing a gun towards Officer Rappa while Officer Rappa was fleeing for cover into said bathroom, in what appeared to be an attempt to continue shooting at Officer Rappa. Freeman then raised his right hand pointing his gun towards me. I had my department issued pistol in my right hand aimed at Freeman while trying to maintain cover behind a stairwell wall. I fired three times at Freeman who appeared to have fallen back further into the bedroom from the shots. I retreated up the stairs for safety and also to check for other people in the home and reassess the situation. I contacted an unknown male, and a juvenile female said to be the male's granddaughter. While at the top of the stairwell I heard another gunshot coming from the same area where Freeman had previously fired his weapon. I went back down the stairs and maintained cover while checking on Officer Rappa who verbally confirmed he was shot. I continued to give verbal commands for Aaron Freeman to come out of the room with his hands up, but he continuously ignored said commands and maintained silence. Officer Rappa who needed medical assistance for a gunshot wound to his leg was able to run out from his cover position and exit the same way we entered the apartment. I maintained cover on Officer Rappa and observed that as soon as he passed the doorway to the bedroom Aaron Freeman was in, a shot was fired. When the shot was fired, I observed a muzzle flash from Freeman's position. I verbally clarified that it was Aaron Freeman shooting at Officer Rappa again. I observed a sneaker move into the doorway just below where the muzzle flash was observed. This indicated that Freeman appeared to also be standing in a position of cover and was lying in wait for any officer to come into his line of site as indicated from his last shot at Officer Rappa. I warned other officers that were in the kitchen area to not cross the threshold leading to the area I was in. At this time, I observed Freeman stick a gun out from his position of cover (right side of the

19

bedroom door) and I fired four shots at Freeman. This writer, and other officers on scene continuously made attempts to have Freeman acknowledge us but he still did not comply. Attempting to deescalate, I told Freeman we wanted to get him medical assistance if it was needed. I continued to verbally de-escalate the situation but Freeman was still not replying to any of my or other Officers' verbal commands or requests.

"I maintained verbal contact with the unidentified adult male and juvenile female to help ensure their safety. After approximately 40 minutes on scene West Haven's Special Response Team (SRT) arrived. While SRT was planning their plan to make contact with Freeman I maintained my position of cover on the stairwell. When members of SRT attempted to make contact with Aaron Freeman he fired at them striking an officer. An apparent exchange of gunfire occurred. SRT maintained cover on the bedroom and as part of their plan, this writer, the adult male, and juvenile female were removed from the residence through a second floor window."

### Sergeant Joseph Riehl

Sergeant Joseph Riehl filed a written sworn report on February 13, 2025. It states in relevant part: "On January 29, 2025, I was working as a West Haven Police Special Response Team ("SRT") operator and assigned to assist the West Haven Police Street Crime Unit during the execution of a search and seizure warrant at 719 Grand Avenue, New Haven, CT. I, along with other SRT members, arrived at the location at approximately 0614 hours.

"Upon arrival we were briefed by Officer Brandon Butler of the West Haven Police Street Crime Unit. We were advised that the Street Crime Unit, with assistance from the New Haven DEA Task Force, had made entry into Unit 105 at 719 Grand Avenue. During the entry, . . . [o]fficers were fired upon by an occupant of the residence who was reported to be in the first-floor bedroom and that one . . . [o]fficer, Officer Robert Rappa, was struck in the leg by a bullet. We were advised that TFO Rappa had been safely removed from the apartment, but that TFO Martin Scanlon was trapped inside somewhere between the bedroom and the rear exit of the residence. Officer Butler also provided a basic layout of the interior of the apartment.

"After the briefing, other SRT Officers and I entered the residence through the rear door which led into a living room area. I was given a ballistic shield and began to proceed through the living room towards the first-floor bedroom with other SRT Officers behind me. As we moved forward, we called out to TFO Scanlon to establish communication with him, and he advised us that the suspect was still located in the first-floor bedroom.

"As I approached the end of the living room wall, I began to turn toward my left attempting to clear the threshold to the bedroom door. As I did so, I was able to peer into the room through the window of my ballistic shield and saw the legs of an individual lying on the floor on their right side. I also saw what appeared to be blood on the floor and on the

20

individual's legs. I then saw the legs of the individual move slightly and instantaneously heard the sound of a gunshot coming from the bedroom. I felt a burning sensation in my right thigh and realized I had been shot. I returned fire and immediately retreated backwards. I do not recall how many rounds I discharged and I did not hear the sound of any more gunshots being discharged after I fired.

"I was then assisted out of the residence by other SRT members and transported to Yale New Haven Hospital by American Medical Response for treatment and evaluation."

**Digital Evidence**
**(GRAPHIC WARNING: The following videos contain violent and graphic images.  Viewer discretion is advised.)**

The incident was captured on the body-worn cameras (BWC) of various officers who initially responded to the scene.  The most relevant videos are summarized and linked to below.

### Officer Robert Rappa's BWC video

Officer Rappa's BWC video shows his approach to the exterior door of Apartment #105 with other members of the Task Force. He placed a key into the lock of the door and then proceeded to knock and announce in a loud voice: "Police with a search warrant, police with a search warrant, come to the door." He then unlocked the door, pushed it open and entered the apartment with his firearm unholstered and raised in front of him.

An unclothed woman can be seen standing in the hallway just outside the kitchen and the door to Freeman's bedroom. Contrary to Rappa's command, she moved back toward the bedroom. She then began to comply by moving closer to Rappa and he handed her an article of clothing with which she could cover herself. She accepted the item of clothing but again moved backwards in the direction of the bedroom. Rappa followed her, grabbed her by the wrist and tried to lead her back into the living room.

At this point, Freeman can be seen standing naked just inside the door frame of the bedroom.  The bedroom was dark, the door was partially open, but Freeman's right arm and hand were not visible. Freeman was ordered to show his hands by Rappa. Freeman did not comply. Rappa then proceeded to push open further the bedroom door with his left hand.  As he did so, Freeman can be seen in a screen shot from the video set forth below holding a firearm in his right hand.

21



[Freeman holding firearm]

A single gunshot can then be heard. Rappa yelled out in apparent pain. He immediately sought cover in the adjacent bathroom just as additional gun shots are heard. He quickly reported to his fellow officers that he had been struck by gunfire. Through a small crack between the bathroom door and the door frame, another officer can be seen standing near the bottom of the stairwell, which was diagonally across the hallway. Rappa then inquired with other officers regarding whether the suspect had been hit.

Rappa began to apply a tourniquet to his injured leg. Another officer can be heard ordering Freeman to come out with his hands raised. The sound of officers trying to breach the front door to the apartment can be heard, but they were told by another officer to stop trying to do so. Freeman shouted at the officers to "get the fuck out" of the apartment.

Another officer climbed through a pass-through window from the living room into the kitchen. Rappa communicated with that officer about his plan to run out of the bathroom to safety. A few moments later, Rappa dashed out of the bathroom past the open door to Freeman's bedroom. Just as he made it to the relative safety of the living room, an additional gunshot can be heard. Rappa then exited the apartment and was assisted by other officers as he moved away from the apartment building.

[To view Officer Rappa's BWC video, click here.]

22

**Detective Martin Scanlon's BWC video**

Officer Scanlon's video from his BWC shows that he entered the apartment just behind Officer Rappa. When Rappa approached Freeman, who was just inside the bedroom door, Scanlon stood to the right and rear of Rappa.  After Freeman shot Rappa, Scanlon, with his weapon drawn, immediately sought cover in the stairway diagonally across from the bathroom. He then reached his right hand around the corner of the stairwell wall in the direction of Freeman's bedroom, and three gunshots can be heard.[5]

Scanlon then proceeded up the stairs and interacted with two individuals on the second floor.[6] A loud noise can be heard from downstairs and Scanlon quickly proceeded back down the stairs and provided cover for Rappa who said he was trying to put on a tourniquet. He also issued commands to Freeman to surrender. Officers began to breach the front door to the apartment, but Scanlon commanded them to stop because they would be in the line of fire.

Next, Rappa dashed out of the bathroom and the sound of a gunshot can be heard immediately thereafter.  Shortly thereafter, Scanlon indicated that he believed he knew Freeman's location in the bedroom. He then fired four shots at Freeman's suspected location.

For the next 35 minutes or so, Scanlon continued to train his firearm at the door to Freeman's bedroom while trying to communicate with him.  Freeman, however, did not respond.  At 6:20 a.m., Scanlon sought additional cover up the staircase and additional gunfire can be heard.[7]

At 6:30 a.m., the whirring sound of a drone can be heard. From the staircase, Scanlon continued to train his weapon towards the front door of the apartment. At approximately 6:43 a.m., Scanlon received orders to assist the evacuation of the two individuals on the second floor of the apartment through a second-floor window where other officers were waiting on a ledge.

[To view Officer Scanlon's BWC video, click here and here.]

---

[5] In his written statement, Scanlon stated that he fired three shots at Freeman just after he found cover in the stairwell. Because his right hand was obscured by the stairwell wall, his firearm is also not visible in the video when he fired three shots. Additionally, in his statement, he indicated that he could see Freeman pointing a gun at him as he sought cover. Because his BWC was facing away from the door, it did not capture Freeman at that moment.

[6] The investigation later revealed that these individuals lived in the apartment and were related to the woman who police encountered when they first entered the apartment.

[7] Based on other evidence, this moment appears to be when Sergeant Riehl and Freeman exchanged gunfire.

23

**Sergeant Joseph Riehl's BWC video**

Sergeant Riehl's BWC video shows that he arrived at the scene with other members of the SRT at 6:14 a.m.  Riehl and other officers received a briefing on the layout of the apartment and the location of Freeman.  After a discussion of tactics, including the use of bullet-proof shields, Riehl and other SRT officers entered the living room through the rear apartment door. Riehl held a rifle when he first entered the apartment but then appeared to shoulder the rifle when he was handed a bullet-proof shield.

At 6:20 a.m., Riehl is standing along the wall of the living room near the entrance to the kitchen. His BWC is mostly blocked by the bullet-proof shield, which was held in his left hand. His duty pistol and his right hand are not visible in the video.

Seconds later, a warning yell can be heard, followed immediately by the sound of gunfire. At this time, Riehl was standing near the entrance to the kitchen and at the end of wall that separates the living room from Freeman's bedroom. Riehl exclaimed "I am hit, I am hit." He then began to move backwards, while dropping the shield. He then raised his arms in what appears to be a shooting position, but the video does not show whether he was holding his service weapon. He then fell towards the floor while bracing himself with his left hand.

Finally, Riehl exited the apartment, and officers began to render him medical assistance. He reported that he had been shot in his right leg.

[To view video from Sergeant Riehl 's BWC, click here.]

**Medical Records and Autopsy Report**

Aaron Freeman was pronounced dead at the scene at 7:25 a.m.  On January 30, 2025, an autopsy was performed on Freeman by the Office of the Chief Medical Examiner. The autopsy revealed that Freeman had suffered a total of seven gunshot wounds, including to his chest, abdomen, and both legs.  The cause of death was determined to be gunshot wounds to his torso and extremities. Bullets and bullet fragments were removed from his body and sent to the State Forensic Lab for testing and analysis.

Toxicology tests were performed postmortem on Freeman's blood, urine and vitreous fluid. The tests were negative for the presence of alcohol or illegal substances. The test were positive for tetrahydrocannabinol (THC metabolites, the main active ingredient in cannabis.

24

**Firearm and Ballistic Evidence**

**<u>Firearm Recovered Next to Aaron Freeman</u>**

A black and purple .40 caliber Glock 27 semi-automatic pistol (Serial #SMZ641) was located on the bed in the apartment's downstairs bedroom close to Freeman's body.[8] The firearm was stovepiped[9] with a .40 caliber S&W, manufactured by Federal, live round. Two live rounds of the same caliber and manufacturer were recovered from Freeman's bedroom floor and on top of his bed.

The Glock had an empty, extended magazine (nineteen round capacity), mounted Streamlight TLR-6 light, XGrip and a Glock switch.[10] The firearm was covered in a blood-like substance. It was photographed, documented (Evidence marker #19), seized, and sent to the firearm unit of the State's Forensic Laboratory for further testing and analysis.

Upon forensic examination and test-firing, the firearm was operable but only in semi-automatic mode because the Glock switch device was missing a part and therefore was not functioning properly. Expended shell casings and projectiles were obtained by test-firing the Glock so that they could be compared to expended shell casings collected from the scene and to projectiles collected from the scene and at Freeman's autopsy.

Five spent shell casings recovered from various locations inside Freeman's bedroom were determined to have originated from Freeman's firearm. (Evidence markers #22, 25, 36, 36, and 39). Comparison of the projectile obtained from test-firing Freeman's firearm with projectiles recovered at the scene were inconclusive or excluded the recovered projectiles as having been fired from Freeman's gun.

---

[8] This firearm has been potentially linked to an unsolved 2024 homicide in New Haven but Freeman is not a suspect with respect to that matter.

[9] When an expended shell casing is not properly ejected from the firearm after it is fired, the weapon is sometimes referred to as "stovepiped." The same term is often used to describe a live round that is jammed in the firearm's slide.  The term is derived from the appearance of the weapon because the jammed expended shell casing or live round often sits upright in the ejection port like a chimney or "stovepipe." A semi-automatic firearm that is stovepiped cannot be fired unless and until the spent shell casing or the live round is cleared from the weapon because it prevents the live round or an additional round from entering the weapon's firing chamber.

[10] A Glock switch, sometimes referred to as a "full-auto sear," is a mechanical device that can be attached to a semi-automatic pistol, which typically fires one round per trigger pull, to a fully automatic weapon, which continuously fires rounds with one pull and hold of the trigger. A Glock switch is illegal under federal law. 18 U.S.C. §922(o); 27 C.F.R. 479.105.

**Officers' Firearms**

The firearms of both officers who discharged their handguns were seized and submitted for forensic examination.

Detective Scanlon was armed with a FN model 509 9mm Luger semi-automatic pistol (Serial #GKS0282020). The firearm had a SIG optic sight and a Streamlight flashlight. It was seized from him along with a seventeen round capacity magazine. There were ten rounds in the magazine, and one round was found in the chamber of the pistol. All were 9mm Luger rounds manufactured by Speer. The round count supports a conclusion that Detective Scanlon fired seven rounds during the incident.

Scanlon's firearm was operable when test fired. Expended shell casings obtained by test-firing the weapon were microscopically compared to shell casings recovered from the scene of the incident. This testing determined that expended shell casings recovered from an area around the bottom of the stairwell at the scene (Evidence marker ##s 3, 5, 6, 7, 8, 45, and 46) originated from Scanlon's firearm. In sum, this evidence strongly supports the conclusion that Scanlon fired seven rounds.

A projectile (bullet) also was obtained by test-firing Scanlon's firearm. Projectiles and bullet fragments seized from the scene and from Freeman's body during his autopsy were microscopically compared to the projectile obtained from the test-fire of the gun. Projectiles found at the bottom of the stairwell (Evidence marker #4 and #52), lodged in the floor next to Freeman's body in the bedroom (Evidence marker #15), laying on top of Freeman's bed (Evidence marker #29), and recovered from Freeman's right hip during the autopsy were determined to have been fired from Detective Scanlon's weapon. Comparison of other projectiles and fragments to the test-fired projectile from Scanlon's weapon were inconclusive or excluded as having been fired by his pistol.

Sergeant Riehl was armed with a Glock 45 semi-automatic pistol (Serial #BYHZ690) with a Streamlight TLR-1 flashlight, and Steiner Optic sight, and a Glock seventeen round capacity magazine. There were thirteen live rounds in the magazine and one live round in the chamber when the firearm was seized.  Two additional seventeen-round capacity magazines were also seized from his duty belt.  Both magazines contained seventeen live rounds.  All rounds were 9mm Luger and manufactured by Winchester. The total round count suggests that Sergeant Riehl fired four rounds.

Riehl's firearm was operable when test fired. Expended shell casings obtained by test-firing the weapon were microscopically compared to shell casings recovered from the floor of the hallway and bathroom at the scene. This testing determined that four shell casings recovered from the scene (Evidence marker ##s 9, 10, 12, and 44) originated from Riehl's firearm. In sum, this evidence strongly supports the conclusion that Riehl fired four rounds.

26

A projectile from Riehl's firearm was obtained by test-firing the pistol. Projectiles and bullet fragments seized from the scene and from Freeman's body during his autopsy were microscopically compared to the projectile obtained from the test-fire of the weapon. Projectiles recovered from Freeman's thoracic spine and right shoulder were determined to have been fired from Sergeant Riehl's firearm. Comparison of other projectiles and fragments to the test-fired projectile from Riehl's weapon were inconclusive or excluded from having been fired by his pistol.

**FINDINGS**

Based on this investigation, I find the following material facts:

1. On January 29, 2025, law enforcement officers assigned to a DEA Task Force went to Apartment #105 at 719 Grand Avenue in New Haven to execute a search warrant for the premises and an arrest warrant for Aaron Freeman.
2. After knocking and announcing their presence at 5:36 a.m., they entered the apartment and encountered Freeman standing just inside a bedroom on the first floor, with the door partially closed. Officer Rappa of the West Haven Police Department ordered him to show his hands. Detective Martin Scanlon of the Waterbury Police Department, a member of the Task Force, also ordered him to come out of the bedroom with his hands up.
3. Freeman was armed with a Glock semi-automatic pistol.
4. Instead of complying with the officer, Freeman fired several rounds at Officer Robert Rappa of the West Haven Police Department. One bullet struck Rappa in the calf.
5. Rappa sought cover in a nearby bathroom. He did not fire any rounds during the incident.
6. Scanlon was standing next to Rappa when Freeman shot Rappa. Scanlon sought cover in a nearby stairwell and then fired three rounds at Freeman.
7. A few minutes later, Freeman fired at least one additional round at Rappa when he tried to escape the bathroom so that he could receive medical treatment for the gunshot wound to the calf.
8. After confirming with fellow officers that it had been Freeman who had just fired on Rappa, Scanlon saw Freeman extend a gun out through the doorway from a position of cover.  Scanlon then fired an additional four rounds at Freeman.
9. At least one of the seven total rounds fired by Scanlon struck Freeman.
10. For the next thirty-five minutes or so, Task Force Members attempted to communicate with Freeman to persuade him to surrender peacefully. Freeman did not respond.

27

11. Because Officer Scanlon remained trapped inside the apartment, members of the West Haven SRT, including Sergeant Joseph Riehl, entered the apartment at 6:19 a.m. As Riehl and other officers approached Freeman's bedroom while holding bullet-proof shields, Freeman fired additional rounds at the officers through the wall.

12. One of the rounds fired by Freeman struck Riehl in the right thigh.

13. Riehl returned fired at Freeman with his duty pistol.  At least one of these rounds struck Freeman.

14. After retreating to safety, members of the SRT attempted again to communicate with Freeman and to convince him to surrender with no additional violence.  When Freeman did not respond, a drone was deployed into the apartment and Freeman's bedroom to ascertain his condition. Freeman appeared to be deceased.

15. Officers subsequently entered Freeman's bedroom and confirmed that he was deceased.

16. Freeman died of gunshot wounds to his torso and extremities.

**LAW**

The use of force by a police officer is governed by General Statutes §53a-22.  The version of that statute in effect on January 29, 2025, in relevant part, provides:

(b) [A] peace officer . . .  is justified in using physical force upon another person when and to the extent that he or she reasonably believes such use to be necessary to:  (1) Effect an arrest or prevent the escape from custody of a person whom he or she reasonably believes to have committed an offense, unless he or she knows that the arrest or custody is unauthorized; or (2) defend himself or herself or a third person from the use or imminent use of physical force while effecting or attempting to effect an arrest or while preventing or attempting to prevent an escape.

(c) (1) . . . a peace officer . . . is justified in using *deadly physical force* upon another person for the purposes specified in subsection (b) of this section only when his or her actions are objectively reasonable under the circumstances, and:

(A) He or she reasonably believes such to be necessary to defend himself or herself or a third person from the use or imminent use of deadly physical force; or

(B)  He or she (i) has reasonably determined that there are no available reasonable alternatives to the use of deadly physical force, (ii) reasonably believes that the force employed creates no unreasonable risk of injury to a third party, and (iii) reasonably believes such force is necessary to (I) effect an arrest of a person whom he or she reasonably believes has committed or

28

attempted to commit a felony that involved the infliction of serious physical injury, and if, where feasible, he or she has given warning of his or her intent to use deadly force . . . ." (Emphasis added).

The statute further provides:

"For the purpose of evaluating whether the actions of a peace officer . . . are reasonable under subdivision (1) of this subsection, factors to be considered include, but are not limited to, whether (A) the person upon whom deadly force was used possessed or appeared to possess a deadly weapon, (B) the peace officer . . . engaged in reasonable de-escalation measures prior to using deadly physical force, and (C) any unreasonable conduct of the peace officer . . . led to an increased risk of an occurrence of the situation that precipitated the use of force." §53a-22(c)(2).

Accordingly, a police officer is justified in using deadly physical force upon another person when the officer reasonably believes such force to be necessary to defend the officer or a third person from the use or imminent use of deadly physical force. "Deadly physical force" means "physical force that can be reasonably expected to cause death or serious physical injury." General Statutes § 53a-3(5). "Serious physical injury" means "physical injury which creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ." General Statutes §53a-3(4).

The reasonableness of a police officer's belief under § 53a-22 is evaluated pursuant to a subjective-objective formulation. *State* v. *Smith*, 73 Conn. App. 173, 185, 807 A.2d 500, cert. denied 262 Conn. 923, 812 A.2d 865 (2002). Under this test, the first question is whether, on the basis of all of the evidence, the police officer in fact honestly believed that deadly force was necessary to defend himself/herself or a third person. Id. If it is determined that the police officer honestly believed that deadly force was necessary, the second part of the test asks whether the police officer's honest belief was reasonable from the perspective of a reasonable police officer in the officer's circumstances. Id. at 198.

The United States Supreme Court has explained this test as follows: "The reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on scene rather than with the 20/20 vision of hindsight. . . . [T]he calculus of reasonableness must embody allowance of the fact that police officers are often forced to make split-second decisions—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham* v. *Connor*, 490 U.S. 386, 396-97, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).

29

**ANALYSIS**

There is no dispute in this case that, by discharging their firearms at Aaron Freeman, Detective Scanlon and Sergeant Riehl both used deadly physical force against him.  Accordingly, the critical inquiry in this case is whether each of the officer's use of deadly physical force was objectively reasonable and therefore legally justified under the totality of the circumstances.

Under Connecticut law as applicable here, a determination as to whether a police officer's use of deadly force was legally justified requires, in part, consideration of four questions:

1.  Did the officer, as a matter of fact, actually – that is honestly and sincerely – believe that he/she or a third person was facing either the actual or imminent use of deadly force when the officer used deadly force?

2.  Was that actual belief reasonable in the sense that a reasonable police officer in the officer's circumstances at the time of the officer's actions, viewing those circumstances from the officer's point of view, would have shared that belief?

3.  Did the officer, as a matter of fact, actually – that is honestly and sincerely – believe that the use of deadly force was necessary to defend himself/herself or a third person from such threat?

4.  Was that actual belief reasonable, in the sense that a reasonable police officer in the officer's circumstances at the time of the officer's actions, viewing those circumstances from the officer's point of view, would share the belief that deadly force was necessary?

Additionally, the reasonableness of the officer's conduct also turns on whether (1) the other person possessed a deadly weapon (or appeared to), (2) the officer attempted reasonable de-escalation measures, and (3) the situation was not precipitated by the officer's own conduct.

There can be no serious debate that both officers' use of deadly physical force was legally justified under this test. First, both officers honestly and subjectively believed that during the incident Freeman had used and would continue to use deadly physical force against themselves and/or their fellow officers.  Both officers honestly believed that Freeman was armed with a firearm and in fact discharged it as they attempted to effectuate his arrest and serve the search warrant.

Second, both officers' belief that Freeman had used or was about to use again imminent deadly force against them or their fellow officers was objectively reasonable. Any reasonable police officer in the same circumstances would have shared that view because they experienced Freeman discharging a firearm at them and/or another officer. Both knew that Officer Rappa had already been shot in the calf.

30

Third, both officers honestly and subjectively believed that it was necessary to defend themselves or their fellow officers by using deadly physical force. At the time that they fired rounds at Freeman, they knew he had a firearm and that he already shot another officer.

Finally, I conclude that a reasonable police officer in the same circumstances confronting both officers, when viewing those circumstances from the officers' point of view, would share their belief that deadly physical force was required under the circumstances.

The officers' need to use deadly physical force was not precipitated by any of their individual actions. The Task Force officers had a general duty to attempt to serve a search warrant for the premises and arrest warrant for Freeman on felony charges. Indeed, there is nothing in the officers' specific conduct or tactics here, beyond the inherent risks related to the service of a search warrant and a felony arrest warrant, that precipitated the need to use deadly physical force. Moreover, Officer Rappa did not have an opportunity to utilize substantial de-escalation measures as he was immediately fired upon by Freeman. Finally, Task Force members spent a significant period of time attempting to convince Freeman to surrender before Sergeant Riehl and members of the SRT attempted to approach the bedroom at 6:20 a.m.

In the simplest terms, Freeman fired repeatedly at Task Force and SRT officers suddenly and without provocation. The necessity of the use of deadly physical force by Scanlon and Riehl arose from the violent and life-threatening conduct of Freeman. Fortunately, Officer Rappa and Sergeant Riehl have recovered from their injuries.

## CONCLUSION

In sum, I conclude that the use of deadly physical force by Detective Scanlon and Sergeant Riehl was objectively reasonable in response to the use of deadly physical force used by Aaron Freeman in this incident. Accordingly, I find that their actions were legally justified. Accordingly, I and my office will take no further action with respect to this matter.

December 19, 2025

ELIOT D. PRESCOTT
INSPECTOR GENERAL

31

# Attachment C

| | |
|---|---|
| **From:** | P. J. O"Brien |
| **To:** | Prescott, Eliot |
| **Cc:** | Cain, Racheal; Bahgat, Dena |
| **Subject:** | RE: Introductions and MOU |
| **Date:** | Friday, February 20, 2026 11:32:32 AM |

> EXTERNAL EMAIL: This email originated from outside of the organization. Do not click any links or open any attachments unless you trust the sender and know the content is safe.

Eliot,

Just wanted to thank yourself and Racheal for swinging by yesterday.

I hope we can continue to dialog such that we can come to agreement on we preserve the equities of each of our organizations.

Please reach out with any follow up questions and I will circle back with my Inspection Division to clear up some of the questions regarding TFO involved incidents.

Thanks,
Pat

**From:** Prescott, Eliot <Eliot.Prescott@ct.gov>
**Sent:** Wednesday, February 11, 2026 3:06 PM
**To:** O'Brien, P. J. (NH) (FBI) <pjobrien3@fbi.gov>
**Cc:** Cain, Racheal <Racheal.Cain@ct.gov>; Bahgat, Dena <Dena.Bahgat@ct.gov>
**Subject:** [EXTERNAL EMAIL] - Re: Introductions and MOU

Thank you for your thoughtful and encouraging email!! Yes, I would love to meet and further our discussions. I am copying Racheal on this email so she can reach out to you and find a mutually convenient date and time.

Thank you, again.

Eliot

Get Outlook for iOS

**From:** P. J. O'Brien <pjobrien3@fbi.gov>
**Sent:** Wednesday, February 11, 2026 3:00:43 PM
**To:** Prescott, Eliot <Eliot.Prescott@ct.gov>

**Subject:** RE: Introductions and MOU

EXTERNAL EMAIL: This email originated from outside of the organization. Do not click any links or open any attachments unless you trust the sender and know the content is safe.

Elliot,

I was at this morning's LEC meeting and it was great to have the received the general introduction to yourself and Racheal.  I was hoping to catch you at the end of the meeting but did not want to excuse myself while Pat was speaking to catch you before you had to depart.

Unfortunately, I believe both our offices have been overcome by events trying to schedule a meeting to get together and ensure the long-standing cooperation between our offices continues.

Please let me know your availability.  I would love to get together to discuss our respective responsibilities/processes and continue the work started by Judge Devlin and SAC Fuller.

Look forward to hearing from you,
Pat

Special Agent in Charge P. J. "Pat" O'Brien
FBI New Haven
203-503-5001 (O)
347-436-3614 (C)
pjobrien3@fbi.gov

---

**From:** Shukla, Anish (NH) (FBI) <ashukla@fbi.gov>
**Sent:** Monday, July 7, 2025 10:17 AM
**To:** Prescott, Eliot <Eliot.Prescott@ct.gov>
**Cc:** Viadero, James <James.Viadero@ct.gov>; O'Brien, P. J. (NH) (FBI) <pjobrien3@fbi.gov>; Costanza, Anthony J. (NH) (FBI) <ajcostanza@fbi.gov>
**Subject:** RE: Introductions and MOU

Good Morning, Judge,

It is a pleasure to connect with you and thank you for your email. We look forward to continuing with you the partnership we maintained with Judge Devlin and Jim.

I would like to introduce to you Special Agent in Charge P.J. "Pat" O'Brien who is the head of

FBI New Haven (and my immediate supervisor, I serve as his ASAC). I will defer to Pat and you on the best time and place to meet soon.

Very Respectfully,
Anish

Anish Shukla
FBI New Haven
Assistant Special Agent in Charge
National Security Branch
(203) 503-5009 (office)
(203) 823-2205 (cell)

---

**From:** Prescott, Eliot <Eliot.Prescott@ct.gov>
**Sent:** Monday, July 7, 2025 9:21 AM
**To:** Shukla, Anish (NH) (FBI) <ashukla@fbi.gov>
**Cc:** Viadero, James <James.Viadero@ct.gov>; O'Brien, P. J. (NH) (FBI) <pjobrien3@fbi.gov>; Costanza, Anthony J. (NH) (FBI) <ajcostanza@fbi.gov>
**Subject:** [EXTERNAL EMAIL] - Introductions and MOU

Good morning, Anish.

I wanted to reach out to you as the new Inspector General for the State of Connecticut.  I know Bob Devlin had previously corresponded with you and other members of your office and that you have been a helpful resource to the OIG.  I am also aware that steps had been taken to negotiate an MOU between agencies.  Perhaps, we should schedule an meeting in the near future.

I hope you enjoyed the holiday weekend and I look forward to hearing from you soon.

Eliot D. Prescott
Deputy Chief State's Attorney – Inspector General
Office of the Inspector General
P.O.Box 460Cheshire, CT 06410
eliot.prescott@ct.gov

# Attachment D



# State of Connecticut

## OFFICE OF
## INSPECTOR GENERAL

ELIOT D. PRESCOTT
INSPECTOR GENERAL

P.O. BOX 460
CHESHIRE, CONNECTICUT 06410
ELIOT.PRESCOTT@CT.GOV
Telephone: (203) 806-1595

February 6, 2026

Over the past few months, we all have seen a rise nationally in the use of deadly physical force incidents involving federal law enforcement officers, particularly, U.S. Immigration and Customs Enforcement (ICE) and Border Patrol agents. In the past, in Connecticut, the Office of Inspector General (OIG) has conducted investigations into the use of deadly physical force by federal law enforcement officers in cooperation with our federal partners. As we have seen recently in Minnesota, cooperation from federal law enforcement agencies with these investigations is not necessarily assured.

First and foremost, it is the Inspector General's position that a federal agency cannot lawfully prohibit Connecticut's state or local law enforcement agencies from investigating a deadly use-of-force incident within our State. Indeed, any alleged violation of Connecticut's criminal laws can and will be investigated by the appropriate law enforcement agencies of this State.

Although we are unaware of any increased immigration operations in Connecticut, the OIG has been working with both the Governor's Office, the Division of Criminal Justice, and Connecticut State Police to provide clarification and guidance on how the OIG will respond in the event a federal law enforcement officer, including an ICE and/or Border Patrol agent, is involved in a deadly use of force incident.

Due to the increased potential for civil unrest surrounding immigration enforcement activities, local law enforcement will likely need to play a critical role in ensuring crowd control and securing relevant evidence until personnel from the OIG arrive on scene. It is for this purpose that we provide the following guidance to all Chiefs of Police and Executive Officers.

> If there are protests or civil unrest of more than minimal size in your jurisdiction due to an immigration operation, please notify our office even if no use of deadly physical force has yet occurred. This advance notification will assist the OIG in responding promptly to an incident scene if the need arises.

AN EQUAL OPPORTUNITY/AFFIRMATIVE ACTION EMPLOYER

Page 2

In the event there is a deadly use of force incident in your jurisdiction involving any federal law enforcement officers, it is imperative that you immediately contact the OIG's office and the State's Attorney fo your judicial district.

Please secure the immediate scene and preserve all evidence until personnel from the OIG arrive at the incident scene.

Please photograph or otherwise document the scene and the relevant participants upon arrival.

If you are unable to secure the scene due to civil unrest, please safely attempt to collect any items of evidence that may be destroyed, preferably after photographing the item and its location at the scene. Once the scene has been secured, any evidence collected will then be turned over to the State Police Major Crime detectives with accompanying documentation.

In most cases, the federal law enforcement officer involved will immediately leave the scene with his/her duty weapon. Do not use force on any officer to secure evidence or identify participants.

Local law enforcement agencies will be asked to maintain a scene perimeter so that Major Crimes Detectives or Inspectors can process the scene safely. If local law enforcement agencies are unable to adequately secure the primary scene, Connecticut State Police will assist.

I realize that most of the above guidance is consistent with existing best practices for securing a potential crime scene. My office does not anticipate any incidents like those seen in other parts of the country, but I hope this guidance will reduce any conflict if one occurs. If you have any additional questions, please do not hesitate to contact me.

Best,

Racheal Cain
Chief Inspector
Office of Inspector General
203-627-1586
Racheal.cain@ct.gov