# Exhibit 4

*Declaration of Robert J. Devlin, Jr. with Attachments A, B, and C*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA : 3:26-CV-00758-SVN
   *Plaintiff* :
    :
v. :
    :
STATE OF CONNECTICUT, ET AL. :
   *Defendants.* : JULY 2, 2026

### DECLARATION OF ROBERT J. DEVLIN JR.

I, ROBERT J. DEVLIN, JR., DO DECLARE (OR CERTIFY, VERIFY, OR STATE) UNDER PENALTY OF PERJURY THAT THE FOLLOWING IS TRUE AND CORRECT AND IS BASED UPON MY PERSONAL KNOWLEDGE:

### *Introduction*

1.  I am over the age of eighteen years old and believe in the obligations of an oath.

2.  I am an attorney licensed to practice law in the State of Connecticut, and I have been practicing law in Connecticut for over fifty years.

3.  I am currently employed by the State of Connecticut Division of Criminal Justice ("DCJ") in the Office of the Inspector General ("OIG") as a Temporary Worker Retiree. In this role, I assist Inspector General Eliot D. Prescott in preparing reports regarding OIG cases.

4.  Prior to that, I was employed by the DCJ, and I served as a Deputy Chief State's Attorney, as Inspector General for the State of Connecticut. I served as the first Inspector General for the State of Connecticut, following the creation of the position and the OIG by statute in 2020. *See* Conn. Gen. Stat. § 51-277e. I was

appointed as the Inspector General on September 27, 2021, and served in that role until July 1, 2025.

5. Prior to my role as the Inspector General, I held various legal positions in Connecticut. I served as a public defender (1979), a state prosecutor (1980-1987), and a federal prosecutor in the U.S. Attorney's Office in Connecticut (1987-1992). In 1992, Governor Weicker appointed me to serve as a Judge of the Connecticut Superior Court, and from 2010 to 2017 I served as the Chief Administrative Judge for the Criminal Division of the Connecticut Superior Court. In 2019, Governor Lamont appointed me to the Connecticut Appellate Court, where I served as a Judge until 2021.

### My Role and Duties as Inspector General

6. The Connecticut General Assembly established the OIG through Public Act No. 20-1, which amended Conn. Gen. Stat. § 51-277e, and became effective July 31, 2021.

7. Although I had various duties as the Inspector General, as relevant here, I was required to investigate and determine whether use of physical force occurring in Connecticut was justified whenever 1.) a peace officer used non-deadly physical force upon another person, and the person died as a result, or 2.) when a peace officer used deadly physical force. *See* Conn. Gen. Stat. § 51-277a.

8. Before the creation of the OIG, Conn. Gen. Stat. § 51-277a vested investigatory, reporting, and prosecutorial authority for use of force involving peace officers in the Division of Criminal Justice generally. It required the Chief State's Attorney to designate a prosecutorial official from a judicial district other than that in

which the use of force incident occurred or appoint a special assistant or special deputy assistant state's attorney to conduct the investigation or prosecution.

9. Conn. Gen. Stat. § 51-277a has existed in some form since 1988, and under all versions of the statute, Connecticut prosecutorial authorities had the authority to investigate and prosecute use of force incidents by peace officers occurring in Connecticut.

10. Conn. Gen. Stat. § 51-277a has always included a determination of whether a use of force by a peace officer was appropriate or met the "justified in" standard set forth in Conn. Gen. Stat. § 53a-22. While Section 53a-22 is a criminal statutory defense for justifiable use of force, it serves as an important factor in exercise of prosecutorial discretion under Section 51-277a. Some subparts of Section 53a-22 apply solely to peace officers, and others apply to members of the public who use force because they were directed to do so by a peace officer. Section 53a-22 is not a charging statute, it is a defense to a criminal charge such as murder, manslaughter, or assault.

11. Federal officials have long been considered "peace officers" in Connecticut. During my tenure as Inspector General, "peace officer" was defined by statute (Conn. Gen. Stat. § 53a-3(9)), to include special agents of the federal government authorized to enforce Title 21 of the United States Code, including agents or officials of the Federal Bureau of Investigation ("FBI"), the Bureau of Alcohol, Tobacco, and Firearms ("ATF"), the Drug Enforcement Agency ("DEA"), and the

United States Marshal Service ("USMS"). This definition of "peace officer" had been in place since 1991.

### Cooperation Between the Federal Government and the OIG

12. During my tenure as Inspector General, there was consistent cooperation and collaboration between the federal government and the OIG regarding use of force incidents in Connecticut that involved federal agents or a federal Task Force Officer ("TFO") (including state and local officers designated as TFOs).

13. In January and February of 2025, I met with representatives from various federal law enforcement agencies, including the leadership of the Connecticut offices of the FBI, DEA, USMS, and ATF, to discuss what would occur if a federal official or TFO were involved in a use of force incident in Connecticut. Specifically, at the meeting with federal law enforcement agencies on February 13, 2025, I met with: ATF – Special Agent in Charge ("SAC") Jim Ferguson, Scott Reardon, and Chris Martin; DEA – SAC David Lanzoni, Tara Hurley, and Steve Belleau; USMS – Lawrence Bobnick and John Iverson; FBI – Acting SAC Anish Shukla, Steven Shapiro, and Tony Constanza.

14. Leadership from these federal agencies acknowledged the OIG's statutory authority to investigate use of force incidents in Connecticut involving federal agents or TFOs. None of these agencies' leadership suggested that they would exclude the OIG from a scene of an incident involving a use of force by a federal officer. For many of the federal agencies, they had no objection to the OIG handling the investigation. The FBI expressed a willingness to jointly collaborate with the OIG in investigations. And certain other agencies, such as

the DEA and USMS, generally expressed that the OIG's involvement in incidents involving their officers would be useful because they were not as well-equipped as the OIG to conduct these types of investigations in the field.

15. To that point, the OIG and the State of Connecticut were well set up to investigate any incidents involving use of force by peace officers, including securing the scene, collecting evidence, and interviewing witnesses. In addition to the OIG, the Connecticut State Police ("CSP") Major Crimes Squads would respond to a scene. Because the CSP Major Crimes Squads regularly secure scenes, collect and preserve sensitive evidence, and conduct comprehensive investigations into major crimes, they are well suited to respond to and investigate use of force incidents. In my experience in the criminal justice system, the CSP Major Crimes Squads are the most effective unit for securing and processing a scene and collecting relevant information and evidence.

16. CSP are familiar with state and local considerations that federal law enforcement may not be. For example, CSP are more likely to understand traffic needs or other operational considerations requiring different approaches to collecting and processing evidence. CSP are also able to respond to a scene much quicker than federal law enforcement and usually are on the scene within hours of the incident occurring. The ability to quickly respond to an incident, secure a scene, and begin collecting evidence is vital to an effective investigation.

17. While the FBI could investigate a use of force incident involving one of their agents in Connecticut, they would not be able access and respond to the scene

and conduct an investigation as quickly as the OIG and the CPS Major Crimes Squad, as they would have to travel from out-of-state and might not be able to arrive at the scene until many hours or days after the incident. Such delay can jeopardize an investigation, including the potential loss of valuable evidence or witnesses, and can also lead to burdens on the local community if a scene or area is shut down for an extended period of time for an investigation.

18. Based on my meetings with these federal agencies, it was my perception that they agreed to the OIG's assistance in investigating use of force incidents due to the State's resources and ability to quickly respond to an incident, secure the scene, and collect relevant evidence. I felt that there was a clear understanding that the federal law enforcement agencies and the OIG would collaborate and work cooperatively with one another if a use of force incident occurred in Connecticut and involved a federal agent or TFO.

19. In fact, my office and the FBI were working towards an agreed upon Memorandum of Understanding ("MOU") to delineate how an investigation would proceed in a use of force incident involving an FBI agent in Connecticut.

20. Beginning in January 2025, and continuing through April 2025, I had conversations with the FBI SAC (first, Robert Fuller and then, Anish Shuckla), and we exchanged several iterations of the proposed MOU. During these discussions, the FBI acknowledged the OIG's statutory role and duties and the different responsibilities that each side had if an incident occurred in Connecticut. In fact, we got so far as agreeing to nearly all the substantive terms

concerning cooperation between the OIG and the FBI; however, there were a few outstanding issues that still needed to be addressed. While I believed that we were close to having a final agreement, the MOU was never finalized and signed. A true and accurate copy of the latest draft version of the MOU is attached hereto as Attachment A.

21. The primary source of disagreement concerning the MOU was who would control the media releases about these incidents. At no point during these discussions was the FBI's view that the OIG should be completely excluded from a scene or prevented from investigating a use of force incident in Connecticut. I believe the MOU would have been signed and finalized if we had more time to do so.

22. During my tenure, the OIG conducted two investigations into use of force incidents involving federal agents and/or TFOs.

23. In the first investigation, members of a joint state and federal task force were involved in a non-deadly shooting of a 31-year-old male in Bridgeport on June 15, 2021. During this shooting, there were four FBI agents involved and present, as well as various local law enforcement officials serving as TFOs. Despite the involvement of FBI agents and TFOs, the OIG investigated this incident without issue and without interference or objection from the FBI. Among other things, the CSP took statements from the FBI agents involved, which I referenced in my final report. A true and accurate copy of that final report is attached hereto as Attachment B. Ultimately, based upon my investigation, I determined the use of force by the TFO was reasonable and justified under Connecticut law, and

therefore, no criminal charges were brought. At no point during this investigation was my access to the scene or to evidence blocked, nor did the FBI voice objection to my office investigating this incident to determine if criminal charges should be brought.

24. In the second investigation, a Deputy United States Marshal ("DUSM") discharged his firearm five times at a truck driven by a suspect attempting to flee arrest in New Haven on January 13, 2022. Even though a member of the USMS was involved in the shooting, the OIG investigated this incident without interference or objection from the USMS. This included taking the lead in processing the scene, collecting evidence, and interviewing witnesses. The DUSM involved in the shooting also provided me with a statement, which I referenced in my final report. A true and accurate copy of that final report is attached hereto as Attachment C. Ultimately, based upon my investigation into this incident, I determined that the use of force by the DUSM was reasonable and justified under Connecticut law, and therefore, no criminal charges were brought. At no point during this investigation was my access to the scene or to evidence blocked, nor did the federal government voice objection to the OIG investigating this incident to determine if criminal charges should be brought.

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

I, Robert J. Devlin, Jr., declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct to the best of my belief and based upon my personal knowledge.  Executed on July 2, 2026.

Robert J. Devlin, Jr., *Esq.*,

# Attachment A

**MEMORANDUM OF UNDERSTANDING
BETWEEN
THE FEDERAL BUREAU OF INVESTIGATIONS
AND
THE CONNECTICUT DIVISION OF CRIMINAL JUSTICE
AND THE OFFICE OF INSPECTOR GENERAL**

## PARTIES

1.  This Memorandum of Understanding (MOU) is entered into by and between the Federal Bureau of Investigation (FBI), and the Connecticut Division of Criminal Justice (DCJ) AND Connecticut Office of Inspector General (OIG), hereinafter referred to as the Parties ("Parties").

## AUTHORITIES

2.  Authority for the FBI to enter into this agreement can be found at Title 28, United States Code (U.S.C.), Section (§) 533; 42 U.S.C. § 3771; Title 28, Code of Federal Regulations (C.F.R.), § 0.85; and applicable United States Attorney General's Guidelines.
3.  The Chief States's Attorney is authorized to "coordinate the activities of the division with those of such other…federal…agencies as are concerned with the administration of criminal justice. C.G.S. § 51-279(a)(9)
4.  The OIG is authorized under C.G.S. § 51-277(a)(3) to request the assistance of an appropriate law enforcement agency with their investigation into the use of physical force resulting in death by peace officers, pursuant to C.G.S. § 51-277(a)(1).

## PURPOSE

5.  The purpose of this MOU is to establish a general working relationship between the OIG and Federal Bureau of Investigation (FBI), as a means of reinforcing interagency coordination and responsibility concerning Use of Force investigations involving FBI Special Agents (SAs) and Task Force Officers (TFOs). This MOU is not intended, and should not be construed, to create any right or benefit, substantive or procedural, enforceable at law or otherwise by any third party against the parties, the United States, or the officers, employees, agents, or other associated personnel thereof.

## RESPONSIBILITIES

6.  The OIG is an office within the DCJ and is charged with investigating Use of Force incidents involving Connecticut peace officers.

7. Under C.G.S. § 51-277(a)(1) "Whenever a peace officer, in the performance of such officer's duties, uses physical force upon another person and such person dies as a result thereof or uses deadly force, as defined in section 53a-3, upon another person, the Inspector General shall investigate and determine whether the use of physical force by the peace officer was justifiable under 53a-22."

8. Under C.G.S. § 51-277(a)(3) "The Inspector General shall request the appropriate law enforcement agency to provide such assistance as is necessary to determine the circumstances of an incident investigated under subdivision (1) …of this subsection."

9. The Federal Bureau of Investigation (FBI) is tasked with investigating all Use of Force incidents, including shooting incidents, involving Special Agents and TFOs of the FBI. The FBI has a two-fold interest in conducting its own investigation. Under Title 18 U.S.C. § 111, the FBI is the primary federal agency tasked with investigating actual or attempted assaults of officers and employees of the United States. Additionally, the FBI's Office of Inspections (INSD) deploys a Shooting Incident Review Team (SIRT) to conduct an administrative inquiry for the purposes of assessing and documenting the Use of Force incident and to provide the DOJ Civil Rights Division sufficient information to make a prosecutorial determination and prepare a report for the Shooting Incident Review Group (SIRG).  The SIRG is ultimately responsible for determining whether the use of force was justified under federal law. The OIG has the statutory responsibility to determine whether a Connecticut peace officer's use of deadly force was justifiable under Connecticut law.

10. Upon arrival, the SIRT will brief and coordinate with partner agencies, including but not limited to the OIG and police department heads from any task force officers' parent agency. During this briefing SIRT will provide an overview of their procedures and the expected timeline. At the conclusion of their on-site review, the FBI will prepare a single shooting incident investigation report, which will be made available for review by partner agencies. The incident will be treated as a potential criminal investigation until prosecutorial declinations are received from DOJ and any relevant local prosecutorial entity.

11. Pursuant to C.G.S. § 51-277a, the OIG has the statutory responsibility to prepare a report that contains the OIG's determination as to whether the use of deadly force was justified under C.G.S. 53a-22. That statute further provides that the report be made available to the public.

12. If FBI TFOs or other state or local law enforcement are involved in a Use of Force incident or were witnesses, the FBI collaborates with local or state authorities in the interviews of those personnel. The FBI's Evidence Response Team (ERT), in collaboration with the FBI Laboratory, will process the scene. FBI

ERT will further collaborate with any Major Crimes Squad assigned to the investigation.

13. FBI firearms and associated evidence generally remains in the custody of the FBI and are processed by the FBI Laboratory Division (LD). The results of any examination conducted by the FBI LD will be shared with the OIG as appropriate. If additional testing is requested by OIG, these examinations will be conducted by the FBI LD.

## INFORMATION SHARING

14. The Parties acknowledge that this MOU may provide OIG with access to information about U.S. persons which is protected by the Privacy Act of 1974 and/or Executive Order 12333. The Parties expressly agree that all such information will be handled lawfully pursuant to the provisions thereof.

15. Each Party that discloses personally identifiable information (PII) is responsible for making reasonable efforts to ensure that the information disclosed is accurate, complete, timely, and relevant.

16. Each Party is responsible for ensuring that information it discloses was not knowingly obtained or maintained in violation of any law or policy applicable to the disclosing Party, and that information is only made available to the receiving Party as may be permitted by laws, regulations, policies, or procedures applicable to the disclosing Party.

17. Each Party will immediately report to the other Party each instance in which data received from the other Party is used, disclosed, or accessed in an unauthorized manner (including any data losses or breaches).

## FUNDING

18. This MOU is not an obligation or commitment of funds, nor a basis for transfer of funds, but rather is a basic statement of the understanding between the parties hereto of the tasks and methods for performing the tasks described herein. Unless otherwise agreed in writing, each party shall bear its own costs in relation to this MOU.  Expenditures by each party will be subject to its budgetary processes and to the availability of funds and resources pursuant to applicable laws, regulations, and policies.  The parties expressly acknowledge that the above language in no way implies that Congress will appropriate funds for such expenditures.

## MEDIA RELEASES

19. All media releases and statements will be handled according to FBI and participating agency guidelines. The OIG reserves the right to issue its own media releases and will provide an advance copy of such release to the FBI.

20. Press releases will conform to DOJ Guidelines regarding press releases. No release will be issued without FBI final approval.

21. The FBI acknowledges that, under C. G. S. § 51-277a(a)(4), the Inspector General is mandated to complete a preliminary status report which includes: "(A) the name of the deceased person, (B) the gender, race, ethnicity and age of the deceased person, (C) the date, time and location of the injury causing such death, (D) the law enforcement agency involved, (E) the status on the toxicology report, if available, and (F) the death certification, if available." The FBI understands that a copy of this report must be submitted to the General Assembly within five business days "after the cause of death is available."

22. The FBI further understands that, under C. G. S. § 51-277a(b), upon the conclusion of an OIG Use of Force investigation, the Inspector General must file a report to the Chief State's Attorney which must include: (1) The circumstances of the incident, (2) a determination of whether the use of physical force by the peace officer was justifiable under section 53a-22, and (3) any future action to be taken by OIG as a result of the incident. The FBI understands that this report must be made available to the public.

## DURATION

23. The provisions of this MOU are effective upon signature and date as indicated below and will be reviewed every 3 years, or as required. This MOU may be terminated at any time upon written mutual consent of the agency involved.

24. Any participating agency may withdraw by written notification to the other party at least 30 days prior to withdrawal.

25. This MOU does not create additional jurisdiction or limit or modify existing jurisdiction vested in the parties. This MOU is intended exclusively to provide guidance and documents an agreement for general support between the parties. Nothing contained herein creates or extends any right, privilege, or benefit to any person or entity.

26. Other areas of mutual interest may arise where services and support from one party of this MOU is required by the other party of this MOU. This MOU is not meant to limit those instances nor prohibit cooperation outside the above listed situations set forth and agreed upon.

## BODY WORN CAMERA EVIDENCE

27. The Parties anticipate that Special Agents and TFOs will be equipped with body worn cameras (BWCs) during ~~targeted~~ pre-planned task force operations. The Parties further understand that these BWCs may be the property of the FBI, Connecticut State Police, or a municipal policy agency. TFOs who wear their

home agencies' BWCs on FBI pre-planned operations must provide the FBI with unmodified copies of all BWC recordings as soon as possible following the conclusion of any FBI pre-planned search or arrest. In the event of an officer-involved shooting, the FBI understands that pursuant to C.G.S. § 29-6d(f), the OIG must publicly disclose BWC recordings within 96 hours of the incident. ~~The FBI will provide the OIG with access to BWC recordings to enable the OIG to comply with this statutory directive.~~ Consistent with FBI and DOJ policy, OIG will be allowed to review BWC recordings after authorization is provided to the field office by FBI's Inspection Division.

## MODIFICATIONS

28. This agreement may be modified at any time by written consent of all involved agencies.
29. Modifications to this MOU shall have no force and effect unless such modifications are reduced to writing and signed by an authorized representative of each participating agency.

**FOR THE DIVISION OF CRIMINAL JUSTICE**


_____          _____
Patrick J. Griffin                                    Date
Chief State's Attorney


**FOR THE OFFICE OF THE INSPECTOR GENERAL**


_____          _____
Robert J. Devlin, Jr.                                Date
Inspector General
Office of Inspector General


**FOR THE FEDERAL BUREAU OF INVESTIGATION**


_____          _____
Anish Shukla                                          Date
Acting Special Agent in Charge
FBI, New Haven

# Attachment B

# State of Connecticut

## OFFICE OF INSPECTOR GENERAL



Report Concerning
Use of Deadly Force by the Bridgeport Police Department on June 15, 2021

Robert J. Devlin, Jr.
Inspector General

**TABLE OF CONTENTS**

ACKNOWLEDGMENTS ............................................................................................. 3

INTRODUCTION ................................................................................................... 4

INVESTIGATION .................................................................................................. 5

    BACKGROUND ..................................................................................................... 5

    POLICE REPORTS .................................................................................................. 6

    STATEMENTS....................................................................................................... 18

    SCENE ................................................................................................................ 25

    DIGITAL EVIDENCE .............................................................................................. 47

FINDINGS ......................................................................................................... 49

LEGAL STANDARD ............................................................................................. 52

POSTC STANDARD ............................................................................................. 54

ANALYSIS............................................................................................................ 54

CONCLUSION ..................................................................................................... 55

ADDENDUM........................................................................................................ 56

    APPENDIX ........................................................................................................... 56

    RECOMMENDATIONS .......................................................................................... 56

*Acknowledgements*

*The Office of Inspector General acknowledges the assistance to this investigation provided by:*
*Department of Emergency Services and Public Protection, Division of State Police, Eastern District Major Crime Squad*
*Bridgeport Police Department*
*Federal Bureau of Investigation*
*Stamford/Norwalk Judicial District State's Attorney Paul J. Ferencek*

3

**INTRODUCTION**

On June 15, 2021, at approximately 10:11 p.m., near the intersection of Catherine Street and Main Street in Bridgeport, Officer Carlos Vazquez[1] fired one shot from his department-issued handgun striking and wounding Dennis Lee Waiters, Jr.[2]

Chief State's Attorney Richard J. Colangelo, Jr. named Stamford/Norwalk State's Attorney Paul J. Ferencek to lead the investigation into the officer-involved shooting. On November 3, 2021, pursuant to General Statutes §51-277a(a)(1)[3], the Office of Inspector General assumed responsibility for the investigation. The details of the investigation are contained in this report.[4]

Briefly stated, the investigation establishes that on June 15, 2021, at approximately 10:11 p.m., State and Federal Task Force Officers (TFOs) stopped a 2006 Chrysler 300 automobile on reasonable suspicion that there was a gun in the vehicle. Officers maneuvered their police vehicles to surround the Chrysler while it was stopped at a red light. Dennis Waiters was driving the Chrysler and Lamain Heard[5] was in the front passenger seat. As Officer Carlos Vazquez approached the Chrysler, it abruptly accelerated in reverse, striking four vehicles. It then rapidly drove forward turning sharply and came directly at Officer Vazquez. Vazquez fired one shot to prevent the vehicle from running him over. The Chrysler changed direction and, after striking another police vehicle, crashed into a utility pole. The bullet struck Dennis Waiters in the upper area of his left leg. He was treated at Bridgeport Hospital. After the crash, Lamain Heard fled on foot and ran north. Officers chased him to the parking lot of a

---

[1] On June 15, 2021, Carlos Vazquez was a 41-year-old Hispanic male. He had been a member of the Bridgeport Police Department for 14 years and no disciplinary history. He received remedial training for one incident involving the accidental discharge of a firearm where no one was hurt.

[2] On June 15, 2021, Dennis Lee Waiters, Jr. was a 31-year-old African American male.

[3] As relevant here, General Statutes §51-277a(a)(1) provides, "Whenever a peace officer, in the course of such officer's duties uses … deadly force … upon another person, the Division of Criminal Justice shall cause an investigation to be made and the Inspector General shall have the responsibility of determining whether the use of force was justified under section 53a-22."

[4] The timeline for this investigation is summarized as follows:
   6/15/21:  Date of incident;
   6/15/21:  Chief State's Attorney Richard J. Colangelo, Jr. appoints Stamford/Norwalk State's Attorney Paul J. Ferencek to lead the investigation;
   6/15/21:  State's Attorney Ferencek requests the Connecticut State Police Eastern District Major Crime Squad to investigate the police use of force incident;
   10/8/21:  Robert J. Devlin, Jr. is sworn in as Inspector General;
   11/3/21:  Office of Inspector General assumes responsibility for the investigation;
   11/12/21:  State's Attorney Ferencek transfers file to Office of Inspector General;
   4/27/22:  Eastern District Major Crime Squad submits its investigative report to the Office of Inspector General.

[5] On June 15, 2021, Lamain Heard was a 32-year-old African American male.

restaurant, Sazon Y Mambo, where he was taken into custody.  On the floor of the Chrysler, in front of the passenger seat, police located a handgun.

Officer Vazquez used deadly force to defend himself from what he reasonably believed to be a threat of serious physical injury or death posed by an oncoming vehicle.  Accordingly, I find such use of force to be objectively reasonable and justified.

**INVESTIGATION**

**BACKGROUND**

On June 14, 2021, at approximately 7:45 p.m. (the day before the officer-involved shooting that is the subject of this report) Bridgeport Police were summoned to the 800 block of State Street.  There, the police found a Honda Accord crashed into a fence.  The driver of the Honda, Shamar Swinton, age 39, had been shot multiple times.  It appeared that Swinton was behind the wheel of the Honda when he was shot.  Medics transported Swinton to Saint Vincent's Hospital where he died.

Less than twenty-four hours later, on June 15, 2021, at approximately 3:30 p.m., the Connecticut State Police responded to Route 8 in Bridgeport on a report of a male in a vehicle suffering multiple gunshot wounds.  Troopers found Dha'moni Lockhart, age 21, who had been shot.  He was transported to a local hospital where he died.

The circumstances surrounding the deaths of both men strongly suggested that they had been assassinated.

Both Swinton and Lockhart were known gang members associated with the Greene Homes Federal Housing Complex (Greens).  Following the deaths of Swinton and Lockhart, the Greens served as a venue for more than 100 persons who gathered to mourn them.  Law enforcement officers affiliated with the Bridgeport Police Task Force, FBI Safe Streets Task Force, and the Connecticut State Police Statewide Urban Violent Crime Task Force monitored the activity at the Greens during the evening hours of Tuesday June 15, 2021.  They had received intelligence information that many in the group were armed and intended to retaliate against gang members affiliated with the North End of Bridgeport whom they believed responsible for the deaths of Swinton and Lockhart.

Sometime prior to 10:00 p.m., TFOs received specific information that Lamain Heard, a known gang member and convicted felon, possessed a gun and was intent on shooting someone.  The TFOs were positioned in unmarked cars at various locations near the Greens.

5

The members of the task forces conferred and decided that the risk of stopping Heard while he was at the Greens was too great. They decided to wait until he left the area. Utilizing the surveillance camera capabilities of the Bridgeport Police Department Fusion Center, TFOs learned that Heard had entered the passenger seat of a Chrysler 300 automobile with aftermarket chrome rims. As the Chrysler drove away from the Greens, cameras picked it up taking a left onto Washington Avenue. TFOs then observed the vehicle take a right onto Catherine Street. Sergeants Jason Amato and John Andrews made the decision to stop the vehicle before it could enter the Route 8 onramp located just past the intersection of Catherine Street and Main Street. As multiple TFO vehicles turned onto Catherine Street, they saw the Chrysler stopped at the red light at the intersection of Catherine and Main Streets. They then implemented the plan to contain the vehicle to determine if, in fact, Heard possessed a firearm.

**POLICE REPORTS**

**Sergeant Jason Amato**

Following the incident, Sergeant Jason Amato filed a police report. That report is summarized as follows.

On June 15, 2021, members of the Bridgeport Police Task Force, Special Agents of the Federal Bureau of Investigation, and Connecticut State Police Urban Violence Crime Control Task Force assisted by the Bridgeport Fusion Center commenced an undercover operation to attempt to intercept and suppress ongoing gang/group gun violence taking place between gang/group members from the Greene Homes Housing Complex (Greens) and gang/group members from the North End of Bridgeport.

Bridgeport Police Department (BPD) Sergeant Jason Amato and BPD Sergeant John Andrews were the officers in charge. Both were receiving information pertaining to known and active gang members who were in possession of illegal firearms within the Greens. All Task Force Officers (TFOs) were set up in the area adjacent to the Greens in several unmarked vehicles. All TFOs and FBI Agents were wearing clearly identifiable police tactical vests with Police/FBI insignias. Sergeant Amato was operating a black Dodger Charger equipped with emergency lights and siren. In this vehicle with Amato, were Sergeant Andrews and Mark Spinello, Jr., FBI Staff Operations Specialist.

During the evening of June 15, 2021, approximately 100 persons gathered around Buildings #3 and #4 of the Greens. They were mourning the deaths of Dha'moni Lockhart and Shamar Swinton. Both were known and active gang/group members associated with the Greens. Confidential sources advised TFOs that numerous males walking around the crowd were armed. Using the Fusion Center live video feed. TFOs observed several males who appeared to be concealing weapons. Given the number of people and the potential for

6

violence, TFOs determined that the most prudent method to engage these armed persons was when they exited the Greens or walked away from larger groups of people.

At approximately 10:00 p.m., Amato and Andrews both received credible information that "Main" (known to investigators as Lamain Heard) was at the Greens carrying an illegal firearm in his pocket. The information from an independent source was that Main was at the Greens intending to shoot someone. Using Fusion Center live video, TFOs saw Heard enter a gray Chrysler 300 with rims. At this point, Amato and Andrews determined that they had sufficient information to conduct an investigative stop of the Chrysler and detain its occupants for further investigation.

The Chrysler departed the Greens and traveled east on Highland Avenue, north on Washington Avenue, and east on Catherine Street. The Chrysler stopped at a red light at the intersection of Catherine Street and Main Street. TFOs, utilizing unmarked police vehicles, converged on the Chrysler and activated lights and sirens. The officers' intent was to close all avenues of escape and avoid a high-speed chase.

The report continues:

"I was directly behind TFO Detective William Reilly who operated a white unmarked police pickup truck equipped with emergency lights and siren. Detective Reilly pulled around a civilian vehicle [being operated by a person later identified as Quanell Wade] crossing over the double yellow lines stopping at the back of the driver's side portion of the Chrysler. From my location, I observed TFO Carlos Vazquez in his black Dodge Journey pull in front of the Chrysler from the passenger side followed by TFO Mark Martocchio, in his Police Crown Victoria, who pulled along the passenger side of the Chrysler. I stopped behind Det. Reilly's vehicle crossing over the double yellow lines. I had activated my emergency lights and siren. Just prior to exiting my patrol vehicle, I saw the Chrysler backing up striking Det. Reilly's pickup and the civilian vehicle that was directly behind the Chrysler. With this, I now pulled around Det. Reilly's vehicle (Police pick-up truck) drove around Reilly's pickup and positioned my police vehicle at an angle just over the double yellow lines blocking part of the roadway in an attempt to stop the fleeing Chrysler.

"With this action, TFO Vazquez was now standing adjacent to my driver's side door/ front driver's side fender. The Chrysler was now pulling forward and attempted to flee the area. The Chrysler made a hard left turn attempting to fit between my Dodge Charger, Vazquez's Dodge Journey, and TFO Simmons' police Dodge Charger. As I began to exit my vehicle, the Chrysler was now passing in front of my vehicle heading directly toward Vazquez's location. Vazquez was still positioned adjacent to my driver's side. It was at this time I heard a single gunshot and immediately saw the Chrysler veer right striking TFO Simmons' Dodge Charger

7

front passenger side.  After striking the Dodge, the Chrysler now accelerated and drove directly into the traffic pole on the other side of Catherine Street."

As soon as the Chrysler came to rest, the passenger (Lamain Heard) fled the vehicle on foot.  Amato and other TFOs gave chase.  Ultimately, Amato returned to the scene and saw that the driver, Dennis Waiters, was out of the vehicle.  Amato asked Waiters if he was injured.  Waiters said nothing.  At this point, Amato noticed a bullet hole in the Chrysler's driver side door just below the door handle.  Amato then checked Waiters for injuries and saw blood seeping through his pants in the area of his left upper leg/hip.  After removing his pants, Amato and Reilly saw a single gunshot wound (GSW) to this area.  When officers asked Waiters medical questions and his name, he continued to refuse to speak.  Amato updated police dispatch that there was a GSW and medics were needed immediately.  While Reilly stayed with Waiters, Amato began to document the crime scene and secure it.

Vazquez told Amato that he fired one round from his duty weapon.  He said that he felt lightheaded and his heart was racing.  In addition, TFO Martocchio told Amato that he was struck by the Chrysler and had severe pain in his left hand.  Amato ordered Martocchio to drive himself and Vazquez to the hospital for evaluation.

Amato photographed the vehicles on scene as they were positioned in the initial stop.  The lights were activated on three police vehicles.  Amato also photographed (1) Waiters as he was being evaluated by medics, (2) the Chrysler where, in plain view on the front passenger floor, was a firearm, and (3) a single shell casing adjacent to the Charger.  At this point, patrol officers arrived and taped off the crime scene.

Amato maintained the crime scene until Connecticut State Police investigators arrived.  Martocchio returned from the hospital and reported that he suffered a hair-line fracture to his left hand.  Amato asked him to return the Crown Victoria to the approximate same position it was in at the time of the stop.

**Sergeant John Andrews**

Following the incident, Sergeant John Andrews filed a police report.  That report is summarized as follows.

In response to the homicides of Swinton and Lockhart, Sergeant John Andrew and other TFOs collected intelligence suggesting that gang members associated with the Greens were going to retaliate against the so-called North End.  Throughout Tuesday, June 15, 2021, over 100 persons gathered at the Greens to mourn the deaths of Swinton and Lockhart.

At approximately 10:00 p.m., TFOs received credible information that "Main" (Lamain Heard) was on the grounds of the Greens carrying a firearm.  An independent source stated that Heard intended to shoot someone.  Real time information from the Fusion Center reported that Heard was entering a Chrysler 300 with aftermarket rims.  With this information, Andrews and other officers determined that there was sufficient information to conduct an investigative stop of the Chrysler and detain the occupants for further investigation.

The Chrysler drove from the Greens and ultimately stopped for a red light at the intersection of Main Street and Catherine Street.  TFOs, utilizing unmarked police vehicles, activated lights and sirens and converged on the Chrysler closing all avenues of escape in an attempt to avoid a high-speed pursuit.   Andrew's report continues:

"Task Force Officers and Special Agents dressed in tactical vests and clothing clearly displaying "POLICE" and/or "FBI" exited their vehicles and advanced toward the occupants of the Chrysler shouting commands.  At first, the vehicle remained static.  It wasn't until officers started advancing closer to the vehicle that the operator, later identified as Dennis Lee Waiters, Jr., shifted the vehicle in reverse and proceeded to drive backwards sideswiping an unmarked Crown Victoria Police Cruiser operated by Officer Martocchio.  During the collision, the driver's side door on Officer Martocchio's vehicle closed on his body and crushed his left hand.

"Waiters continued accelerating his vehicle in reverse crashing into a civilian vehicle identified as a 2000 Toyota Avalon, color tan, … operated and owned by Quanell Delvon Lee Wade … and an unmarked police vehicle (Ford Pickup truck) occupied by Detective William Reilly (Driver), Special Agent Andrew Pappas (Front Passenger) and Special Agent Michael Paoletti.

"Special Agent Pappas was exiting the front passenger's seat of the pickup truck when Waiters crashed into the truck's passenger's side door almost crushing him between the door and the door frame.

"After colliding with the pickup truck and civilian vehicle, Waiters abruptly accelerated forward while turning left in an unsuccessful attempt to avoid contact with the front end of the Dodge Charger and Dodge Journey that were parked in front of him.  This abrupt and unpredictable turn made it almost impossible for Officer Vazquez to avoid being run over. Officer Vazquez discharged one round from his duty-issued firearm. Subsequently, the vehicle crashed into a nearby metal pole situated at the northwest corner of the intersection of Main Street and Catherine Street causing heavy front-end damage and airbags to deploy."

Upon impact, Lamain Heard exited the Chrysler and fled the scene on foot.  Officers pursued him. Heard ran north on Main Street ultimately reaching the parking lot of a restaurant (Sazon Y Mambo) at 1691 Main Street.  Heard continued to be noncompliant and Officer

Jonathan Simmons deployed his Taser. This enabled officers to take Heard into custody without incident.

At the scene of the stop, FBI Special Agent James Domachowski checked the rear of the Chrysler for additional occupants. Domachowski observed on the floor in front of the front passenger compartment a black semiautomatic firearm. The weapon was left in place pending the issuance of a search warrant.

As a result of Officer Vazquez discharging his firearm, Waiters sustained a gunshot wound to his left thigh. Medics transported him to Bridgeport Hospital for treatment. Medics also transported Heard to Bridgeport Hospital for treatment for possible injuries from the Taser or the collision. Officer Martocchio drove Vazquez to St. Vincent's Hospital. Hospital staff determined that Martocchio had a hairline fracture of a finger on his left hand. Vazquez was evaluated for any physical or emotional reaction to the incident.

Members of the BPD patrol division secured the scene at Catherine Street and Main Street as well as the secondary scene at Sazon Y Mambo. The State's Attorney's Office responded to the scene and requested the Connecticut State Police Eastern District Major Crime Squad to investigate the officer-involved shooting.

**Officer Jonathan Simmons**

Following the incident, Officer Jonathan Simmons filed a police report. That report is summarized as follows.

Bridgeport Police Officer Jonathan Simmons was among the TFOs participating in the investigation of activity at the Greens during the evening of June 15, 2021. At approximately 10:00 p.m., Sergeants Amato and Andrews relayed that a silver Chrysler 300 with shiny rims was at the Greens in front of building #4 and that one of the occupants was possibly armed with a gun. The plan was that, once the vehicle left the area, TFOs would conduct a felony stop of the Chrysler.

Simmons was aware that officers assigned to the Bridgeport Fusion Center were actively watching video of the Greens and could see the Chrysler and its two occupants. Fusion Center Officer Edwin Garcia reported that the vehicle and its occupants were moving and had made a left-hand turn onto Washington Avenue and were heading toward the underpass at Catherine Street.

From his position in the parking lot of 210 Congress Street, Simmons drove to Main Street and headed north. At the intersection of Main Street and East Washington Avenue,

10

Simmons observed multiple BPD vehicles with their emergency lights activated and a vehicle stopped.  Simmons' report continues:

"As I was more than half-way through the intersection with my emergency lights activated.  I turned left and positioned my vehicle in front of the silver Chrysler 300.  I placed my vehicle in the park position and remained in my vehicle as other Officers were approaching the vehicle with their lights and sirens active.  Moments later, the Chrysler 300 vehicle began to reverse at a high rate of speed striking the surrounding police cars and then drove toward my vehicle.  The silver Chrysler struck my vehicle head on and then turned to the left, contacting a light pole.  The front passenger door then immediately swung open and a black male wearing a grey shirt fled from the front passenger seat.  I then immediately exited my vehicle and chased the suspect on foot."

The male (Lamain Heard) ran north toward the intersection of Main Street and Madison Avenue.  Simmons followed repeatedly yelling "Police, stop."  During the foot chase, Simmons deployed his Taser, but it was not successful.  Heard ran into the parking lot of Sazon Y Mambo at 1673 Main Street.  There, Heard fell and Simmons deployed his Taser again.  This time it was successful and cover officers handcuffed Heard.  He was later transported to Bridgeport Hospital for evaluation.

**Sergeant Michael Paoletti**

Following the incident, Sergeant Michael Paoletti filed a police report.  That report is summarizes as follows.

Sergeant Paoletti worked with the TFOs and Special Agents on June 15, 2021, to prevent further acts of violence associated with back-to-back homicides.  Both victims were identified as group/gang members aligned with the Greene Homes Housing Complex in Bridgeport.

At approximately 10:00 p.m., Paoletti learned that a party, later identified as Lamain Heard, was in possession of a firearm. He further learned that Heard was to leave the Greens in a Chrysler 300 with aftermarket rims.  Officer Edwin Garcia from the Fusion Center reported that the Chrysler was departing the Greens taking Highland Avenue to Washington Avenue.

Sergeant Paoletti, along with Special Agent Andrew Pappas, were in an unmarked police vehicle (white Ford pick-up truck crew cab) operated by Detective William Reilly.  They followed the Chrysler out of the area of the Greens.  Paoletti's report continues:

"We followed the Chrysler north on Washington Avenue, east on Catherine Street and later stopped behind it as it became static for a traffic control signal at the intersection of Catherine Street and Main Street.   At such time, S.A. Pappas activated emergency lights and

11

sirens.  Simultaneously, additional Task Force units arrived on scene from different directions with their lights and sirens activated and attempted to close off all avenues of escape.

"I, along with Special Agent Pappas, wearing tactical vests and clothing clearly displaying "POLICE" and/or "FBI", exited the pick-up truck and advanced toward the suspect vehicle, as did other officers who were also wearing tactical vests and identifiable Police/FBI clothing.  At such time, the operator of the Chrysler, later identified as Dennis Lee Waiters … abruptly shifted the vehicle in reverse and drove backwards, almost crushing Special Agent Pappas, before crashing into another vehicle.

"Fearing that I would be struck by the subject vehicle, I took up cover behind the crushed vehicle and attempted to approach the subject vehicle from the passenger side.  However, just after Waiters struck Detective Reilly's pick-up truck and ultimately collided with the civilian vehicle, he abruptly accelerated forward while turning left.  About that time, I heard what I believed through training and experience to be the sound of a firearm being discharged.

"Due to the chaotic scene, my involvement in the incident, coupled with the motor vehicle collisions, I was unable to determine who discharged a firearm at that time.  The subject vehicle then struck a metal pole and came to a final rest."

Once the vehicle became disabled, Lamain Heard engaged officers in a foot chase.  That chase ended in the parking lot of Sazon Y Mambo, 1691 Main Street, where Heard lost his footing and fell.  After a successful Taser deployment by Officer Simmons, Heard was handcuffed without further incident.

Paoletti did not discharge his firearm or use force during the incident.  At the time that the Chrysler was crashing into cars, Paoletti took cover behind a civilian's vehicle, described as a tan 2000 Toyota Avalon, color tan.

**Officer Mark Martocchio**

Following the incident, Officer Mark Martocchio submitted a police report.  That report is summarized as follows.

Office Mark Martocchio assisted the Bridgeport Gang Task Force in connection with the June 15, 2021, surveillance at the Greens.  He operated an unmarked Ford Crown Victoria police vehicle equipped with lights and siren.  The vehicle also had a push bumper.  When TFOs learned that Lamain Heard was in possession of a firearm and getting into a grey Chrysler 300, Martocchio was in the area of the Greens.  He participated in the effort to "box" the Chrysler at the intersection of Catherine Street and Main Street in order to avoid a high-speed pursuit.  His reports states:

12

"I activated my emergency flashing lights, and pulled my police vehicle's push bar up to the passenger's front door. I did this to prevent the passenger from escaping on foot. I shifted my vehicle into Park, and started to exit my cruiser.

"The Chrysler, operated by Dennis Lee Waiters, then shifted into reverse and attempted to flee in reverse. In doing so, the vehicle struck my driver's door, and the door was now closing with my body wedged between the door and door frame. I instinctively put my hands on the door frame, and tried to push it open, but it was physically impossible to do. The door pinned me between the door frame, pinning my left hand as well. I was now screaming and yelling in an attempt to get Waiters to stop the car. Waiters ignored my commands, and continued to back up, smashing his car into two other vehicles.

"It was at this time I heard a single gunshot, and did not realize at the time who shot, or where the shot came from. Right after the gunshot, Waiters stopped the vehicle, and put the vehicle into drive. He then took off from a stopped position, spinning the tires, and rammed his vehicle into a Dodge Charger Police Vehicle that had the emergency lights flashing. After he struck the Dodge Charger, Waiter's vehicle bounced off it, and went straight into a utility pole causing a loud and violent impact, stopping the vehicle. I then began to run up to Waiter's vehicle, and could see the male passenger bail out and begin to flee on foot. I ran up to the driver's side door and Waiters was already out of the vehicle, and lying on the ground."

After Martocchio placed Waiters in custody, Sergeant Amato determined that Waiters had been shot. At this point, Martocchio felt a sharp pain in his left hand. Martocchio drove to St. Vincent's Hospital to have his hand examined.

During the incident, Martocchio was wearing outer garments with "POLICE" markings and displayed a badge secured by a neck chain.

**Detective William Reilly (Retired)**

Following the incident, Detective William Reilly submitted a written statement. That statement is summarized as follows.

Reilly was on duty on June 15, 2021, as a member of the Bridgeport Police Task Force team. He was operating an unmarked BPD white Ford F-350 pickup truck with lights and siren. After receiving information that Lamain Heard possessed a firearm and possibly planned to shoot someone, officers formed a plan to stop Heard after he left the Greens.

Heard was seen entering the passenger seat of a gray Chrysler 300. Officers followed this car to the intersection of Main Street and East Washington Avenue. At this location, TFOs, using unmarked vehicles, converged on the suspect vehicle. The objective was to close off all

13

potential means of escape and avoid a high-speed pursuit.  At the time of the stop, Reilly activated the lights and siren of the pick-up truck.

Reilly's statement continues:

"I positioned the truck on the left side of the suspect's car.  Other police vehicles were also observed with lights and sirens on at this time.  Officers were observed exiting their cars at this time demanding both occupants in the gray Chrysler 300 to put up their hands.  All officers were dressed in a manner to easily recognize themselves as police officers.  The operator of the gray Chrysler 300, a black male identified as Dennis Lee Waiters, Jr., ignored officers' requests and backed his vehicle up in a reckless manner to avoid capture.  After striking a civilian car that was stopped at the traffic signal directly behind him. The civilian car backed up leaving a possible means of escape.  I quickly attempted to fill this void by backing up and moving my truck over to the right.

"Special Agent FBI Andrew Pappas who was sitting in the passenger seat of my truck attempted to exit the truck and assist officers at this time.  The suspect vehicle was observed crashing into my front bumper and passenger door at this time.  At this point, I thought the agent could easily be crushed in between my truck and the suspect's vehicle.  I put my truck into gear and attempted to push the suspect's car away from the agent.  The suspect vehicle then sped forward striking other police vehicles before striking a metal utility pole and coming to rest on the other side of the street.

"The passenger of this car, a Lemain [sic] Heard, was observed exiting and took off running with officers giving chase.  I assisted Officer Martocchio with removing Waiters from the car and placing him under arrest with little resistance.  After being handcuffed, I discovered he was shot in the left upper thigh.  Officers called for medics at this time.  I rendered aid to Waiters checking his gunshot wound.  The wound did not appear to be bleeding at this time, so I stayed with Waiters attempting to comfort him and periodically checking his wound until medics arrived.  …

"… I was wearing a blue jersey with bold yellow letters "FBI" at the time of the incident. I was also wearing a Bridgeport Police issued bright gold badge around my neck easily distinguishing myself as a police officer."

**Special Agent Andrew Pappas – FBI**

Following the incident, Special Agent Andrew Pappas of the FBI submitted a written report.  That report is summarized as follows.

14

Source reports from the Greene Homes Housing Complex and law enforcement surveillance led Pappas and other task force officers to conduct a vehicle stop at the intersection of Catherine Street and Main Street.  Pappas was in the front passenger seat of a white Ford F-350 unmarked police truck operated by TFO William Reilly.

TFO Reilly positioned the truck behind the target vehicle. A Chrysler 300, with at least four other vehicles surrounding the target vehicle.  The report continues:

"I activated the vehicle's police lights as the F-350 came to a stop behind the target vehicle, which was also stopped at a red light.  The F-350 was equipped with a blue and red flashing light bar across the top of the windshield.  Numerous law enforcement personnel, wearing ballistic vests with clear law enforcement markings, surrounded the target vehicle which remained stationary for a few seconds as I exited the passenger door of the F-350.  I was wearing my FBI issued olive green ballistic body armor with clear "police" markings on the front and back of my armor. … The target vehicle then began to reverse at a high rate of speed.  The target vehicle struck the front passenger side of the F-350, then struck the truck's open passenger door, missing me by approximately one to two feet.  I briefly stumbled and then jumped back into the truck, at which moment there was an audible gunshot and then a crash.  I did not see who fired the shot, and as I exited the truck for a second time, I saw the driver of the suspect vehicle (later identified as Dennis Lee Waiters … ) stumble out of the crashed vehicle.  Law enforcement officers began to close on the driver, and simultaneously I saw the front passenger (later identified as Lamain Heard) exit the vehicle and run from the scene.  Numerous law enforcement officers began to chase the target and I gave chase as well …

"The foot pursuit crossed under Route 8/ Highway 25 Connector bridge across Main Street and into the Sazon y Mambo parking lot at 1691 Main Street, where the original target was subdued … The chase continued approximately 200 more meters into the Sazon y Mambo parking lot, where the target individual attempted to hurdle a stack of objects (possible folding chairs), causing him to trip.  Officer Simmons immediately deployed his Taser into the target individual with positive contact."

Seconds later, Special Agent Matthew Loucks arrived and handcuffed Heard.  Loucks and Officer Matthew Goncalves walked Heard to the ambulance.  Goncalves recovered a roll of cash from Heard's pocket.  Goncalves counted the cash in the presence of Pappas and Loucks, and then put the cash back into Heard's pocket.

After the ambulance departed, Pappas and Loucks returned to the scene of the vehicle accident.  The scene had been secured and Pappas learned that TFO Carlos Vazquez had fired a shot.  Vazquez was no longer at the scene.

15

**Special Agent James Domachowski – FBI**

Following the incident, FBI Special Agent James Domachowski submitted a report.  That report is summarized as follows:

On June 15, 2021, Domachowski and other task force members, while on surveillance near the Greene Homes Housing Complex, received credible information that a subject had entered a silver vehicle with rims and was believed to be in possession of a firearm.  The vehicle was later identified as a silver Chrysler 300 bearing Connecticut Registration BC49134.  At approximately 10:10 p.m., the Chrysler departed the area of the Greene Homes and was followed by law enforcement officers in several unmarked vehicles.  While stopped at a red light at the intersection of Catherine Street and Main Street, law enforcement officers, utilizing unmarked vehicles, attempted to conduct a motor vehicle stop of the Chrysler for further investigation. Law enforcement vehicles approached the Chrysler from several angles in an attempt to surround the vehicle and eliminate avenues of escape.  Law enforcement vehicles that were outfitted with emergency equipment activated lights and sirens during the stop.

At the time of the stop, Domachowski and Special Agent Matthew Loucks were in a black SUV operated by TFO Carlos Vazquez.  Domachowski and Loucks wore FBI-issued green ballistic vests containing FBI insignias in large yellow letters on the front and back.  Vazquez had a vest with a law enforcement insignia clearly displayed on it.  Vazquez positioned his vehicle across the front of the Chrysler to prevent escape.  The report continues:

"I exited the left rear door of TFO Vazquez's vehicle and immediately drew my Bureau-issued firearm, verbally identified myself as "FBI" and began issuing loud verbal commands to "show me your hands."  While advancing toward the Chrysler, I clearly heard other law enforcement officers on scene also issue loud verbal commands to the occupants of the vehicle, which were ignored.

"As the Chrysler was surrounded by law enforcement officers, the operator abruptly placed the vehicle in reverse and accelerated striking several parked BPD vehicles and a civilian vehicle.  The operator of the vehicle was later identified as Dennis Lee Waiters, Jr. …  Waiters then placed the vehicle in drive and accelerated at a high rate of speed.  At that time, I situated myself on the side of a parked BPD vehicle to avoid being struck by the silver Chrysler.  The vehicle proceeded to travel at a high rate of a speed forward and struck yet another parked BPD vehicle.  Around that time, I heard a sound of what I believed to be one gunshot, and observed the silver Chrysler drive at a high rate of speed into a large metal pole located off the roadway.  As a result of hitting the pole, the Chrysler sustained front-end damage and airbags were deployed.

16

"Upon hitting the metal pole, I observed a male adult quickly exit the front passenger's side door of the silver Chrysler and flee the scene on foot. The front passenger was later identified as Lamain Heard … Several law enforcement officers on scene pursued Heard in a foot chase at this time. I remained on scene and approached the right rear passenger's door of the Chrysler, which was closed, in an attempt to clear the vehicle of unknown dangers. Upon opening the right rear passenger's door of the Chrysler, I observed that there were no other occupants located inside the vehicle. After ensuring that there were no other occupants in the vehicle, I observed a black handgun in plain view on the front passenger's side floorboard of the Chrysler. Immediately, I notified BPD officers of the located handgun and assisted securing the scene for processing."

**Special Agent Matthew Loucks – FBI**

Following the incident, FBI Special Agent Matthew Loucks filed a report. That report may be summarized as follows.

On June 15, 2021, Loucks and Special Agent James Domachowski were in an unmarked police vehicle operated by TFO Carlos Vazquez. They learned that TFOs received intelligence that a silver car with after-market rims was on the grounds of the Greene Homes Housing Complex and that an occupant of the vehicle possessed a gun. With the aid of the BPD Fusion Center, their attention was directed to a silver Chrysler 300 and when that vehicle left the Greens, law enforcement officers in unmarked police vehicles followed it to the intersection of Catherine Street and Main Street. The report continues:

"When the suspect vehicle stopped at the red light at the intersection of Catherine Street and Main Street, law enforcement officers, utilizing unmarked police vehicles, converged on the suspect vehicle, activated their emergency lights and attempted to conduct a motor vehicle stop of the suspect vehicle for further investigation. Simultaneously, TFO Vazquez positioned our vehicle in front of the suspect vehicle in an attempt to prevent the suspect vehicle from escape. At that time TFO Vazquez, SA Domachowski and I exited our vehicle and began to approach the suspect vehicle. SA Domachowski and I were dressed in plain clothes and wore FBI-issued green ballistic vests bearing "FBI" markings in yellow on the front and back of the vests. TFO Vazquez was dressed in plain clothes and wore a black ballistic vest hearing visible "POLICE" markings.

"Upon exiting TFO Vazquez's vehicle, I proceeded toward the front of the suspect vehicle with my FBI-issued firearm drawn, verbally identified myself as "FBI." At this time, I observed other law enforcement officers dressed in tactical vests and/or clothing clearly displaying "POLICE" or "FBI", had exited their vehicles and began converging on the suspect vehicle. I clearly heard other law enforcement officers verbally identifying themselves and shouting verbal commands.

17

"The suspect operator (later identified as Dennis Lee Waiters, Jr. (Waiters)), disregarded my and other law enforcement officers' presence and verbal commands.  Instead, I observed Waiters abruptly accelerate the suspect vehicle in reverse in the direction of other law enforcement officers and vehicles, striking at least one unmarked law enforcement vehicle (a white pick-up truck) in the process.  Law enforcement officers and I continued to order Waiters to stop the vehicle.  Waiters continued to disregard my and other law enforcement officers' commands to stop the vehicle.  Instead, Waiters placed the vehicle in drive and accelerated forward toward me and other law enforcement officers, at which point I sought safety and cover behind TFO Vazquez' vehicle while I continued to maintain visual contact of the suspect vehicle.  At this time, I heard what I believed to be a single gunshot.  I then observed the suspect vehicle strike another unmarked police vehicle with its emergency lights activated before crashing into a pole at the northwest intersection of Catherine Street and Main Street."

Following the collision, the front passenger of the Chrysler (Heard) exited the vehicle and fled on foot.  Loucks and other officers engaged in a foot pursuit.  Heard was taken into custody in the parking lot of the Sazon Y Mambo restaurant.

**STATEMENTS**

**Officer Carlos Vazquez**

Officer Carlos Vazquez provided a written statement regarding the events of June 15, 2021.  That statement is reprinted in the Appendix.  To access the statement, click here.  The statement is summarized as follows.

On June 15, 2021, Vazquez, along with other task force officers and FBI Special Agents and assisted by Officer Edwin Gomez assigned to the Fusion Center, engaged in an undercover operation aimed at suppressing ongoing gun violence between gang/group members affiliated with the Greene Homes Housing Complex and those affiliated with the North End of Bridgeport. Vazquez was operating a black Dodge Journey.  In the vehicle with him were FBI Special Agent Matthew Loucks and FBI Special Agent James Domachowski.  All three wore tactical vests that clearly identified them as "POLICE" and/or "FBI."

At approximately 10:00 p.m., task force officers received information that a person known as "Main" (Lamain Heard) was at the Greens and possessed a firearm.  Heard was described as operating a silver Chrysler 300 vehicle with "rims."  Utilizing Bridgeport Public Safety Cameras, Office Garcia located the vehicle.   A short time later, task force officers received intelligence that "they" were pulling off in the Chrysler 300.  Officer Garcia immediately corroborated this information and advised that two males entered the Chrysler and departed the area of the Greene Homes.  Task force officers proceeded to follow the

18

vehicle.  The vehicle travelled north on Washington Avenue and east on Catherine Street.  It drove to the far left lane of Catherine Street before coming to a stop at a red light at the intersection of Main Street under Route 8.  The statement continues:

"At this time, Task Force Officers, operating unmarked police vehicles, immediately activated their lights and sirens and converged upon the occupants of the Chrysler 300 in an attempt to close off all potential avenues of escape thus avoiding a high-speed pursuit.

"I traveled ahead of the Task Force Officers and positioned my vehicle [Black Dodge Journey] ahead of the Chrysler 300.  Upon exiting my vehicle, I unholstered my department issued firearm, kept it in a low ready position, and repeatedly shouted verbal commands for the occupants of the Chrysler 300 to show their hands as I moved to the driver's side door of the vehicle.

"The Chrysler 300 remained in a stationary position.  However, as I reached the driver side door of the Chrysler 300, the operator, later identified as Dennis Lee Waiters … , placed the vehicle in reverse and in an aggressive and abrupt manner backed into a civilian vehicle; continuing in reverse hitting Officer Mark Martocchio's unmarked police vehicle [Dark Blue/Ford Crown Victoria]and Detective William Reilly's unmarked police vehicle [White / Ford F350 Pickup Truck] both of which had emergency lights activated.

"From my position, I observed the Chrysler 300 sideswipe Officer Martocchio's [Ford Crown Victoria] and pin his body in between the door and the door frame of the [Ford Crown Victoria].  I also observed Officer Martocchio in distress and screaming in excruciating pain.

"I observed the Chrysler 300 reversing aggressively and striking the front passenger side bumper and front passenger side door area of Detective Reilly's [Ford F350 Pickup Truck] nearly injuring FBI Special Agent Andrew Pappas and causing him to fall back and retreat for cover.

"Waiters then accelerated forward, while aggressively turning the wheel and to the left, in an apparent attempt to avoid striking my vehicle [Black/Dodge Journey] and the unmarked police vehicle operated by Officer Simmons [Black Dodge Charger/Flashing Emergency Lights].  This abrupt and reckless turn by Waiters, caused the vehicle to button hook back toward my position in a collision course, making it clearly impossible for me to retreat for safety and avoid being run over and/or side swiped and crushed between the driver side of the Chrysler 300 and the unmarked police vehicle [Black Dodge Charger/flashing emergency lights] occupied by Sergeant Amato and Sergeant Andrews.  Fearing that my life and the lives of others in the area, due to the reckless attempt to escape, were now in immediate danger of serious physical injury or death, I discharged one round from my duty issued firearm at the operator (Waiters), causing Waiters to steer the vehicle away from me.

19

"Subsequently, the Chrysler 300 hit the front end of Officer Simmons' unmarked police vehicle [Black Dodge Charger] and crashed into a nearby metal pole situated in the northwest corner of the intersection of Main Street and Catherine Street, causing heavy front-end damage and airbags to deploy.  I then observed Detective Reilly and Officer Martocchio remove Waiters from the Chrysler 300 and place him in handcuffs without further incident.

"As a result of my discharging my firearm, Waiters sustained a gunshot wound to his left thigh area.  He was immediately transported by medics to Bridgeport Hospital to be treated for the gunshot wound, as well as any possible injuries sustained during the collision with other vehicles and metal pole.

"I was driven to St. Vincent's Hospital by Officer Martocchio, where it was determined that Officer Martocchio sustained contusions and a hairline fracture to his left hand and I was evaluated and monitored for any delayed physical or emotional reactions associated with the incident, which would require medical attention."

**Dennis Lee Waiters, Jr.**

Dennis Waiters did not provide a formal written statement to detectives.  He did give two oral statements.  Connecticut State Police Sergeant William Utermarck spoke to Waiters at Bridgeport Hospital shortly after the incident and Eastern District Major Crime Squad (EDMCS) Detective Steven Gardner interviewed Waiters on June 24, 2021, at Troop G in Bridgeport.

On June 15, 2021, Sergeant Utermarck went to see Waiters in the Emergency Department of Bridgeport Hospital.  After providing identifying information, Waiters spoke to Utermarck about the incident.  In his report, Utermarck described Waiter's comments as follows:

"Waiters [explained] that he was upset based on what had happened earlier.  He explained that he attended a memorial service for his cousin. Dha'moni Lockhart and was on his way home with a friend.  While stopped at a traffic light, his car became surrounded by other vehicles blocking him.  Waiters went on to explain he had all he could do to not think about his cousin being killed the night before, directly above him on Route 8.  Waiters was telling this story to me and a female, who he continued to talk to on the telephone.  Waiters went on to explain he was scared and attempted to get away and slammed into a pole. …

"I then discussed with Waiters if he would be willing to provide consent to the Connecticut State Police to obtain his medical records for the treatment he was receiving, which he agreed to.  Waiters reviewed and signed the medical consent form.

20

"After signing the consent form, Waiters went on to explain that his teeth were bothering him from when he crashed his car and he had received treatment for the gunshot wound to his hip and teeth area.  Waiters explained that the hospital staff determined they would leave the bullet inside his hip area, and not remove it."

Utermarck concluded the interview by advising Waiters that members of the EDMCS would be in touch with him upon his release from the hospital in order to inform him about his personal items and to obtain a written statement.

On July 8, 2021, EDMCS detective Steven Gardner met Waiters at Troop G in Bridgeport. Gardner returned various items of personal property to Waiters.  Detective Gardner informed Waiters that he was not under arrest and could leave at any time.  Waiters stated that he was missing his driver's license and that his Venmo card had been fraudulently used after the incident on June 17, 2021.  Gardner's report summarized Waiters' statement regarding the incident as follows:

"Dennis Waiters then begins to talk about the gun that was found in the car.  Dennis Waiters stated that the other Steven performed a GSR test on him and had already told him that he had tested negative for GSR.  Dennis Waiters then stated that a gun was found in the car only after he had gone to the news.  Dennis Waiters then stated that he knows that no fingerprints were found on the gun.  Dennis Waiters then explained that Reverend Lord from the NAACP told him personally that his fingerprints weren't on the gun.  Dennis Waiters was then informed that the gun had not yet been tested for fingerprints.  Dennis Waiters then stated that he would give a statement.

"Dennis Waiters explained that he had just left the memorial, and mentioned the shooting on State Street, followed by the shooting on the highway, during which his cousin was killed.  Dennis explained that he left the Greens from "the U" and drove and arrived at the intersection.  Dennis explained that the reason that he was driving his friend's car was because his friend was a little too drunk to drive.  Dennis explained that during a pause in a song, he heard a vehicle accelerate and then a vehicle cut him off without sirens.  Dennis stated that he didn't know that it was a cop.  Dennis explained that when he saw two doors on the vehicle open, he reversed, and then all of a sudden there was a bunch of shooting.  Dennis stated that police fired more than one bullet.  Dennis explained that when he reversed, he struck a civilian vehicle and then he put the vehicle into drive and after doing so, he got hit in the leg, his leg gave out, and he hit the pole.  After hitting the pole, he was ripped out of the vehicle, had one cuff put on him, which is when he realized it was the police, and then the officer kicked him in the mouth.  The officer then put another cuff on him, got lifted up and put down, and then woke up in the hospital.  Dennis Waiters then explained that the officer had kicked his teeth in and because he was on Fentanyl, he was able to pull his teeth back into place at the hospital.  Dennis stated that the officer who arrested him told him, 'I was hoping those bullets hit your face, you fucking scumbag."  Dennis Waiters explained that he reversed the vehicle out of fear

after being cut off.  Dennis was asked if he thought he would have reacted the same way prior to the nearby shootings and Dennis Waiters then explained that he would have reacted the same way.  Dennis Waiters explained that, "The first reaction that you think of is, is you see two doors open … I didn't even get a chance to see who the fuck jumped out, just reversed.  That's it … I was trying to save my life."  Dennis Waiters stated that the vehicle that cut him off was a truck, like a Durango, and was black.  Dennis Waiters was asked who his passenger was and he stated that it was 'Lemaine' (sic), and explained that when he hit the pole, Lemaine (sic) jumped out.  Dennis stated that the car belonged to Lemaine (sic).  Dennis then confirmed that he was driving because Lemaine (sic) was drunk, however then explained that he was also drunk, and explained that he should have gotten a DUI.  Dennis was asked if after hitting the pole, if the airbags went off, and Dennis said that they did go off.  Dennis was asked if he had his seatbelt on and he said, "I had my seatbelt on.  I always wear my seatbelt.  Always."  Dennis was asked what sort of injuries he had from hitting the pole, and he stated that he was just dizzy after hitting the pole, but otherwise had no injuries.  Dennis explained that after he hit the pole, he immediately got pulled out of the vehicle and put on the ground and had a handcuff put on him, and that's when he regained his senses, and was also when he got his face kicked.  Dennis explained that he was then put on the back of the car, and explained that he knows his blood was all over the back of the car because he was spitting the blood from inside his mouth from being kicked.  Dennis was asked if he had any other blood on him and he stated that all the blood had been in his mouth. …

"Dennis was asked for a description of the officer that kicked him and he stated that he has a gray shirt and blue jeans on, but could not describe him."

Waiters agreed to type a written statement and provide it to Gardner.  He also stated that he did not want to sign a medical release without a lawyer around.  The interview then concluded and Waiters left.  Waiters did not send a written statement to Gardner.

**Lamain Heard**

Lamain Heard did not give a formal written statement.  Detective Steven Gardner contacted him by telephone on July 27, 2021, and obtained Heard's oral account of what happened.

Gardner's report states:

"Lamain explained that he and a friend were at a vigil for his niece's boyfriend.  After leaving the vigil, his friend drove and stopped at a red light for about 10 seconds and a car pulled up abruptly and cut them off.  A man jumped out of the car with a gun drawn, shots went off, his friend pulled off and crashed.  Lamain stated that he didn't know what was happening, jumped out and ran down the street toward Sazon y Mambo, when he fell.  Lamain

22

explained that he put his hands behind his back and was tased.  Lamain explained that he passed out and police went through his pockets before transporting him to the hospital for treatment, and later he was charged by Bridgeport Police for interfering."

Although Gardner arranged to meet Heard at 2:00 p.m. the next day at Troop G in Bridgeport to take a written statement, Heard did not arrive at Troop G nor did he make contact with Gardner.  Gardner waited until 4:00 p.m. but Heard did not show.

Police ultimately seized the handgun observed by Sergeant Amato and Special Agent Domachowski on the front passenger-side floor of the Chrysler 300.  Police swabbed the grip and magazine of the handgun for possible DNA.  Police also obtained swabs of known DNA from both Waiters and Heard. Detectives sent this material to the State of Connecticut Forensic Laboratory for analysis.

As to the grip area of the firearm, the laboratory concluded that there was a DNA profile that was a mixture of four contributors.  The results were inconclusive as to whether Dennis Waiters was one of the contributors.  The laboratory concluded that Lamain Heard's DNA was present on the grip.[6]  As to the magazine, both Waiters and Heard were eliminated as contributors to the DNA profile.

In January 2022, Lamain Heard was arrested on federal gun charges.  TFOs advised of his Miranda rights and, after signing a waiver of those rights, they interviewed him about a number of topics including the gun seized from the Chrysler 300.  This interview was video recorded.  During this interview, Heard indicated that he obtained the gun from his cousin's uncle who gave it to him to hold because he was going to the Greens.  Heard stated:

"I ain't gonna lie, because I was scared … I didn't want to be out … I didn't want to go out without … without a gun …

People get killed in those stairwells …,

That's basically, you know what I mean, the only reason, I mean, that I'm saying that was that, I had it, you know what I'm saying, me having it and having it for a while."

To review that portion of Heard's interview, click here.

---

[6] The laboratory reported this result as follows:  "Assuming four contributors, the DNA profile from [the swab from the grip] is at least 100 billion times more likely to occur if it originated from Lamain Heard and three unknown individuals then if it originated from four unknown individuals."

**John Rodican**

On July 28, 2021, EDMCS detectives interviewed John Rodican.  Rodican was a paramedic with American Medical Response (AMR) who responded to the shooting scene on Catherine Street.  Rodican told detective that he started his shift on June 15, 2021 at 9:00 p.m. and shortly thereafter, was sent on a call to Sazon y Mambo.  When AMR arrived there, they were redirected to Catherine Street and Main Street on a gunshot wound call.  Rodican's statement continues:

"The person that I treated was Dennis Waiters.  Dennis was on the ground, and I talked to him there.  Dennis had a single gunshot wound to his leg, which I began treating.  I believe that I cut some of his clothes off then.  Dennis told me that he had been shot.  I remember that Dennis told me that, "they rushed up on me" and that he "didn't know that they were cops." Dennis also told me that he had been drinking.  I saw Dennis had an injury to his bottom row of teeth.  Dennis told me that he had hit his face on the steering wheel in the vehicle.  It did not appear to me that it would have been an injury from a car accident because he didn't have any airbag dust on him.  Dennis also did not have any dirt or debris in his mouth.  Dennis did not complain at the time that anyone had done anything to him.  We loaded Dennis onto a stretcher and transported him to Bridgeport Hospital.   After we loaded Dennis into the back of the ambulance, there was a uniformed Bridgeport Police Officer in the back of ambulance, who rode in the back of the ambulance to Bridgeport Hospital.  I believe the officer's name was Goncalves and I believe that he had his bodycam on."

**Quanell Wade**

EDMCS detectives interviewed and took a statement from Quanell Wade, a civilian who happened to be driving home on the night of June 15, 2021, around 10:00 p.m.  He stopped his car on Catherine Street intending to turn left onto Route 8.  Wade's statement continues:

"In front of me in the left lane, there was a car.  The car was a gray Chrysler.  It looked like the car was going to go straight across to go to East Washington.  When I pulled behind that vehicle, I left about a full car length between him and I.  At the time, I was the only person in the car and my front two windows were rolled down about half way.  The car that I was driving was my tan Toyota Avalon.  A few seconds after I pulled behind the Chrysler, multiple police cars came from all directions and boxed in the car in front of me.  I remember two of the vehicles were a white pickup truck and a dark colored Honda.  The white pickup truck was on my left side.  The dark Honda was to my right somewhere.  All of the cars that I saw pull up were unmarked police cars; I did not see any marked police cars.  When the police cars pulled up, they did not have their police lights on, but right after they pulled up, the police got out of their cars and the police lights of the vehicles came on.  I remember that the flashing police lights were red and blue.  When the police got out of their vehicles, I saw that they all had black

24

vests on.  I saw vests that said, "FBI" on them, but did not see any vests that said "Police", however, I did not see any of the officers that did not have vests on.  When the police got out of their cars, I heard them yelling.  They were yelling stuff like, "Police", "Freeze", and stuff like that, but I couldn't tell exactly what they were yelling.  When the police were out of their vehicles, I saw the reverse lights of the Chrysler turn on.  I panicked and tried to put my car in reverse to get away, but before I could, the Chrysler reversed into me hard.  When the Chrysler reversed, police were already out of their cars and were surrounding the Chrysler.  When the Chrysler reversed, police that were surrounding the vehicle had to try to get out of the way of the reversing car.  Immediately after striking my car, the Chrysler pulled forward and to the left, and struck a light pole on my left.  I don't remember exactly where all the officers were, but I remember that they had to get out of the way of the Chrysler.  The police had boxed in the Chrysler in such a way that he did not have enough room to get away without first reversing into my car to create space.  Immediately after the Chrysler hit the utility pole, I heard a loud pop, which I believed was a gunshot.  Shortly after that, I heard a second loud pop.  I remember that the two pops were distinctly different from one another, but I can't say for sure which one was louder or if one of them may have been from a Taser.  I then saw that police had one person on the ground near the rear driver's side of the Chrysler.  I also saw an officer chasing one person to my left through the wide-open area under the highway.  I remember that the officer had a Taser out and he was fumbling with the Taser, but I am not sure what he was doing.  I then stayed on scene until police took my information and told me that I could leave.  When the Chrysler hit my car, it caused front-end damage to my car as a result.  I have pain in my neck, back, and shoulders.  I went to the walk-in clinic the night after to get checked out.  I have been thinking about what I saw a lot and it was a traumatic experience for me as it was a lot to take in."

**SCENE**

EDMCS detectives documented the scene at the intersection of Main Street and Catherine Street, as well as the area leading to the Sazon y Mambo restaurant.  Detectives located a single .45 caliber shell casing in the roadway on Catherine Street.

25

Shell casing

Detectives also located evidence of two Taser deployments along the path between the area of the Chrysler 300 and Sazon y Mambo.

Detectives determined that there were five police vehicles at the Catherine Street scene: (1) Dodge Charger with registration 163ZVC, (2) white Ford F350 with registration 254BPT, (3) Dodge Journey with registration 162MED, (4) Dodge Charger with registration 154TJN, and (5) Ford Crown Victoria with registration 293BPT. The Dodge Charger (163ZVC) had damage to the front bumper, passenger side headlight, hood, and passenger side quarter panel.

26





Charger 163ZVC





Charger 163ZVC

The Ford F350 (254BPT) had damage to the passenger side front bumper, passenger side quarter panel, and passenger side door.



F350





F350

The Crown Victoria (293BPT) had damage to the front driver side door and driver side mirror.





Crown Victoria

The Dodge Journey (162MED) did not have any observable damage.



Dodge Journey

The Dodge Charger (154TJN) also did not have an observable damage.



Charger 154TJN

32

With the exception of the Dodge Journey, all vehicles were equipped with emergency lights and sirens.

Quanell Wade who had stopped behind the Chrysler 300 at the intersection had left the scene prior to the arrival of EDMCS detectives.  Wade reported that his Toyota sustained front-end damage during the incident.



Toyota Avalon

Detectives observed the Chrysler 300 positioned in front of a utility pole.  It had significant front-end damage and air bag deployment.  Detectives also observed damage to (1) front driver side quarter panel, (2) rear driver side quarter panel, (3) rear driver side light, (4) front passenger side quarter panel, (5) rear passenger door, (6) front passenger side door, and (7) damage to the center console, radio and environmental control area.

33

















Chrysler 300 Interior

A single defect resembling a bullet hole was located in the front driver side door.



Bullet Hole

A blood-like substance was observed on the left side of the vehicle's trunk.



In plain view on the front passenger floorboard, detectives seized a Stoeger T6429 Cougar .40 caliber pistol.



Gun on Floorboard







Stoeger Cougar Pistol

The Chrysler 300 was towed to Troop G, and examined pursuant to a search warrant. The defect in the front door resembling a bullet hole was 34 inches from the ground. Using a trajectory rod, detectives determined that the trajectory coincided with Waiters' bullet wound.







Trajectory Rod

The State Police Collision Analysis and Reconstruction Squad (CARS) did a post-collision inspection of the Chrysler 300.  CARS detectives noted that the front row driver and passenger seat belts were locked in the retracted position after the seatbelt pretensioners deployed indicating that neither the driver nor passenger were wearing seat belts at the time of the collision.

After the incident, Officer Vazquez went to St. Vincent's Hospital in Bridgeport for medical observation.  He was released from medical care prior to the arrival of EDMCS detectives.  The Bridgeport Police Department turned over Vazquez's Smith & Wesson M&P 2.0 .45 caliber pistol (#NCP36210) along with his police tactical vest.  The firearm had an eleven round capacity and contained ten rounds.

42





Vazquez's Firearm with Magazine



Vazquez's Tactical Vest

EDMCS detectives met with involved officers to document their attire and equipment at the time of the incident. The detectives met with Sergeant Jason Amato, Sergeant John Andrews, Officer Jonathan Simmons, Officer Michael Paoletti, and Officer William Reilly.  All officers were wearing clothing or vests marked with "POLICE" or "FBI" on both the front and back of the clothing as well as displaying either a cloth or metal badge on their front.



Sergeant Jason Amato

44



Sergeant John Andrews



Officer Jonathan Simmons



Officer Michael Paoletti



Officer William Riley

46

Four members of the Federal Bureau of Investigation were present at the time of the incident but had left prior to the arrival of EDMCS detectives.

The Bridgeport Police Department Fusion Center provided Shotspotter reports generated around the time of the officer-involved shooting. The report indicated that a single gunshot occurred at the intersection of Catherine Street and Main Street on June 15, 2021, at 10:12:14 p.m.

To review the Shotspotter report, click here.

Finally, detectives obtained video files captured by the Bridgeport Police Fusion Center Public Safety Cameras. These videos show the Chrysler 300 prior to its leaving the Greene Homes Housing Complex. They also show, to a limited extent, the event itself.

To view the video of the Chrysler at the Greens, click here.

To view the video of the incident, click here.

**DIGITAL EVIDENCE**

At the time of the OIS, neither TFO Vazquez nor any of the other officers or federal agents on scene were wearing body worn cameras. Federal TFO policy precluded State TFO from wearing body worn cameras. Their unmarked police cars did not have dashboard cameras. Accordingly, the only digital evidence obtained during the investigation was from the Bridgeport Police Officers who responded to the scene after the shooting as well as from the Bridgeport surveillance cameras described above.

**Body Worn Camera (BWC)**

All Bridgeport Police Department officers who responded to the scene at Catherine Street and Main Street had body worn cameras. While none of these officers were present at the time of the stop and ensuing shooting, their BWC recordings do provide information regarding: (1) the position of the vehicles, and (2) the attire worn by the TFOs present. In addition, there are some references to the gun seized from the Chrysler. A sample of these recordings is included.

47

**Officer Michael Salemme**

This 11 minute, 34 second video shows Officer Salemme arriving at the scene of the incident.  TFOs are describing to other officers what happened.  The audio starts at elapsed time 030.[7]  At 047 seconds, Salemme walks near the white Ford F350 and Officer Simmons' unmarked Charger.  Both vehicles have their emergency lights flashing.  At 8:54, the video shows the position of the Chrysler after the crash in front of the utility pole.

To view Salemme's BWC, click here.

**Sergeant Ian Schumaker**

The video shows Sergeant Schumaker arriving at the scene at elapsed time 1:00.  At 1:33, Schumaker approaches TFO Mark Martocchio who is in the blue Police Crown Victoria with TFO Carlos Vazquez.  Martocchio describes his injury to Schumaker.  At 1:57, the video shows Waiters on the pavement next to the Chrysler.  At 4:47, Schumaker walks around the scene; the video shows the white F350, Sergeant Amato's unmarked Charger, and Officer Simmons' unmarked Charger all with flashing lights.

To view this portion of Schumaker's BWC, click here.

**Officer John Perry**

Officer John Perry's BWC recording is in two parts designated as #134 and #137.

#134 – At elapsed time 5:10 Perry arrives on scene.  At 6:58, the video shows medics working on Waiters.  At 7:35, Perry speaks to Sergeant Andrews who describes what happened.  At 8:00, the video shows Andrews asking Waiters about any medical problems or allergies that he might have.  At 9:50, the video shows Perry inspecting the white F350 pick-up and at 13:13, the video shows Perry inspecting the Chrysler.

#137 – At elapsed time 5:27, Perry remarks, "There's a gun right in the front."  At 6:30, TFO Reilly can be heard describing the incident to another officer.  At 11:30, Perry is standing near the Chrysler. At 13:20, Perry tells Lieutenant Miner, "Yeah, the gun is right here."

To review these portions of Perry's BWC video, click here and here.

---

[7] All times are approximate.

**FINDINGS**

Based on the credible evidence developed by the investigation, I make the following material factual findings:

1.  On June 14, 2021, Shamar Swinton, a suspected gang member associated with the Greene Homes Housing Complex (Greens), was shot and killed while in an automobile on State Street in Bridgeport.

2.  On June 15, 2021, Dha'moni Lockhart, also a suspected gang member associated with the Greens, was shot and killed while in a vehicle on Route 8 in Bridgeport.

3.  Law enforcement officers affiliated with the Bridgeport Police Task Force, FBI Safe Streets Task Force, and Connecticut State Police Statewide Urban Violent Crime Task Force received intelligence that Greens gang members believed that members of a gang affiliated with the North End of Bridgeport were responsible for the deaths of Swinton and Lockhart.

4.  On June 15, 2021, during the evening hours, a group gathered at the Greens to mourn the deaths of Swinton and Lockhart.  Task Force Officers (TFO) monitored this gathering utilizing, in part, video surveillance of the Greens maintained by the Bridgeport Police Department Fusion Center.  TFOs also maintained proximity to the Greens in unmarked police vehicles.

5.  Sometime prior to 10:00 p.m., TFOs received specific information that Lamain Heard, a known gang member and convicted felon, possessed a gun and was intent on shooting someone.

6.  At approximately, 10:00 p.m., the Bridgeport Fusion Center reported to TFOs that surveillance video showed Heard entering the passenger seat of a silver Chrysler 300 automobile with chrome rims that was parked at the Greens.

7.  As the Chrysler drove away from the Greens, cameras picked it up turning left onto Washington Avenue and then right onto Catherine Street.  Sergeants Jason Amato and John Andrews made the decision to stop the Chrysler at the red light at the intersection of Catherine Street and Main Street.  The basis for the stop was their reasonable belief that Heard illegally possessed a gun in the car.  Their intent was to avoid a high-speed pursuit by stopping the car before it could drive onto Route 8.

8.  The Chrysler stopped at the red traffic light at the intersection of Catherine Street and Main Street.  Dennis Lee Waiters, Jr. was driving and Lamain Heard was in the passenger seat.  Stopped behind the Chrysler was a Toyota Avalon operated by Quanell Wade.

49

9. Multiple Task Force unmarked police vehicles converged on the Chrysler in an effort to box it in. TFO Carlos Vazquez stopped his black Dodge Journey diagonally in front of the Chrysler. TFO Mark Martocchio pulled his Police Crown Victoria along the passenger side. TFO William Reilly stopped his Police F-350 pick-up truck behind the back of the driver's side of the Chrysler. Sergeant Amato stopped his Police Dodge Charger behind TFO Reilly's pick-up and TFO Jonathan Simmons' Police Dodge Charger entered the intersection from Main Street and stopped in front of and facing the Chrysler.

10. With the exception of Vazquez's Dodge Journey, all police vehicles involved in the stop were equipped with emergency lights and sirens. All TFOs wore vests clearly displaying the words "POLICE" or "FBI."

11. Prior to exiting their unmarked vehicles, TFOs activated the emergency lights and sirens on all vehicles so equipped. TFOs approached the Chrysler identifying themselves as "Police" or "FBI" and directed the occupants to show their hands.

12. At this point, in an effort to escape, Waiters drove the Chrysler in reverse striking TFO Reilly's pick-up truck, TFO Martocchio's Crown Victoria, and Quanell Wade's Toyota Avalon. Waiters then accelerated rapidly forward turning abruptly to avoid striking TFO Vazquez's Dodge Journey and TFO Simmons' Dodge Charger. This turn put the Chrysler on a direct collision course with TFO Vazquez who was positioned near the driver's side of Sergeant Amato's Dodge Charger. Fearing that the oncoming Chrysler would strike him, Vazquez fired one shot from his duty firearm. The shot penetrated the Chrysler's driver's door and struck Waiters in his left hip/thigh area.

13. Changing direction, the Chrysler struck the front end of TFO Simmons' Dodge Charger and then violently collided with a utility pole.

14. Following the collision, Heard fled from the Chrysler on foot. TFOs pursued and apprehended him near the Sazon Y Mambo restaurant on Main Street.

15. TFOs Martocchio and Reilly removed Waiters from the Chrysler and placed him under arrest. When they discovered that he had been shot, they summoned medical aid. Medics were also summoned to treat Heard for possible injury from the Taser deployment used in his apprehension.

16. Following the incident, officers discovered a handgun on the Chrysler's passenger floor. DNA analysis of swabbing's from the handgun's grip were a match to Heard's DNA. In a subsequent interview, Heard admitted possessing the gun for protection at the Greens.

17. During his oral statement to EDMCS detectives, Waiters made the following assertions:

50

a.  The claim that a gun was found in the car was only made after Waiters had gone to the news.

b.  He did not know that the vehicles or persons involved in the stop were police officers.

c.  The police fired more than one shot.  Lamain Heard also suggested that multiple shots were fired.

d.  After being removed from the Chrysler, a police officer kicked Waiters in the mouth displacing his teeth and made the comment, "I was hoping those bullets hit your face you fucking scumbag."

e.  At the time of the collision with the utility pole, Waiters was wearing a seat belt.

I reject each of these assertions as not credible for the following reasons:

GUN – credible evidence establishes that the gun was discovered in the Chrysler the night of the incident.  Sergeant Amato's sworn police report states that he saw the gun in the Chrysler at the scene the night of June 15, 2021.  He took a photo of it in place.  Special Agent Domachowski's report likewise states that he saw the gun in the car that night.  The BWC of Officer Perry suggests that he also saw the gun in the car and said so to other officers on scene, DNA analysis matched a swab from the gun's grip to Heard's DNA, and Heard admitted possessing the gun that night for protection.

POLICE – credible evidence establishes that the TFOs revealed their identities as law enforcement officers at the time of the stop.  Quanell Wade stated that as soon as the officers exited their unmarked cars, the emergency lights went on, the officers had vests that said "FBI," and when officers approached the stopped Chrysler, they yelled "Police" and words like that. The body worn camera (BWC) video from the officers that responded to the scene all show the unmarked police vehicles displaying emergency lights.  The BWCs also show multiple TFOs with vests clearly marked "Police" or "FBI."

MORE THAN ONE SHOT – Shotspotter equipment reported only one shot fired in the area of Catherine Street and Main Street at the time of the incident.  EDMCS detectives recovered only one shell casing at the scene.   There was only one bullet hole in the car and the sworn statements of TFO Vazquez admitted firing one shot.  The other TFOs denied discharging their weapons.

KICK IN THE TEETH / "SCUMBAG" COMMENT – Credible evidence establishes that Waiters sustained injury to his teeth due to the collision with the utility pole and that no inflammatory comment was made to him.  Waiters spoke to Sergeant Utermarck at Bridgeport Hospital the night of the incident and told him that he injured his teeth when he crashed the car.  Waiters told medic John Rodican, who rode with Waiters in the ambulance to the hospital, that he hit

51

his face on the steering wheel during the collision.  The State Police CARS unit determined that, at the time of the crash, neither Waiters nor Heard were wearing seatbelts.

I reject Waiters claim that an officer kicked him in the teeth and called him a "Scumbag."

**LEGAL STANDARD**

The use of force by a police officer is governed by General Statutes §53a-22.  The version of that statute in effect on June 15, 2021, in relevant part, provides:

"(a)(1)  For purposes of this section, a reasonable belief that a person has committed an offense means a reasonable belief in facts or circumstances which if true would in law constitute an offense.  If the believed facts or circumstances would not in law constitute an offense, an erroneous though not unreasonable belief that the law is otherwise does not render justifiable the use of force to make an arrest or prevent an escape from custody.

(2) A peace officer … who is effecting an arrest pursuant to a warrant or preventing an escape from custody is justified in using the physical force prescribed in subsections (b) and (c) of this section unless such warrant is invalid and known by such officer to be invalid.

(b) Except as provided in subsection (a) … of this section, a peace officer … is justified in using physical force upon another person when and to the extent that he or she reasonably believes such use to be necessary to:  (1) Effect an arrest or prevent the escape from custody of a person whom he or she reasonably believes to have committed an offense unless he or she knows that the arrest or custody is unauthorized; or (2) defend himself or herself or a third person from the use or imminent use of physical force while effecting or attempting to effect an arrest or while preventing or attempting to prevent an escape.

(c) (1) … a peace officer … is justified in using *deadly force* upon another person for the purposes specified in subsection (b) of this section only when his or her actions are objectively reasonable under the circumstances, and:

(A) He or she reasonably believes such to be necessary to defend himself or herself or a third person from the use or imminent use of deadly physical force …" (Emphasis added).

The statute further provides:

 "For the purpose of evaluating whether the actions of a peace officer … are reasonable under subdivision (1) of this subsection, factors to be considered include, but are not limited to,

52

whether (A) the person upon whom deadly force was used possessed or appeared to possess a deadly weapon, (B) the peace officer … engaged in reasonable de-escalation measures prior to using deadly physical force, and (C) any conduct of the peace officer … led to an increased risk of an occurrence of the situation that precipitated the use of force," §53a-22 (c)(2).

Accordingly, a police officer is justified in using deadly physical force upon another person when the officer reasonably believes such force to be necessary to defend the officer or a third person from the use or imminent use of deadly physical force. "Deadly physical force" means "physical force that can be reasonably expected to cause death or serious physical injury." General Statutes §53a-3(5). "Serious physical injury" means "physical injury which creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ." General Statutes §53a-3(4).

The reasonableness of a police officer's belief under §53a-22 is evaluated pursuant to a subjective-objective formulation. *State v. Smith*, 73 Conn. App. 173, 185, 807 A.2d 500, cert. denied 262 Conn. 923, 812 A.2d 865 (2002). Under this test, the first question is whether, on the basis of all of the evidence, the police officer in fact honestly believed that deadly force was necessary to defend himself/herself or a third person. Id. If it is determined that the police officer honestly believed that deadly force was necessary, the second part of the test asks whether the police officer's honest belief was reasonable from the perspective of a reasonable police officer in the officer's circumstances. Id., 198.

The United States Supreme Court has explained this test in a civil rights case: "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on scene rather than with the 20/20 vision of hindsight. . . .The calculus of reasonableness must embody allowance of the fact that police officers are often forced to make split-second decisions—in circumstances that are tense, uncertain, and rapidly evolving— about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396–97, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).

Under current Connecticut law, evaluation of the reasonableness of an officer's conduct also requires consideration of whether (1) the person upon whom deadly physical force was used possessed, or appeared to possess, a deadly weapon, (2) the officer engaged in reasonable de-escalation measures prior to using deadly force, and (3) the conduct of the officer led to an increased risk of the occurrence of the situation that precipitated the use of deadly physical force. While Dennis Waiters did not appear to possess a deadly weapon, he did possess a dangerous instrument in the form of a vehicle that was driving directly at Vazquez. A vehicle is included in the definition of dangerous instrument. See General Statues §53a-3(7). Under the circumstances presented, there was no opportunity to employ de-escalation techniques. Things moved far too fast to attempt de-escalation. Finally, the decision to stop the vehicle to determine if it contained a gun and the method used to make the stop did not amount to police-created jeopardy. The situation was precipitated by Waiters' reckless attempt to escape and not the conduct of the police.

53

**POSTC STANDARD**

The State of Connecticut Police Officer Standards and Training Council (POSTC), on November 19, 2019, adopted an updated Model Policy regarding motor vehicle pursuits.  As relevant here, Section 8 of the Model Police provides:

"1. Officers shall not discharge their firearms at a moving vehicle or its occupants unless the occupants are using, or threatening the use of, deadly physical force against the officer or another person by means other than the vehicle.

a. This does not preclude exigent circumstances such as, but not limited to, where the officer reasonably believes that there are no other means available to avert the threat of the vehicle, or if such vehicle is being utilized as a weapon against the officer(s), or another person such as in a vehicle ramming attack.

c. No officer should intentionally position his or her body into a path of a fleeing motor vehicle unless such tactic is approved by the law enforcement unit that employs such police officer and in accordance with an established written policy.  Wherever possible, the involved officer should make an effort to move to an area of safety if the vehicle becomes a threat, including retreating from the threat if practical."

This policy expresses the general proposition that police officers should not discharge their firearms at moving vehicles.  The policy, however, authorizes the use of a firearm in certain exigent circumstances.  One such circumstance is where the officer reasonably believes that there are no other reasonable means available to avert the threat of the vehicle.

**ANALYSIS**

Under Connecticut law as applicable here, a determination as to whether a police officer's use of deadly force was objectively reasonable requires, in part, consideration of four questions:

1.  Did the officer, as a matter of fact, actually – that is honestly and sincerely – believe that he or she was facing either the actual use or imminent use of deadly force when the officer used deadly force?

2.  Was that actual belief reasonable in the sense that a reasonable police officer in the officer's circumstances at the time of the officer's actions, viewing those circumstances from the officer's point of view, would have shared that belief?

54

3.  Did the officer, as a matter of fact, actually –that is honestly and sincerely –believe that the use of deadly force was necessary to defend himself or herself from such threat?

4.  Was that actual belief reasonable, in the sense that a reasonable police officer in the officer's circumstances at the time of the officer's actions, viewing those circumstances from the officer's point of view, would share the belief that deadly force was necessary?

Additionally, the reasonableness of the officer's conduct also turns on whether (1) the other person possessed a deadly weapon (or appeared to), (2) the officer attempted reasonable de-escalation measures, and (3) the situation was not precipitated by the officer's own conduct.

The credible evidence supports Officer Carlos Vazquez's statement that he actually believed that he was facing death or serious physical injury had he been run over by Waiter's accelerating Chrysler 300 automobile.  Such actual belief was not exaggerated or unfounded and a reasonable police officer in the same circumstances at the time would have felt the same way. The credible evidence further supports Officer Vazquez's stated belief that discharging his firearm at the oncoming Chrysler was the only readily available feasible means to defend himself from the threat that he faced.  Such belief was reasonable because a reasonable police officer in the same circumstances at the time would have shared that belief.  Moreover the exigencies of the situation did not permit the utilization of any de-escalation techniques, and the use of deadly force was not precipitated by police conduct.  Finally, Officer Vazquez's discharge of his firearm at the Chrysler fits squarely within the exception in the POSTC policy regarding the discharge of firearms at moving vehicles.

**CONCLUSION**

Based on my investigation of this incident, the factual findings supported by that investigation, and the applicable law, I conclude that Officer Carlos Vazquez's use of deadly force was objectively reasonable and therefore justified.  With the filing of this report, the Office of Inspector General intends to take no further action in this matter.

Submitted this  26th  day of August, 2022.

_____
ROBERT J. DEVLIN, JR.
INSPECTOR GENERAL

55

**ADDENDUM**

**Appendix**

1. Statement of Officer Carlos Vazquez

2. Shotspotter Report

**Recommendations**

On June 15, 2021, Connecticut law did not mandate the use of body worn cameras. Such use was mandated effective July 1, 2022.  Had the TFOs in the present case worn cameras it would have provided a real time account of what transpired in the chaotic scene at Catherine Street and Main Street as well as the later interaction between the police and Waiters and Heard.

The United States Department of Justice (DOJ) addressed the subject of BWCs in two memos issued by Deputy Attorney General Lisa Monaco.  On October 29, 2020, Monaco announced that the DOJ would permit federally deputized officers to activate BWCs while serving arrest warrants, during planned arrest operations, and during the execution of search warrants.  On June 7, 2021, Monaco announced a change in DOJ policy to require federal agents and task force officers to wear and activate BWC recording during (1) a pre-planned attempt to serve an arrest warrant and other pre-planned arrest operations, including the apprehension of fugitives sought on state and federal warrants; or (2) the execution of a search or seizure warrant or order.  The memo directed federal law enforcement agencies to submit to the DOJ their own BWC policies and name a senior official with responsibility to implement its BWC policy.

These two memos did not make changes to DOJ policies that identify any recordings generated by BWCs as federal records pursuant to the Federal Records Act.  The TFO, the TFOs agency, or any third party cannot disseminate such records without the written permission of the federal government.

As of the time of this report, there are ongoing and productive discussions about the use of BWCs by TFOs and the availability of such recordings to non-federal agencies.  My recommendation is that TFOs should wear cameras during the preplanned activities noted in the DOJ memo, as well as unplanned vehicle stops, arrests, and searches provided such actions are reasonably foreseeable.



**STATE OF CONNECTICUT**
**DEPARTMENT OF EMERGENCY SERVICES AND PUBLIC PROTECTION**
**DIVISION OF STATE POLICE**



## Victim/Witness Statement

| Date: 4/6/2022 | Time Started: 2:00 PM | Time Ended: 2:10 PM | CFS #: 2100241531 |
|---|---|---|---|
| Location: 628 HEBRON AVE. GLASTONBURY, CT | | Statement taken by: INSPECTOR S. HUNT | |

I, __Carlos Vazquez_____ Date of Birth: __7-25-79_____

of __300 Congress St._____ Town/City:__Bridgeport_____ State:__CT_____

I make the following statement, without fear, threat or promise.  I have been advised that any statement(s) made herein which I do not believe to be true, and which statement is intended to mislead a public servant in the performance of his / her official function, is a crime under C.G.S. section 53a-157b and is punishable by law

CV I, Officer Carlos Vazquez, have been a sworn member of the Bridgeport Police Department since July 9th, 2007 and am currently assigned to the Federal Bureau of Investigations Bridgeport Safe Streets Task Force.

Between June 14, 2021 and June 15, 2021, two shooting incidents occurred within a 24-hour span in the City of Bridgeport, resulting in the death of two victims, known by Task Force Officers to be associated with group/gang members of the Greene Homes Housing Complex, located at 98 Highland Avenue, Bridgeport, Connecticut. Consequently, Task Force Officers received intelligence information from multiple independent confidential sources, reporting that a vigil was being held at the Greene Homes Housing Complex to mourn the loss of the two victims.  That group/gang members from this location were among the crowd of people in attendance for the vigil and were heavily armed with high caliber weapons, high capacity magazines and "switches" (vernacular for fire selector switch used to convert the weapon from semi-automatic mode to full-automatic firing mode at a rate of 20 rounds per second) and had every intention of utilizing these weapons to retaliate against and/or protect themselves from retaliation by the opposing group/gang members.

On June 15, 2021, members of the Bridgeport Police Task Force, Special Agents assigned to the Federal Bureau of Investigation Bridgeport Safe Streets Task Force, and Connecticut State Police Statewide Urban Violent Crime Control Task Force, assisted by Officer Edwin Garcia assigned to    CV

By affixing my signature to this statement, I acknowledge that I have read it and / or have had it read to me and it is true to the best of my knowledge & belief.

| Victim/Witness Name: CARLOS VAZQUEZ | Victim/Witness Signature: | Date: 4/6/22 |
|---|---|---|
| Parent/Guardian Name: | Parent/Guardian Signature: | Date: |

Personally appeared the signer of the foregoing statement and made oath before me to the truth of the matters contained therein. If notarized, endorse here:

Oath Taken By: _Inspector Frank Capri_____  ___Capri_____  __04/06/22_____
                        Name                                        Signature                              Date Signed

DPS-633-C (Rev. 11/05//13)          *An Affirmative Action/Equal Employment Opportunity Employer*          Page __1__ of __4__



**STATE OF CONNECTICUT**
**DEPARTMENT OF EMERGENCY SERVICES AND PUBLIC PROTECTION**
**DIVISION OF STATE POLICE**



the Fusion Center and tasked with monitoring the Bridgeport Police Fusion Center – Public Safety Cameras, commenced an undercover operation in an attempt to intercept and suppress ongoing gun violence taking place between group/gang members from the Greene Homes Housing Complex and group/gang members from the North End of Bridgeport, Connecticut.

On this date, I was operating a non-descript vehicle (Black/Dodge Journey) assigned to me by the FBI. This vehicle was not equipped with emergency lights and/or sirens. I was accompanied by FBI Special Agent Matthew Loucks who was sitting in the front passenger seat and FBI Special Agent James Domanchowski who was sitting in the rear driver side passenger seat. Each of us wore tactical vests and badges clearly identifying ourselves as "POLICE" and/or "FBI".

At approximately 10:00 p.m., Task Force Officers received source information that an individual named "Main", known to Task Force Officers from previous incidents/arrests as Lamain Heard, born on November 20, 1989, was in attendance at the Greene Homes vigil with a firearm on his person with intentions of shooting someone. Lamain was described as wearing a gray colored shirt, carrying the firearm on his person, and operating a silver Chrysler 300 vehicle with "rims" that was currently parked in the "U" shape parking lot area situated in front of building #3.

Upon receiving this information, Officer Garcia located this vehicle, via Public Safety Camera, parked in the "U" parking lot as previously reported by the confidential source(s). Officer Garcia maintained constant surveillance of this vehicle and kept Task Force Officers apprised with all pertinent information. Task Force Officers positioned themselves on the outskirts of Greene Homes in preparation to follow the vehicle a safe distance away from the Greene Homes Housing Complex so that a motor vehicle stop could be conducted to investigate the underlying allegations.

Shortly thereafter, Task Force Officers received an update from a confidential source reporting that "they" were pulling off in the Chrysler 300. This information was immediately corroborated, by Officer Garcia, who advised over police radio that two male occupants entered the Chrysler 300 and departed from the Greene Homes, east on Highland Avenue. Upon reaching the intersection of Highland and Washington Avenue, Task Force Officers proceeded to follow the vehicle as it traveled north on Washington Avenue, and east on Catherine Street. The vehicle merged onto the far left-hand lane on Catherine Street before coming to a full stop for the (red) traffic control signal at its intersection of Main Street, under the RT 8 bridge (underpass).

By affixing my signature to this statement, I acknowledge that I have read it and / or have had it read to me and it is true to the best of my knowledge & belief.

| Victim/Witness Name: CARLOS VAZQUEZ | Victim/Witness Signature: | Date: 4/6/22 |
|---|---|---|
| Parent/Guardian Name: | Parent/Guardian Signature: | Date: |

Personally appeared the signer of the foregoing statement and made oath before me to the truth of the matters contained therein. If notarized, endorse here:

Oath Taken By: _Inspector Frank Caproi_      _Frank Caproi_      _04/06/22_
　　　　　　　　Name　　　　　　　　　　　Signature　　　　　　　　　Date Signed



**STATE OF CONNECTICUT**
**DEPARTMENT OF EMERGENCY SERVICES AND PUBLIC PROTECTION**
**DIVISION OF STATE POLICE**



At this time, Task Force Officers operating unmarked police vehicles, immediately activated their lights and sirens and converged upon the occupants of the Chrysler 300 in attempt to close all potential avenues of escape thus avoiding a high-speed pursuit.

I traveled ahead of the Task Force Officers and positioned my vehicle [Black/Dodge Journey] ahead of the Chrysler 300. Upon exiting my vehicle, I unholstered my department issued firearm, kept it in a low ready position and repeatedly shouted verbal commands for the occupants of the Chrysler 300 to show their hands, as I moved to the driver's side door of the vehicle.

The Chrysler 300 remained in a stationary position. However, as I reached the driver side door of the Chrysler 300, the operator, later identified as Dennis Waiters, born on March 29, 1990, placed the vehicle in reverse and in an aggressive and abrupt manner backed into a civilian vehicle; continuing in reverse hitting Officer Mark Martocchio's unmarked police vehicle [Dark Blue/Ford Crown Victoria] and Detective William Reilly's unmarked police vehicle [White/Ford F350 Pickup Truck] both of which had emergency lights activated.

From my position, I observed the Chrysler 300 sideswipe Officer Martocchio's [Ford Crown Victoria] and pin his body in between the door and door frame of the [Ford Crown Victoria]. I also observed Officer Martocchio in distress and screaming in excruciating pain.

I also observed the Chrysler 300 reversing aggressively and striking the front passenger side bumper and front passenger side door area of Detective Reilly's [Ford F350 Pickup Truck] nearly injuring FBI Special Agent Andrew Pappas and causing him to fall back and retreat for cover.

Waiters then accelerated forward, while aggressively turning the steering wheel to the left, in an apparent attempt to avoid striking my vehicle [Black/Dodge Journey] and the unmarked police vehicle operated by Officer Simmons [Black/Dodge Charger/ Flashing Emergency Lights]. This abrupt, and reckless turn by Waiters, caused the vehicle to button hook back toward my position in a collision course, making it clearly impossible for me to retreat for safety and avoid being run over and/or side swiped and crushed between the driver side of the Chrysler 300 and the unmarked police vehicle [Black/Dodge Charger/ flashing emergency lights] occupied by Sergeant Amato and Sergeant Andrews. Fearing that my life and the lives of others in the area due to the reckless attempt to escape, were now in immediate danger of serious physical injury or death, I discharged one round from my duty issued firearm at the operator (Waiters), causing Waiters to steer the vehicle away from me.

By affixing my signature to this statement, I acknowledge that I have read it and / or have had it read to me and it is true to the best of my knowledge & belief.

| Victim/Witness Name: CARLOS VAZQUEZ | Victim/Witness Signature: | Date: 4/6/22 |
|---|---|---|
| Parent/Guardian Name: | Parent/Guardian Signature: | Date: |

Personally appeared the signer of the foregoing statement and made oath before me to the truth of the matters contained therein. If notarized, endorse here:

Oath Taken By: _Inspector Frank Capozi_   Signature: _Frank Capozi_   Date Signed: _04/06/22_
           Name



**STATE OF CONNECTICUT**
**DEPARTMENT OF EMERGENCY SERVICES AND PUBLIC PROTECTION**
**DIVISION OF STATE POLICE**



Subsequently, the Chrysler 300 hit the front end of Officers Simmons unmarked police vehicle [Black/Dodge Charger] and crashed into a nearby metal pole situated at the northwest corner of the intersection of Main Street and Catherine Street, causing heavy front-end damage and airbags to deploy.  I then observed Detective Reilly and Officer Martocchio remove Waiters from the Chrysler 300 and place him in handcuffs without further incident.

As a result of discharging my firearm, Waiters sustained a gunshot wound to his left thigh area. He was immediately transported by medics to Bridgeport Hospital to be treated for the gunshot wound, as well as any possible injuries sustained during the collision with the other vehicles and metal pole.

I was driven to St. Vincent's Hospital by Officer Martocchio, where it was determined that Officer Martocchio sustained contusions and a hairline fracture to his left hand and I was evaluated and monitored for any delayed physical or emotional reactions associated with the incident, which would require medical attention.

While at St. Vincent's Hospital, Captain Brian Fitzgerald took custody of my tactical vest and my department issued firearm.

I was then relieved from duty and was transported from the hospital by Detective Vincent Lariccia.

By affixing my signature to this statement, I acknowledge that I have read it and / or have had it read to me and it is true to the best of my knowledge & belief.

| Victim/Witness Name: | Victim/Witness Signature: | Date: |
|---|---|---|
| CArrios Vazquez | a | 4/6/22 |
| Parent/Guardian Name: | Parent/Guardian Signature: | Date: |

Personally appeared the signer of the foregoing statement and made oath before me to the truth of the matters contained therein. If notarized, endorse here:

Oath Taken By: _Inspector Frank Capri_    _Frank Capri_    _04/06/22_
              Name                        Signature            Date Signed



# INVESTIGATIVE LEAD SUMMARY

| | |
|---|---|
| **INCIDENT DATE:** | JUN 15, 2021 |
| **CITY / ZONE:** | BRIDGEPORT / BRIDGEPORTCTCENTRAL |
| **REPORT DATE:** | JUN 18, 2021 14:36:24 |
| **REQUESTED BY:** | SUPPORT@SHOTSPOTTER.COM |



| | | | |
|---|---|---|---|
| **INCIDENT** | 860-191529 | **LOCATION** | 41.185379, -73.192706 |
| **DATE/TIME** | JUN 15, 2021 22:12:14 | **ADDRESS** | 1539 MAIN ST |
| **ROUNDS** | 1 | **AREA** | |
| **CAD ID** | | **TAGS** | OIS |

## INCIDENT AUDIO

| SENSOR | RANGE FROM INCIDENT | AUDIO |
|---|---|---|
| # 106 | 695 ft / 212 m | CLICK TO PLAY ▶ |
| # 95 | 1238 ft / 377 m | CLICK TO PLAY ▶ |
| # 60 | 1311 ft / 400 m | CLICK TO PLAY ▶ |

For more information, email support@shotspotter.com, call 888.274.6877 or +1.510.794.3144. ©2021 ShotSpotter, Inc. All rights reserved. ShotSpotter® and the ShotSpotter logo are registered trademarks of ShotSpotter®, Inc.

ILS



# INVESTIGATIVE LEAD SUMMARY

**INCIDENT DATE:** JUN 15, 2021
**CITY / ZONE:** BRIDGEPORT / BRIDGEPORTCTCENTRAL
**REPORT DATE:** JUN 18, 2021 14:36:24
**REQUESTED BY:** SUPPORT@SHOTSPOTTER.COM



| INDIVIDUAL SHOTS | The following shot count, times, and locations were automatically calculated by the ShotSpotter system at the time of detection. They are approximate and should be deemed as such. The number of individual shots below may not match the round count reported on page one if an Incident Reviewer adjusted the round count during incident review prior to publication. Some shots may overlap or hide other shots on the map. |
| --- | --- |

| SHOT | DATE | TIME | INTERVAL (sec) | LOCATION |
| --- | --- | --- | --- | --- |
| # 1 | 06/15/2021 | 22:12:14.851 | 0.000 | 41.185379, -73.192706 |

For more information, email support@shotspotter.com, call 888.274.6877 or +1.510.794.3144. ©2021 ShotSpotter, Inc. All rights reserved. ShotSpotter® and the ShotSpotter logo are registered trademarks of ShotSpotter®, Inc.

ILS



## INVESTIGATIVE LEAD SUMMARY

**INCIDENT DATE:** JUN 15, 2021
**CITY / ZONE:** BRIDGEPORT / BRIDGEPORTCTCENTRAL
**REPORT DATE:** JUN 18, 2021 14:36:24
**REQUESTED BY:** SUPPORT@SHOTSPOTTER.COM

### INCIDENT TIMELINE

| DATE/TIME | USERNAME | DETAILS |
|---|---|---|
| 06-18-2021 14:31:12 | REVIEWER@SHOTSPOTTER.COM | TAGS CHANGED TO OIS |
| 06-18-2021 14:31:01 | REVIEWER@SHOTSPOTTER.COM | PER CUSTOMER, OIS |
| 06-18-2021 14:30:53 | REVIEWER@SHOTSPOTTER.COM | RECLASSIFIED FROM NOT GUNFIRE TO SINGLE GUNSHOT |
| 06-15-2021 22:12:45 | REVIEWER@SHOTSPOTTER.COM | REVIEW COMPLETED |
| 06-15-2021 22:12:45 | REVIEWER@SHOTSPOTTER.COM | DISMISSED |

For more information, email support@shotspotter.com, call 888.274.6877 or +1.510.794.3144. ©2021 ShotSpotter, Inc. All rights reserved. ShotSpotter® and the ShotSpotter logo are registered trademarks of ShotSpotter®, Inc.

ILS



| | |
|---|---|
| **INCIDENT DATE:** | JUN 15, 2021 |
| **CITY / ZONE:** | BRIDGEPORT / BRIDGEPORTCTCENTRAL |
| **REPORT DATE:** | JUN 18, 2021 14:36:24 |
| **REQUESTED BY:** | SUPPORT@SHOTSPOTTER.COM |

# INVESTIGATIVE LEAD SUMMARY

## DISCLAIMER

The Investigative Lead Summary is produced using data automatically generated by the ShotSpotter system and has not been independently reviewed by our Forensic Engineers. Although it provides precise trigger-pull location and timing as determined automatically by the ShotSpotter system, this summary should only be used for initial investigative purposes because the shot timing, location, and count could differ once reviewed by a ShotSpotter Forensic Engineer. Factors, such as obstructed or attenuated muzzle blast, weapon discharge in an enclosed space, or if the weapon discharged is of .25 or smaller caliber, may prevent the sensor(s) from detecting all or some of the shots fired. This summary has been generated solely for the purpose for which it is provided. Nothing herein shall to any extent substitute for the independent investigation of the shooting incident. The data and conclusions herein should be corroborated with other evidentiary sources such as recovered shell casings and witness statements.

## COPYRIGHT

This is proprietary, confidential, and copyrighted data. Use of this data is restricted to authorized ShotSpotter customers pursuant to their license agreement with ShotSpotter, Inc. The data may not be used for any purposes other than those explicitly authorized by the ShotSpotter license agreement and may not be distributed outside the licensed customer's department without the express, written permission of ShotSpotter, Inc. Copyright (c) 2021 ShotSpotter, Inc. All rights reserved. US and foreign patents and/or trademarks apply as described at: www.shotspotter.com/patents.

## ABOUT SHOTSPOTTER

ShotSpotter uses strategically placed acoustic sensors to detect and locate gunshots within a coverage area. The locations of the gunshots are calculated using audio pulse data and multilateration. Machine learning algorithms analyze and classify the sounds before they are reviewed by acoustic experts at the Incident Review Center. Within seconds, Incident Reviewers add relevant tactical intelligence and publish confirmed gunshots to ShotSpotter subscribers. Learn more about the ShotSpotter technology at ShotSpotter.com/technology.

NOTES

ILS

# Attachment C

# State of Connecticut
## OFFICE OF INSPECTOR GENERAL



Report Concerning
Use of Deadly Force by the United States Marshals Service on January 13, 2022

Robert J. Devlin, Jr.
Inspector General

**TABLE OF CONTENTS**

ACKNOWLEDGMENTS ................................................................................................ 3

INTRODUCTION........................................................................................................ 4

SUMMARY ............................................................................................................... 5

INVESTIGATION ...................................................................................................... 6

    STATEMENTS............................................................................................................. 6

    SCENE ................................................................................................................. 15

    SURVEILLANCE CAMERAS ........................................................................................... 30

FINDINGS ............................................................................................................. 32

LEGAL STANDARD .................................................................................................. 35

ANALYSIS............................................................................................................... 38

CONCLUSION ......................................................................................................... 40

ADDENDUM............................................................................................................ 40

    DEPARTMENT OF JUSTICE POLICY RE: BODY WORN CAMERAS ...................................................... 40

*Acknowledgments*

*The Office of Inspector General acknowledges the assistance provided to this investigation by the following:*

*United States Marshals Service, Violent Fugitive Task Force*
*Department of Emergency Services and Public Protection, Division of State Police, Western District Major Crime Squad*
*Bridgeport Police Department*
*New Haven Police Department*
*Chief State's Attorney Patrick J. Griffin, Former New Haven Judicial District State's Attorney*

**INTRODUCTION**

On January 13, 2022, at approximately 11:43 a.m., at or near 35 Wheeler Street, New Haven, Connecticut, Deputy United States Marshal (DUSM) James Masterson[1] discharged his firearm five times at a box truck being driven by Marvin Owens[2]. New Haven State's Attorney Patrick J. Griffin notified the Office of Inspector General of the incident. The Office of Inspector General requested the assistance of the Connecticut State Police Western District Major Crime Squad to conduct an investigation. The results of that investigation are summarized in this report.[3]

Briefly stated, the investigation establishes that, in connection with an attempt to serve three arrest warrants on Owens, DUSM Masterson fired his weapon at the front tire of the box truck and not at Owens. The DUSM's intent was to prevent imminent serious physical injury to other task force officers by disabling the truck. The DUSM fired his weapon to eliminate the threat to federal and municipal officers endangered by Owens' efforts to flee the scene to avoid arrest. Accordingly, I find such use of deadly force to be justified under Connecticut law.

---

[1] On January 13, 2022, DUSM Masterson was a Caucasian male age 52.

[2] On January 13, 2022, Marvin Owens was an African-American male age 54.

[3] The timeline for this investigation is as follows:

January 13, 2022 – date of incident

January 13, 2022 – Office of Inspector General notified and requests assistance from the Connecticut State Police

January 13, 2022 – Connecticut State Police Western District Major Crime Squad (WDMCS) commences its investigation

July 13, 2022 – WDMCS submits its completed report to the Office of Inspector General.

## SUMMARY

On November 15, 2021, a judge issued an arrest warrant for Marvin Owens charging him with five counts of violation of a protective order in violation of General Statutes §53a-223, and one count of assault in the third degree in violation of General Statutes §53a-61. The court set bond at $250,000. On January 12, 2022, a judge issued an arrest warrant for Owens charging him with five counts of violation of a protective order, reckless endangerment in the first degree in violation of General Statutes §53a-63, and assault in the third degree in violation of General Statutes §53a-61. The court set bond at $150,000. On that same date of January 12, 2022, a judge issued a second arrest warrant for Owens. That warrant charged him with five counts of violation of a protective order, assault in the second degree in violation of General Statutes §53a-60, unlawful restraint in the first degree in violation of General Statutes §53a-95, reckless endangerment in the first degree in violation of General Statutes 53a-63, and threatening second degree in violation of General Statutes §53a- 62. The court set bond on this warrant at $300,000. All three warrants were based on incidents of alleged domestic violence and involved the same alleged victim.

The apprehension responsibility for the three warrants was delegated to the United States Marshals Service Violent Crime Task Force. Task Force Officers (TFOs) contacted Bridgeport Police Detective Lynn Henschel. Henschel was the affiant on the January 12, 2022, arrest warrants. She reported that Owens had a history of weapons possession and was known to carry a firearm in his vehicle. In addition, Henschel stated that Owens was aware of the arrest warrants and might try to run.

In preparing to serve the warrants, TFO Adam Roscoe discovered a Bridgeport Police Department report that listed Owens' current employer as Onofrio Ultimate Foods in New Haven. On January 13, 2022, Roscoe contacted Detective Elizabeth White of the New Haven Police Department who offered to respond to Onofrio's to gain further information. A short time later, White advised Roscoe that Owens' personal vehicle, a 2015 Chevy Cruz, was parked in the Onofrio's parking lot. White also contacted Onofrio's shipping manager who confirmed Owens' employment. The shipping manager indicated that Owens was currently operating an Onofrio-owned box truck in New Jersey and should be on his way back to Connecticut.

TFOs responded to New Haven and took up positions near Onofrio's parking lot. Detective Robert Winkler and Roscoe met with White and took a position with a view of the loading dock and driveway. Masterson and Detective Nicholas Grasso arrived and positioned themselves on the opposite side of the parking lot. Detective Matthew Szymczak and Detective Jesse Meade also arrived and parked a short distance away. Finally, Officer Angel Rivera arrived operating a marked Bridgeport police vehicle.

At approximately 11:40 a.m., Masterson and Grasso observed Owens enter the parking lot operating the white box truck.  He parked the truck facing a wall.  He opened the driver's door.  Masterson and Grasso followed the truck into the lot.  Winkler and Roscoe followed them.  The two TFO vehicles parked on the left side of the truck.  Grasso exited the front passenger door of Masterson's vehicle and approached Owens who closed the truck's door.  Grasso was wearing a police tactical vest marked "POLICE" on the front and back.  He climbed onto the truck's side running board announcing "Police" and for Owens to open the truck's door.  Masterson also exited his vehicle and took a position at the front of the box truck.  At this time, Winkler exited the TFO vehicle parked behind Masterson's vehicle and was standing at the driver side rear of the truck.

Owens ignored Grasso's commands, started the truck's engine, and started traveling in reverse.  Grasso was still on the running board and Winkler was to the rear.  As the truck moved rearward, Masterson fired five rounds at the left front tire of the box truck.

Owens quickly drove from the parking lot and was able to get onto I-95 southbound.  TFOs pursued.  Ultimately, the Connecticut State Police took over the pursuit.  At one point, the front tires of the box truck shredded off.  The truck continued south exiting I-95 in Bridgeport.  While being pursued on Bridgeport streets, Owens collided with two vehicles near the intersection of Boston Avenue and Seaview Avenue.  Following the collision, Owens fled on foot.  Stratford police officers, who had responded to assist, quickly apprehended him.

## INVESTIGATION

**STATEMENTS**

**Detective Adam Roscoe**

Task Force Detective Adam Roscoe was with Detective Robert Winkler in an unmarked police vehicle.  They positioned their vehicle to have a clear view of Onofrio's parking lot.  Roscoe's statement continues:

"Approximately 1100 hours, Deputy Masterson and Detective Grasso observed OWENS, operating the Onofrio's white colored box truck, enter the Onofrio's lot, subsequently parking.  Deputy Masterson and Detective Grasso followed the box truck into the lot.  Detective Winkler and Detective Roscoe followed parking our vehicles to the left side of the truck.  Detective Grasso exited the front right door of Masterson's vehicle and approached OWENS, who was now exiting the vehicle.  I observed Detective Grasso approaching OWENS, who quickly re-entered the box truck.  Detective Grasso climbed onto the side running board, now at the driver's side window, announcing "Police" and for OWENS to open the door of the vehicle.

6

"I then heard the vehicle's engine start, at which time I returned to my vehicle. Detective Grasso was still on the running board of the truck and Detective Winkler was still outside of my vehicle, when OWENS started traveling in reverse. Detective Winkler was now in the path of travel of this box truck but was able to retreat into my vehicle's right front seat, just as the truck reversed, nearly striking the right side of my vehicle. Deputy Masterson fired an unknown number of shots at the left front tire of this vehicle while it was in motion.

"Detective Szymczak and Detective Meade were just entering the parking lot when OWENS was fleeing for the exit. Detective Winkler and I followed, out another exit and immediately located the box truck, activated our emergency apparatus and followed onto I-95 Southbound."

**Detective Robert Winkler**

In his statement, Winkler described the events leading up to the attempted apprehension of Owens in the Onofrio parking lot. In relevant part, the statement provides:

"Sometime after 11:00 hours, U.S. Marshal Masterson and TFO Grasso observed the delivery vehicle exiting I-95 and surreptitiously followed it to 35 Wheeler Street. U.S. Marshal Masterson and TFO Grasso informed TFO Roscoe and I that they would follow the delivery truck to its final resting spot and apprehend OWENS as he exited the vehicle. All communications were conducted via police department radios and cellular phones.

"TFO Roscoe and I observed the delivery truck enter the parking lot. U.S. Marshal Masterson and Grasso were following the truck as it began to park in front of a building. TFO Roscoe and I fell in line behind them as the delivery truck came to a complete stop. I observed TFO Grasso approach the driver's side of the delivery truck as the driver was exiting. The driver observed TFO Grasso and quickly returned to the cab, shutting the door. TFO Grasso then climbed onto the truck's running board steps, yelling several commands for OWENS to open the door, but OWENS had placed the vehicle in reverse, with TFO Grasso still holding onto the driver's door handle. As the vehicle was heading in reverse, and directly at me, I quickly retreated to TFO Roscoe's vehicle. As this was occurring, U.S. Marshal Masterson fired several rounds toward the delivery truck.

"OWENS drove out of the parking lot and onto I-95 southbound, disregarding the lights/sirens of investigators' vehicles…"

7

**Detective Nicholas Grasso**

In his statement, Grasso describes his investigative efforts to locate Owens to arrest him on the three warrants.  He reported that he and Masterson positioned their task force vehicle near the exit 50 off-ramp for I-95.  From that position, they were able to observe the Onofrio's delivery truck on Forbes Avenue and ultimately saw it turn into the Onofrio's parking lot.  The statement continues:

"Deputy Masterson then pulled alongside the vehicle once Task Force Officer Roscoe and Detective Winkler arrived to the location and positioned themselves behind the Onofrio's delivery truck.  At the approximate time of 11:35 hours, Task Force members observed and immediately identified the operator of the Onofrio's delivery truck as Marvin Owens … as he began to exit the delivery truck by way of the front operator door.  At this time, I, Task Force Officer Grasso, exited the front passenger seat of my Task Force vehicle wearing my U.S. Marshal Tactical Ballistic Vest with the words POLICE labeled on the front and back as Deputy Masterson exited the front operator's seat of the same Task Force vehicle.

 

Detective Nicholas Grasso

8

Being the closest to the operator's seat of the Onofrio's delivery truck, I approached Marvin Owens and called him by his name addressing Mr. Owens by name while pointing by (sic) department issued firearm directly at Marvin Owens based on the said knowledge collected by Bridgeport Police Detective Gorman that Marvin Owens was in possession of a firearm at all times.  I then began to give verbal commands to Marvin Owens stating:  "Police,"  "Get out of the vehicle" as the vehicle door was half opened during his exit.  At this point, Task Force members observed Owens reenter the Onofrio's delivery truck.  I then attempted to open the truck's operator door which is where Owens positioned himself.  At this time, I was positioned on the exterior of the truck as I was standing on the step bar of the vehicle.  I then observed Owens lock the operator door preventing me from opening it from the outside of the vehicle.  At this point, Marvin Owens started the engine of the delivery truck as I was positioned on the exterior of the vehicle.  I then continued to give verbal commands to Owens stating, "Get out of the vehicle," however, Owens disregarded my commands and began to back the vehicle out of the parking space into the parking lot.  At this time, Deputy Masterson was also yelling verbal commands to Owens to stop the vehicle.  It should be noted that Bridgeport Police Detective Winkler was standing directly in the rear path of the delivery truck as Owens continues to back up the vehicle ignoring the verbal commands to stop.  I, Task Force Officer Grasso, continued to hold onto the vehicle's outer door handle as Owens accelerated rearward during which time I was looking for a safe landing place to jump off of the vehicle into the parking lot.  During this time, however, Deputy Masterson attempted to stop the vehicle from moving any further in fear for my safety as well as Detective Winkler's safety who was standing behind the delivery truck as it was backing.  Deputy Masterson then fired his assigned duty weapon at the front end of the vehicle numerous times; however Owens did not stop and continued to back away.  Task Force Officers then observed Owens place the said delivery truck into drive and speed out of the parking lot engaging officers in pursuit."

**Detective Matthew Szymczak**

TFO Szymczak and Detective Meade were among the officers involved in the attempted apprehension of Owens in New Haven.  They were in an unmarked Bridgeport police vehicle. TFO Grasso directed Szymczak and Meade to stage a short distance away from 35 Wheeler Street.  Once TFO Grasso confirmed that Owens was at 35 Wheeler Street operating a white box truck, he advised Szymczak and Meade to move in.

Szymczak's statement continues:

"I drove into the southernmost entrance for 35 Wheeler Street.  As I entered the parking lot, I began to hear gunshots and I observed Task Force Officers, marked by Police vests, running toward the east side of the building.  There were multiple civilians running toward the Officers.  As we came further into the lot, I could see U.S. Marshal James Masterson discharging his handgun towards the front end of a white, medium duty, box truck.

9

"The truck was coming head-on towards us as we rounded the building.  I had to pull our vehicle to the left behind a dumpster to avoid being hit.  The box truck passed us on the right and we circled the building exiting the parking lot at the northern entrance/exit on Wheeler Street.

"Owens fled from 35 Wheeler Street out of the southernmost entrance/exit onto Wheeler Street southbound."

.    .    .

"At approximately 11:48 hrs Owens passed I-95 southbound rest stop at exit 40.  The left front tire of the vehicle shredded, and the truck was now running on the front rim."

Szymczak goes on to describe Owens' exit from I-95 at exit 29, his flight from the police on Bridgeport streets, his collision with a civilian vehicle, and apprehension in the parking lot of Yankee Discount Muffler at 1290 Boston Avenue.

**Deputy United States Marshal James Masterson**

Deputy United States Marshal (DUSM) James Masterson provided a statement in which he described the information that he and other task force officers developed about Owens. The United States Marshals Service Violent Fugitive Task Force had responsibility to apprehend Owens and arrest him on the three warrants.  Masterson was aware of Owens' history of weapons possession and that he was known to carry a firearm in his vehicle.  Masterson also had information that Owens likely was aware of the warrants and might try to run.

On January 13, 2022, after learning that Owens' car was in the Onofrio's parking lot and that he was returning to Onofrio's from making a delivery in New Jersey, Masterson and others proceeded to New Haven.  Masterson and TFO Grasso positioned themselves near the I-95 exit 50 off ramp. At 11:30 a.m., Masterson saw a truck matching the description of Owens' work truck come down the exit 50 off ramp.  The truck stopped at the bottom of the off ramp.  Using binoculars, Masterson positively identified Owens as the driver.  The truck proceeded to Wheeler Street and turned right into the work yard/parking lot of Onofrio's at 35 Wheeler Street.  Masterson and Grasso pulled into the work yard after the truck.  Masterson advised other officers that, once the truck parked, all units would move in and surround the truck.

Masterson's statement continues:

"Once the truck parked, this DUSM called over the radio to move in.  TFO Grasso and this DUSM's vehicle pulled along the side of the truck (parallel to it).  TFO Roscoe and Detective

10

Winkler's vehicle pulled in behind the truck and this DUSM's vehicle.  At that time, task force members and Detective Winkler exited their vehicles.  NOTE:  All task force members and detectives were wearing tactical vests clearly marked "police" on the front and rear of the vests.



DUSM James Masterson

"TFO Grasso was the closest to the driver side of the cab of the truck.  This DUSM observed the driver side door of the truck open and the subject began to step down out of the truck cab.  Upon exiting the vehicle, TFO Grasso announced "police" and ordered the subject not to move.  At that time, this DUSM observed the subject get back into the truck and close the door.  This DUSM observed TFO Grasso jump onto the running board located below the driver's door and attempted to open the door.  This DUSM observed TFO Grasso attempt to open the door, but the subject locked the driver side door.  This DUSM could also hear TFO Grasso giving commands to the subject to stop and open the door.   The subject was ignoring TFO Grasso's commands.  This DUSM heard the truck start up and was put into gear.  This DUSM observed the truck start to back up and accelerate rearward.  At that time, TFO Grasso was still located on the running board of the truck as it moved rearward.  This DUSM could also observe TFO Roscoe and Detective Winkler towards the rear of the vehicle.  At no time did the subject stop the vehicle or obey TFO Grasso or any law enforcement officers' commands.  At that time, this DUSM determined that the subject and truck were an imminent serious threat to TFO Grasso,

11

TFO Roscoe, and Detective Winkler. This DUSM drew his duty weapon and discharged the weapon towards the front left tire of the truck in an attempt to stop the imminent threat to task force members and other officers.  This DUSM didn't shoot at the operator of the truck (OWENS) because of concerns of a friendly fire situation regarding TFO Grasso's close proximity to the driver's cab.  TFO Grasso located on the running board of the driver side and the possibility of erratic driving from Owens this DUSM didn't want to engage the operator.  This DUSM chose an alternate aiming point, which was the front left tire to stop the imminent threat to task force members and other officers.  The subject ignored all orders to stop and instead kept operating the truck rearward, narrowly missing TFO Roscoe's vehicle and officers. The truck made a quick pivot turn, exited the yard, and accelerated onto Wheeler Street."

**Stacy Rouleau**

Stacy Rouleau was at Onofrio's on the morning of January 13, 2022, to repair a refrigeration container.  He stated:

"At approximately 11:00 a.m., I was sitting in my truck looking at my phone; a refrigerated box truck came into the lot pretty fast.  The truck was white in color.  The driver of the truck was sitting inside the truck for two to three minutes.  I heard somebody say something, but I was not sure what was said.  The truck began to reverse erratically.  I saw a white male, with light colored hair, jeans, a black vest with "Police" in white writing.  The writing was easily identifiable.  The officer yelled something, it was a command to the driver of the truck.  I observed a second officer that had darker hair, he was behind the first officer.  The second officer had a vest that said police on the rear in white writing.  As I observed the first officer come around the container, I saw his weapon drawn.  The weapon was a blue or black handgun.  The truck was perpendicular to the officer and was trying to evade the police officer. The officer fired four or five rounds at the front driver side tire of the truck.  The weapon was pointed at the driver side tire the entire time.  It appeared that the officer never made it to the driver side door.  The truck went out of the lot towards Wheeler Street.  The truck turned left out of the lot onto Wheeler Street."

**Marvin Owens**

The Office of Inspector General advised Marvin Owens of its investigation into the January 13, 2022, incident.  Owens, thereafter, mailed several pieces of written correspondence to the IG office.  In his hand-written letter dated February 8, 2022, Owens provided what he described as his "full statement of account."  This statement provides:

on January 13, 2022 as I Just finished my days work, I pulled my truck into the companies parking lot. As i parked my work truck facing toward the company building. Applied air brake's' to truck. Then started to fill out daily work log's aswell trucking log's as I was writing, Head looking downward I was then surprised by person Attempting to enter my work Vehicle. being that Vehicle door was locked, the person in all Black fully covered face mask, starts to yell. OPEN THE DOOR, OPEN THE FUCKING DOOR he then steps back pulled out Gun started firing Towards' driver side door, of Truck in total shock Scared for my life, reversed truck and exited parking Lot. didnt Know any officer involved until police cars started persuing me. only person or officer I seen while parked was the one who fired his Gun at me he never stated or attempted to state he was united states Marshal. Marvin Owens did not have any Type weapon, just coming in from work. he didnt need to draw or Fire his weapon

END STATEMENT:                            THANK YOU; MO 314066

13

In subsequent correspondence received by the Office of Inspector General on May 18, 2022, Owens asserted that an incident report filed concerning the January 13, 2022, incident was fabricated and misleading.  The relevant portion of the letter provides:

The following is The incident Report filed of January 13, 2022 police involved shooting. in which Clearly. Clearly by viewing video of incident, Report is fabricated, misleading, adding of Supplemented Statements

EXZAMPLE: January 13, 2022 Report

A multi-jurisdictional Task force attempted to secue Marvin Owens with the Three open domestic violence warrants previously mentioned.

The Task force operated with information that Owens was most likely armed with a firearm (GUN). Task force was able to locate Owens with, with help from his employer, via the G.P.S systems installed on his work Truck. Owens was approached by members of the task force, WITH THERR FIREARMS DRAWN" ORDERING Owens to exit the vehical. Owens initially began to comply. HALFWAY EXITING THE VEHICLE. AT WHICH point get got back into the Truck and SHUT/LOCKED the doors. Owens proceeded to drive away with a Member of the task force hanging on to the truck. I Fear for the Safety of fellow officers and the public. one of the members of the Task force fired his firearm at the front end of the vehical. This did not stop Owens and he drove away.

FACT: (A) it was only U.S Marshal in whom attempted to Arrest Me for fabricated incident Jan. 10. 2022: (B) when Marshal approached his firearm was not drawn Marshal on Truck Started reaching for firearm (C) Owens never came out, Exited or opened door of truck (D) Owens never Got back in Truck And SHUT/Locked doors (E) AS OFFICER Jump on Truck Screaming, Cursing in all black, not identifying him-self as U.S Marshal. As Owens Scared Simotaniusly officer reaching for weapon & jumping down from truck Owens vehical in reverse, officer fires weapon. There was Zero THREAT

14

Based on this letter, it appears that Owens' claim that the report is misleading is based on the following assertions:

A. It was only a U.S. Marshal who attempted to arrest him and not a task force;

B.  When the Marshal approached, his firearm was not drawn.  It was only when the Marshal got onto the truck that he started reaching for his gun;

C.  Owens never came out of, exited, or opened the door of the truck;

D.  Owens never got back into the truck and shut/locked the doors; and

E.  The officer jumped onto the truck screaming and cursing wearing all black and not identifying himself as a U.S. Marshal.  Owens was scared.  When the officer reached for a weapon and jumped down from the truck, Owens put the vehicle in reverse and the officer fired his weapon.  There was zero threat.

**SCENE**

**35 Wheeler Street[4]**

On January 13, 2022, at approximately 2:00 p.m., Western District Major Crime Squad (WDMCS) detectives were called to process the scene located at the parking lot of 35 Wheeler Street, New Haven.  Detectives documented the scene through video, image photography, and FARO CD laser scan.  In addition, detectives seized five shell casings and one spent bullet.

The scene was located at the rear parking lot behind 35 Wheeler Street.  Onofrio Ultimate Foods owns the building and property.  The parking lot is accessible from Wheeler Street via two driveways and via a single driveway on 44 Laura Street.  There were metal gates that closed across these driveways.  These gates are open during business hours to allow employees to park their cars.

Three buildings surrounded the parking lot that were part of Onofrio Ultimate Foods.

---

[4] During the investigation, detectives learned that the building utilized by Onofrio Ultimate Foods was located at 35 Wheeler Street, but the parking lot where the incident occurred was designated as 55 Wheeler Street.  The reports reference both addresses.

15



Onofrio Ultimate Foods Parking Lot



Detectives located Owens' 2015 Chevy Cruz parked near the Laura Street entrance.

There were several Conex storage boxes along the west side of one of the buildings.  A red Dodge Ram pickup truck was parked next to one of the Conex boxes.  The owner, Stacy Rouleau, was seated in the vehicle.  He later provided a statement regarding what he saw.



The building at 35 Wheeler Street was along the west side of the parking lot.  There were surveillance cameras mounted on either corner of the east side of the building.  Detectives seized video recordings from these cameras.



17

Detectives located five shell casings within the center of the parking lot designated as Exhibits 1,2,3,4, and 5.





















22

All five casings were Hornaday 9mm Luger R+P.  A copper-jacketed projectile was located next to pallets in the parking lot and designated as Exhibit 8.







Detectives placed a FARO Focus at four locations in the parking lot to document the scene.  FARO Scene software merged the coordinates into a common coordinate system.  From that data, detectives created a detailed scene diagram.



**Boston Avenue, Bridgeport**

Detectives also photographed the Onofrio Ultimate Foods truck at the scene where it was involved in a motor vehicle accident near the intersection of Boston Avenue and Seaview Avenue in Bridgeport.

25











The truck was towed to Troop G in Bridgeport where it was searched pursuant to a search warrant.







Given the damage to the exterior of the vehicle, detectives located nothing of evidentiary value. Detectives searched and inventoried the contents of the truck. This search of the interior also revealed nothing of evidentiary value.

**ONOFRIO'S SURVEILLANCE CAMERAS**

The officers involved in the attempted arrest of Owens at 35 Wheeler Street were not wearing body-worn cameras and their vehicles were not equipped with dash cameras. The Onofrio building at 35 Wheeler Street did have surveillance cameras covering different sections of the parking lot. Three of those cameras provided relevant information.

**Camera 10**

This camera was located in the northeast area of the building and faced east. As relevant to this investigation, the video depicts the following:

January 13, 2022

11:22:55 – Owens pulls white box truck into parking spot in Onofrio's lot.

11:23:14 – Owens opens driver's door.

11:23:18 – DUSM Masterson and TRO Grasso pull next to Owens' truck.

11:23:22 – TFO Roscoe and Detective Winkler park their vehicle to the rear of the truck.

11:23:27 – Masterson and Grasso exit their vehicle.

11:23:29 – Owens closes driver's door.

11:23:30 – Grasso attempts to open door.

11:23:33 – Winkler is outside of his vehicle to the rear of the truck.

11:23:37 –Grasso, holding driver door handle, steps onto running board of truck. Back-up lights of truck illuminate.

11:2:38 – Masterson points his gun toward truck.

11:23:39 – Truck starts to back up.

11:23:41 – Grasso jumps off running board and runs alongside of the truck as it moves rearward.

11:23:42 – Masterson runs toward the front of the truck as it pivots to drive ahead.

11:23:48 – Truck drives away.  Grasso runs behind.

11:23:53 – TFO Matthew Szymczak and Detective Jesse Meade drive near the truck as it pulls away.  Roscoe and Winkler start to drive out of parking lot.

11:24:06 – Masterson and Grasso return to their vehicle and leave parking lot.

To view this portion of the video recording from Camera 10 [11:22:50 to 11:24:22], click here.

**Camera 11**

This camera was located at the southeast corner of the building facing east.  As relevant to this investigation, the video depicts the following:

January 13, 2022

11:22:46 – Owens drives white box truck into parking lot.

11:23:05 – Owens parks truck.

11:23:09 – Masterson and Grasso drive into parking lot.

11:23:17 – Roscoe and Winkler drive into parking lot.

11:23:27 – The two task force cars pull to the driver side and to the rear of the truck.

11:23:29 – Winkler exits passenger side of his vehicle.

11:23:39 – Truck stars to back up.

11:23:43 – Truck moves quickly in reverse.  Masterson in view at front of truck.

11:23:44 – Truck in process of turning and starting to go forward.  Masterson aiming in vicinity of front driver side tire.

31

11:23:40 – Flashes seen coming from Masterson's gun.  Szymczak and Meade enter parking lot in a blue vehicle.

11:23:50 – Owens drives truck out of parking lot.  Masterson and Grasso follow for a short distance.

11:24:21 – Masterson and Grasso drive out of lot in pursuit of Owens.

To view this portion of the video recording from Camera 11 [11:22:44 to 11:24:23], click here.

**Camera 15**

This camera recorded the south entrance to the parking lot.  As relevant to this investigation, the video depicts the following:

January 13, 2022

11:23:40 – Szymczak and Meade drive into parking lot in a blue vehicle.

11:23:58:  Owens drives truck out of parking lot.

11:24:21 – Masterson and Grasso drive out of the lot in pursuit of Owens.

To view this portion of the video recording from Camera 15 [11:23:35 to 11:24:25], click here.


**FINDINGS**

1.  On January 13, 2022, three arrest warrants were outstanding charging Marvin Owens with various offenses, including multiple counts of violation of a protective order, assault in the third degree, reckless endangerment in the first degree, and assault in the second degree.  The warrants were based on incidents of alleged domestic violence and involved the same alleged victim.

2.  The apprehension responsibility for the three warrants was delegated to the United States Marshals Service Violent Crime Task Force.

3.  Bridgeport Police Department Detective Lynn Henschel advised task force officers (TFOs) that Owens had a history of weapons possession and was known to carry a firearm in his vehicle.  Henschel also reported that Owens was aware of the arrest warrants and might try to flee.

32

4.  TFOs learned that Onofrio Ultimate Foods in New Haven employed Owens.

5.  On January 13, 2022, Detective Elizabeth White determined that Owens' personal vehicle was parked in the Onofrio's parking lot and that Owens was on the job making a delivery out of state.

6.  TFOs responded to New Haven and took up positions near Onofrio's business premises at 35 Wheeler Street, New Haven.

7.  At approximately 11:40 a.m., Owens drove a white Onofrio Ultimate Foods box truck into the parking lot and parked the truck facing a wall.  He opened the driver's door.  DUSM James Masterson and TFO Nicholas Grasso followed Owens into the parking lot stopping next to the driver's side of the truck.  TFO Adam Roscoe and Bridgeport Police Detective Robert Winkler also drove into the lot and stopped behind Masterson's vehicle.

8.  Grasso exited his vehicle and approached Owens who closed the truck's door.  Grasso was wearing a police tactical vest with "POLICE" on the front and back.  Grasso attempted to open the driver's door but it was locked.  Grasso stepped onto the truck's running board.  He announced "Police" and for Owens to open the door.

9.  Masterson exited his vehicle and was at the front of the truck.  Winkler also exited his vehicle and was at the rear of the truck on the driver's side.

10.  Owens ignored Grasso's commands, started the truck's engine, and began rapidly moving in reverse.  Grasso was still on the running board and Winkler was to the rear.

11.  As the truck reversed, Masterson determined that the moving truck presented an imminent risk of serious injury to Grasso, Winkler, and Roscoe.  To eliminate the threat, he fired five rounds at the truck's driver side front tire.

12.  Owens drove out of the parking lot and onto I-95 southbound.  The Connecticut State Police took over the pursuit.  Owens did not comply with police efforts to pull him over.  During the chase, the tires on the truck's two front wheel shredded off.

13.  Owens exited I-95 at exit 29 in Bridgeport.  The pursuit ended when Owens collided with two vehicles near the intersection of Boston Avenue and Seaview Avenue.  Owens fled on foot but was quickly apprehended.

16.  In his two handwritten submissions to the Office of Inspector General, Owens made the following assertions:

33

   a.  A person in black attempted to enter his truck yelling for Owens to open the door. He then stepped back pulled out a gun and started firing towards the driver side door of the truck.

   b.  Owens did not know that any officer was involved until the police pursuit.

   c.  The person who fired at Owens never stated or attempted to state that he was a United States Marshal.

   d.  When the Marshal approached the truck, his firearm was not drawn. It was only when the Marshal got onto the truck that he reached for his firearm.

   e.  Owens never came out, exited, or opened the door to the truck.

   f.  Owens never got back into the truck and shut or locked the door.

   g.  The officer who jumped onto the truck never identified himself as a United States Marshal.  While on the truck, he reached for a weapon and jumped down.  Owens then put vehicle in reverse and the officer fires his weapon.

   h.  There was zero threat.

   The import of these assertions are that (1)  none of the officers involved in the attempted arrest of Owens were identifiable as police officers, (2)  Owens never opened, closed or locked the door to the truck, (3) TFO Grasso fired at the truck's driver door, and (4) Owens' action posed "zero threat."  I reject these assertions for the following reasons:

IDENTIFICATION AS POLICE

   The credible evidence supports Grasso's statement that he wore a tactical vest labeled POLICE on the front and back.  Detectives photographed Grasso wearing such vest and it is visible on the video recordings.

   The video also shows Grasso at the door of the truck gesturing.  I find credible his statement that he verbally identified himself as a police officer at that time.

DOOR

   The video from Camera 10 shows Owens opening the door shortly after parking the truck.  As Grasso and Masterson approach the truck, the video shows Owens pulling the door

34

closed.  That the door was locked is demonstrated by Grasso's repeated unsuccessful efforts to open it.

ACTIONS OF TFO GRASSO

Grasso never fired his gun.  The video from Camera 10 shows his efforts to open the truck's driver door and his jumping from the truck's sideboard as it moves in reverse.  At no time, does he fire his weapon.  To the contrary, both videos show that Masterson was the only person who fired his weapon.

ZERO THREAT

Task force officers had intelligence that Owens was aware that the police had warrants for his arrest and that he might run.  His actions in rapidly backing the truck up while TFOs were either on the truck or in close proximity, posed a grave threat of injury to them.

The desperation of Owens' efforts to avoid arrest at all costs is evident from his flight from police during a twenty-mile pursuit from New Haven to Bridgeport.  The shredding of the tires on both front wheels and having to drive on bare rims did not make him stop.  It took a motor vehicle collision in Bridgeport to stop the truck.  Even then, Owens attempted to flee on foot.

Owens' general assertion is that his flight was due to fear from an unexpected encounter with a man in all black who fired at the truck's door and had nothing to do with the police trying to arrest him.  I find that not to be credible.

**LEGAL STANDARD**

The use of force by a police officer is governed by General Statutes §53a-22.  The version of that statute in effect on January 13, 2022, in relevant part, provides:

"(a)(1)  For purposes of this section, a reasonable belief that a person has committed an offense means a reasonable belief in facts or circumstances which if true would in law constitute an offense.  If the believed facts or circumstances would not in law constitute an offense, an erroneous though not unreasonable belief that the law is otherwise does not render justifiable the use of force to make an arrest or prevent an escape from custody.

(2) A peace officer … who is effecting an arrest pursuant to a warrant or preventing an escape from custody is justified in using the physical force prescribed in subsections (b), (c), and (d) of this section unless such warrant is invalid and known by such officer to be invalid.

35

(b) Except as provided in subsection (a) … of this section, a peace officer … is justified in using physical force upon another person when and to the extent that he or she reasonably believes such use to be necessary to:  (1) Effect an arrest or prevent the escape from custody of a person whom he or she reasonably believes to have committed an offense, unless he or she knows that the arrest or custody is unauthorized; or (2) defend himself or herself or a third person from the use or imminent use of physical force while effecting or attempting to effect an arrest or while  preventing or attempting to prevent an escape.

(c) (1) … a peace officer … is justified in using *deadly physical force* upon another person for the purposes specified in subsection (b) of this section only when his or her actions are objectively reasonable under the circumstances, and:

(A) He or she reasonably believes such to be necessary to defend himself or herself or a third person from the use or imminent use of deadly physical force …" (Emphasis added).

The statute further provides:

"For the purpose of evaluating whether the actions of a peace officer … are reasonable under subdivision (1) of this subsection, factors to be considered include, but are not limited to, whether (A) the person upon whom deadly force was used possessed or appeared to possess a deadly weapon, (B) the peace officer … engaged in reasonable de-escalation measures prior to using deadly physical force, and (C) any conduct of the peace officer … led to an increased risk of an occurrence of the situation that precipitated the use of force,"  §53a-22 (c)(2).

Accordingly, a police officer is justified in using deadly physical force upon another person when the officer reasonably believes such force to be necessary to defend the officer or a third person from the use or imminent use of deadly physical force.[5]  "Deadly physical force" means "physical force that can be reasonably expected to cause death or serious physical injury." General Statutes § 53a-3(5).  "Serious physical injury" means "physical injury which creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ."  General Statutes §53a-3(4).

The reasonableness of a police officer's belief under § 53a-22 is evaluated pursuant to a subjective-objective formulation.  *State v.* Smith, 73 Conn. App. 173, 185, 807 A.2d 500, cert. denied 262 Conn. 923, 812 A.2d 865 (2002).  Under this test, the first question is whether, on the basis of all of the evidence, the police officer in fact honestly believed that deadly force was necessary to defend himself/herself or a third person.  *Id.*  If it is determined that the police

---

[5] It is arguable that §53a-22 should not apply to Masterson's use of force.   As noted above, that statute applies to the use of force against another *person*.  Masterson, the TFOs, and civilian witness all agree that the shots were fired at the truck's front tire.  Whether the use of force directed to a truck is also a use of force against the occupant of the truck, is an issue that I need not address.  Masterson's use of force is justified either way.

36

officer honestly believed that deadly force was necessary, the second part of the test asks whether the police officer's honest belief was reasonable from the perspective of a reasonable police officer in the officer's circumstances. *Id.* at 198.

The United States Supreme Court has explained this test in a civil rights case: "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on scene rather than with the 20/20 vision of hindsight. … [T]he calculus of reasonableness must embody allowance of the fact that police officers are often forced to make split-second decisions—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396-97, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).

## UNITED STATES MARSHALS SERVICE (USMS) POLICY

The United States Marshals Service Policy Directives pertaining to the use of force in effect on January 13, 2022, set forth the following directives:

A**. Policy Statements:**  The use of force by USMS personnel must be objectively reasonable and may range from verbal commands to the use of deadly force.

.    .    .

2. **Deadly Force:** USMS personnel may use deadly force only when necessary; that is, when there is an objectively reasonable belief that the subject of such force poses an imminent danger of death or serious physical injury to USMS personnel or to another person.

a.  If feasible, and if doing so would not increase the danger to USMS personnel or others, a verbal warning to submit to the authority of USMS personnel shall be given prior to the use of deadly force.

b.  Deadly force may not be used solely to prevent the escape of a fleeing subject or prisoner.

c.  Firearms may not be fired solely to disable moving vehicles or prevent a fugitive's escape.

d.  Warning shots are not authorized.

37

**POSTC STANDARD[6]**

The State of Connecticut Police Officer Standards and Training Council (POSTC), on November 19, 2019, adopted an updated Model Policy regarding motor vehicle pursuits.  As relevant here, Section 8 of the Model Police provides:

"1. Officers shall not discharge their firearms at a moving vehicle or its occupants unless the occupants are using, or threatening the use of, deadly physical force against the officer or another person by means other than the vehicle.

a. This does not preclude exigent circumstances such as, but not limited to, where the officer reasonably believes that there are no other means available to avert the threat of the vehicle, or if such vehicle is being utilized as a weapon against the officer(s), or another person such as in a vehicle ramming attack.

c. No officer should intentionally position his or her body into a path of a fleeing motor vehicle unless such tactic is approved by the law enforcement unit that employs such police officer and in accordance with an established written policy.  Wherever possible, the involved officer should make an effort to move to an area of safety if the vehicle becomes a threat, including retreating from the threat if practical."

This policy expresses the general proposition that police officers should not discharge their firearms at moving vehicles.  The policy, however, authorizes the use of a firearm in certain exigent circumstances.  One such circumstance is where the officer reasonably believes that there are no other reasonable means available to avert the threat posed by the vehicle.

**ANALYSIS**

Under Connecticut law as applicable here, a determination as to whether a police officer's use of deadly force was objectively reasonable requires, in part, consideration of four questions:

1.  Did the officer, as a matter of fact, actually – that is honestly and sincerely – believe that he/she or a third person was facing either the actual or imminent use of deadly force when the officer used deadly force?

2.  Was that actual belief reasonable in the sense that a reasonable police officer in the officer's circumstances at the time of the officer's actions, viewing those circumstances from the officer's point of view, would have shared that belief?

---

[6] The statutory definition of "police officer" does not include United States Marshals.  See General Statutes §7-294a(9).  POSTC Standards, therefore, do not apply to them.  The POSTC Standards are included in this report as an example of best practices.

3.  Did the officer, as a matter of fact, actually – that is honestly and sincerely – believe that the use of deadly force was necessary to defend himself/herself or a third person from such threat?

4.  Was that actual belief reasonable, in the sense that a reasonable police officer in the officer's circumstances at the time of the officer's actions, viewing those circumstances from the officer's point of view, would share the belief that deadly force was necessary?

Additionally, the reasonableness of the officer's conduct also turns on whether (1) the other person possessed a deadly weapon (or appeared to), (2) the officer attempted reasonable de-escalation measures, and (3) the situation was not precipitated by the officer's own conduct.

The credible evidence supports Masterson's statement that he actually believed that other task force officers were facing death or serious physical injury had they been hit or run over by the accelerating box truck moving rearward toward them.  Such actual belief was not exaggerated or unfounded and a reasonable police officer in the same circumstances at the time would have felt the same way. The credible evidence further supports Masterson's stated belief that discharging his firearm at the reversing truck was the only readily available feasible means to defend other officers from the threat that they faced.  Such belief was reasonable because a reasonable police officer in the same circumstances at the time would have shared that belief.  Moreover, the exigencies of the situation did not permit the utilization of any de-escalation techniques, and the use of deadly force was not precipitated by police conduct.

It is arguable that, at the time Masterson fired his last shot, the moving truck no longer posed a threat to other officers.  See Camera 11 at time 11:23:45 (elapsed time 8:45).  For several reasons, I do not see this possibility as undermining my conclusion that Masterson's use of force was justified.  First, Masterson's discharge of his firearm lasted only about four seconds. Second, Owens' erratic driving posed a continuing threat to others.  Third, the video does not show Grasso's exact location with respect to his proximity to the truck at the time of the last shot.  Fourth, Masterson's actions to stop the threat posed by the truck were one continuous unit.  Fifth, the situation presented a classic need for split-second decision-making.  This was not a situation where shots were fired as the truck drove away from the officers and out of the parking lot.  It is also relevant that Masterson's shots were directed at the truck's tire.

I would note that I fully endorse the general prohibition against shooting at moving vehicles contained in federal, state and local police standards.  Masterson's conduct, however, falls within the exception for situations in which moving vehicles pose an imminent danger to others.

39

**CONCLUSION**

The investigation establishes that DUSM James Masterson used deadly force to protect other officers who were in imminent danger from Owens' efforts to avoid arrest.  I therefore conclude that such use of force was justified under Connecticut law.  The Office of Inspector General will take no further action on this matter.

Submitted this  17th  day of November, 2022.

_____
ROBERT J. DEVLIN, JR.
INSPECTOR GENERAL

40

**ADDENDUM**

**Recommendations**

On January 13, 2022, Connecticut law did not require the use of body worn cameras (BWCs).  Such use was mandated by statute effective July 1, 2022.  Had the TFOs in the present case worn cameras, it would have provided a real time account of what transpired in the parking lot of Onofrio Ultimate Foods.

The United States Department of Justice (DOJ) addressed the subject of BWCs in two memos issued by Deputy Attorney General Lisa Monaco.  On October 29, 2020, Monaco announced that the DOJ would *permit* federally deputized officers, that is task force officers,  to activate BWCs while serving arrest warrants, during planned arrest operations, and during the execution of search warrants.  On June 7, 2021, Monaco announced a change in DOJ policy to *require* federal agents and task force officers to wear and activate BWC recording during (1) a pre-planned attempt to serve an arrest warrant and other pre-planned arrest operations, including the apprehension of fugitives sought on state and federal warrants; or (2) the execution of a search or seizure warrant or order.  The memo directed federal law enforcement agencies to submit to the DOJ their own BWC policies and name a senior official with responsibility to implement such BWC policy.

As of the time of this report, there are ongoing and productive discussions about the use of BWCs by TFOs and the availability of such recordings to non-federal agencies.  My recommendation is that TFOs should wear cameras during the preplanned activities noted in the DOJ memo, as well as unplanned vehicle stops, arrests, and searches, provided such actions are reasonably foreseeable.

41