# Exhibit 6

*Declaration of Scott Shuchart with Attachment A*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | 3:26-CV-00758-SVN |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| STATE OF CONNECTICUT, ET AL. | : | |
| *Defendants* | : | JULY 13, 2026 |

**EXPERT DECLARATION OF SCOTT SHUCHART**

I, SCOTT SHUCHART, DO DECLARE (OR CERTIFY, VERIFY, OR STATE) UNDER PENALTY OF PERJURY THAT THE FOLLOWING IS TRUE AND CORRECT AND IS BASED UPON MY PERSONAL KNOWLEDGE:

**Qualifications**

1.      My name is Scott Shuchart. I am over 18 years old and a resident of Maryland. I make this declaration based on my own knowledge and general expertise in the field of immigration enforcement and law enforcement policy. I have also reviewed the United States' Complaint, Motion for a Preliminary Injunction, and several supporting Declarations filed in this matter; federal agency use of force policies produced by the Plaintiff; as well as the Connecticut laws being challenged and the State of Connecticut Model Policy on Police Badge and Name Tag Identification Requirement ("Model Policy"). I have personal knowledge of the facts stated herein, and if called as a witness, I could and would testify competently to the matters set forth below.  My professional resume is attached hereto as Attachment A.

1

2.    I began my legal career as a law clerk on the U.S. Court of Appeals for the Ninth Circuit in San Francisco.

3.    From 2010 to 2018, I served as the Senior Advisor to the Officer for Civil Rights and Civil Liberties in the Office for Civil Rights and Civil Liberties (CRCL) within the Department of Homeland Security (DHS). In that role, I consulted on policy and provided civil rights oversight for all of DHS's component agencies, including U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), and the U.S. Secret Service (USSS).

4.    Outside of government, I have litigated complex cases against federal agencies. For example, I served on the litigation team that prevailed in *Negusie v. Holder*, 555 U.S. 511 (2009). From 2019 to 2022, I was the Senior Director for Legal Strategy at Kids in Need of Defense (KIND), leading impact litigation on behalf of unaccompanied minors. I was also a Senior Fellow at the Center for American Progress from 2018 to 2019.

5.    From 2022 to 2025, I served as a senior official at ICE. From May 2022 to November 2023, I was Counselor to the Director of ICE, as well as for some of that time the Acting Assistant Director for External Affairs. From November 2023 to January 2025, I was the Assistant Director for Regulatory Affairs and Policy. In that role, I had senior responsibility for ICE's written policies and regulations, including for example ICE's policy on body-worn cameras.

6.    When I worked at ICE, it had approximately 21,000 personnel, largely divided between the two principal operational directorates, Enforcement and

2

Removal Operations (ERO) and Homeland Security Investigations (HSI), as well as a large legal department and other service units. Policy that applied to all of ICE was made in the policy office I headed, while policies applicable only to ERO or HSI might be made by the Executive Assistant Director of the specific directorate, often in consultation with my office.

7.     Since leaving government service, I have maintained a private law practice and have also consulted for corporations and nonprofit institutions on public policy, including immigration, law enforcement, and privacy policy. I filed an expert declaration on law enforcement policy issues similar to those at issue here in *United States v. California*, No. 2:25-cv-10999 (C.D. Cal.) and *United States v. Virginia*, No. 3:26-cv-545 (E.D. Va.).

8.     Through this experience inside and outside of government, I have both personal knowledge and a thorough understanding of many of the policies and practices of ICE's two directorates, including those applicable to use of force, uniform appearance, and wearing of indicia, and a more general understanding of policies applicable in CBP and across federal law enforcement on those subjects.

9.     Since early 2025, there has been considerable public attention on changes in ICE's practices with respect to officers wearing face-covering masks and hiding personal identifiers (name tags or indicia). Some of these practices have also been undertaken by the many federal agencies that have been delegated immigration enforcement authority or have otherwise been detailed or seconded to support ICE's immigration enforcement mission.

10.    Several states have considered or enacted legislation in the last six months to address the rise in law enforcement officers wearing face-disguising masks and removing personal identifiers. In addition to the Connecticut enactment at issue here, I have reviewed similar statutes including California SB 627 (No Secret Police Act) and SB 805 (No Vigilantes Act); New Jersey's S.B. S3114 and 3216/A1743 (Law Enforcement Officer Protection Act); and Virginia's S. 352 (2026), Va. Acts 1132, which adds Va. Code § 19.2-83.6:1 and amends Va. Code §§ 9.1-102 and 18.2-422.

### Summary of Conclusions

11.    Based on my experience and review, my principal opinions are as follows:

a.    As to officer anonymity, use of masks, and wearing visible officer identifiers: *First*, routine use of identity-concealing masks and removal of visible individual identifiers during ordinary public-facing immigration enforcement was not standard ICE practice before 2025. *Second*, officer-safety concerns can be addressed through written policies, supervisory risk assessments, officially issued equipment, and limited exceptions for undercover, surveillance, tactical, medical, and other sensitive circumstances, rather than ad hoc disguises left to officer discretion. *Third*, the United States' declarations do not show that routine masking or withholding of unique identifiers is necessary across ordinary public-facing enforcement operations. And *fourth*, ad hoc masking and lack of visible agency or

4

individual identifiers can increase public-safety risks by creating confusion, increasing the risk of impersonation, impeding oversight, and escalating encounters.

b.    As to use of force policies and oversight: *Fifth*, that providing a limited use-of-force justification for peace officer defense to criminal liability is not unique to Connecticut; and *sixth*, that federal law enforcement agencies recognize the possibility that states or localities will investigate and prosecute excessive force by federal agents, but do not consider state justification defenses an important part of use-of-force policy or training.

## I.    Anonymity, Masking, and Individual Identifiers

### Background

12.    Federal statutory law regulating law enforcement officer uniforms and indicia is limited. The area is largely governed by policies created by individual federal departments and agencies pursuant to their general authorizing statutes. The principal applicable federal statutes, to my knowledge, are (a) 5 U.S.C. § 5901, concerning who pays for law enforcement uniforms, and (b) 10 U.S.C. § 723, which was first enacted in 2021. Under that provision, "Whenever . . . Federal law enforcement personnel provide support to Federal authorities to respond to a civil disturbance, each individual employed in the capacity of providing such support shall visibly display . . . the individual's name or other individual identifier that is unique to that individual" and the name of the entity employing the individual. However, this requirement is not applicable to plain-clothes or undercover

5

personnel. *Id.* § 723(c). I understand that by policy and practice ICE assures compliance with § 723 by special response teams (SRT) fielded by HSI—teams similar to SWAT units—but that § 723 has not been understood to apply to routine civil law enforcement by its personnel, who are generally not uniformed.[1] Section 723 is more broadly applicable to CBP, whose three operational units (Air & Marine Operations (AMO), Office of Field Operations (OFO), and the U.S. Border Patrol (USBP)) are generally uniformed.

13.    I understand the United States also cites general agency-management and employee-safety statutes, including 5 U.S.C. § 301, 8 U.S.C. § 1103, and 29 U.S.C. § 668, as authority for its practices. While the text of those provisions speaks for itself, in my experience, those are broad provisions understood in the Executive Branch to authorize agencies to manage personnel, issue regulations, and provide safety equipment. They do not themselves prescribe a masking rule, require routine anonymity, or establish standards for withholding visible individual identifiers during ordinary public-facing enforcement. The citation to 29 U.S.C. § 668 strikes me as particularly unhelpful to the United States's position in this litigation, inasmuch as it calls for agencies to "acquire" and "maintain" "safety equipment, personal protective equipment, and devices reasonably necessary to protect employees." *Id.* § 668(a)(2). Since, as discussed below, federal agencies generally are not supplying anonymity masks to officers, but rather allowing them to source their

---

[1] A heavily redacted memorandum reflecting this policy is available on ICE's website. Memorandum Re: Special Response Team Uniform Standards (June 1, 2021), *redacted version available at* https://www.ice.gov/doclib/foia/policy/memo_SRT_UniformStandards_06.01.2021.pdf.

own Halloween-style masks, § 668(a)(2) obviously provides no support for Plaintiff's arguments.

14.     Certain policies that have been made available for public inspection have bearing on ICE's use of masks and displays of indicia. However, no public policy directly addresses use of masks for anonymity or hiding of personal identifiers. These broadly relevant policies include:

a.   The ICE Employee Code of Conduct,[2] effective 2012, which provides as paragraph 5.15, "Standard of Attire," that "ICE Employees must present a professional and positive image to the public and our colleagues both within and outside of ICE. While on official duty, employees must adhere to any applicable dress code policy where they are stationed";

b.   The ICE Body Armor Policy,[3] effective 2005, which provides in part that "All ICE armed officers are strongly encouraged to wear their issued body armor while performing law enforcement duties," and that ERO officers "*shall* wear their issued body armor while in performance of their law enforcement duties" (emphasis added). That policy also provides that "ICE does not authorize the use of personally owned body armor for armed officers while functioning as ICE employees"; and

---

[2] U.S. Immigration and Customs Enforcement, Employee Code of Conduct, Directive No. 1033.1 (Aug. 7, 2012), available at https://tinyurl.com/3wv2298v.

[3] U.S. Immigration and Customs Enforcement, ICE Body Armor Policy, Directive No. 5-1.0 (Feb. 4, 2005), *redacted version available at* https://tinyurl.com/4rza89mu (also identified as Directive 19001.1). Note that this older policy refers to the ICE directorate now called ERO as "DRO."

c.  The dress code policy for ICE's Health Service Corps (IHSC) unit,[4] effective 2020, which reiterates the principles in the Employee Code of Conduct.

15.     ICE ERO officers also receive a uniform allowance to cover "at least one branded polo shirt, one branded ball cap, and one branded raid jacket." As of January 2025, ICE ERO had "transitioned from a uniformed agency to one that only provides branded items . . . that are required to be worn during enforcement actions."[5]

16.     These policies exist in part because clear identification of officers is important in civil immigration enforcement. That importance is further underscored by controversies over ICE's use of deceptive-entry tactics. When officers use ambiguous clothing, unmarked vehicles, or generic "police" identifiers, members of the public may reasonably be confused about which agency is exercising authority and whether the encounter is lawful. Indeed, ICE has been subject to litigation over deceptive arrest tactics, including deceptive attire. In particular, litigation has challenged ICE officers identifying themselves, verbally and in appearance, as working for any other law enforcement agency, or simply as "police." In early 2025, ICE settled one class action in *Kidd v. Noem*, No. 2:20-cv-03512 (C.D. Cal.), agreeing that officers in the Central District of California will not engage in the

---

[4] U.S. Immigration and Customs Enforcement, IHSC Dress Code, IHSC Directive No. 01-26, ERO Directive No. 11770.2 (Feb. 3, 2020), available at https://tinyurl.com/6tptvcfk.

[5] Department of Homeland Security, Homeland Procurement Reform Act Uniform Allowance Adequacy Study (Jan. 17, 2025), at 10, 12, available at https://www.govinfo.gov/content/pkg/CMR-HS1-00193169/pdf/CMR-HS1-00193169.pdf.

ruse of identifying themselves as police, including by not wearing jackets that say "POLICE" unless they also say "ICE" with equal prominence.[6]

17.    Outside of the Central District of California, it appears that ICE officers continue to rely on deception about their parent agency to effectuate civil immigration arrests. For example, according to a habeas petition and news reports, an arrest operation at Columbia University in February 2026 involved ICE officers posing as local police and pretending to look for a missing child in order to gain entrance to a university-owned apartment building without a judicial warrant.[7]

18.    CBP officers and agents are generally uniformed. They receive a uniform allowance of $1,100.[8] Some of CBP's dress and uniform policies have been made publicly available. Border Patrol's policy clearly states that "*Only* uniform items obtained through the official uniform vendor(s) should be worn, and may not be altered or modified" apart from tailoring.[9] The policy further indicates that personnel must have official credentials at all times except when undercover, with nameplates or unique identifiers "worn on the outermost uniform garment and visible to the public when practicable."[10] While the public document has redactions, the only circumstance in which it appears to provide for a mask is a "Cloth face

---

[6] The settlement agreement is available at https://tinyurl.com/5n6pnbr4.

[7] https://www.nytimes.com/2026/02/26/nyregion/columbia-university-ice-student.html; *see also Aghayeva v. Genalo*, No. 1:26-cv-01602 (S.D.N.Y.) (habeas petition filed Feb. 26, 2026, ECF No. 1, *dismissed as moot*, ECF No. 7 (March 2, 2026)).

[8] *See* Uniform Allowance Adequacy Study, *supra* note 5, at 5.

[9] U.S. Border Patrol, USBP Uniform and Grooming Standards 2025, available at https://www.cbp.gov/sites/default/files/2025-11/usbp_uniform_and_grooming_standards_2025.pdf, p.3.

[10] *Id.* at 4.

covering (free of designs and dark in color) as dictated by current guidelines as recommended by CBP, Centers for Disease Control and Prevention (CDC), Occupational Health and Safety Administration (OSHA), and other public health resources."[11] That is, the policy appears to contemplate only medical, not identity-concealing, masks.

19.    I understand from the *California* litigation and the Declaration of Jeffrey Egerton filed in support of Plaintiff's motion that CBP may also now have a policy allowing officers "modification" of its uniform policy to wear face coverings or remove name plates from daily use uniforms when there is an assessment that the risk of doxxing is high; but the policy, if it exists in written form at all, does not appear to have been publicly released.

20.    As far as I know, ICE has no formal or written policy on wearing masks or removing identification, and no public policy setting forth the purpose, standards, or manner in which officers or agents may wear masks or hide nameplates. ICE maintains on its website the body armor policy, noted above, that generally prohibits ad hoc additions. While the Declaration of Dr. Floyd Cleveland says that "ICE policy permits personnel[] to use any facial covering they feel is appropriate to meet operational needs and to protect them from health hazards" (¶ 31), I am unaware of any public, written policy that says so. If there is such a policy, it would apparently modify or supersede the public policies prohibiting personally-supplied armor and requiring adherence to dress code.

---

[11] *Id.* at 22, 23, 24.

10

21.     As a general matter, large state and local law enforcement agencies often do have uniform policies that address masking and badging, along the lines of the "model policy" under Conn. Gen. Stat. § 7-294ii. For example, the New York Police Department's public policy addresses the need to wear a nameplate and authorizes only balaclavas that do not cover the face,[12] and the Chicago Police Department's standards, even for riot control uniforms, authorize balaclavas only when "worn in such a manner that the face is not covered."[13]

22.     I am unaware of any law enforcement agency that, as a matter of course, authorizes individual officers to decide when to remove their name badges as a matter of ad hoc discretion, as ICE apparently does, as opposed to requiring a supervisory assessment of risk, which is apparently the CBP policy. Nor am I aware of any agency that allowed officers to add personally obtained, non-medical face masks to an on-duty uniform as a matter of ad hoc discretion, before federal agents conducting immigration enforcement began to do so in 2025.

23.     Like ICE, the FBI, and the DEA, many law enforcement agencies engage in plain-clothes surveillance, plain-clothes meetings with confidential informants, and other plainclothes work. I am not aware of any state or local law enforcement agency that, as a matter of policy, allows officers to routinely wear masks when in other duty status, such as interacting with the public during

---

[12] New York Police Dep't, Admin. Guide #305-04 (June 4, 2025), https://www.nyc.gov/assets/nypd/downloads/pdf/public_information/public-adminguide1.pdf.

[13] Chicago Police Dep't, Uniform and Appearance Standards, U04-01 (Jan. 15, 2026), http://directives.chicagopolice.org/#directive/public/6169.

11

protective or at-large law enforcement work, simply to reduce the chance the officers are identified when in plain clothes. I am aware that some agencies allow officers who are or may be doing undercover work to cover their faces when in uniform to avoid being so identified.

## Recent Changes

24.     Since January 2025, ICE, CBP, and other federal law enforcement officers have increasingly appeared in public conducting civil immigration enforcement (a) with their faces covered with masks, bandanas, or gaiters; and (b) without uniforms, agency name identifiers, or individual identifiers like badge numbers.

25.     Notably, no agency appears to have issued a mask as a piece of official uniform, armor, or equipment. Rather, officers and agents appear to have been allowed to source their own face coverings, which frequently bear images of the "Punisher" comic-book villain logo, the "Chucky" horror movie villain/doll, skulls and other gang-related insignia, the "thin blue line" flag, and images taken from horror and genre films.[14] Even if the choice to use terrorist and Nazi-associated mask imagery was initially adopted by individual officers ad hoc, the agency has

---

[14] *See, e.g.*, https://www.reddit.com/r/ICE_Watch/comments/1qv0qmx/while_abducting_someone_from_the_middl e_of_a_busy/ (full face mask with half-skull); https://www.ksla.com/2025/11/02/homeland-security-official-responds-images-ice-agents-wearing-halloween-masks/ ("Chucky" and other Halloween masks); https://www.instagram.com/p/DOTl1ifjdBY/?hl=en (skull mask on ICE officer at detention facility).

subsequently endorsed those choices, responding "Happy Halloween" to media inquiries as to whether the agency approved.[15]

26.    These were extremely uncommon practices for federal officers and agents prior to 2025. Rather, in a typical ICE ERO enforcement action, officers would wear body armor and a jacket or vest clearly marked as "ICE" or "ICE POLICE" and would generally have a credential, bearing their badge and number, visible on their person, without an identity-concealing face mask.[16] These practices seem essentially aligned with the of the Connecticut Model Policy for an "on-duty, plain clothes officer . . . interacting with the public."

27.    I am aware that, since January 2025, ICE leadership has stated publicly that it supports officers wearing masks and failing to display agency or individual identifiers due to fears of "doxxing" and other concerns for individual officer safety. Prior to 2025, I am not aware of the agency making any effort to conceal officer appearances with masks or hide badges, although the concerns for officer safety are long-standing and predated 2025, as noted in several of Plaintiff's supporting declarations.

28.    One federal judge has rejected ICE leadership's arguments in this regard as "disingenuous, squalid and dishonorable":

> ICE goes masked for a single reason—to terrorize Americans into quiescence. . . . It should be noted that our troops do not ordinarily wear

---

[15] *See* Aisha Wallace-Palomares, "We Asked DHS if Federal Agents Wore Horror Masks on Raids. They Responded 'Happy Halloween!,'" *L.A. Taco* (Oct. 30, 2025), https://lataco.com/federal-immigration-agents-halloween-masks.

[16] *See, e.g.*, https://www.youtube.com/watch?v=wcCZhs7Ijw4; https://www.foxnews.com/video/6366233990112 ("ride-along" videos showing typical ICE gear in late 2024).

masks. Can you imagine a masked marine? It is a matter of honor—and honor still matters. To us, masks are associated with cowardly desperados and the despised Ku Klux Klan. In all our history we have never tolerated an armed masked secret police.

*Amer. Assoc. of Univ. Profs. v. Rubio*, 802 F. Supp. 3d 120, 174 (D. Mass. 2025).

29.     I am aware that the United States has alleged an escalating set of numbers purporting to show a massive increase in assaults on law enforcement personnel. I am not clear what is being considered a "death threat" in these statistics, but my understanding from my familiarity with DHS statistics is that the publicized increase in "assault" numbers do not differentiate between serious assaults and routine forms of unwanted touching that are inherent risks of conducting hands-on law enforcement work. Media reports attempting to understand DHS's claims of 1000% or more increases in assaults have found no objective basis for those claims.[17] By one objective measure—actual referrals for prosecution for assaults on DHS officers—in 2025, DHS only referred about twice as many individuals for prosecution for assaulting its officers as in its previous highest year, 2019, following a push to increase referrals for prosecution.[18]

---

[17] *See* "ICE Officers Face an 8,000% Increase in Death Threats Against Them and Their Families," https://www.dhs.gov/news/2026/01/26/ice-officers-face-8000-increase-death-threats-against-them-and-their-families (Jan. 26, 2026) (claiming 1,300% increase in assaults, inconsistent with the 1,000% figure cited in Plaintiff's declarations); see also, e.g., A. Sherry et al., "White House claims 'more than 1,000%' rise in assaults on ICE agents, data say otherwise," NPR (Oct. 10, 2025), https://www.npr.org/2025/10/10/nx-s1-5565146/white-house-claims-more-than-1-000-rise-in-assaults-on-ice-agents-data-says-otherwise.

[18] W. Sytsma & N. Schwellenbach, "DHS Assault Cases Spiked to a Record High," Project on Government Oversight (Feb. 24, 2026), https://www.pogo.org/investigates/dhs-assault-cases-spiked-to-a-record-high-experts-and-judges-have-raised-alarms.

30.　Even if one grants a substantial increase in threats and assaults against federal law enforcement since January 2025, it is much harder to identify cases where physical attacks have actually been facilitated by "doxxing." Indeed, it is not clear there has been even a single episode of a federal agent being assaulted when out of uniform, outside of an operation, as a result of "doxxing." The declarations I reviewed do not identify a single physical assault on an officer (or their family) when off-duty and outside of an enforcement operation that resulted from facial visibility during an enforcement operation.  A June 2025 analysis in the Washington Post identified no such episodes. While Plaintiff's declarations discuss elevated risks, threats, and intelligence of such, the only physical attack related to doxxing of a concealed identity that I see identified in the declarations is the slashing of the tires of an unoccupied, unmarked vehicle. Cleveland Decl. ¶ 27; *cf.* Decl. of Matthew W. Allen (describing "[a]nticipated [i]mpacts" but no past examples); Decl. of P.J. O'Brien (opining that law "could reasonably be expected" to have adverse impacts but not citing past examples of doxxing-related assault); Egerton Decl. ¶ 9 (describing multiple alarming doxxing incidents and threats, none of which are tied to a physical assault).

31.　The Plaintiff's brief and declarations leave out the critical context for this rise in threats and assaults. In the years before 2025, most immigration enforcement took place at the U.S. border; in jails and prisons; and in targeted fugitive operations rather than at-large sweeps. The volume of at-large immigration enforcement (by ICE, CBP, and officers borrowed from other federal agencies) has

risen markedly over that same time period, with operations like Midway Blitz in Chicago and Metro Surge in the Twin Cities leading to thousands of encounters between officers, agents, and the general public that had no parallel in prior years. This is not to justify any harassment or assault, but to note that one would ordinarily expect adverse events to scale alongside a dramatic increase in encounters between law enforcement and the public; all the more when those encounters are large-scale, dramatic, and lead to civilian casualties, as took place in Metro Surge.[19]

## Assessment

### *Accountability, Oversight, and Interactions with the Public*

32.    Law enforcement oversight depends on investigators being able to discover, after the fact, which officers or agents were involved in potential misconduct. A visible identifier—ideally a name tag, or when necessary, an identification number that can be linked to an individual officer with agency records—is critical to that inquiry. Only by recording the specifics of the personnel with whom they interact can members of the public file meaningful, actionable reports or complaints about improper conduct by officers. Investigating an excessive force or unlawful arrest complaint at DHS, for example, would be effectively impossible without a name or numerical identifier that would allow an oversight

---

[19] In well publicized incidents, an ICE agent fatally shot one U.S. citizen in a traffic encounter on January 7, 2026, and CBP officers fatally shot another citizen upon taking him down to the street on January 24, 2026. *See* Killing of Renée Good, Wikipedia, https://en.wikipedia.org/wiki/Killing_of_Renée_Good; Killing of Alex Pretti, Wikipedia, https://en.wikipedia.org/wiki/Killing_of_Alex_Pretti.

office to identify the personnel involved in the incident, unless there were cell-phone or body-camera footage that allowed for visual identification.

33. I have familiarity with DOJ, DHS, and component policies concerning body-worn cameras in pre-planned federal law-enforcement operations. Those policies, which may implement Congressional mandates, reflect the judgment that transparency and accountability can be compatible with planned arrests, searches, and other enforcement operations. In my experience, the same principle applies to visible agency identification and unique officer identifiers. Accountability measures can be structured to protect officer safety while preserving the ability to identify officers after the fact for oversight, complaint review, use-of-force review, and discipline where appropriate.

34. Visible identifiers are especially important because after-the-fact oversight depends on the ability to determine which officers participated in an incident. DHS has multiple oversight mechanisms, including the Office of the Inspector General and component offices of professional responsibility, but those mechanisms cannot function effectively if complaints, videos, or witness accounts cannot identify the officers involved.

35. Officers in intimidating, ad hoc masks, without visible identification, are at greater risk of a hostile encounter with the public. This is true for several reasons: The public may worry that the officers are in fact impersonators, since they are not in regular gear; the public may be on edge due to threatening (Punisher, etc.) symbolism inconsistent with a law enforcement role; masks can inhibit verbal

17

and nonverbal communication; and members of the public may recognize that without identification in the form of a name tag, badge number, or facial features, the officer has a level of impunity from oversight or accountability, meaning that the public has less protection from misconduct by those officers.

36.     A recent Illinois statutory commission's report on Operation Midway Blitz confirms these points. It identified "ICE agents concealing their identities [as] a prime example of paramilitary style tactics that created a sense of occupation" and "a perception that the state did not want to be truthful about incidents where agents used force."[20] The Illinois commission noted that use of unmarked rental vehicles, plain clothes, and masks also supported suppression of lawful observation and protest of the officers.

37.     Paragraph 49 of the Complaint mischaracterizes federal agents' obligations to announce their identities in the course of an immigration arrest. Title 8, C.F.R. § 287.8(c) provides regulatory standards for the conduct of immigration arrests. While the Complaint describes immigration officers as having "discretion as to when they announce themselves," the text of the regulation provides an objective, nondiscretionary standard: "At the time of the arrest, the designated immigration officer shall, *as soon as it is practical and safe to do so* . . . identify himself or herself as an immigration officer . . . and[ s]tate that the person is under arrest and the

---

[20] Illinois Accountability Commission, Final Report (April 2026), at 123, https://ilac.illinois.gov/2026-04-iac-final-report.html.

reason for the arrest." *Id.* § 287.8(c)(iii) (emphasis added). I am not clear why the government says this is "up to the officers," rather than a bright-line rule.

38.    The circumstances in which masking may be operationally justified are generally identifiable in advance and can be addressed by written policy. In my experience, those circumstances include undercover work; surveillance; certain gang, drug, or organized-crime investigations; tactical operations; specific medical or environmental hazards; and other particularized safety risks identified through supervisory review. I do not understand ordinary public-facing civil immigration enforcement to require routine identity-concealing masks as a categorical matter, and I can think of no reason that an exception for an unusual operation should be decided ad hoc by front-line officers rather than by supervisors implementing a written policy.

### Risks of Ad Hoc Masking

39.    I acknowledge that there are circumstances in which an officer wearing a face covering for non-medical reasons may be necessary or sensible in light of specific risks, as noted in Plaintiff's declarations. However, what Plaintiff's presentation leaves out is that concealing the face also creates significant risks to officers and to the individuals with whom they interact. Non-verbal communication through facial expressions and clarity of speech, particularly when dealing with hearing impaired or limited English proficient persons, can be beneficial in a high-tension encounter.

19

40.     The federal body armor and uniform policies cited above expressly prohibit officers and agents from wearing any body armor sourced themselves as opposed to supplied by the agency. It is striking, in that context, that federal agencies have encouraged mask wearing without identifying or supplying an approved, official mask as part of a uniform or tactical equipment suite. In other words, if officer-safety face coverings were warranted, based on my expertise in law enforcement policy and procedures, I would expect face coverings to be treated as any other officer-safety equipment, issued by the agency and used in conformity with a uniform or equipment policy.[21] This would also satisfy the requirement that agencies provide necessary officer safety equipment under 29 U.S.C. § 668(a)(2).

41.     The fact that ICE appears to have informally allowed its personnel to wear irregular face coverings, rather than a uniform mask with a reasonable accompanying policy, in my view undermines the suggestion that wearing those masks is necessary to officer safety. If the point is to project law enforcement authority while protecting officer anonymity, a uniform mask would only further that aim, whether or not warranted. By instead allowing officers to wear ad hoc masks and comic-book villain logos, ICE has decreased the clarity of its officers' presentations, increased the risk of conflict with the public, and raised the likelihood that they can be impersonated by bad actors.

---

[21] Unlike during the COVID-19 pandemic, there appears to be no supply-chain constraint on sourcing uniform face coverings. I was able to set up an order for 400 gaiters with a custom image for delivery in 10 days through a simple internet search.

42.    Indeed, the ad hoc nature of ICE officers' appearance has coincided with a significant rise in officer impersonation crimes.[22] A May 2026 investigation found a 600% increase in crimes committed by people impersonating immigration agents since the widespread use of ad-hoc masks began last year,[23] and an October 26, 2025 FBI bulletin warned police that "Criminal Actors Impersonate ICE Agents to Commit Violent Crime."[24] It does not appear from Plaintiff's declarations that this risk is being taken into account when agencies decide to allow ad hoc mask use.

43.    The failure to display agency or individual identifiers, officers' wearing of masks, and the driving of unmarked vehicles also increase the risk of federal officers being mistaken, by the public or by other (state, local, or tribal) law enforcement agencies, as criminal elements warranting a law enforcement response. It seems self-evident that civilians engaging in conduct like making nonconsensual stops, bundling people into unmarked vehicles and driving off, brandishing long guns, and using tear gas or other less-lethal munitions would be committing serious crimes.[25] And so it is critical for public safety that federal agents deploying those tactics be understood by their targets, the general public, and especially other law enforcement elements as legitimate law enforcement personnel. Again, I do not see

---

[22] https://www.cnn.com/2025/10/02/us/ice-impersonator-incidents-rise-invs-vis.

[23] https://www.nbcnews.com/news/us-news/ice-impersonators-immigrants-raids-violence-trump-administration-rcna265653?cid=eml_npd_nws_mrd_05252026.

[24] https://www.documentcloud.org/documents/26364028-20251016-fbi-alert-re-ice-impersonators/. The bulletin specifically notes "outdated, incorrect protective gear or equipment" as an indicator of an ICE impersonator (p. 3-4), but since ICE allows officers to wear anything on their faces, it would be impossible to determine whether an impersonator had an "incorrect" mask.

[25] The Illinois commission noted that wearing a mask elevates kidnapping to aggravated kidnapping under that state's criminal law. Final Report, *supra* note 20, at 73.

21

anything in the Plaintiff's presentation that acknowledges this risk or indicates that agencies are taking action to ensure that their masked, plain-clothes, un-badged officers are not mistaken for criminals.

44.     Plaintiff fairly notes that facial recognition software has increased the risk to officers and agents of being identified off-duty. But it does not explain why there are seemingly few official policies on how to respond to this risk, outside of the CBP policy suggested in the Egerton Declaration that has not been made public. It is hard to see how doxxing from publicly-available facial recognition software is different in kind from other evolving risks to officers and agents, which are dealt with through policy, application of risk-management standards by supervisors, issuance of appropriate body armor, and other ordinary law enforcement management tools. The way DHS, and especially ICE, have responded to these purported threats with a lack of written policy, lack of standards, and lack of a uniform mask is inconsistent with a good-faith, professional response to any threat posed by facial recognition software.

45.     Moreover, the fact that—to my knowledge—no state or local law enforcement agency in the country has adopted a broad policy of wearing privacy masks, despite facing similar risks from bad actors, makes me skeptical that facial recognition of federal officers is a materially different risk.

46.     Some of the other allegations from the Plaintiff and its declarants about officer risk are either general risks faced by all of law enforcement, or else seemingly describe First Amendment protest activity:

a. Plaintiff describes the posting of officer identities to websites (*e.g.*, Egerton Decl. ¶ 11; Cleveland Decl. ¶ 28). I do not minimize the seriousness of doxxing or threats, and indeed I have personally experienced them. When I worked at ICE in 2022–25, my photograph and personal information were posted as a "target" on the "dhswatchlist.com" site, along with dozens of other DHS employees.[26] This and related websites argued that dozens of public servants should be fired for their personal views; I received an anonymous phone call threatening my home and children after the website posting. The posting of officer names and photos might be unpleasant, but it is hardly a distinct threat faced only now or only by federal agents. Accordingly, the risks of doxxing can and should be balanced against the risks and harms of having anonymous, masked agents in public.

b. The declarations suggest that members of the general public observe and film federal agents "for the sole purpose of intimidating and harassing government employees." Cleveland Decl. ¶ 23. This seems facially untrue: Protesters and civil observers have been documenting officer misconduct and using video of officer conduct as part of protected First Amendment political expression for many years, even before the 1991 Rodney King assault captured on videotape.

---

26 *See* https://dhswatchlist.com/targets/scott-shuchart (describing this declarant as "unfit for public service").

23

c.  The declarations describe officers being followed home or to their hotels, but apart from the tire-slashing incident, do not state that anything violent happened as a result.

47.    It is perhaps also relevant that the same agencies that here complain about their agents being called "terrorists" or having their officers' identities placed in databases themselves label lawful protesters as "domestic terrorists" and place their photographs in a "database"; and that the same agencies concerned about officers being subject to having their cars followed have themselves followed protesters' cars home with no predicate for a criminal investigation.[27]

## II.    Use of Force

### Background

48.    Federal law enforcement agencies are subject to constitutional rules and policy guiding officers' and agents' use of force. Often policies will exist at both the Department and agency or component level, each setting forth both broad principles (often informed by constitutional rulings like *Graham v. Connor*, 490 U.S. 386 (1989)) and operational guidance. Even more specific guidance is usually provided in officer training, both at the time of onboarding (such as a training academy at the Federal Law Enforcement Training Centers (FLETC)) and in annual or biennial refresher training.

---

[27] *See, e.g.*, C.J. Ciarmella, "ICE tells legal observer, 'We have a nice little database, and now you're considered a domestic terrorist,'" MSN.com (Jan. 23, 2026); Final Report, supra note 20, at 124–27; see generally *Hilton v. Mullin*, No. 26-cv-00092 (D. Me.) (litigation challenging protesters' database entries).

49.    I have reviewed the use of force policies provided by Plaintiff, including:

a. Department of Justice Updated Use of Force Policy[28]

b. Justice Manual 1-16.000, Department of Justice Policy on Use of Force[29]

c. Department of Homeland Security, Policy Statement 044-05, Update to Department Policy on the Use of Force (2023)[30]

d. ICE Directive 19009.3: Firearms and Use of Force (2023)[31] and ICE's Firearms and Use of Force Handbook (2021, some chapters updated subsequently)

e. CBP Use of Force Policy (2021)[32]

50.    While training materials are not generally released publicly, a recent whistleblower report to the Senate on ICE's curtailment of training for new officers shows that officers receive, for example, 30 hours of training on "Control Tactics," two hours on "4th Amendment Seizures," one hour on "Investigative Detention vs. Arrest," one hour on "Use of Force," two hours on the "ICE Use of Force and Firearms Policy," eight hours on "ERO Subject Control." These courses are a mix of classroom learning and hands-on technique and practical training.[33]

---

[28] https://www.justice.gov/archives/ag/file/1220256-0/dl?inline

[29] https://www.justice.gov/jm/1-16000-department-justice-policy-use-force

[30] https://www.dhs.gov/sites/default/files/2023-02/23_0206_s1_use-of-force-policy-update.pdf

[31] https://www.ice.gov/doclib/policy/19009.3.pdf

[32] https://www.cbp.gov/sites/default/files/assets/documents/2021-Jul/cbp-use-of-force-policy_4500-002A.pdf; *see also* CBP Use of Force – Administrative Guidelines and Procedures Handbook (2021), https://www.cbp.gov/sites/default/files/assets/documents/2021-Jul/cbp-use-of-force-admin-guide-procedure-handbook_4500-002B.pdf

[33] *See* Blumenthal Releases Whistleblower Documents Showing Drastic Cuts to ICE Training

25

51.     To my knowledge, no federal use of force policies are materially different from the constitutional "objective reasonableness" standard of *Graham*; rather, they apply that standard to circumstances and fact patterns commonly faced by the agency's own officers and agents. For example, the 2022 policy statement from the Attorney General starts with Graham:

> It is the policy of the Department of Justice to value and preserve human life. Officers may use only the force that is objectively reasonable to effectively gain control of an incident, while protecting the safety of the officer and others, in keeping with the standards set forth in *Grahamv. Connor*, 490 U.S. 386 (1989).

And the DHS policy first sets out a broad principle that implements *Graham*:

> [Law enforcement officers] may use force only when no reasonably effective, safe, and feasible alternative appears to exist and may use only the level of force that is **objectively reasonable** in light of the facts and circumstances confronting the [officer] at the time force is applied.[34]

52.     The DHS policy then describes the objective reasonableness standard and describes certain tactics and strategies that facilitate only reasonable uses of force, such as training in de-escalation tactics; a principle that personnel "avoid intentionally and unreasonably placing themselves in positions in which they have no alternative to using deadly force"; and a requirement that, once force has been used, personnel render "appropriate medical assistance." The policy goes on to impose further policy restrictions on uses of force beyond the constitutional baseline, such as general (but not absolute) prohibitions on "warning shots,"

---

& Testing for New Recruits (Feb. 23, 2026), https://www.blumenthal.senate.gov/newsroom/press/release/blumenthal-releases-whistleblower-documents-showing-drastic-cuts-to-ice-training-and-testing-for-new-recruits.

[34] DHS Policy, *supra* note 30, at 2.

26

"disabling fire," and use of deadly force to prevent escape where the subject poses only a threat to themselves or property.[35] The DOJ implementation policy is similar in scope and detail.[36]

53.     Agency policies then add additional, specific substantive detail and procedural elements to implement the departmental policy. The ICE policy principally assigns roles and responsibilities within the agency for training, administration, and oversight of use of force policy. It also defines a "use of force continuum" that is more nuanced than the parent department's policy, differentiating, for example, between "soft techniques" (escort positions, chemical agents) and "hard techniques" (strikes, throws, tasers, batons) within the domain of uses of force short of deadly force.

54.     The consistency in these policies is no surprise: They all key off from the 2020 *National Consensus Policy on Use of Force* developed by the International Association of Chiefs of Police.[37] That is, federal, state, and local agencies all implement the same constitutional limits on use of force and best practices for managing force with a consistent framework, developed by policing experts. For this reason, law enforcement officers do not require extensive retraining on use-of-force concepts when detailing or joining task forces led by other agencies whose policies are then applicable.

---

[35] *Id.* at 3, 4, 6, 8.

[36] DOJ Manual, *supra* note 29.

[37] https://www.theiacp.org/resources/document/national-consensus-policy-and-discussion-paper-on-use-of-force

27

55.     The policies produced by Plaintiff expressly note that state and local authorities may investigate and prosecute excessive-force incidents. For example, the 2021 edition of ICE's *Firearms and Use of Force Handbook* provides:

> Local law enforcement agencies may investigate use of force incidents occurring within their territorial jurisdictions, including those resulting in serious bodily injury or death of an individual (critical incidents). Accordingly, ICE employees involved in a critical incident should anticipate an investigation by local authorities. They may be interviewed by local police or subpoenaed to a local grand jury or court proceeding.[38]

Similarly, the CBP policy contemplates that a "state or local law enforcement agency [may] take action" in response to misconduct.[39]

## Assessment

56.     Plaintiff and its declarants are obviously correct that federal personnel could not reasonably be trained on 50 divergent state use-of-force policies. However, based on my understanding of the federal law enforcement approach to use of force and training, this threat is largely specious: Compliance with the Connecticut provision in question would not appear to require any meaningful change in policy or training by federal agencies operating within Connecticut. As noted above, state and local law enforcement all follow the same general constitutional rule and policies developed in light of commonly-reviewed frameworks like the *National Consensus Policy*.

---

[38] U.S. Imm. & Customs Enf't, *Firearms and Use of Force Handbook* (Aug. 2, 2021) at Ch. 4, ¶ A.1.

[39] CBP Use of Force Policy, *supra* note 32, at 42.

57.    I understand the Connecticut measure to operate largely by articulating a specific *justification defense* to criminal liability for certain charges of excessive force by peace officers and other law enforcement. Conn. Gen. Stat. 53a-22 (2026). While I do not claim expertise on state use-of-force law or criminal law, it is evident that Connecticut is not the only state with such an affirmative or justification defense for peace officer use of force charges. *See, e.g.*, Cal. Penal Code § 835a (providing standard for permissible use of deadly force); Colo. Rev. Stat. § 18-1-707 ("Use of force by peace officers"); N.Y. Penal Code § 35.30 ("Justification; use of physical force in making an arrest or in preventing an escape"). And with respect to the New York law, at least, most federal agents are encompassed within the relevant definition of "peace officer." N.Y. Penal Code § 10.20 (cross referencing N.Y. Crim. Proc. L. § 2.15).

58.    Federal law enforcement personnel have been subject to state criminal prosecution for excessive force for centuries.[40] While federal law enforcement officials may carry Supremacy Clause immunity for actions authorized by law and necessary and proper for their duties, unauthorized or unnecessary excessive force may be subject to state prosecution.[41] For example, an ICE officer is currently facing state charges for brandishing a weapon while driving along a highway shoulder unrelated to enforcement activity.[42]

---

[40] *See generally* Bryna Godar, Can States Prosecute Federal Officials?, State Democracy Research Initiative (Univ. of Wisc. Law School) (July 17 2025), https://statedemocracy.law.wisc.edu/our-work/can-states-prosecute-federal-officials.

[41] *See Wyoming v. Livingston*, 443 F.3d 1211 (10th Cir. 2006).

[42] *Minnesota v. Morgan*, No. 27-CR-26-9656 (Hennepin Co. 2026); *see generally* Max Nesterak, "First ICE officer charged with assault for threatening people with a gun in Minnesota,"

59.     Despite the prospect for prosecution and the existence of these justification defenses, I have never encountered a discussion of state-law criminal defenses in a federal agency's use of force policy—even where, as noted above, the policy reminds officers of the possibility of state prosecution for misconduct. While I am less familiar with training than with policy, as far as I know, and from my review of available materials, federal personnel are simply not trained on the details of justification defenses to state criminal liability.

---

*Minn. Reformer* (April 16, 2026), https://minnesotareformer.com/2026/04/16/first-ice-officer-charged-with-assault-for-threatening-people-with-a-gun-in-minnesota/.

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

I, Scott Shuchart, declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct to the best of my belief and based upon my personal knowledge.  Executed on July 13, 2026.

Scott Shuchart

31

# Attachment A

# Scott Shuchart

scott@shuchartlaw.com • 202-527-9026                         www.shuchartlaw.com

## Professional Experience

**Principal, Shuchart PLLC, 2025-Present**

**Of Counsel, LeGrand Law PLLC, 2025-Present**

**Advisor, Protect Democracy Project / Protect Democracy United, 2025-Present**

   Litigator and policy consultant in private practice.

**Assistant Director for Regulatory Affairs & Policy, Department of Homeland Security,**
   **U.S. Immigration & Customs Enforcement, 2022-2025**

- Led policy staff of 30+ lawyers and economists for 21,000-employee sub-agency
- As senior executive service (SES) leader, directed all agency regulatory and policy development and advised agency and department leadership
- Led drafting and approval process for regulations and policy on Fifth Amendment bond determinations, First Amendment compliance, and I-9 modernization
- Principal policy liaison to Department, interagency committees, and the White House

**Senior Director for Legal Strategy, Kids in Need of Defense, 2019-2022**

- Directed impact litigation and legal strategy for leading advocacy organization protecting unaccompanied migrant children, including federal litigation securing nationwide preliminary and permanent injunctions in *J.O.P. v. DHS.*
- Managed multimillion-dollar federal contract and hundreds of staff providing legal services at emergency intake shelters.

**Senior Fellow, Center for American Progress, 2018-2019**

- Immigration law expert for think tank, advancing proposals to reform immigration policy and civil rights oversight.

**Senior Advisor, Department of Homeland Security,**
   **Office for Civil Rights and Civil Liberties, 2010-2018**

- Federal policy and regulatory development lead for 200-person civil rights office; escalating supervisory roles culminating in acting leadership of 90-person branch
- Chaired Department efforts on anti-profiling policy and civil rights regulations; led reforms at family detention facilities
- Led inspection teams at detention facilities; represented Department in stakeholder forums and international treaty review bodies

**Supreme Court Clinical Fellow, Yale Law School, 2008-2010**

- Taught and supervised clinical students in Supreme Court Advocacy Clinic and Complex Federal Litigation Clinic, overseeing all written and pre-trial work
- Prevailed in three Supreme Court cases including *Carr v. United States*, *Negusie v. Holder*, and *Fitzgerald v. Barnstable School Committee.*

**Litigation Associate, Boies Schiller & Flexner, 2006-2008**

**NRDC Fellow, Altshuler Berzon LLP, 2004-2006**

**Law Clerk, 9th Circuit Court of Appeals, 2003-2004**

## Education

**Yale Law School, New Haven, Connecticut (J.D.)**

Comments editor, *Yale Law Journal*; editor, *Yale Law & Policy Review; Yale Law Revue*; Stephen J. Massey Prize for clinical work and leadership

**Oxford University, Oxford, United Kingdom (B.Phil.)**

John Locke Prize; Royal Institute of Philosophy Jacobsen Fellowship

**Harvard College, Cambridge, Massachusetts (A.B. *magna cum laude*)**

Phi Beta Kappa; co-president, *Harvard Review of Philosophy*.

## Awards and Professional Memberships

**Prize.** Ridenhour Prize for Truth-Telling, 2019

**Bar membership.** New York and District of Columbia Bars; Supreme Court and multiple federal appellate and district court bars

**Security clearance.** Held Top Secret or TS/SCI clearances throughout federal service