# Exhibit 12

*ICE Firearms and Use of Force Handbook*

# Firearms and Use of Force Handbook

Effective Date: August 2, 2021



U.S. Immigration and Customs Enforcement

ICE 0001

## Foreword

I am pleased to present the U.S. Immigration and Customs Enforcement (ICE) Firearms and Use of Force Handbook. Together, ICE Directive 19009.2, ICE Firearms and Use of Force (August 2, 2021), and this Handbook supersede ICE Directive 19009.1, Firearms and Use of Force (November 8, 2019), ICE Firearms and Use of Force Handbook 19009.1 (November 8, 2019), ICE Policy No. 19002.1, Interim ICE Firearms Policy (July 7, 2004) and ICE Policy No. 19005.1, Interim ICE Use of Force Policy (July 7, 2004), and all other ICE policy issuances and previously recognized guidance on firearms and use of force that are inconsistent with the policy, guidance, and procedures contained in this Handbook.

This Handbook sets forth ICE policy on firearms and use of force. ICE's law enforcement mission brings with it the authority to use force when necessary. To this end, it is the policy of ICE that its Authorized Officers only use force that is objectively reasonable and necessary to carry out their law enforcement duties. The use of excessive force by ICE employees is strictly prohibited. In the performance of their law enforcement duties, Authorized Officers may only carry firearms and intermediate force weapons that have been approved by ICE.

Furthermore, this Handbook assigns responsibilities for agency employees and establishes procedures and protocols concerning firearms and the use of force, including, but not limited to training and proficiency; the reporting of use of force incidents; and the proper maintenance, storage, and accounting of firearms and intermediate force weapons.

This Handbook serves as the authoritative guidance for ICE employees regarding firearms and use of force in the performance of their law enforcement duties. As such, ICE employees are expected to be familiar with the contents of this Handbook and required to take appropriate action to comply with policies and procedures established herein. Compliance with these policies and procedures will help ensure that ICE employees conduct their law enforcement activities in a manner that keeps themselves and the public they serve safe.  Violation of the policies and procedures contained in this Handbook may be grounds for disciplinary action or other appropriate action.

This document provides only internal ICE policy guidance, which may be modified, rescinded, or superseded at any time without notice. It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable by law or equity by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigative prerogatives of ICE.

Inquiries related to this Handbook may be directed to the ICE Office of Policy and Planning (OPP) and the ICE Office of Firearms and Tactical Programs (OFTP).

---

**Foreword**

Table of Contents

**Definitions.** ...................................................................................................................**6**

**Chapter 1: Policy on Use of Force by Authorized Officers** ...............................................**10**

  **A.**  General Guidelines ...........................................................................................................10

  **B.**  Objectively Reasonable and the Totality of Circumstances ...............................................11

  **C.**  Use of Intermediate Force ................................................................................................12

  **D.**  Use of Deadly Force ........................................................................................................12

  **E.**  ICE Use of Force Continuum ...........................................................................................13

  **F.**  Firearms and Use of Force Incident Review Committee ...................................................15

**Chapter 2: Firearms** ........................................................................................................**16**

  **A.**  Authority to Carry ICE Firearms .....................................................................................16

  **B.**  Carriage of ICE Firearms .................................................................................................16

  **C.**  Personally Owned Firearms .............................................................................................18

  **D.**  Flying Armed on a Commercial Aircraft ..........................................................................18

  **E.**  Firearms Reserves ...........................................................................................................19

  **F.**  Flash and Undercover Firearms .......................................................................................20

  **G.**  Alcohol and Medication ...................................................................................................20

  **H.**  Suspension or Revocation of the Authority to Carry Firearms...........................................20

  **I.**  Retrieval of Firearms and Other Law Enforcement Equipment .........................................24

**Chapter 3: Intermediate Force Weapons** ........................................................................**25**

  **A.**  General Guidelines ...........................................................................................................25

  **B.**  Chemical and Specialty Impact Munitions (CSIM)...........................................................25

**Chapter 4: Use of Force Reporting Requirements** ..........................................................**28**

  **A.**  General Guidelines ...........................................................................................................28

  **B.**  Reporting the Use of Intermediate Force ..........................................................................29

  **C.**  Reporting the Use of Deadly Force ..................................................................................30

  **D.**  Discharge of a Firearm.....................................................................................................32

**Chapter 5: Firearms and Intermediate Use of Force Proficiency and Training** ...............**34**

  **A.**  General Guidelines and Responsibilities ...........................................................................34

  **B.**  Firearms Proficiency and Training Requirements ..............................................................34

  **C.**  Intermediate Use of Force Proficiency and Training Requirements ....................................38

**Chapter 6: Accountability of Firearms and Other Use of Force Equipment** ...................**39**

  **A.**  General Guidelines and Responsibilities ...........................................................................39

**B.**   Inventory of Accountable Assets in FACTS ....................................................................39

**C.**   Storage of Firearms..........................................................................................................40

**D.**   Storage of Intermediate Force Weapons and Other Use of Force Equipment...................41

**E.**   Lost or Stolen Firearms and Sensitive Assets..................................................................43

**F.**   Lost or Stolen Intermediate Force Weapons.....................................................................45

**G.**   Destroyed/Non-Repairable ICE-issued Firearms .............................................................46

**H.**   Board of Survey Action ....................................................................................................46

**I.**   Seized and Abandoned Firearms ......................................................................................47

**J.**   Sale or Transfer of Authorized Personally Owned Firearms.............................................48

**Chapter 7: ICE Firearms Maintenance, Inspection, and Repair**................................................**48**

**A.**   Armory Operations ...........................................................................................................48

**B.**   Inspections of All ICE Firearms .......................................................................................48

**C.**   Maintenance......................................................................................................................49

**D.**   Repair of ICE Firearms.....................................................................................................49

**E.**   ICE Firearms Replacement ...............................................................................................50

**F.**   ICE Firearm Shipping and Transfer..................................................................................50

**G.**   Destruction of ICE Firearms ............................................................................................51

**Chapter 8: ICE-Issued/Approved Ammunition** ...........................................................................**51**

**A.**   Ammunition Issuance ........................................................................................................51

**B.**   Ammunition Use................................................................................................................51

**C.**   Ammunition Storage .........................................................................................................52

**D.**   Lost or Stolen Ammunition ...............................................................................................52

**Chapter 9: Foreign Travel and Assignments** ...............................................................................**53**

**A.**   Foreign Travel...................................................................................................................53

**B.**   Foreign Assignments .........................................................................................................53

**Chapter 10: Specialized Operations and Honor Guards**..............................................................**55**

**A.**   Specialized Operations......................................................................................................55

**B.**   ICE National Honor Guard ...............................................................................................55

**Chapter 11: Firearms and Defensive Tactics Instructors and Range Operations** ......................**56**

**A.**   Firearms Instructors .........................................................................................................56

**B.**   Defensive Tactics Instructors............................................................................................56

**C.**   Range Operation and Safety .............................................................................................56

**D.**   Occupational Safety and Health Administration (OSHA) Requirements...........................57

**E.**    Metal Reactive Targets ...................................................................................58

**F.**    Force-On-Force Training ...............................................................................58

**APPENDIX I – AUTHORITIES/REFERENCES** .............................................................**60**

**APPENDIX II – DEPARTMENT POLICY ON THE USE OF FORCE**.............................**62**

**APPENDIX III – ICE-APPROVED FIREARMS AND INTERMEDIATE FORCE WEAPONS ... 73**

**A.**    Handguns .......................................................................................................73

**B.**    Shotguns .........................................................................................................73

**C.**    Rifles and Automatic Firearms ......................................................................73

**D.**    Specialized Weapons ......................................................................................74

**E.**    Intermediate Force Options............................................................................74

**APPENDIX IV – GUIDELINES AND PROCEDURES FOR ELECTRO-MUSCULAR DISRUPTION DEVICES (EMDDs)** .................................................................................**75**

**APPENDIX V – ICE COURSES ON DEMONSTRATION OF FIREARMS PROFICIENCY** .......**82**

**A.**    Handgun Qualification Course .......................................................................82

**B.**    Five Shot Handgun .........................................................................................85

**C.**    Rifle Qualification Course ..............................................................................88

**D.**    Shotgun Qualification Course ........................................................................89

**E**.    Submachine Gun Qualification Course ..........................................................90

**F.**    Special Response Team (SRT) Rifle/Specialized Weapons Qualification Course ...........93

**APPENDIX VI – CONDUCTING COURSES OF FIRE AND SCORING TARGETS** .....................**97**

**A.**    Conducting Courses of Fire ...........................................................................97

**B.**    Scoring Targets ..............................................................................................99

**APPENDIX VII – USE OF FORCE TRAINING REQUIREMENTS**............................................**103**

**APPENDIX VIII – GUIDELINES AND PROCEDURES FOR CANINE USE OF FORCE** ..........**109**

**A.**    Definitions .....................................................................................................109

**B.**    Certification, Training, and Documentation..................................................110

**C.**    Guidelines for Canine Deployment and Release ...........................................111

**D.**    Reporting Requirements ................................................................................112

**E.**    Canine Bites..................................................................................................113

**Definitions.**

The following definitions apply for the purposes of this Handbook only:

**Authorized Officer.** An ICE employee who is authorized to carry an ICE-issued firearm(s) and/or approved, personally-owned weapon(s) (POW) pursuant to Title 19, United States Code (U.S.C.), Section 1589a, 8 U.S.C. § 1357, Title 8, Code of Federal Regulations (C.F.R.) Part 287, and/or other statutory authority as delegated to ICE employees by the Director of ICE. Authorized Officers are also permitted to carry intermediate force weapons.

Authorized Officers include, but are not limited to:

   **A.** Enforcement and Removal Operations (ERO) Deportation Officers;

   **B.** Homeland Security Investigations (HSI) Special Agents, Technical Enforcement Officers, Tactical Communications Officers, Seized Property Specialists, and ICE Tactical Officers (Shadow Wolves); and

   **C.** Office of Professional Responsibility (OPR) Special Agents, Technical Enforcement Officers, and Security Inspectors.

**Board of Survey.** A committee led by OFTP and composed of members from across all Program Offices that is responsible for reviewing events of loss, damage, destruction, or theft of ICE firearms and other controlled assets determined to be sensitive, as stipulated by the Assistant Director for OFTP.

**Canine.** A certified canine which an ICE Directorate received, approved, accepted and certified for training or field use for apprehension of subjects.

**Convicted of a Misdemeanor Crime of Domestic Violence**. A conviction under federal, state, or tribal law of a crime defined by 18 U.S.C. § 921(a)(33)(A), provided that the Authorized Officer "was represented by counsel in the case, or knowingly and intelligently waived the right to counsel in the case," and, if the Authorized Officer was entitled to a trial by jury, the case was, in fact, tried by jury or the Authorized Officer "knowingly and intelligently waived the right to have the case tried by a jury, by guilty plea or otherwise," 18 U.S.C. § 92l(a)(33)(B). (Note: Convictions include no contest pleas and sentences of probation.)

**Critical Incident**. An event in which an ICE employee, acting in an official capacity and within his or her scope of employment, is involved in, or witnesses, activities that result in serious bodily injury to, the disappearance of, or death of, any individual. *See* ICE Directive No.1044.1, ICE Response to and Evaluation of Critical Incidents Involving ICE Employees (Aug. 4, 2015) or as updated.

**Deadly Force.** That degree of force that is likely to cause death or serious bodily injury. Examples of deadly force include, but are not limited to, any discharge of firearms against persons or animals, any use of impact weapons to strike the neck or head, any

strangulation techniques, any strikes to the throat, and the use of any edged weapons.

**Defensive Tactics Coordinator (DTCO).** An ICE-certified Defensive Tactics Instructor who has been designated in writing by his or her Responsible Official to manage the overall defensive tactics, intermediate force weapons, and related use of force programs.

**Defensive Tactics Instructor (DTI).** An Authorized Officer who has been trained and certified by ICE to conduct training on certain defensive tactics, intermediate force weapons, and related use of force programs.

**Electro-Muscular Disruption Device (EMDD).** A weapon designed primarily to discharge electrical charges into a subject that will cause an immediate loss of a person's neuromuscular control, as well as the ability to perform coordinated action for the duration of the impulse.

**Equipment Specialist Ordnance (ESO).** An employee authorized by the Assistant Director of OFTP or his/her delegate, who has been trained and certified to overhaul, rebuild, repair, maintain, examine, and modify ICE firearms, to include function firing.

**Field Maintenance Armorer (FMA).** An ICE-certified Firearms Instructor who has also been trained and certified by OFTP's Field Maintenance Armorer Training (FMAT) program to perform inspections, repairs, and maintenance on ICE firearms.

**Firearms, Armor, and Credential Tracking System (FACTS).** The Department of Homeland Security (DHS) system of record for sensitive property, demonstration of firearms proficiency scores, and in-service use of force training.

**Firearms Coordinator (FCO).** An ICE-certified Firearms Instructor who has been designated in writing by his or her Responsible Official to manage the overall firearms and related use of force program. The Authorized Officer appointed to this position must successfully complete a training program specifically designated for Firearms Coordinators by ICE. The Responsible Official may appoint more than one depending on office size and operational requirements.

**Firearms Instructor (FI).** An Authorized Officer who has been trained and certified by ICE to conduct certain firearms and use of force training and make proficiency determinations.

**Firearms and Use of Force Incident Review Committee.** An ICE committee that is responsible for reviewing critical incidents involving firearms, use of force events, and enforcement-related officer safety issues. The committee is composed of the Assistant Director for OFTP, who serves as committee chair; the Executive Associate Directors (EADs) for HSI and ERO; the Associate Director for OPR; and the Principal Legal Advisor.

**Flash Firearms.** Lethal weapons including, but not limited to, firearms, ammunition, missiles, grenades, rockets, mines, artillery, cannons, mortars, bombs, explosives, and other similar weapons and ordnance utilized in support of undercover investigations, wherein they are displayed, shown, presented, exhibited, or otherwise physically exposed during in-person

---

**Definitions**

undercover interactions in furtherance of a criminal investigation and/or for establishing the bona fides of an undercover agent, storefront, company, or operation.

**Handgun.** Semi-automatic pistol or a 5-shot revolver.

**ICE Firearm.** A firearm owned by ICE and assigned to an Authorized Officer for use in the performance of his or her official duties or a handgun that is not ICE-owned, but is approved by ICE for use by an Authorized Officer in the performance of his or her official duties and loaded with ICE-issued ammunition.

**ICE Use of Force Continuum.** An instructional model used to describe the levels of force an Authorized Officer may need to use to gain control over a resistant subject. It is not a progression of the levels of force an Authorized Officer must apply to each situation, but rather it serves to identify and describe types of force options, categorizing them within one of five levels. The five levels, as described more fully in Chapter 1.E., are: (1) officer presence; (2) verbal commands; (3) soft techniques; (4) hard techniques; and (5) deadly force.

**Intermediate Force.** Physical force that is not likely to cause death or serious bodily injury.

**Intermediate Force Weapon.** Weapon designed or intended to be used in a manner that is not likely to result in death or serious bodily injury. These weapons include impact weapons, chemical agents, and EMDDs.

**Program Heads.** The EADs of ERO, HSI, and Management and Administration (M&A), and the Associate Director for OPR, and the Assistant Director for OFTP.

**Responsible Official (RO).** ICE employee that is accountable for all aspects of the ICE firearms and use of force program within his or her area of responsibility. For ICE Headquarters (HQ), these officials are: (1) the Deputy Director; (2) the Assistant Directors who report to the ERO and HSI EADs and to the OPR Associate Director; (3) the Assistant Director for OFTP; and (4) other officials designated in writing by the ICE Director. For ICE field locations, these officials are: (1) HSI Special Agents in Charge and, where applicable, Attachés; (2) ERO Field Office Directors; (3) OPR Special Agents in Charge; and (4) other officials designated in writing by the ICE Director.

**Restraining Device.** Any physically attached or applied ICE-approved device having the purpose of preventing, restricting, limiting, or controlling the movement of the person on whom it is applied.

**Revocation.** The permanent termination of the Authorized Officer's authority to perform law enforcement duties and to carry an ICE-issued firearm and the authority to carry an ICE-approved personally owned firearm in the performance of the officer's official duties.

**Sensitive Assets.** Badges, credentials, firearms, intermediate force weapons, ammunition, and other items recorded in FACTs, as deemed as such by the Department of Homeland Security

(DHS)[1] and the AD of OFTP.

**Serious Bodily Injury.** Injury that involves a substantial risk of death, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty.

**Specialized Weapon.** Weapon intended for particular tactical application such as a firearm capable of enhanced accuracy, range, or rate of fire.

**Suspension.** The temporary removal of the Authorized Officer's authority to perform law enforcement duties and to carry an ICE-issued or ICE-approved pow in the performance of the officer's official duties.

**Tactical Doctrine.** The methodology by which law enforcement entities use personnel and equipment to control individuals, structures, and terrain.

**Totality of the Circumstances.** All factors existing in each individual case, which are used to determine the reasonableness of an Authorized Officer's actions. These factors include but are not limited to the level of training, strength, and size of the Authorized Officer and subject; the age of the subject; weapons involved; the presence of other officers, subjects, or bystanders; and environmental conditions. *See* Chapter 1.B.2 for additional factors.

**Undercover Firearm.** Non-standard firearm used by Authorized Officers in an undercover activity.

---

[1] See DHS MANUAL 119-03-001-01 *PERSONAL PROPERTY ASSET MANAGEMENT MANUAL,* as updated.

**Definitions**

**Chapter 1: Policy on Use of Force by Authorized Officers**

**A.      General Guidelines**

1) An Authorized Officer may use only that force which is necessary and objectively reasonable in light of facts and circumstances confronting the officer.

2) Use of force is necessary when it is reasonably required to carry out the Authorized Officer's law enforcement duties in a given situation, considering the totality of facts and circumstances of a particular situation. *See* Section 5.2 of ICE Directive No. 19009.2, Firearms and Use of Force (Month Day, 2021) and Chapter 1.B. of this Handbook for more information.

3) Authorized Officers have a duty to intervene to prevent or stop a perceived use of excessive force by another Authorized Officer when it is safe to do so. Authorized Officers shall report any such incident to OPR . Failure to intervene and/or report will be considered misconduct and may result in adverse action.

4) An Authorized Officer may have to rapidly intensify or diminish force and employ varying use of force options, depending on the totality of circumstances present and the evolving situation.

5) When feasible, Authorized Officers shall employ tactics to deescalate, i.e., stabilize, slow, or reduce the intensity of, a potentially violent situation without using physical force. Such tactics include Officer Presence and Verbal Commands as outlined in the ICE Use of Force Continuum. *See* Section 5.5 of ICE Directive 19009.2, Firearms and Use of Force (Month Day, 2021) and Chapter 1.E. of this Handbook for more information. Recognizing that it is not always possible to obtain a subject's voluntary compliance, these tactics should be attempted only when feasible and when a delay is not likely to create a greater threat to the safety of the Authorized Officer or others.

6) Based on the totality of the circumstances, different Authorized Officers may have different responses to the same situation, any of which may be both reasonable and necessary. The level of force applied must reflect the totality of circumstances surrounding the situation, including the presence of imminent danger to the Authorized Officer or others.

7) The supervisor of any ICE employee involved in a use of force incident must advise the employee of the resources available to the employee, including the ICE Employee Assistance Program and the ICE Peer Support Program.

8) When an Authorized Officer uses deadly force, either on or off duty, which results in death or serious bodily injury to a person, the Authorized Officer, following a verbal report of the incident as required in Chapter 4.C.1.a, must be immediately placed on administrative leave for 3 consecutive workdays. This period of absence is not for disciplinary purposes. The Office of Human Capital (OHC) Employee and Labor Relations (E&LR) and the Office of the Principal Legal Advisor (OPLA) must be consulted regarding any extensions of administrative leave.

9) Following any use of force incident and when safe to do so, Authorized Officers must seek medical assistance for any person who appears or claims to be injured.

10) Every use of force incident and any discharge of an ICE firearm by an Authorized Officer (other than in a training activity where no injury or property damage occurs) must be properly reported and reviewed in accordance with the procedures and guidelines set forth in Chapter 4 of this Handbook.

11) ICE firearms and authorized intermediate force weapons may only be carried by Authorized Officers. Authorized Officers, their supervisors, and managers will be provided training and guidance on the issuance, use, safeguarding, and maintenance of ICE firearms, intermediate force weapons, and related use of force equipment.

12) Every Authorized Officer must, at the appropriately designated intervals, demonstrate proficiency with each ICE firearm that he or she is authorized to carry, and maintain proficiency with intermediate force weapons and use of restraining devices (*e.g.*, handcuffs, belly chains, and leg irons).

13) Strangulation techniques used to restrain an individual or as a compliance technique are prohibited except when the use of deadly force is authorized.

B.    **Objectively Reasonable and the Totality of Circumstances**

1) The "reasonableness" of a particular use of force will be reviewed based on the totality of the circumstances confronting the Authorized Officer at the time of the use of force. Reasonableness is an objective standard viewed from the perspective of a reasonable officer, rather than with 20/20 vision of hindsight.

2) The totality of the circumstances are all factors existing in each individual case which are used to determine the reasonableness of an Authorized Officer's actions. These factors include, but are not limited to:

   a)   The seriousness of the offense at issue;

   b)   Whether the subject poses an imminent threat to the safety of the Authorized Officer or others;

   c)   Whether circumstances are uncertain and rapidly evolving;

   d)   Whether the subject is actively resisting or attempting to evade arrest by flight;

   e)   The foreseeable risk of injury to subject(s) involved and others;

   f)   The level of training, strength, and size of the Authorized Officer;

   g)   The apparent level of training, strength, size, and age of the subject(s);

   h)   The weapons involved and/or available;

---

i)   The presence of other officers, subjects, or bystanders; and

j)   Environmental conditions.

**C.    Use of Intermediate Force**

1)   Intermediate force is physical force that is neither likely nor intended to cause death or serious bodily injury.

2)   Any use of intermediate force must be both objectively reasonable and necessary in order to carry out the Authorized Officer's law enforcement duties.

3)   Intermediate force options may be used in situations where empty-hand techniques are not sufficient to bring a disorderly, non-compliant, or violent subject under control, but where deadly force is not deemed justified.

**D.    Use of Deadly Force**

1)   Deadly force is force that is likely to cause death or serious bodily injury.

2)   The *Department Policy on the Use of Force* dated September 7, 2018, or as amended or superseded, governs the use of deadly force by all DHS law enforcement officers. *See Appendix II.*

3)   Authorized Officers may use deadly force only when the officer has a reasonable belief that the subject of such force poses an imminent danger of serious bodily injury or death to the officer or to another person.

4)   Deadly force is not authorized solely to prevent the escape of a fleeing suspect. Deadly force against a fleeing subject is only authorized if there is probable cause to believe that the escape of the suspect would pose an imminent danger of death or serious bodily injury to the officer or another person.

5)   When feasible, and if to do so would not increase the danger to the Authorized Officer or others, a verbal warning to submit to the authority of the Authorized Officer shall be given before the use of deadly force.

6)   An Authorized Officer is not limited to the use of authorized weapons/devices if the Authorized Officer or others are faced with imminent threat of death or serious bodily injury and if authorized weapons are not readily accessible or inoperable.

7)   The use of firearms to discharge chemical munitions or specially designed breaching munitions against structures does not constitute the use of deadly force unless there is reason to believe that the chemical munitions or specially designed breaching munitions are likely to cause the death of a person or serious bodily injury *(e.g.,* may cause a fire).

---

8) Deadly force may be used against animals when the officer has a reasonable belief that the animal(s) pose an imminent danger of serious bodily injury or death to the officer or to another person, or to euthanize a seriously injured or diseased animal.

**E.    ICE Use of Force Continuum**

1) The ICE Use of Force Continuum describes and categorizes the application of various levels of force an Authorized Officer may use to gain control over a resistant subject.

2) An Authorized Officer may have to rapidly intensify or diminish force and employ varying use of force options through the Continuum, depending on the totality of circumstances present and the evolving situation.

3) Outlined below are the 5 levels of the Continuum (with associated non-exhaustive examples of each):

a)   First level (Officer Presence):

   i)   Professional, courteous demeanor;

   ii)  Positive attitude; physical condition;

   iii) Confident posture and body language; and

   iv)  Professional attire, or clean, neat attire appropriate to the work being performed.

b)  Second level (Verbal Commands):

   i)   Professional, firm voice;

   ii)  Instructions that are simple, easy to understand, and repeated as necessary; and

   iii) Only one officer issuing verbal commands at any given time.

c)  Third level (Soft Techniques):

   i)   Empty-hand techniques with a minimal chance of injury;

   ii)  Escort position;

   iii) "Come-along" holds, to include the use of impact weapons that involve the application of pressure to move noncompliant subjects;

   iv)  Use of touch pressure points; and

---

**ICE Firearms and Use of Force**

FOR OFFICIAL USE ONLY

v)  Use of chemical agents.

d)  Fourth level (Hard Techniques):

    i)  Techniques that have a greater possibility of injury to subjects;

    ii)  Strikes with a hand, arm, foot, leg, head, or the whole body;

    iii) Throws;

    iv) Take-downs;

    v)  Specified EMDDs;

    vi) Impact weapons when used for striking; and

    vii) Specialty impact weapons.

    viii) Canine Release

e)  Fifth level (Deadly Force):

    i)  Discharge of firearms against persons or animals;

    ii)  Any use of impact weapons to strike the neck or head;

    iii) Any strangulation techniques;

    iv) Any strikes to the throat; and

    v)  Use of any edged weapons.

**F.**     **Firearms and Use of Force Incident Review Committee**

1) When reviewing a critical incident involving the use of force, the Firearms and Use of Force Incident Review Committee will determine the following:

    a) Did the use of force adhere to current ICE policy; and

    b) Are changes needed to tactics, training, or policy.

    When the committee determines the use of force was not in compliance with ICE policy and/or changes are needed to current tactics, training, or policy, the Committee will discuss their findings with OFTP during their quarterly meeting or sooner if needed. OFTP will address any recommended changes and report their actions to the Committee. If the Committee determines additional review is warranted, the case will be referred to OPR for review.

2) The Firearms and Use of Force Incident Review Committee shall meet quarterly, or more frequently, if required.

**Chapter 2: Firearms**

**A.     Authority to Carry ICE Firearms**

1) To carry an ICE firearm an Authorized Officer must:

   a) Be authorized to carry firearms by federal law, including 19 U.S.C. § 1589a, 8 U.S.C. § 1357, 8 C.F.R. § 287, or other statutory authority as delegated to ICE employees by the Director of ICE;

   b) Be issued an ICE badge and credentials indicating that the Authorized Officer is permitted to bear firearms;

   c) Have successfully completed the mandatory basic law enforcement training related to his or her statutory authority, including basic firearms training required for his or her ICE-specific job series and title, or have successfully completed a substantially equivalent training program approved by the ICE Director through the Assistant Director for OFTP;

   d) Maintain proficiency, as set forth in Chapter 5 of this Handbook, in the use of ICE firearms and intermediate force weapons that he or she is authorized to carry; and

   e) Adhere to all applicable policies, use of force proficiency, and training requirements set forth in this Handbook.

2) The ICE Director may approve, as permitted by law, additional individuals or classes of individuals to be authorized to carry an ICE firearm in the performance of their official duties.

3) All ICE employees who are not Authorized Officers or who are not otherwise authorized by ICE to transport firearms are prohibited by Federal law from carrying any firearm into a federally owned, rented or leased facility.

**B.     Carriage of ICE Firearms**

1) While performing law enforcement duties, Authorized Officers must carry ICE firearms unless operational circumstances preclude the carriage of firearms.

2) Authorized Officers may not be issued or authorized to carry more than two handguns.[2] This does not include ICE-owned firearms issued to an Authorized Officer for purposes of competition or ICE-issued firearms assigned to a Firearms Instructor for inventory control or use in training.

3) Authorized Officers may only carry those firearms determined to be suitable by the

---

[2] Current or Former Responsible Officials with oversight of SRTs, current SRT members, and SRT certified Officers and Agents are exempt from this limitation and may be issued and authorized to carry up to three handguns.

Assistant Director for OFTP and specifically approved in writing by the respective Program Head.

4)  When carrying an ICE firearm during a planned enforcement action, Authorized Officers must carry their ICE-issued badges and credentials authorizing them to bear firearms; an intermediate force weapon in accordance with Chapter 3; and their ICE-approved restraining device (issued or authorized flexible restraints meet this requirement). In all other instances when carrying an ICE firearm while on duty, Authorized Officers must carry an ICE-approved restraining device in addition to their ICE-issued badge and credentials. Authorized Officers involved in an approved undercover or sensitive surveillance operation are exempt from this requirement if the possession of an ICE-issued badge and credentials or restraining devices could compromise officer safety or the undercover operation. When carrying an ICE firearm while off duty, Authorized Officers must carry their ICE-issued badge and credentials but are neither required to nor prohibited from carrying an intermediate force weapon and/or an ICE-approved restraining device.

5)  All Authorized Officers must carry their ICE firearms concealed from public view unless operationally necessary, or if it is not practicable to do so.

6)  Authorized Officers may be permitted to carry shoulder-fired and other specialized weapons as deemed necessary by their respective Program Head.

7)  Authorized Officers must carry all ICE handguns in a holster provided by ICE or in a holster that meets the same minimum published standards prescribed by OFTP. For ICE-approved, POW's, Authorized Officers must provide their own holsters and related accessories at their own expense.

8)  Off-body carrying methods (*e.g.*, backpacks, bags, pouches) may not be used to carry ICE firearms unless the Authorized Officer has specific situational reasons requiring such use.  If the Authorized Officer decides that an off-body carrying method is necessary, he or she must wear or carry the off-body device, maintain it within immediate reach, or keep it secured from unauthorized access.

9)  Authorized Officers must carry their ICE handguns fully loaded and, if applicable, hammer down or de-cocked. Semi-automatic pistols must be carried with a round in the chamber and with the magazines loaded to full capacity. Revolvers must be carried with all chambers in the cylinder loaded.

10) Authorized Officers must properly secure their ICE firearms from unauthorized access in accordance with Chapter 6.C., including during the processing of persons in custody where close proximity exists, such as fingerprinting.

11) Authorized Officers may carry ICE firearms during non-duty hours unless specifically prohibited by their respective Program Head or where carrying a firearm is otherwise prohibited by law.

12) The authorization to carry ICE firearms while in a non-duty status does not confer any additional legal authority or rights upon the Authorized Officer. Authorized Officers must recognize that, while they have the authority to perform their duties at all times, they may be less equipped to safely intervene in an emergency situation while off duty due to the lack of equipment or other support and must be able to explain their actions following such incidents.

## C.    Personally Owned Firearms

1) Authorized Officers may request authorization to carry an ICE-approved, POW(s) from their respective Responsible Official in accordance with the procedures established by OFTP.

2) No more than two (2) personally owned handguns may be approved in a one-year period. A record of all ICE-approved, personally owned handguns authorized for carry in the performance of duties must be maintained in FACTS.

3) Authorized Officers on official foreign travel or foreign assignment are prohibited from carrying any personally owned handguns for duty, even if the personally owned firearm was otherwise authorized by ICE for domestic purposes. *See* Chapter 9 for additional information.

4) Authorized Officers are prohibited from carrying any personally owned shoulder-fired firearms or pow specialized for official use.

5) Nothing in this Handbook shall be construed as interfering with the right that Authorized Officers may have as private citizens to carry a personally owned firearm off-duty for personal use. Authorized Officers must comply with all applicable federal, state, and local laws when exercising this right.

## D.    Flying Armed on a Commercial Aircraft

1) Authorized Officers with arrest authority may carry their ICE firearms in the cabin of a commercial aircraft in accordance with federal regulations and procedures contained in this section. This permission extends to non-official travel unless the Authorized Officer is prohibited from carrying ICE firearms while in non-duty status. A Program Head may restrict the authority to carry firearms in the cabin of commercial aircraft as he or she deems appropriate, including limiting it to official travel only.

2) Authorized Officers must abide by the Transportation Security Administration (TSA) and Federal Aviation Administration (FAA) regulations when flying armed or transporting firearms in their luggage.[3]

---

[3] *See* 49 C.F.R. §§ 1540.111, 1544.219, 1544.221, and 1544.223.

**ICE Firearms and Use of Force**                                               **Page 18**

3) Each Authorized Officer who carries an ICE firearm while traveling on board a commercial aircraft must successfully complete the ICE-approved Law Enforcement Officers Flying Armed training course before his or her planned travel.

4) When traveling on a commercial aircraft, an Authorized Officer who is not in uniform must keep the ICE firearm concealed, out of view, and within immediate reach. If the Authorized Officer is in uniform, he or she must carry the ICE firearm on himself or herself. At no time may any ICE firearm be placed in an overhead storage bin or left unattended anywhere on an aircraft or in the sterile area of an airport.

5) An Authorized Officer may not surrender an ICE firearm to the Pilot in Command, flight crew member, or any other airline employee. Furthermore, an Authorized Officer may not check in his or her ICE firearm as checked baggage except as described in Chapter 2.D.6 (immediately below).

6) If an Authorized Officer is requested to check in his or her ICE firearm as checked baggage, the Authorized Officer should seek the assistance of the airport's Ground Security Coordinator or the TSA Federal Security Director to carry the firearm with him or her on the aircraft. If the Authorized Officer is unable to overcome this request, he or she may check the firearm in checked baggage so long as the Authorized Officer is able to comply with the TSA and FAA regulations, which – among other things – require the firearm to be unloaded and locked in a hard-sided container. Such cases must be reported, in writing, to the Assistant Director for OFTP through the Responsible Official as soon as possible following completion of the flight. This written reporting requirement does not apply to the transportation of long-guns in ICE-approved storage devices, which may be transported as checked baggage in accordance with federal regulations.

7) In cases that require transporting multiple firearms or shoulder-fired firearms on commercial aircraft, Authorized Officers must follow TSA and FAA regulations and the published guidelines provided by OFTP.

## E.    Firearms Reserves

1) Each Responsible Official may maintain in reserve no more than one standard, unissued handgun for every 10 Authorized Officers, with a maximum of no more than 5 per office. The Assistant Director for OFTP may allow a particular office to maintain more than the permitted number of reserve firearms on a case-by-case basis and based on operational needs at the request of the Responsible Official.

2) Each Program Head will determine the number of shoulder-fired firearms to be issued in their Directorate or Program Office. This reserve does not include those issued to tactical team members.

3) Each Program Head will determine the number of special weapons to be issued in their respective Directorate or Program Office in support of their specific mission.

**F.    Flash and Undercover Firearms**

1)   Requests for flash and undercover firearms as well as ICE-issued, non-standard firearms must be made by the Responsible Official in writing and submitted to the Assistant Director for OFTP through the appropriate Program Head. The request must articulate the specific need for this issuance and provide an investigative case number.

2)   If approved, the Assistant Director for OFTP will issue flash and undercover firearms for a period not to exceed 180 days. If additional time is needed, the Responsible Official must make a separate, subsequent written request to his or her respective Program Head articulating the need for additional time. The Assistant Director for OFTP, with the concurrence of the Program Head, may approve the request for additional time.

3)   Responsible Officials must ensure that Authorized Officers in their area of responsibility who are using an undercover firearm have demonstrated proficiency with the firearm in accordance with this Handbook.

4)   The Firearms Coordinator must receive and inspect each flash and undercover firearm prior to issuance and when returned by the Authorized Officer.

**G.    Alcohol and Medication**

1)   Authorized Officers are prohibited from consuming alcoholic beverages while carrying an ICE firearm.  If an on-duty operational situation necessitates the consumption of alcohol while carrying an ICE firearm (*e.g.,* undercover activities, during surveillance/overwatch of an undercover agent, informant, etc.), the Authorized Officer must obtain approval from his or her supervisor if feasible, and the consumption of alcoholic beverages must be limited to an amount that does not render the Authorized Officer legally impaired.

2)   Authorized Officers are prohibited from carrying any ICE firearms after consumption of alcohol or medication if such consumption creates a safety concern as to their judgment and/or ability to carry and control the firearms.

**H.    Suspension or Revocation of the Authority to Carry Firearms**

1)   The authority to carry an ICE firearm and the authority to perform law enforcement duties may be suspended or revoked by the ICE Director, the Deputy Director, Program Heads, or Responsible Officials. The authority to carry an ICE firearm for official duty may also be suspended by an ICE supervisor.

a)   A *suspension* is the temporary removal of the Authorized Officer's authority to perform law enforcement duties and to carry an ICE firearm in the performance of the officer's official duties.

---

**ICE Firearms and Use of Force**                                                           **Page 20**

    b) A *revocation* is the permanent termination of the Authorized Officer's authority to perform law enforcement duties and to carry an ICE firearm.

2) A suspension or revocation will result in the Authorized Officer's surrender of items listed in Chapter 2.I.1, including all ICE-issued firearms, badges, and credentials.

3) In accordance with law, regulation, and policy, a revocation of the authority to perform law enforcement duties and/or carry a firearm may be grounds for disciplinary action up to, and including, removal.

4) Situations that require mandatory suspension or warrant revocation include, but are not limited to:

    a) Notification of an Authorized Officer's conviction for a misdemeanor crime of domestic violence.[4] Note: If the conviction is confirmed, the Authorized Officer's authority will be revoked.

    b) Notification of an Authorized Officer's arrest or charge for a misdemeanor crime of domestic violence.

    c) Notification of an Authorized Officer's off-duty contact with a law enforcement officer/agency where the allegation contains a component of unlawful or unjustified violence by the Authorized Officer.[5]

        i) For purposes of this provision, "contact with a law enforcement officer/agency" means all instances where an Authorized Officer is off-duty and not acting in an official capacity and is questioned, interviewed, detained, or arrested as a subject of an enforcement action or investigation by a law enforcement agency (either internal to DHS or external) during the course of said agency's official duties to determine if the Authorized Officer was a party to an alleged violation of law.

        ii) Examples of "unlawful or unjustified violence" include, but are not limited to, allegations of homicide, manslaughter, assault, battery, threat of deadly harm, rape, sexual assault, robbery, domestic violence, kidnapping, and stalking.

    d) Notification of the issuance of a protective or temporary restraining order against the Authorized Officer related to an allegation of domestic violence or based on some other form of alleged violent behavior, or a court order restricting the Authorized Officer's contact with another individual or ability to possess a

---

[4] Refers to Lautenberg Amendment, 18 U.S.C. § 922(g)(9), which prohibits anyone who has been convicted in any court of a misdemeanor crime of domestic violence from possessing any firearm or ammunition. *See* ICE Directive 1005.2, *Domestic Violence: Lautenberg Amendment Compliance Policy* (November 23, 2012))),) or as updated.

[5] *See* Memorandum from Acting Deputy DHS Secretary Russell Deyo, *Required Reporting of Off-Duty Contact with Law Enforcement by DHS Law Enforcement Personnel and the Suspension and/or Revocation of Authority to Carry a Firearm or other Weapon and Perform Law Enforcement Duties* (January 10, 2017))),) or as updated.

firearm.

e) Notification of the Authorized Officer's failure to demonstrate proficiency in the use of all firearms that he or she carries, or to complete other mandatory training requirements without an authorized exemption. *See* Chapter 5.

f) Instances where there is evidence of:

   i) A medical/psychological condition that would impede the safe and effective use of a firearm;

   ii) Substance abuse;

   iii) Consumption of alcoholic beverages in violation of Chapter 2.G. of this Handbook;

   iv) Taking medication that impairs judgment and/or the ability to safely use or control a firearm;

   v) Commission of a felony;

   vi) Misuse of a firearm; or

   vii) Serious breaches of integrity or security;

g) The existence of an administrative inquiry[6] that precludes the performance of law enforcement duties; and/or

h) When it is in the best of interest of ICE or in circumstances that may call into question the Authorized Officer's ability to safely and effectively use a firearm.

5) Timeline for Suspension, Revocation and Consultation

a) Requirements for conviction for a misdemeanor crime of domestic violence (section 2.H.4.a).[7]

   i) The supervisor must suspend the Authorized Officer's authority to carry an ICE firearm and law enforcement duties within 24 hours of being initially notified of a conviction for a misdemeanor crime of domestic violence.

   ii) Once the existence of a qualifying conviction is confirmed, in consultation with the Responsible Official, OHC E&LR, OPR, and OPLA, the authority to carry an ICE firearm and perform law enforcement duties must be revoked.

---

[6] *See* U.S. Immigration and Customs Enforcement, ICE Directive No.17011.1, Administrative Inquiries Involving Employee Misconduct (May 5, 2005))),) or as updated.

[7] An officer's authority to carry a firearm must be suspended when the officer is charged or arrested for a misdemeanor crime of domestic violence. *See* Section 2.H.4.b.

**ICE Firearms and Use of Force**

FOR OFFICIAL USE ONLY

b) Requirements for sections 2.H.4.b-h.

    i) The Authorized Officer's authority to carry an ICE firearm and perform law enforcement duties must be suspended or revoked within 72 hours of notification of the potentially qualifying event. Upon notification, the supervisor or Responsible Official must take immediate action to determine if the notification received is in fact a qualifying event under Chapter 2.H.4.b-h.[8] The supervisor or Responsible Official must make this determination, in consultation with his or her leadership, OHC E&LR, OPR, and OPLA within 72 hours.

    ii) The supervisor must document efforts to confer and consult with the above-mentioned entities.

6) Notice of ICE Firearm Suspension or Revocation

a) The supervisor must provide a verbal notice to the Authorized Officer at the time of suspension or revocation.

b) The supervisor must provide a written notice to his or her immediate Responsible Official of the action taken within 24 hours of any suspension. The written notice must identify the Authorized Officer involved and explain the reason(s) for the suspension.

c) The Responsible Official must provide a written notification to the affected Authorized Officer explaining: (1) the reason for the suspension or revocation of the authority to carry an ICE firearm and law enforcement badge and credentials; and (2) limitations on the performance of duties. This written notification must be provided to the Authorized Officer within five (5) business days after the verbal notification by the supervisor. The Responsible Official must also communicate this notification to the Authorized Officer's supervisor.

d) In the event of revocation or if the suspension of the Authorized Officer's authority to carry a firearm and perform law enforcement duties extends beyond 72 hours, the Responsible Official must provide written notification to his or her respective Program Head, identifying the Authorized Officer involved and explaining the reason(s) for the action. When the Deputy Director or Program Head is the immediate supervisor of the Authorized Officer, notification to the next higher level of management is not required. However, a permanent record of the action must be maintained by the Deputy Director or Program Head making the decision.

---

[8] If the Authorized Officer is presenting an immediate threat (e.g., situations in which the Authorized Officer is threatening or exhibiting violent or disruptive behavior, and/or appears to be under the influence of substances impairing judgment or safety), the supervisor must also consider removal of the Authorized Officer from ICE premises. For additional guidance, supervisors should refer to U.S. Immigration and Customs Enforcement, ICE Directive No.1045.1, Guidance for Supervisors on Mission Readiness and Employee Safety (Aug. 4, 2015), or as updated.

**ICE Firearms and Use of Force**                                                     **Page 23**

ICE 0023

7) The Authorized Officer's authorization to carry an ICE firearm must remain suspended by his or her Responsible Official until the Authorized Officer has been authorized to return to duty and has met the requirements of this Handbook and all other applicable ICE policies.

## I.    Retrieval of Firearms and Other Law Enforcement Equipment

1) In all situations where an Authorized Officer's authority to carry an ICE firearm is suspended or revoked, the Authorized Officer must immediately return all of the following items that were assigned to him or her to the Firearms Coordinator or his or her supervisor:

   a) Law enforcement badges and credentials;

   b) ICE-issued firearms and ammunition. Note: Authorized Officers must unload their firearm and conduct a visual and physical inspection of the firearm to ensure that it is safe before turning it over to another individual in any environment; unless otherwise directed by the ICE supervisor and

   c) Intermediate force weapons tracked in FACTS.

2) The Firearms Coordinator must complete the transfer of any ICE-issued firearm from the Authorized Officer to the reserve and record the suspension of any authorization to carry an ICE-approved, pow in FACTS. Additionally, the Firearms Coordinator must ensure that the suspension of all other items listed in subsection I.1 is appropriately reflected in FACTS if the item is tracked in FACTS.

3) If an Authorized Officer fails to comply with subsection I.1, his or her supervisor must make all reasonable attempts to retrieve the items that have not been returned. The supervisor must document all actions taken in attempting to retrieve these items.

   a) If an Authorized Officer whose authority to carry a firearm has been suspended or revoked fails to cooperate with the supervisor's reasonable attempts to retrieve any of the items listed in subsection I.1, the supervisor must elevate the matter to his or her Program Head as soon as possible through the Responsible Official in the supervisor's chain of command.

   b) Where an Authorized Officer refuses to surrender any of the items listed in subsection I.1 or fails to respond in a timely manner to attempts by the supervisor to retrieve said items, these items will be treated as stolen.[9]

---

[9] *See* Chapter 6 for accountability for lost or stolen firearms and ammunition. Also see Appendix III IV for accountability for Electronic Control Weapons.

**ICE Firearms and Use of Force**                                            **Page 24**

**Chapter 3: Intermediate Force Weapons**

**A.    General Guidelines**

1) While carrying an ICE firearm and participating in pre-planned enforcement actions, Authorized Officers are required to carry at least one approved intermediate force weapon, unless otherwise prohibited (*e.g.*, chemical agents cannot be carried in the cabin of a commercial aircraft but may be packed in checked luggage if they meet certain conditions). Authorized Officers who are assigned to undercover activities will not be required to carry intermediate force weapons if carrying intermediate force weapons is likely to compromise their undercover capacity or covert identity as a law enforcement officer.

2) Authorized Officers are required to demonstrate proficiency and successfully complete the initial training, certification, and recertification requirements for each intermediate force weapon that they are issued. *See* Chapter 5 and Appendix VII for additional information.

3) POW intermediate force weapons are prohibited for official duty.

4) Authorized Officers must report any loss or theft of intermediate force weapons. *See* Chapter 6.F. of this Handbook for additional information.

5) The Firearms Coordinator or Defensive Tactics Coordinator must document the issuance, theft, or loss of all intermediate force weapons in FACTS, except for chemical munitions, which may only be issued by the Firearms Coordinator.

**B.    Chemical and Specialty Impact Munitions (CSIM)**

1) All Chemical and Specialty Impact Munitions, launchers, delivery devices and initiators must be approved by the AD, OFTP.

2) Chemical Munitions

   a)  May contain Orthochlorobenzylidenemalononitrile (CS) gas, Oleoresin Capsicum (OC), and/or smoke; and

   b)  May be a hand thrown device;

   c)  Must only be fired, launched, and/or initiated from an authorized device;

   d)  Must be used in accordance with the manufacturer's guidelines for indoor use;

   e)  Non-separating munitions, marked by the manufacturer as approved for outdoor use only, may be utilized indoors only when placed inside of an authorized delivery device purpose-built to mitigate the risk of fire.  Only those munitions/munition types authorized by the manufacturer for placement inside the delivery device shall be

utilized.  If an authorized delivery device is not available, the manufacturer's guidelines, pertaining to outdoor use, shall be strictly adhered to;

f)   The utilization of chemical munitions is designated as a soft technique on the ICE Use of Force Continuum.

g)   As per Chapter 4: Use of Force Reporting Guidelines, Section B(1)(a) – utilization of chemical agents must be orally reported to a supervisor within one hour of the time the incident occurred.  In instances where the use of chemical agents subsequently results in serious bodily injury or death, the incident must be reported using the procedures for deadly force reporting, Section (B)(3).

h)   Issuance and Transportation of Chemical Munitions, Spray and Agents

i) Manual logs may be used for temporary issuance during an enforcement action, but the permanent transfer or expenditure must be recorded in FACTS. The Firearms Coordinator must receive all chemical munitions and maintain the control sheet at the storage site.

ii) TSA and FAA do not permit any chemical agents in the cabin of a commercial aircraft. As provided by 49 C.F.R. § 175.10, one self-defense spray (OC spray) may be carried in checked baggage, provided that the container does not exceed four (4) fluid ounces and has a positive means to prevent accidental discharge. Chemical agents used in support of ICE operations are prohibited aboard government aircraft, except when specifically authorized in advance by the Pilot in Command.

3)   Specialty Impact Munitions

a)   May contain Orthochlorobenzylidenemalononitrile (CS) gas, Oleoresin Capsicum (OC), and/or contain eye-safe paints/dyes utilized for marking; and

b)   Must only be fired and/or launched from an authorized device

c)   When using specialty impact munitions, officers should choose the appropriate level of force within the use of force continuum as required by the totality of circumstances.  Officers must keep in mind that:

i) Only that force which is both necessary and reasonable may be used in any situation.

ii) The use of an approved specialty impact munition must be discontinued after a subject has been subdued or incapacitated.

---

d)  When utilized for the purpose of striking a person, the utilization of specialty impact munitions is designated as a hard technique on the ICE Use of Force Continuum.

e)  As per Chapter 4: Use of Force Reporting Guidelines, Section B(1)(a) – utilization of specialty impact munitions must be orally reported to a supervisor within one hour of the time the incident occurred.  Once notified, supervisors shall follow the intermediate use of force reporting procedures outlined in section (B)(2). In instances where the use of specialty impact munitions subsequently results in serious bodily injury or death, the incident must be reported using the procedures for deadly force reporting, Section (B)(3).

4)  12-Gauge Shotgun Chemical and Specialty Impact Munitions

a)  May utilize Orthochlorobenzylidenemalononitrile (CS) gas rounds, Oleoresin Capsicum (OC) rounds, specialty impact rounds, and/or rounds which contain eye-safe paints/dyes utilized for marking; and

b)  Must only be fired and/or launched from an authorized device;

c)  When using specialty impact munitions, officers should choose the appropriate level of force within the use of force continuum as required by the totality of circumstances.  Officers must keep in mind that:

> i) Only that force which is both necessary and reasonable may be used in any situation.
>
> ii) The use of an approved specialty impact munition must be discontinued after a subject has been subdued or incapacitated.

d)  In the capacity in which they will be utilized by ICE personnel, 12-gauge shotguns, specifically designated for CSIM tasks, can be utilized in a variety of formats depending on which chemical/specialty impact munition is being employed. When 12-gauge CSIM shotguns are being utilized to fire/launch chemical munitions, those utilizations will constitute a soft technique.  If the designated munition is utilized to strike a person, that utilization will constitute a hard technique.

e)  As per Chapter 4: Use of Force Reporting Guidelines, Section B(1)(a) – utilization of chemical agents/specialty impact munitions must be orally reported to a supervisor within one hour of the time the incident occurred.  Once notified of the utilization of specialty impact munitions, supervisors shall follow the intermediate use of force reporting procedures outlined in Section (B)(2).  In instances where the use of chemical agents/specialty impact munitions subsequently results in serious bodily injury or death, the incident must be reported using the procedures for deadly force reporting, Section (B)(3).

5) Pneumatic Launchers including Pepperball Launcher Systems (PLS), FN 303 Launcher or others, as authorized

a) May utilize projectiles containing inert powder, Orthochlorobenzylidenemalononitrile (CS) powder, Oleoresin Capsicum (OC) and/or contain eye-safe paints/dyes utilized for marking; and

b) Must only be fired from an authorized device;

c) When utilizing the pneumatic launcher(s) to achieve direct impact on a person(s), officers should choose the appropriate level of force within the use of force continuum as required by the totality of circumstances. Officers must keep in mind that:

> i) Only that force which is both necessary and reasonable may be used in any situation.

> ii) The use of approved specialty impact munitions must be discontinued after a subject has been subdued or incapacitated.

d) Pneumatic launchers can be utilized in a variety of configurations depending on which munition is being employed and how the operator deploys the munition. When launching projectiles containing CS or OC in a general area without impacting a person(s) (i.e., area saturation), those utilizations will constitute a soft technique. If the projectile (inert, chemical-laden, or otherwise) is used to impact a person, that utilization will constitute a hard technique.

e) As per Chapter 4: Use of Force Reporting Guidelines, Section B(1)(a) – utilization of chemical agents/specialty impact munitions must be orally reported to a supervisor within one hour of the time the incident occurred. Once notified of the utilization of specialty impact munitions, supervisors shall follow the intermediate use of force reporting procedures outlined in Section (B)(2). In instances where the use of chemical/specialty impact munitions subsequently results in serious bodily injury or death, the incident must be reported using the procedures for deadly force reporting, Section (B)(3).

## Chapter 4: Use of Force Reporting Requirements

### A.    General Guidelines

1) Local law enforcement agencies may investigate use of force incidents occurring within their territorial jurisdictions, including those resulting in serious bodily injury or death of an individual (critical incidents). Accordingly, ICE employees involved in a critical incident should anticipate an investigation by local authorities. They may be interviewed by local police or subpoenaed to a local grand jury or court proceeding.

2) As part of their official duties, ICE employees are required to complete reports describing actions taken in an official capacity. ICE employees are afforded all constitutional protections, including due process, the right to counsel, protection against unreasonable searches and seizures, and protection against self-incrimination. ICE bargaining unit employees also have the right to Union representation.

## B.    Reporting the Use of Intermediate Force

1) Authorized Officers

   a) Unless physically incapacitated or otherwise unable, Authorized Officers must orally report to a supervisor any use of hard techniques, EMDDs, chemical agents, canine releases, and the use of soft techniques resulting in any injury within one hour of the time the incident occurred, or as soon as is practical, or within one hour of the time the Authorized Officer becomes aware of the incident, or as soon as is practical.

   b) The verbal report must contain the following information (if known):

      i)   Time, date, and location of the incident;

      ii)  Names of Authorized Officers involved or present;

      iii) Subject information (*e.g.*, number of subjects, identity, physical description, etc.);

      iv)  Weapons or techniques used or present;

      v)   Nature of the enforcement action that resulted in the use of force or the circumstances surrounding the use of force if not during an enforcement action;

      vi)  Witness information;

      vii) Injuries sustained by both Authorized Officers and subjects; and

      viii)    Property damage.

   c) If the intermediate use of force involves the deployment of an EMDD, Authorized Officers must also report additional information specified in Appendix IV of this Handbook.

2) Supervisors

When notified about the use of intermediate force weapon, the supervisor must:

   a) Immediately provide a verbal report of the incident to his or her Responsible Official through their established chain of command;

---

**ICE Firearms and Use of Force**

b) Follow up the verbal report with a written report, through their chain of command, containing all relevant information provided during the verbal report as well as any relevant information learned after the verbal report. If the incident involves the deployment of an EMDD, the written report must also include information listed in Appendix IV. The report may be in a memorandum format or may use another written reporting format prescribed by the respective Directorate or Program Office.

c) Send written reports to OPR, OFTP, and their respective Program Head through their chain of command within 48 hours of the incident.

d) Complete an ICE Use of Force, Assaults, and Discharge (UFAD) report, which is associated within the Significant Event Notification (SEN) system, within 48 hours of the incident.

3) When the use of hard techniques and/or chemical agents subsequently results in serious bodily injury or death, the incident must be reported using the procedures for deadly use of force reporting.

## C.    Reporting the Use of Deadly Force

1) Authorized Officer

a) If it is safe and possible to do so, the Authorized Officer must provide a verbal report of the incident to his or her immediate supervisor within one hour of the time a use of deadly force occurs, or as soon as is practical. If it is not safe and possible to do so within this timeframe, the Authorized Officer must provide a verbal report of the incident to his or her immediate supervisor as soon as is possible. The report must contain the following information (if known):

i)   Time, date, and location of the incident;

ii)  Names of the Authorized Officers involved or present;

iii) Subject information (*e.g.*, number of subjects, identity, physical description, etc.);

iv)  Weapons or techniques used or present;

v)   Nature of the enforcement action that resulted in the use of deadly force or if the circumstances surrounding the use of deadly force were not during an enforcement action;

vi)  Witness information;

vii) Any injuries sustained by both Authorized Officers and subjects; and

---

viii) Property damage.

b) If the immediate supervisor is incapacitated or otherwise unavailable, the Authorized Officer must notify another supervisor in his or her direct chain of command or area of responsibility.

2) Supervisor

a) Upon notification of a use of deadly force, a supervisor must immediately provide a verbal report of the incident to:

i) The ICE Joint Intelligence Operations Center (JIOC);

ii) OPR; and

iii) The Responsible Official and the respective Program Head, through the appropriate chain of command.

b) The supervisor must ensure that local law enforcement authorities are notified of incidents involving property damage, bodily injury, or death.

c) The supervisor must follow up the initial verbal report with a written report containing all relevant information provided during the verbal report as well as any relevant information learned after the verbal report. Such reports may be in a memorandum format or may use the established case reporting format prescribed by their Directorate or Program Office as long as it contains the required information.

d) The supervisor must ensure that the written report is sent to OPR, OFTP, and his or her respective Program Head through their chain of command within 48 hours of the incident.

e) The supervisor must also complete a UFAD report, which is associated with the SEN system, within 48 hours of the incident.

f) The supervisor must provide supplemental written reports, separate from the UFAD report, as additional information is obtained.

3) Upon notification of an incident involving deadly force, the JIOC must immediately notify OPR, OFTP, and the appropriate Program Head of the incident.

4) If an ICE employee witnesses a deadly force incident during the course of official duties, he or she may be required to submit a written report.

5) A field office may not conduct an investigation into a use of deadly force incident without first coordinating with, and receiving approval from, OPR. This does not preclude field office personnel who are at the scene of an incident from preserving

evidence and obtaining names and contact information from witnesses on scene for submission to OPR and other agencies conducting an investigation under their primary jurisdiction.[10]

**D.  Discharge of a Firearm**

1)  Authorized Officers must report the following firearms discharges in accordance with the reporting requirements for use of deadly force outlined in Chapter 4.C:

   a)  Any discharge of an ICE firearm (even if unintentional), including by any person other than an Authorized Officer;

   b)  Any discharge of a firearm that is observed as an act of assault against any Authorized Officer or ICE employee, and the assault is, or reasonably appears to be, related to the Authorized Officer's or the ICE employee's ICE employment must be reported by the Authorized Officer who observes the incident

   c)  Any discharge of a firearm by a law enforcement officer from another agency when the discharge occurs during a multi-agency operation involving the Authorized Officer(s); and

   d)  The discharge of specialty impact and/or chemical munitions from a conventional firearm or launcher specifically designed to expel these types of projectiles.

2)  Authorized Officers need not report the following firearms discharges:

   a)  The discharge of firearms during training (*e.g.*, demonstration, practice, training, and qualification, or competition events,) where no personal injury or property damage occurs; and

   b)  The discharge of firearms when Authorized Officers are deployed (militarily) and under the control of another department in a foreign country (e.g., under the direction of the Department of Defense during wartime or armed conflicts).

3)  Examinations of Firearms by OFTP

   a)  If the discharge of an ICE firearm by an Authorized Officer results in personal injury or property damage, the Firearms Coordinator must immediately send the firearm and ammunition to OFTP for examination unless the firearm is required for an ongoing federal, state, local, or tribal law enforcement investigation or legal action.

---

[10] For more information on responsibilities and procedures related to critical incidents, refer to the ICE Directive 1044.1, *ICE Response to and Evaluation of Critical Incidents Involving ICE Employees* (Aug. 4, 2015))),) or as updated.

b) A shooter-induced, unintentional discharge in which there is no personal injury or property damage and for which the Authorized Officer acknowledges responsibility does not require that the firearm be examined by OFTP. However, if an unintentional discharge occurs and the Authorized Officer has a reason to believe that the ICE firearm has malfunctioned, the Firearms Coordinator must immediately send the firearm to OFTP for examination.

c) Before sending the firearm to OFTP, the Firearms Coordinator must ensure that the firearm and magazines are unloaded and that neither has been cleaned nor altered since the incident. At no time may an ICE firearm be disassembled except by an authorized ESO.

4) Replacement Firearm

a) The Responsible Official must issue, as soon as practicable, a replacement firearm to an Authorized Officer who relinquished his or her ICE firearm but who nevertheless retains the authority to carry a firearm.

b) The Authorized Officer must demonstrate proficiency with the replacement firearm no later than 14 days following the issuance of the replacement firearm even if the Authorized Officer has already qualified for that quarter.

**Chapter 5: Firearms and Intermediate Use of Force Proficiency and Training**

**A.    General Guidelines and Responsibilities**

1) Authorized Officers must demonstrate proficiency in firearms and intermediate force weapons as prescribed by OFTP. The specific requirements that Authorized Officers must meet to demonstrate firearms and intermediate force weapons proficiency are listed in Appendix VII.

2) Failure to comply with mandatory training and proficiency requirements will result in the suspension of an Authorized Officer's authorization to carry an ICE firearm and/or intermediate force weapon and may result in disciplinary actions.

3) The amount of time Authorized Officers will be given to accomplish required firearms proficiency each quarter is prescribed in Appendix VII.

4) Firearms Instructors and Defensive Tactics Instructors must record demonstration of firearms proficiency scores and all intermediate force weapons proficiency in FACTS within five (5) business days from the date of the training.

5) The Assistant Director for OFTP will provide periodic reports to the Program Heads regarding the proficiency of their respective Authorized Officers in firearms and intermediate use of force.

**B.    Firearms Proficiency and Training Requirements**

1) All Authorized Officers who carry an ICE firearm (on or off duty) must maintain and demonstrate the required level of proficiency in the use of each firearm they carry as prescribed in Appendix VII.

   a) Authorized Officers must demonstrate proficiency in the use of each ICE firearm they carry once each quarter of the fiscal year. Successful demonstration of proficiency in one quarter authorizes the Authorized Officer to carry such firearms until the last day of the following quarter.

   b) Responsible Officials may require their Authorized Officers to carry and demonstrate firearms proficiency with additional firearms based on operational needs and requirements.

   c) When Authorized Officers are issued an ICE firearm that has significantly different operating characteristics from one previously issued (*e.g.*, trigger operation, decocker, magazine release, etc.), the Authorized Officer must be certified as proficient with the new firearm by a Firearms Instructor before the Authorized Officer may carry such a firearm either on or off duty.

   d) An Authorized Officer who is unavailable to participate in the required

---

**ICE Firearms and Use of Force**                                                    **Page 34**

demonstration of firearms proficiency (Did Not Fire) is still qualified until the last day of that quarter. However, he or she is not qualified or permitted to carry any ICE firearm after the last day of that period until he or she successfully demonstrates firearms proficiency.

2) Failure to Qualify and Remedial Training

   a) Authorized Officers who are unable to demonstrate an acceptable level of proficiency with any ICE firearm must have their authority to carry that firearm suspended. The authority to carry will be reinstated when the Authorized Officer successfully demonstrates proficiency.

      i) The Authorized Officer must immediately relinquish the ICE-issued firearm. Additionally, the Authorized Officer must immediately notify his or her first-line supervisor of the failure to demonstrate proficiency, and that his or her firearm was relinquished to the Firearms Instructor.

      ii) The suspension of the ICE-issued firearm and the suspension of the authorization to carry an ICE firearm must immediately be recorded in FACTS.

   b) The Authorized Officer's authority to perform law enforcement duties must be suspended if the Authorized Officer fails to remain qualified on at least one ICE firearm that he or she carries until the Authorized Officer demonstrates proficiency. This does not preclude the affected Officer from performing administrative duties at the discretion of the Responsible Official until proficiency is demonstrated.

   c) Following a failure to demonstrate proficiency, the Authorized Officer must be promptly directed to attend remedial training in accordance with OFTP's Firearms Remedial Guidelines procedures. The Authorized Officer must remediate and demonstrate proficiency within 45 days.

      i) Authorized Officers will be allotted twelve (12) hours for remedial training in accordance with OFTP's Firearms Remedial Guidelines procedures. Remedial training and procedures must be documented using the ICE Firearms Remedial Training Record.

      ii) The Firearms Instructor must make a reasonable effort to assist the Authorized Officer during remedial training. The remedial training must focus on the Authorized Officer's deficiencies and may include a review of the fundamental skills.

d) A Firearms Instructor must conduct remedial firearms training and direct the demonstration of firearms proficiency.[11]

e) An Authorized Officer who, following remedial training, is unable to demonstrate proficiency with his or her ICE-approved firearm, will:

   i) Be subject to removal from a position requiring the carriage of a firearm in accordance with applicable laws, regulations, and ICE policies; and

   ii) Not be allowed to perform law enforcement duties that would require him or her to carry a firearm.

3) Unable to Participate

a) Unless permitted by the exemption policy outlined in this chapter, an Authorized Officer must turn in all ICE-issued firearms to the Firearms Coordinator if he or she will be on authorized leave with or without pay status for an entire qualification period (*i.e.*, one quarter) and therefore be unable to meet the ICE requirements to demonstrate firearms proficiency.

   i) The supervisor must suspend the Authorized Officer's authorization to carry an ICE firearm until the Authorized Officer has returned to duty and met the requirements of this Handbook.

   ii) The Firearms Coordinator must immediately obtain any ICE-issued firearms from the Authorized Officer and record the suspension of any authorization to carry an ICE firearm in FACTS. This entire action must occur before the commencement of the leave, where possible.

b) Authorized Officers who are unable to participate in the required firearms proficiency and/or intermediate force weapons proficiency due to exigent circumstances (*e.g.*, natural disasters or other significant incidents that are unforeseeable) may be granted an exemption based on the written recommendation of the Responsible Official with the approval of the Program Head and the concurrence of the Assistant Director for OFTP.

   i) Case workload or routine work-related responsibilities are not a basis for an exemption.

   ii) The Responsible Official may initially request the exemption for a period of up to 180 days. While the Responsible Official may request to extend the exemption period on a case-by-case basis, the total exemption period may not exceed 270 consecutive days.

---

[11] Firearms Instructors should follow the procedures and instructions provided in the *ICE Firearms Remedial Training Guidelines* (Feb. 2013) or as updated.

---

**ICE Firearms and Use of Force**

iii) The Responsible Official must document the exemption in writing. The written exemption must state: (1) that the Authorized Officer is authorized to continue carrying any ICE firearm and/or intermediate force weapons; (2) the justification for the exemption; and (3) the date the exemption will expire.

iv) Authorized Officers must demonstrate proficiency with each ICE firearm he or she is authorized to carry within 30 days following the expiration of the approved exemption period.

c) An Authorized Officer who met the requirement for demonstration of firearms proficiency in the previous period but is unable to participate in the current demonstration of firearms proficiency period due to a temporary physical condition (*e.g.*, injury, surgery, illness, or pregnancy) may, by request, be exempted from demonstrating firearms and/or intermediate force weapon proficiency by the Responsible Official with the concurrence of the Assistant Director for OFTP.

   i) The Authorized Officer requesting an exemption based on temporary physical condition must provide the Responsible Official with a licensed physician's written recommendation.

      a) The recommendation must describe the nature of the temporary physical condition and the anticipated duration of the condition.

      b) The Authorized Officer requesting this exemption must still be able to meet his or her specific operational and tactical requirements for personal safety and the safety of others as determined by the Responsible Official, based on the physician's written recommendation and any other relevant documentation that may be obtained. This includes actions such as intermediate force weapons, defensive tactics, and weapon retention.

   ii) The Responsible Official may grant the initial exemption for a period of up to 180 days. While the Responsible Official may extend the exemption period on a case-by-case basis, the total exemption period may not exceed 270 consecutive days.

   iii) The Responsible Official must document the exemption in writing. The written exemption must state: (1) that the Authorized Officer is authorized to continue carrying ICE firearms and/or intermediate force weapons; and (2) the date the exemption will expire.

   iv) Within 30 days after the expiration of his or her exemption, the Authorized Officer must demonstrate proficiency with each ICE firearm he or she is authorized to carry.

---

C.   **Intermediate Use of Force Proficiency and Training Requirements**

1)   Intermediate force weapons may be issued only to those Authorized Officers who have been trained, certified, and recertified[12] in accordance with the standards established by OFTP.

2)   All Authorized Officers are required to demonstrate their proficiency and participate in required training and exercises. These requirements may be revised by OFTP in coordination with and approval by the Program Offices to meet operational needs or to update techniques, tactics, weapons, or knowledge.

3)   Authorized Officers who are unable to demonstrate an acceptable level of proficiency with any intermediate force weapon must have their authority to carry that intermediate force weapon suspended. The authorization will be reinstated when the Authorized Officer successfully demonstrates proficiency.

   a)   The Authorized Officer must immediately relinquish the intermediate force weapon. Additionally, the Authorized Officer must immediately notify his or her first-line supervisor of the failure to demonstrate proficiency, and that his or her intermediate force weapon was relinquished to the Defensive Tactics Instructor.

   b)   The suspension of the intermediate force weapon must immediately be recorded in FACTS.

4)   Following a failure to demonstrate proficiency, the Authorized Officer must remediate and demonstrate proficiency within 30 days.

   a)   Authorized Officers will be allotted a reasonable amount of time for remedial training.

   b)   Reasonable effort must be made by the appropriate ICE-certified instructor to assist the Authorized Officer during remedial training.

   c)   The remedial training must focus on the Authorized Officer's deficiencies and may include a review of the fundamental skills.

5)   An Authorized Officer, who following remedial training, is unable to demonstrate proficiency with any intermediate force weapon, may:

   a)   Be subject to removal from a position requiring the carriage of a firearm or intermediate force weapon in accordance with applicable laws, regulations and ICE policies; and

   b)   Not be allowed to perform law enforcement duties that would require him or her to carry a firearm and intermediate force weapon.

---

[12] Excluding recent academy graduates.

**ICE Firearms and Use of Force**                                              **Page 38**

**Chapter 6: Accountability of Firearms and Other Use of Force Equipment**

**A.    General Guidelines and Responsibilities**

1) FACTS provides oversight and lifecycle accountability for specified law enforcement assets and equipment (including firearms, ammunition, EMDDs, chemical spray, specialty munitions, and batons).

2) All specified law enforcement assets must have accountability and lifecycle data recorded in FACTS, including acquisition, issuance, repair, transfer, loss, and destruction.

3) Authorized Officers must ensure their ICE-assigned law enforcement assets and equipment are recorded in FACTS.

4) Firearm Coordinators are responsible for assigning the firearms, ammunition, and specialty munitions to Authorized Officers in FACTS.

5) Defensive Tactics Coordinators are responsible for assigning chemical spray, batons, and EMDDs to Authorized Officers in FACTS.

6) Responsible Officials must ensure that the data contained in FACTS is accurate.

7) Responsible Officials must ensure proper safeguarding and storage of unissued firearms and intermediate force weapons.

8) Authorized Officers must relinquish and transfer all assets that have been assigned to them in FACTS upon retiring, transferring to another agency, or reassignment to a non-armed position within ICE. Immediate supervisors are responsible for ensuring that the Authorized Officer returns all assigned assets to the Firearms Coordinator.

9) ICE-owned firearms, ammunition, and equipment that are issued to an Authorized Officer for purposes of competitive shooting events must immediately be assigned to the Authorized Officer in FACTS.

10) No ICE component or individual officer or employee is authorized to solicit, accept or otherwise acquire or dispose of ICE-issued firearms or other use of force equipment that is accountable in FACTS without the written consent of the Assistant Director for OFTP and their respective Program Head.

**B.    Inventory of Accountable Assets in FACTS**

1) OFTP will maintain a complete inventory of all ICE-owned firearms and ammunition in FACTS and it will manage inventory schedules.

2) The Responsible Official must conduct an annual inventory of all ICE law

enforcement assets that are accountable in FACTS, as prescribed by OFTP, and in accordance with the current DHS personal property guidelines.[13]

**C.    Storage of Firearms**

1)  All unissued firearms must be stored in a locked safe or firearms vault that prevents unauthorized access or theft and be under separate locking controls from ammunition. All unissued firearms must be stored in a dry environment and must not be stored in wall lockers, closets, or in other unsecured, unattended areas of ICE facilities.

    a)  Responsible Officials must ensure that unissued firearms are stored as noted above. Furthermore, Responsible Officials must restrict access to unissued firearms in their area of responsibility to the Firearms Coordinator. However, the Responsible Official, or his or her designee(s), must also have access in case of an emergency.

2)  Each Authorized Officer is responsible for the safe storage, general care, and maintenance of all firearms that he or she is authorized to carry for duty.

    a)  Authorized Officers must use a safety-locking device (cable lock, trigger lock, and/or lock box) when storing an ICE firearm in a residence or lodging, whether temporary or permanent. The Firearms Coordinator will issue a safety-locking device for each ICE firearm.

    b)  Authorized Officers must store all ICE firearms out of plain view and in a location that prevents theft and unauthorized access by anyone.

    c)  Authorized Officers may not leave ICE firearms unattended in a vehicle unless it is operationally necessary.

        i)  If operational reasons require that a firearm be temporarily stored in a vehicle, the firearm must be concealed from view.

        ii)  To minimize the risk of theft or unauthorized access, the firearm must be secured to the vehicle by a locked chain, locked cable, or safety-locking device or container. The installation and use of an alarm/security system is strongly encouraged to further protect against unauthorized access, theft, use, loss, and damage.

    d)  Authorized Officers may not store an ICE firearm in vehicles overnight unless there is an operational need to do so. Each instance that requires storing a firearm in a vehicle overnight must be pre-approved in writing by a first-line supervisor. When the firearm is stored in a vehicle overnight, it must be secured in an ICE-

---

[13] *See* DHS Manual 119-03-001-01, *Personal Property Asset Management Program Manual* (Sept. 26, 2013) May 22, 2018)),) or as amended or superseded.

approved safety-locking device or container and securely affixed to the vehicle.

e) Authorized Officers must store ICE-issued shoulder-fired firearms in a secure location at an ICE office, except as follows:

    i) ICE-issued shoulder-fired firearms may be stored in a government vehicle (as outlined in Chapter 6.C.2[[c] with the prior written approval of the first-line supervisor.

    ii) ICE-issued shoulder-fired firearms may be stored in a residence (as outlined in Chapter 6.C.2[.[a] if necessitated by operational requirements and with the prior written approval of a second-line supervisor.

    iii) ICE-issued shoulder-fired firearms may be stored at a separate federal, state, or local law enforcement facility or military installation for a specified period of time if necessitated by operational needs and with the prior written approval of the first-line supervisor. If the storage exceeds 72 hours, written approval from the Responsible Official is required with notification to the Assistant Director for OFTP.

f) The Authorized Officer must notify the Provost Marshal, the Master-at-Arms, or the Commanding Officer if he or she plans to leave an ICE firearm unattended for an extended period of time in a vehicle, on a vessel, or on an aircraft located on a military installation.

g) An Authorized Officer must return his or her ICE-issued firearms to the Firearms Coordinator if he or she will be on a foreign assignment that is expected to exceed 30 days.

h) An Authorized Officer may be subject to disciplinary and/or adverse actions if their ICE firearm is stolen or lost and the AO was subsequently determined to have been negligent or used poor judgment in safeguarding the firearm.

## D.    Storage of Intermediate Force Weapons and Other Use of Force Equipment

1) General Guidelines: The following guidelines and responsibilities apply to all ICE-issued intermediate force weapons and other use of force equipment. Additional device-specific guidelines are contained in the subsequent subsections.

a) Each Authorized Officer is responsible for the safe storage, general care, and maintenance of all ICE-issued intermediate force weapons and related equipment assigned to him or her.

b) Authorized Officers must store all ICE-issued intermediate force weapons and related equipment out of plain view and in a location that prevents theft and unauthorized access.

---

c) Intermediate force weapons and other use of force equipment that is accountable in FACTS may not be left unattended in vehicles unless there is a justified operational need.

    i) If operational reasons require that an intermediate force weapon and other use of force equipment be temporarily stored in a vehicle, the intermediate force weapon or use of force equipment must be stored out of plain view.

    ii) To minimize the risk of theft or unauthorized access, the installation and use of an alarm/security system is strongly encouraged to protect against unauthorized access, theft, use, loss, and damage.

2) Storage of Chemical Munitions and Agents

a) All unissued chemical munitions and agents must be stored in a secure room (locked with limited access for authorized individuals only). Furthermore, they must be stored in a secure safe or container separate from firearms and ammunition.

b) Chemical munitions and agents must be kept in a cool, dry environment and be rotated periodically.

c) Authorized Officers must ensure that chemical agents issued to them are stored in a secure place to prevent unauthorized access and replaced before the expiration dates. Authorized Officers must turn in expired or damaged OC spray canisters to the Firearms Coordinator or Defensive Tactics Coordinator for proper disposal.

d) The disposal of expired OC spray canisters must be performed by the Firearms Coordinator or Defensive Tactics Coordinator in accordance with procedures established by state and local ordinances for their areas of responsibility. Expired or partially used canisters that are functional may not be discarded while capable of discharging the chemical agent. Canisters must not be incinerated or disposed of in an unsafe or dangerous manner. Damaged or expired OC spray cannot be transferred to other agencies for any purposes other than disposal. Expired or partially used canisters will not be issued to Authorized Officers and will be made non-functional as soon as practicable.

3) EMDDs

a) All unissued EMDDs must be stored in a locked safe or vault that prevents unauthorized access or theft and placed under separate locking controls from cartridges. Access to unissued EMDDs should be limited to Defensive Tactics Coordinators. Additionally, the Responsible Official, or his or her designee, must also have ability to gain access to the unissued EMDD in case of emergency.

b)  Each Authorized Officer is responsible for the safe storage, general care, and maintenance of all EMDDs issued to him or her by ICE.

c)  Authorized Officers must store EMDDs out of plain view and in a location that prevents unauthorized access by anyone.

d)  Authorized Officers may not leave EMDDs unattended in a vehicle unless there is a justified operational need.

  i)  If operational reasons require that an EMDD be temporarily stored in a vehicle, the EMDD must be concealed from view.

  ii)  To minimize the risk of theft or unauthorized access, the EMDD must be secured inside the vehicle in a lock box to prevent theft and/or unauthorized access by anyone. The installation and use of an alarm/security system is strongly encouraged to further protect against unauthorized access, theft, use, loss, and damage.

  iii)  EMDDs may not be stored in vehicles overnight unless there is a justified operational need and the first-line supervisor has approved each instance that requires storing EMDDs in a vehicle overnight. When the EMDD is stored in a vehicle overnight, it must be secured inside the vehicle in a lock box.

**E.  Lost or Stolen Firearms and Sensitive Assets**

1)  An Authorized Officer whose ICE firearm or sensitive asset is lost or stolen must:

  a)  Report it to his or her supervisor within 2 hours of discovering the loss or theft;

  b)  Notify the local law enforcement authorities within 2 hours of discovering the loss or theft; and

  c)  Complete blocks 1-10 of DHS Form 200-2, Report of Survey, and submit the form and accompanying documents through official channels to the Responsible Official no later than 48 hours after the discovery. In block 8 of DHS Form 200-2, the Authorized Officer must include a detailed description of the circumstances surrounding the loss or theft of the firearm or sensitive asset. This information may also be included on an accompanying memorandum as an attachment.

2)  The supervisor must:

  a)  Report to the Responsible Official within 2 hours of receiving the Authorized Officer's report of a lost or stolen firearm or sensitive asset;

  b)  Report the lost or stolen firearm or sensitive asset to the JIOC via the SEN system

---

within 2 hours of receiving the Authorized Officer's report of a lost or stolen firearm or sensitive asset. In addition to completing the required SEN report fields, the report to the JIOC must include the make, model, and serial number of the firearm or sensitive asset, and the name of the Authorized Officer to whom the firearm or sensitive asset is assigned;

c) Report the lost or stolen firearm or sensitive asset to OPR within 2 hours of receiving the Authorized Officer's report of lost or stolen firearm or sensitive asset; and

d) Ensure that the local law enforcement authorities have been notified and that the firearm or sensitive asset has been annotated in FACTS and National Crime Information Center (NCIC) as lost or stolen.

3) The Responsible Official must:

a) Complete block 13 of DHS Form 200-2 and forward copies of all documentation, including a copy of the police report, to the appropriate Program Head and the Assistant Director for OFTP within 10 business days of the loss. If the Responsible Official is also the Program Head, a copy of the Authorized Officer's report of a lost or stolen firearm or sensitive asset will be sent directly to the Assistant Director for OFTP;

b) Ensure that a report of the loss or theft of a firearm or sensitive asset is forwarded to OPR; and

c) Ensure that the procedures for reporting a lost or stolen firearm or sensitive asset, as well as all relevant federal regulations, are adhered to by Authorized Officers within their area of responsibility.

4) The JIOC must immediately notify OPR, the appropriate Program Head, and the Assistant Director for OFTP. The JIOC's notifications to OFTP and OPR must include the make, model, and serial number of the firearm or sensitive asset, and the name of the Authorized Officer to whom the firearm or sensitive asset is assigned.

5) Lost or Stolen Firearms or Suppressors at the Airport

a) If the loss or theft of a firearm or Suppressor took place within the sterile area of an airport, the Authorized Officer must first notify the TSA Federal Security Director or his or her representative and then immediately comply with all ICE reporting requirements outlined in Chapter 6.E.1.

b) An Authorized Officer who loses a firearm or Suppressor in the sterile area of an airport must remain within that area and conduct an immediate and thorough search for the firearm. The Authorized Officer must seek assistance from any other available law enforcement officers.

---

**ICE Firearms and Use of Force**

FOR OFFICIAL USE ONLY

c) If there is a possibility that the firearm or Suppressor was lost on an aircraft, the Authorized Officer must first notify the airline's Ground Security Coordinator or his or her representative and then immediately comply with all ICE reporting requirements outlined in Chapter 6.E.1.

## F.   Lost or Stolen Intermediate Force Weapons

1) When an Authorized Officer becomes aware that his or her ICE-issued intermediate force weapon is lost or stolen, the lost or stolen item(s) must be reported in accordance with DHS's reporting procedures and timelines, as follows:

   a) Report the loss to a supervisor within 2 hours of discovering the loss or theft;

   b) Annotate the item as lost or stolen in FACTS within 24 hours of discovering the loss or theft; and

   c) Complete blocks 1-10 of DHS Form 200-2, Report of Survey, and submit the form and accompanying documents through official channels to the Responsible Official no later than 48 hours after the discovery. In block 8 of DHS Form 200-2, the Authorized Officer must include a detailed description of the circumstances surrounding the loss or theft of the item.  This information may also be included on an accompanying memorandum as an attachment.

2) The supervisor must:

   a) Report to the Responsible Official within 2 hours of receiving the Authorized Officer's report of a lost or stolen item;

   b) Report the lost or stolen item to the JIOC via the SEN system within 2 hours of receiving the Authorized Officer's report of the lost or stolen item. In addition to completing the required SEN report fields, the report to the JIOC must include the make, model, and serial number (if available) of the item, and the name of the Authorized Officer to whom the item was assigned;

   c) Report the lost or stolen item to OPR within 2 hours of receiving the Authorized Officer's report of the lost or stolen item; and

   d) Ensure that the item has been annotated lost or stolen in FACTS.

3) The Responsible Official must:

   a) Complete block 13 of DHS Form 200-2 and forward copies of all documentation to the appropriate Program Head and the Assistant Director for OFTP within 10 business days of the loss. When the Responsible Official is also the Program Head, a copy of the Authorized Officer's report of the lost or stolen item must be sent directly to the Assistant Director for OFTP;

---

b)  Ensure that the report of the lost or stolen item is forwarded to the JIC for action by OPR; and

c)  Ensure that the procedures for reporting a lost or stolen item, as well as all relevant federal regulations, are adhered to by Authorized Officers within their area of responsibility.

4)  The JIOC must immediately notify OPR, OFTP, and the appropriate Program Head. The notification must include the make, model, and serial number (if available) of the item, and the name of the Authorized Officer to whom the item was assigned.

## G.  Destroyed/Non-Repairable ICE-issued Firearms

1)  An Authorized Officer who has a destroyed or non-repairable ICE-issued firearm must immediately report such a firearm to a supervisor and transfer the destroyed or non-repairable ICE-issued firearm to the Firearms Coordinator. *See* Chapter 7 for additional information on firearms repairs.

2)  Upon notification of a destroyed or non-repairable ICE-issued firearm, the supervisor must ensure that the Responsible Official is notified through the appropriate chain of command.

3)  Within 48 hours of the discovery, the Authorized Officer reporting the destroyed or non-repairable ICE-issued firearm must submit a written report, through official channels, to the Responsible Official describing the circumstances surrounding the damage.

4)  The Responsible Official must submit a completed, signed Report of Survey, through official channels, to the Assistant Director for OFTP within 10 business days.

## H.  Board of Survey Action

1)  The Board of Survey (BOS) must meet on a quarterly basis (or as necessary) to review the circumstances of every lost, stolen, or damaged, non-repairable firearm, intermediate force weapon, ammunition, body armor, or other sensitive assets accounted for in FACTS, as stipulated by the Assistant Director for OFTP. As part of the review process, the BOS must ensure that all appropriate procedures regarding the firearm were completed and documented. Only the BOS may authorize relief of accountability for firearms.

2)  After a thorough review of the circumstances, the BOS will report the following to the respective Responsible Official:

a)  Actions taken to find or repair the sensitive asset;

---

b) Deciding whether the sensitive asset should be retired from FACTS;

c) If the loss, theft, damage, or destruction of the sensitive asset was attributable to the failure by the Authorized Officer to exercise the degree of precaution, attention, and vigilance needed to protect the sensitive asset; and

d) Recommendations for preventing such incidents in the future.

3) OFTP will maintain a record of all BOS findings.

## I. Seized and Abandoned Firearms

1) Authorized Officers frequently encounter firearms during operations. Authorized Officers must, at a minimum, follow these steps when handling firearms they encounter during their official duties.

   a) All firearms in ICE custody or possession must be accounted for by serial number, make, model, and caliber description and accompanied by appropriate documentation related to ICE's possession of the property.

   b) Seized firearms in ICE custody will be tracked in the Seized Assets and Case Tracking System (SEACATS).[14]

   c) An NCIC query must be conducted by the case agent or officer on all firearms acquired through seizure or abandonment processes, and the results of those inquiries must remain with the firearm until final disposition.

   d) All seized firearms will be processed in accordance with the procedures in the *Seized Asset Management and Enforcement Procedures Handbook* (U.S. Customs and Border Protection Handbook (HB) 4400-01B), dated July 2011, or as amended or superseded, and with any policies promulgated by the HSI Asset Forfeiture Unit.

   e) If, a seized firearm cannot be disposed of and/or destroyed through normal CBP asset forfeiture/destruction procedures, then the seizing office should coordinate with OFTP Headquarters to have the firearm properly entered into FACTS and transferred to the OFTP Serialized Vault, then ship the firearm and all accompanying documentation (to include any forfeiture and destruction orders) to the OFTP Armory Operations Unit for destruction.

   f) If the agency has an official need to retain a seized or abandoned firearm (or associated equipment or property), the office should follow the outlined procedures in the HSI Retention of Forfeited Property Handbook (11-04). All

---

[14] This section of the policy will be applicable to ERO once access to and training on Investigative Case Management (ICM//)//SEACATS has been provided to requisite number of ERO personnel within each Field Office.

firearms retention requests must be approved by the Assistant Director of OFTP.

**J. Sale or Transfer of Authorized Personally Owned Firearms**

1) Before an Authorized Officer sells, trades, or otherwise discontinues the carrying of an ICE-approved, personally owned handgun, the Authorized Officer must inform his or her Firearms Coordinator that the Authorized Officer no longer intends to carry the ICE-approved, personally owned handgun for duty purposes. The Firearms Coordinator must update FACTS to reflect the change immediately upon notification.

**Chapter 7: ICE Firearms Maintenance, Inspection, and Repair**

**A. Armory Operations**

1) OFTP will oversee the repair or modification specifically relating to the internal functioning, timing, or cycling of all ICE firearms.

2) At the ICE Academies, ESOs and Field Maintenance Armorers assigned or detailed to the Academy are the only personnel who are permitted to conduct repairs and modifications to ICE firearms.

3) OFTP will oversee the Field Maintenance Armorers and manage the Field Maintenance Armorers Training Program. This program will provide armorer training and certification of proficiency to Firearms Instructors to perform certain repairs on ICE firearms. The Field Maintenance Armorer training must identify repairs that Field Maintenance Armorers are authorized to perform. Only Firearms Instructors may be trained as Field Maintenance Armorers.

**B. Inspections of All ICE Firearms**

1) OFTP is the only ICE Program Office that is authorized to procure and receive new, ICE-owned firearms from vendors.

2) ESOs or Field Maintenance Armorers will inspect firearms in the following situations to ensure proper functioning and compliance with ICE specifications and standards:

   a) New, ICE-owned firearm;

   b) Firearms purchased for official use with personal funds that an Authorized Officer plans to use for official duties;

   c) After a firearm has undergone an authorized repair or modification; and

   d) Firearms held in reserve before reissuance.

3) A Field Maintenance Armorer (if available) or the Firearms Coordinator must inspect all ICE firearms on an annual basis.

4) ESOs, Field Maintenance Armorers, or Firearms Coordinators must document all annual inspections or inspections for cause as specified in this section in FACTS.

5) OFTP may, as warranted, recall and/or inspect any ICE firearm.

## C. Maintenance

1) All Authorized Officers are responsible for the normal cleaning and preventive maintenance of each ICE firearm they are authorized to carry. Maintenance must be done in accordance with the instructions provided by OFTP or as described in the user manual for that particular firearm. User manuals will be provided to all Authorized Officers for each ICE-issued firearm.

2) All firearms must be cleaned within 72 hours after being fired or exposed to a marine environment or other harsh or extreme conditions.

3) Authorized Officers must properly clean the firearm before submitting it to the Firearms Coordinator, Firearms Instructor, or Field Maintenance Armorer. Firearms Instructors must ensure that all firearms used in training, practice, or qualification sessions are properly cleaned and have received appropriate preventive maintenance before returning the firearms to storage. These firearms may be refused by the Firearms Coordinator, Firearms Instructor, or Field Maintenance Armorer until the weapon has been properly cleaned.

4) In the case of a shooting incident or an unintentional discharge that requires the firearm to be used in an ongoing federal, state, local, or tribal law enforcement investigation or legal action, or sent to the Assistant Director for OFTP under such circumstances, firearms must not be cleaned or altered from their condition as it was at the time of the incident.

## D. Repair of ICE Firearms

1) Authorized Officers are prohibited from making or having any repairs or modifications made to any ICE firearm unless permitted under subsection D.2 or expressly authorized by the Assistant Director for OFTP. The restriction includes, but is not limited to, the installation of sights, scopes, optics, paint projectile launcher conversion kits, and blank firing devices.

2) Firearms Instructors and Authorized Officers are permitted to adjust sights requiring the use of sight adjustment tools, replace grips as authorized, and attach slings to shoulder-fired firearms using existing sling swivels only. Additionally, Authorized Officers may use weapon-mounted lights if authorized by OFTP and installed and used in accordance with OFTP training.

3) ESOs and Field Maintenance Armorers are authorized to repair ICE firearms that are authorized for duty carry.

    a) Field Maintenance Armorers are authorized to make repairs and modifications as

---

**ICE Firearms and Use of Force**

FOR OFFICIAL USE ONLY

provided in the Field Maintenance Armorers training and subsequent OFTP-directed repairs and modifications guidance.

  b)  ESOs are authorized to make all repairs and modifications.

4)  ESOs are the only personnel authorized to determine if an ICE firearm is non-repairable and subject to disposal.

5)  ESOs and Field Maintenance Armorers must document all repairs and modifications made to any ICE firearm in FACTS.

6)  Repairs to ICE firearms will be provided at no cost to the Authorized Officer. However, ICE will not replace a damaged, non-repairable ICE-approved, personally owned weapon.

## E.  ICE Firearms Replacement

1)  The Field Maintenance Armorer or the Firearms Coordinator must document any inoperable or unsafe ICE Firearm in FACTS as well as retrieve any such ICE-issued firearm from the Authorized Officer.

2)  The Firearms Coordinator, with the Responsible Official's approval, must immediately issue an ICE firearm if an Authorized Officer requires a replacement firearm due to loss, damage, pending repairs, inspection, or similar circumstances. The replacement ICE firearm must be a firearm in the same trigger configuration as the firearm the Authorized Officer is currently authorized to carry. The Authorized Officer must demonstrate proficiency with the replacement firearm no later than 14 days following the issuance even if the Authorized Officer already qualified for that quarter.

## F.  ICE Firearm Shipping and Transfer

1)  The Firearms Coordinator is responsible for the receipt and shipment of ICE firearms under the control of the Responsible Official.

2)  The shipping, transfer, or receipt of any ICE firearms must be documented and controlled in FACTS in accordance with the current DHS property guidelines and as follows:

  a)  The transfer of a firearm must be acknowledged in FACTS by the Authorized Officer who is initiating the transfer prior to physical delivery or shipment of the firearm, and in no case must the acknowledgement exceed 24 hours after the transfer.

  b)  The receiving Authorized Officer must acknowledge the acceptance of a firearm in FACTS immediately after taking physical custody of the firearm, and in no case must the acknowledgement exceed 24 hours after the acceptance.

---

**ICE Firearms and Use of Force**
FOR OFFICIAL USE ONLY

ICE 0050

    c) Any exceptions to these requirements must be approved by the Assistant Director for OFTP.

3) The shipment of any ICE firearms must be accomplished by standard overnight shipping, as prescribed by OFTP, and sent by commercial carrier FEDEX that can control and track secure packages, or hand-carried by an Authorized Officer.

## G. Destruction of ICE Firearms

1) OFTP is the only ICE Program Office that is authorized to destroy ICE firearms.

2) Each ICE firearm destroyed must be documented in FACTS and the record permanently maintained.

3) All destructions must conform to federal property regulations.

## Chapter 8: ICE-Issued/Approved Ammunition

## A. Ammunition Issuance

1) The Assistant Director for OFTP will create, as necessary, specific procedures and guidelines regarding ammunition ordering, inventory, control, distribution, usage, and accountability.

2) Firearms Instructors will maintain accurate receipt, inventory, expenditure, and issuance records in FACTS for all ICE ammunition within their area of responsibility.

## B. Ammunition Use

1) Authorized Officers may only use ICE-issued ammunition for their ICE firearm, even when off duty. However, Authorized Officers are allowed to use ammunition not issued by ICE when using their ICE-approved, pow for shooting sports, marksmanship practice, or other lawful recreational activities. In special situations where Authorized Officers are deployed and under the control of another department in a foreign country (*e.g.*, under the direction of the Department of Defense during wartime or armed conflicts), they may be relieved from the requirement to use only ICE-issued ammunition.

2) Authorized Officers must rotate ammunition by expending previously issued duty ammunition during demonstrations of firearms proficiency training in accordance with the procedures established by OFTP.

3) Based on the Firearms Instructor's assessment and with the concurrence of the Firearms Coordinator, additional ammunition may be issued for practice to Authorized Officers who fail to qualify or who desire additional practice to maintain or improve their proficiency. The amount of additional ammunition issued must be sufficient to qualify or improve proficiency.

---

### C.  Ammunition Storage

1)  All unissued ammunition must be stored in a cool, dry environment, under separate locking controls from firearms and in a safe and secure location that prevents unauthorized access or theft.

2)  Responsible Officials must ensure the storage of unissued ammunition in their area of responsibility as noted above in subsection C.1. Additionally, they must restrict access to unissued ammunition in their area of responsibility to the Firearms Coordinator and his or her designee, who must be a Firearms Instructor. However, the Responsible Official and his or her designee must also have the ability to gain access in case of an emergency.

3)  Authorized Officers must store all ICE-issued ammunition out of plain view and in a location that prevents theft and unauthorized access by anyone.

### D.  Lost or Stolen Ammunition

1)  When an Authorized Officer becomes aware that his or her ICE-issued ammunition is lost or stolen, the lost or stolen ammunition must be reported in accordance with DHS's reporting procedures and timelines, as follows:

   a)  Report it to a supervisor within 2 hours of discovering the loss or theft;

   b)  Annotate the ammunition lost or stolen in FACTS within 24 hours of discovering the loss or theft; and

   c)  Complete blocks 1-10 of DHS Form 200-2, Report of Survey, and submit the form and accompanying documents through official channels to the Responsible Official no later than 48 hours after the discovery. In block 8 of DHS Form 200-2, the Authorized Officer must include a detailed description of the circumstances surrounding the loss or theft of the ammunition. This information may also be included on an accompanying memorandum as an attachment.

2)  The supervisor must:

   a)  Report the lost or stolen ammunition to the Responsible Official within 2) hours of receiving the Authorized Officer's report of lost or stolen ammunition;

   b)  Report the lost or stolen ammunition to the JIOC via the SEN system within two (2) hours of receiving the Authorized Officer's report of the lost or stolen ammunition. In addition to completing the required SEN report fields, the report to the JIOC must include the number of rounds, ammunition type, model number and lot number (if available) of the ammunition, and the name of the Authorized Officer to whom the ammunition was assigned;

   c)  Report the lost or stolen ammunition to OPR within 2 hours of receiving the Authorized Officer's report of the lost or stolen ammunition; and

---

**ICE Firearms and Use of Force**                                    **Page 52**

ICE 0052

d)  Ensure that the ammunition has been annotated as lost or stolen in FACTS.

3)  The Responsible Official must:

a)  Complete block 13 of DHS Form 200-2 and forward copies of all documentation to the appropriate Program Head and the Assistant Director for OFTP within 10 business days of the loss. When the Responsible Official is also the Program Head, a copy of the Authorized Officer's report of the lost or stolen ammunition must be sent directly to the Assistant Director for OFTP;

b)  Ensure that a report of the loss or theft of ammunition is forwarded to OPR; and

c)  Ensure that the procedures for reporting lost or stolen ammunition, as well as all relevant federal regulations, are adhered to by Authorized Officers within their area of responsibility.

4)  The JIOC must immediately notify OPR, OFTP, and the appropriate Program Head of the lost or stolen ammunition. The notification must include the number of rounds, ammunition type, model number, and lot number (if available) of the ammunition, and the name of the Authorized Officer to whom the ammunition was assigned.

## Chapter 9: Foreign Travel and Assignments

### A. Foreign Travel

1)  With the exception of Authorized Officers assigned to OPR, Authorized Officers who are required to carry firearms into a foreign country on official business will notify and receive approval from the respective Program Head, the Assistant Director for HSI International Operations, the U.S. Embassy, and the transit country or countries prior to their travel.

2)  Authorized Officers assigned to OPR and who are required to carry firearms into a foreign country on official business must notify and receive approval from the Associate Director for OPR. The Associate Director for OPR must ensure that approval is received from the U.S. Embassy and the transit country or countries prior to travel.

3)  Even with prior approval from the U.S. Embassy, Authorized Officers on ICE official foreign travel or foreign assignment are authorized to carry only ICE-issued firearms. Authorized Officers are prohibited from carrying personally owned firearms in a foreign country for duty, even if the personally owned firearm was otherwise authorized by ICE for domestic purposes.

### B. Foreign Assignments

1)  An Authorized Officer who is going to a permanent assignment at a foreign post of

---

duty will relinquish his or her domestic ICE-issued firearms to the appropriate Firearms Coordinator before departing to his or her foreign post of duty.

   a)  These firearms will be inspected and retained in the inventory of the domestic office as reserve firearms or returned to the Armory, as appropriate.

   b)  Authorizations to carry any ICE-approved, personally owned handguns must be revoked and removed from FACTS before the Authorized Officer's departure from the domestic duty station.

2)  The shipment of firearms into and out of a foreign country in support of ICE's law enforcement mission, as well as carriage of a firearm in a foreign country, requires concurrence from the U.S. Embassy and the Associate Director of OPR.

   a)  Each ICE Attaché office or post, where permitted, may maintain spare firearms. Such firearms must be assigned to the ICE Attaché who will serve as the Responsible Official in FACTS and who must ensure compliance with the laws and policies of the foreign country. On a case-by-case basis and as approved by the Assistant Director for OFTP, a firearm may be assigned to a Responsible Official for that office or post.

   b)  Requests for other weapons will be considered on a case-by-case basis with the approval of the Program Head and the concurrence of the Assistant Director for OFTP. Any excess firearms must be returned to the Assistant Director for OFTP.

   c)  At the request of the respective Program Head, the Assistant Director for OFTP may issue a non-standard firearm to Authorized Officers in foreign countries.

3)  Any Authorized Officer permanently assigned to a foreign office and authorized by the foreign office to carry a firearm must comply with the Department of State's firearms policy and guidance at foreign post, which may be more restrictive than ICE's policies on firearms.

4)  Each Authorized Officer who is newly assigned to an ICE Attaché office and approved to carry a firearm in that country must be issued a firearm from the inventory of his or her foreign post.

   a)  This firearm will be the Authorized Officer's assigned firearm for the duration of the foreign tour. Upon completion of a foreign tour, the Authorized Officer must return the firearm to the ICE Attaché or other Responsible Official.

5)  An Authorized Officer permanently assigned to a foreign office is exempt from periodic demonstration of firearms and intermediate force device proficiency requirements. However, Authorized Officers permanently assigned to a foreign office are encouraged to maintain firearms proficiency with the same make and model firearm at least once a year during their return to the United States or any other

location where a Firearms Instructor can conduct proficiency training.

a) An Authorized Officer exempted from the periodic demonstration of firearms and intermediate force device proficiency requirements while permanently assigned to a foreign office must meet all ICE training requirements should he or she wish to carry a firearm while on temporary duty in the United States.

b) This exemption will be documented in FACTS, as system limitations allow, for each Authorized Officer to whom the exemption applies.

6) Upon returning from an assignment in a foreign location, the respective field office or ICE HQ Directorate or Program Office will issue a firearm to the Authorized Officer. The Authorized Officer must demonstrate proficiency with the firearm before carrying it.

## Chapter 10: Specialized Operations and Honor Guards

### A. Specialized Operations

1) Tactical teams may be established consistent with the guidelines and procedures established by OFTP and approved by their respective Program Head.

2) Tactical team members may use specialized firearms which are specifically approved for tactical teams by their respective Program Head, with the concurrence of the Assistant Director for OFTP.

3) Only tactical team members who have successfully completed the required training and demonstrated proficiency are authorized to carry specialized firearms.

4) With written authorization from the Responsible Official and the Assistant Director for OFTP, Firearms Instructors and Authorized Officers assigned to tactical teams (including detailed assignments) may carry any firearm selected by the Assistant Director for OFTP for training or operational purposes, or any firearm that ICE is considering acquiring to conduct:

a) Basic training;

b) Advanced firearms and use of force training;

c) Testing and evaluation of firearms, specialized weapons, ammunition, or other ordnance or munitions; or

d) Operational activities approved by the Program Heads.

### B. ICE National Honor Guard

1) Authorized Officers assigned to the ICE Honor Guard may use firearms specifically approved by ICE Directive and Handbook No. 1049.1, ICE National Honor Guard Program (Jun. 15, 2016), or as updated. Designated honor guard firearms are ceremonial in nature and may not be used to discharge live ammunition.

## Chapter 11: Firearms and Defensive Tactics Instructors and Range Operations

### A. Firearms Instructors

1) Firearms Instructors must successfully complete all required training and certifications for use of basic and specialized firearms.

2) Firearms Instructors must be recertified at least once every 5 years. The Assistant Director for OFTP may extend a Firearms Instructor's certification period on a case-by-case basis, if necessary, because of training or resource limitations.

3) During firearms training, practice, and demonstration of proficiency sessions, Firearms Instructors must take all reasonable steps to ensure the safety and security of all personnel and property involved.

### B. Defensive Tactics Instructors

1) Defensive Tactics Instructors must successfully complete all required training and certifications required by OFTP.

2) Defensive Tactics Instructors must be recertified at least once every 5 years. The Assistant Director for OFTP may extend an Instructor's certification period on a case-by-case basis, if necessary, because of training or resource limitations.

3) During defensive tactics training, practice, and demonstration of proficiency sessions, Defensive Tactics Instructors must take all reasonable steps to ensure the safety and security of all personnel and property involved.

### C. Range Operation and Safety

1) All personnel participating in firearms qualifications must conduct themselves in a safe and professional manner at all times.

2) Firearms Instructors must perform a safety briefing prior to any training evaluation involving firearms.

3) Failure of any Authorized Officer to comply with safety practices, procedures, or instructions may result in the removal of the Authorized Officer from the range by a Firearms Instructor.

4) Firearms Instructors must ensure compliance with safety precautions, including

---

ensuring that all personnel on or near the firing line use appropriate eye and hearing protection.

5) Firearms Instructors must ensure that participants do not score their own targets for official record purposes.

6) The minimum ratios of Firearms Instructors to Authorized Officers on the firing line are:

   a) For static line training, practice, and demonstration of firearms proficiency sessions, one Firearms Instructor per every 5 shooters (1:5);

   b) For transition to a new or different handgun, one Firearms Instructor per every two shooters (1:2); and

   c) For advanced live-fire training exercises that involve movement or that cannot otherwise be conducted on a static firing line, one Firearms Instructor per one shooter (1:1).

7) The Firearms Instructors-to-shooters ratio may be increased for specific activities based on the Firearms Instructor's judgment, considering the skill levels of participants, complexity of the exercises, or configuration and condition of the facilities being used.

8) Any officer who sees any condition that is unsafe or life threatening should immediately call "CEASE FIRE" in a voice that can be heard by all officers.

**D.    Occupational Safety and Health Administration (OSHA) Requirements**

1) Responsible Officials must ensure that all personnel engaging in firearms training adhere to all applicable occupational health and safety program requirements. The requirements include providing audiograms for all Authorized Officers and conducting blood lead level testing for all Firearms Instructors and other personnel, as applicable.

2) Firearms Instructors must ensure that the OSHA Lead standards contained in 29 C.F.R. § 1910.1025 and a Material Safety Data Sheet for the following materials are available for review by personnel at the training areas as appropriate:

   a) Lead;

   b) Cleaning solvents;

   c) Chemicals and propellants;

   d) Diversionary devices; and

---

**ICE Firearms and Use of Force**                                      **Page 57**

ICE 0057

e) Smoke.

The manufacturer or distributor of the hazardous material provides Material Safety Data Sheets.

3) For further assistance involving occupational health and safety program requirements or Material Safety Data Sheets, contact the M&A Health and Safety Branch within the Office of the Chief Financial Officer, Office of Asset and Facilities Management.

**E.    Metal Reactive Targets**

1) Frangible ammunition must be used when firing at metal reactive targets at close range. Firearms Instructors must ensure that metal reactive targets are used in compliance with all safety precautions recommended by the manufacturer.

2) The minimum safe distances authorized for use of metal reactive targets by ICE are as follows:

a) When firing frangible handgun ammunition, metal reactive targets must not be placed closer than 3 yards from the shooter. When firing all other types of handgun ammunition, metal reactive targets must not be placed closer than 10 yards from the shooter.

b) When firing buck or birdshot, metal reactive targets must be placed no closer than 10 yards from the shooter. When firing rifled slugs, metal reactive targets cannot be placed closer than 50 yards from the shooter. NOTE: Steel shot is prohibited from being used on any metal reactive target.

c) When firing frangible rifle ammunition, metal reactive targets must not be placed closer than 25 yards from the shooter. When firing all other types of rifle ammunition, metal reactive targets must not be placed closer than 50 yards from the shooter. NOTE: If the manufacturer recommended safety distances are greater than those specified above, the manufacturer's recommendations must be observed.

**F.  Force-On-Force Training**

1) Safety

a) Full face, throat, and groin protection; gloves; and long sleeve shirts or coveralls must be worn when using paint projectiles.

b) Adequate instructional staff must be used to clearly delineate the safe, semi-safe, and unsafe zones within the training area.

2) Paint Projectile Firearms and Launchers

    a) Paint projectiles may only be used in firearms and launchers authorized and provided by OFTP.

    b) Paint projectile firearms and launchers must be permanently modified to be incapable of expelling live ammunition and marked for this purpose. Exceptions to this rule may be approved on a case-by-case basis by the Assistant Director for OFTP.

## APPENDIX I – AUTHORITIES/REFERENCES

8 U.S.C. § 1103. *Powers and duties of the Secretary, the Under Secretary, and the Attorney General.*

8 U.S.C. § 1357. *Powers of immigration officers and employees*.

19 U.S.C. § 1589a. *Enforcement authority of customs officers*.

5 C.F.R. § 339, *et. seq. Medical Qualification Determinations*.

8 C.F.R. § 1.2. *Definitions*.

8 C.F.R. § 2.1. *Authority of the Secretary of Homeland Security*.

8 C.F.R. Part 287. *Field Officers; Powers and Duties*.

49 C.F.R. § 175.10. *Exceptions for passengers, crewmembers, and air operators*.

49 C.F.R. § 1540.111. *Carriage of weapons, explosives, and incendiaries by individuals*.

49 C.F.R. § 1544.219. *Carriage of accessible weapons*.

49 C.F.R. § 1544.221. *Carriage of prisoners under the control of armed law enforcement officers*.

49 C.F.R. § 1544.223. *Transportation of Federal Air Marshals*.

DHS Policy Statement 044-05, *Department Policy on the Use of Force* (Sept. 7, 2018), or as amended or superseded.

DHS Instruction Manual 119-03-001-01, *Personal Property Asset Management Manual* (May 22, 2018), or as amended or superseded.

Memorandum from Acting Deputy DHS Secretary Russell Deyo, *Required Reporting of Off- Duty Contact with Law Enforcement by DHS Law Enforcement Personnel and the Suspension and/or Revocation of Authority to Carry a Firearm or other Weapon and Perform Law Enforcement Duties*, (Jan. 10, 2017), or as amended or superseded.

ICE Directive 19001.1 (former number: 5-1.0), *ICE Body Armor Policy* (Feb. 4, 2005), or as amended or superseded.

ICE Directive No. 3002.1, ICE Badge and Credential Program (Jan. 12, 2010), or as amended or superseded.

ICE Directive No. 10092.1, DNA Sample Collection (Dec. 28, 2020).

ICE Directive No.1044.1, Response to and Evaluation of Critical Incidents Involving ICE Employees (Aug. 4, 2015), or as amended or superseded.

ICE Directive No. 1005.2, Domestic Violence: Lautenberg Amendment Compliance Policy (Nov. 23, 2012), or as amended or superseded.

ICE Directive No. 1040.1, Premium Pay Guide (May 7, 2015), or as amended or superseded U.S. Customs and Border Protection, *Seized Asset Management and Enforcement Procedures Handbook* (July 2011), or as amended or superseded.

ICE Memorandum from Associate Director for OPR and the Assistant Director for OFTP, *New Use of Force, Assaults and Discharges Reporting Process* (Oct. 15, 2015), or as amended or superseded.

*ICE Firearms Remedial Training Guidelines* (Feb. 2013), or as amended or superseded.

## APPENDIX II – DEPARTMENT POLICY ON THE USE OF FORCE



**U.S. Department of Homeland Security**
Washington, DC 20528

Issue Date:  September 7, 2018

Policy Statement 044-05

MEMORANDUM FOR:     Component Heads

FROM:                             Claire M. Grady
                                       Acting Deputy Secretary of Homeland Security and
                                       Under Secretary for Management

SUBJECT:                        **Department Policy on the Use of Force**

### I.     Purpose

Pursuant to the Secretary's authority under Title 6, United States Code (U.S.C.) § 112, this policy articulates Department-wide standards and guidelines related to the use of force by Department of Homeland Security (DHS) law enforcement officers and agents (LEOs) and affirms the duty of all DHS employees to report improper uses of force.  All DHS Components employing LEOs are directed to implement this guidance, including investigation and documentation practices, through Component-specific policy, procedure, and training.

This memorandum supersedes the Memorandum from Secretary Tom Ridge, "Department of Homeland Security Policy on the Use of Deadly Force" (June 25, 2004).

### II.     Use of Force Standard

#### A.     Introduction

In determining the appropriateness of a particular use of force, the Department is guided by constitutional law, as interpreted by the U.S. Supreme Court.[1]  The Fourth Amendment supplies a constitutional baseline for permissible use of force by LEOs in the course of their official duties; law enforcement agencies may adopt policies that further constrain the use of force.  This policy describes the governing legal framework and articulates additional principles to which the Department will adhere.

#### B.     General Statement

Unless further restricted by DHS Component policy, DHS LEOs are permitted to use force to control subjects in the course of their official duties as authorized by law, and in defense of themselves and others.  In doing so, a LEO shall use only the force that is **objectively reasonable** in light of the facts and circumstances confronting him or her at the time force is applied.

---

[1] See, e.g., *Graham v. Connor*, 490 U.S. 386 (1989), and *Tennessee v. Garner*, 471 U.S. 1 (1985).

C.    Discussion: The Fourth Amendment "Reasonableness" Standard

1.    The Supreme Court has ruled that "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."[2]  This standard is an objective one that, in the context of use of force policy and practice, is often referred to as "objective reasonableness."

2.    Because this standard is "not capable of precise definition or mechanical application," its "proper application requires careful attention to the facts and circumstances of each particular case."[3]  The reasonableness of a LEO's use of force must be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[4]  In determining whether the force a LEO used to effect a seizure was reasonable, courts allow for the fact that LEOs are often forced to make split-second judgments, in circumstances that are tense, uncertain, and rapidly evolving.

3.    Consequently, there may be a range of responses that are reasonable and appropriate under a particular set of circumstances.

4.    Once used, physical force[5] must be discontinued when resistance ceases or when the incident is under control.

III.    General Principles

A.    Respect for Human Life

All DHS personnel have been entrusted with a critical mission: safeguarding the American people, our homeland, and our values.  In keeping with this mission, respect for human life and the communities we serve shall continue to guide DHS LEOs in the performance of their duties.

---

[2] *Graham*, 490 U.S. at 396.  The Court has further determined that a Fourth Amendment "seizure" of a person occurs when an officer, "by means of physical force or show of authority, terminates or restrains his freedom of movement *through means intentionally applied* (emphasis in original)." Brendlin v. California, 551 U.S. 249, 254 (2007)(citations omitted).

[3] *Graham*. (citing *Garner*, 471 U.S at 8-9: "[T]he question is 'whether the totality of the circumstances justifie[s] a particular sort of . . . seizure'"). The "totality of the circumstances" refers to all factors surrounding a particular use of force.  In *Graham*, the Court lists three factors, often referred to as the "*Graham* factors," that may be considered in assessing reasonableness: the severity of the crime/offense at issue, whether the subject poses an immediate threat to the safety of the LEO or others, and whether the subject is actively resisting arrest or attempting to evade arrest by flight.  Other factors include, but are not limited to: the presence and number of other LEOs, subjects, and bystanders; the size, strength, physical condition, and level of training of the LEO(s); the apparent size, strength, physical condition, and level of training of the subject(s); whether an individual is forcibly assaulting, resisting, opposing, impeding, intimidating, or interfering with a LEO while the LEO is engaged in, or on account of the performance of, official duties; proximity and type of weapon(s) present; criminal or mental health history of the subject(s) known to the LEO at the time of the use of force; and the perceived mental/emotional state of the subject.

[4] *Id.*

[5] Other than the force reasonably required to properly restrain a subject and safely move him or her from point to point.  That is, once the subject is secured with restraints, a LEO may maintain physical control of the subject via the use of "come-along or other control techniques" to safely and securely conclude the incident.

---

**Appendix II – Department Policy on the Use of Force**

FOR OFFICIAL USE ONLY

ICE 0063

C.      Discussion: The Fourth Amendment "Reasonableness" Standard

1.      The Supreme Court has ruled that "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."[2] This standard is an objective one that, in the context of use of force policy and practice, is often referred to as "objective reasonableness."

2.      Because this standard is "not capable of precise definition or mechanical application," its "proper application requires careful attention to the facts and circumstances of each particular case."[3] The reasonableness of a LEO's use of force must be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[4] In determining whether the force a LEO used to effect a seizure was reasonable, courts allow for the fact that LEOs are often forced to make split-second judgments, in circumstances that are tense, uncertain, and rapidly evolving.

3.      Consequently, there may be a range of responses that are reasonable and appropriate under a particular set of circumstances.

4.      Once used, physical force[5] must be discontinued when resistance ceases or when the incident is under control.

## III.   General Principles

A.      Respect for Human Life

All DHS personnel have been entrusted with a critical mission: safeguarding the American people, our homeland, and our values. In keeping with this mission, respect for human life and the communities we serve shall continue to guide DHS LEOs in the performance of their duties.

---

[2] *Graham*, 490 U.S. at 396. The Court has further determined that a Fourth Amendment "seizure" of a person occurs when an officer, "by means of physical force or show of authority, terminates or restrains his freedom of movement *through means intentionally applied* (emphasis in original)." Brendlin v. California, 551 U.S. 249, 254 (2007)(citations omitted).

[3] *Graham*. (citing *Garner*, 471 U.S at 8-9: "[T]he question is 'whether the totality of the circumstances justifie[s] a particular sort of . . . seizure'"). The "totality of the circumstances" refers to all factors surrounding a particular use of force. In *Graham*, the Court lists three factors, often referred to as the "*Graham* factors," that may be considered in assessing reasonableness: the severity of the crime/offense at issue, whether the subject poses an immediate threat to the safety of the LEO or others, and whether the subject is actively resisting arrest or attempting to evade arrest by flight. Other factors include, but are not limited to: the presence and number of other LEOs, subjects, and bystanders; the size, strength, physical condition, and level of training of the LEO(s); the apparent size, strength, physical condition, and level of training of the subject(s); whether an individual is forcibly assaulting, resisting, opposing, impeding, intimidating, or interfering with a LEO while the LEO is engaged in, or on account of the performance of, official duties; proximity and type of weapon(s) present; criminal or mental health history of the subject(s) known to the LEO at the time of the use of force; and the perceived mental/emotional state of the subject.

[4] *Id.*

[5] Other than the force reasonably required to properly restrain a subject and safely move him or her from point to point. That is, once the subject is secured with restraints, a LEO may maintain physical control of the subject via the use of "come-along or other control techniques" to safely and securely conclude the incident.

B.    De-escalation

To ensure that DHS LEOs are proficient in a variety of techniques that could aid them in appropriately resolving an encounter, DHS Components shall provide use of force training that includes de-escalation tactics and techniques.

C.    Use of Safe Tactics

DHS LEOs should seek to employ tactics and techniques that effectively bring an incident under control while promoting the safety of LEOs and the public, and that minimize the risk of unintended injury or serious property damage. DHS LEOs should also avoid intentionally and unreasonably placing themselves in positions in which they have no alternative to using deadly force.

D.    Additional Considerations

1.    DHS LEOs are permitted to use force that is reasonable in light of the totality of the circumstances. This standard does not require LEOs to meet force with equal or lesser force.

2.    DHS LEOs do not have a duty to retreat to avoid the reasonable use of force, nor are they required to wait for an attack before using reasonable force to stop a threat.

E.    Warnings

1.    When feasible, prior to the application of force, a DHS LEO must attempt to identify him- or herself and issue a verbal warning to comply with the LEO's instructions. In determining whether a warning is feasible under the circumstances, a LEO may be guided by a variety of considerations including, but not limited to, whether the resulting delay is likely to:

a.    Increase the danger to the LEO or others, including any victims and/or bystanders;

b.    Result in the destruction of evidence;

c.    Allow for a subject's escape; or

d.    Result in the commission of a crime.

2.    In the event that a LEO issues such a warning, where feasible, the LEO should afford the subject a reasonable opportunity to voluntarily comply before applying force.

F.    Exigent Circumstances

In an exigent situation, for self-defense or the defense of another, DHS LEOs are authorized to use any available object or technique in a manner that is reasonable in light of the circumstances.

G.    Medical Care

As soon as practicable following a use of force and the end of any perceived public safety threat, DHS LEOs shall obtain appropriate medical assistance for any subject who has visible or apparent injuries, complains of being injured, or requests medical attention. This may include rendering first aid if properly trained and equipped to do so, requesting emergency medical services, and/or arranging transportation to an appropriate medical facility.

H.    Duty to Intervene In and Report Improper Use of Force

1.    The Department is committed to carrying out its mission with honor and integrity, and to fostering a culture of transparency and accountability. As such, DHS law enforcement Components will ensure that their policies and procedures unambiguously underscore the following:

**The use of excessive force is unlawful and will not be tolerated. Those who engage in such misconduct, and those who fail to report such misconduct, will be subject to all applicable administrative and criminal penalties.**

2.    DHS LEOs have a duty to intervene to prevent or stop a perceived use of excessive force by another LEO—except when doing so would place the observing/responding LEO in articulable, reasonable fear of death or serious bodily injury.

3.    **Any DHS employee** with knowledge of a DHS LEO's improper use of force shall, without unreasonable delay, report it to his or her chain of command, the internal affairs division, the DHS Office of Inspector General, and/or other reporting mechanism identified by Component policy or procedure.

4.    Failure to intervene in and/or report such violations is, itself, misconduct that may result in disciplinary action, with potential consequences including removal from federal service, civil liability, and/or criminal prosecution. DHS Components shall ensure that all personnel are aware of these obligations, as well as the appropriate mechanism(s) by which such reports should be made.

IV.    **Less-Lethal Force and Less-Lethal Devices**

A.    All DHS Components employing LEOs shall have appropriate written policies and procedures regarding the use of authorized control tactics or techniques; authorized less-lethal devices; and necessary training and certifications—both initial and recurring.

B.    DHS Components shall conduct less-lethal use of force training no less than every two years and incorporate decision-making and scenario-based situations in these training programs.

C.    DHS LEOs are prohibited from carrying any unauthorized less-lethal device for duty use.

D.    LEOs shall demonstrate proficiency, in accordance with established Component standards, for each less-lethal device that they are authorized and certified to carry. If a certification or valid waiver expires, a LEO is prohibited from carrying that device for duty use until he or she meets the requirements for recertification on that device.

V.    **Warning Shots and Disabling Fire**

A.    General Prohibition

Except in the limited circumstances described in Section V.B., "Exceptions," DHS LEOs are prohibited from discharging firearms solely:

1.    As a warning or signal ("warning shots") or

2.    To disable moving vehicles, vessels, aircraft, or other conveyances ("disabling fire").

B.    Exceptions

1.    Warning Shots

a.    Maritime Law Enforcement Operations: Authorized U.S. Coast Guard (USCG), U.S. Customs and Border Protection (CBP), and U.S. Immigration and Customs Enforcement (ICE) personnel conducting maritime law enforcement operations may use warning shots only as a signal to a vessel to stop, and only after all other available means of signaling have failed. Such warning shots are classified as less-lethal force.

---

b.    Aviation Law Enforcement Operations: Authorized USCG, CBP, and ICE personnel conducting aviation law enforcement operations may use warning shots only as a signal to an aircraft to change course and follow direction to leave the airspace, and only after all other available means of signaling have failed.  Such warning shots are classified as less-lethal force.

2.    Disabling Fire

a.    Maritime Law Enforcement Operations: Authorized USCG, CBP, and ICE personnel, when conducting maritime law enforcement operations, may discharge firearms to disable moving vessels or other maritime conveyances.  Such disabling fire is classified as less-lethal force.

b.    Physical Protection: Authorized United States Secret Service (USSS) personnel exercising USSS's protective responsibilities, and other authorized and appropriately trained DHS LEOs assigned to assist USSS in exercising these responsibilities, may discharge firearms to disable moving vehicles, vessels, and other conveyances, and such disabling fire is classified as less-lethal force—EXCEPT:  Aircraft in Flight: Disabling fire against an aircraft in flight is permitted only if the use of deadly force against the occupants of the aircraft, or in response to the threat posed by the aircraft, itself, is otherwise authorized under this policy.  This is classified as a use of deadly force. [6]

C.    Safety Considerations

1.    Warning shots and disabling fire are inherently dangerous and, when authorized under this policy, should be used with all due care.  DHS LEOs must exercise good judgment at all times and ensure that safety is always the primary consideration.

2.    When authorized LEOs deem warning shots or disabling fire warranted, each shot must have a defined target.

## VI.    Deadly Force

A.    General Guidelines

1.    As with any use of force, a LEO's use of deadly force must be reasonable in light of the facts and circumstances confronting him or her at the time force is applied.

---

[6]As a use of deadly force, this is not mere "disabling fire," which by definition is not intended to cause bodily injury.

2.      A DHS LEO may use deadly force only when the LEO has a reasonable belief that the subject of such force poses an imminent threat of death or serious bodily injury to the LEO or to another person.[7]

    a.      Fleeing Subjects:  Deadly force shall not be used solely to prevent the escape of a fleeing subject.  However, deadly force is authorized to prevent the escape of a fleeing subject where the LEO has a reasonable belief that the subject poses a significant threat of death or serious physical harm to the LEO or others and such force is necessary to prevent escape.[8]

B.      Discharge of Firearms

1.      General Guidelines

    a.      Discharging a firearm against a person constitutes the use of deadly force and shall be done only with the intent of preventing or stopping the threatening behavior that justifies the use of deadly force.

    b.      The act of establishing a grip, unholstering, or pointing a firearm does not constitute a use of deadly force.

2.      Moving Vehicles, Vessels, Aircraft, or other Conveyances

    a.      DHS LEOs are prohibited from discharging firearms at the operator of a moving vehicle, vessel, aircraft, or other conveyance unless the use of deadly force against the operator is justified under the standards articulated elsewhere in this policy.[9]  Before using deadly force under these circumstances, the LEO must take into consideration the hazards that may be posed to law enforcement and innocent bystanders by an out-of-control conveyance.

    b.      Firearms shall not be discharged solely as a warning or signal or solely to disable moving vehicles, vessels, aircraft, or other conveyances, except under the limited circumstances described in Section V., Warning Shots and Disabling Fire.

---

[7] For more detailed discussion of the use of force standard and the "reasonableness" determination, see Section II., Use of Force Standard.

[8] See *Garner*, 471 U.S. at 11-12.  To further illustrate a "threat of serious physical harm," the *Garner* Court explained: "…if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Id.* The Supreme Court has further explained that this "necessity" refers not to preventing the flight, itself, but rather the larger context: the need to prevent the suspect's potential or further serious physical harm to the LEO or other persons.

[9] Here, a distinction is drawn between firing at the operator, i.e., targeting the operator with the intent to cause serious physical injury or death, and firing at a moving vehicle or other conveyance solely as a warning or signal or to disable the vehicle, and with no intent to injure (see section V., Warning Shots and Disabling Fire).

---

## VII. Reporting Requirements and Incident Tracking

A.    Uses of force shall be documented and investigated pursuant to Component policies.

B.    It is a Department priority to ensure more consistent Department-wide reporting and tracking of use of force incidents.  More consistent data will enable both the Department and Components to more effectively assess use of force activities, conduct meaningful trend analysis, revise policies, and take appropriate corrective actions.

C.    DHS Components employing LEOs shall establish internal processes to collect and report accurate data on Component use of force activities.  At a minimum, Components shall report the following as a "use of force incident" when resulting from a use of force:

1.    A less-lethal device is utilized against a person (except when the device is deployed in a non-striking control technique);

2.    Serious bodily injury occurs;

3.    Deadly force is used against a person, to include when a firearm is discharged at a person; or

4.    Death occurs.

D.    Components shall report this data to the Deputy Secretary, through the Deputy Assistant Secretary for Law Enforcement Policy, on no less than an annual basis (in accordance with a process and timeline to be determined) and to others as required for official purposes.

## VIII. Departmental Review and Oversight

A.    Each DHS Component employing LEOs will establish and maintain a use of force review council or committee to perform internal analysis of use of force incidents from the perspective of training, tactics, policy, and equipment; to identify trends and lessons learned; and to propose any necessary improvements to policies and procedures.

B.    The Office of Strategy, Policy, and Plans, working in consultation with DHS Components employing LEOs, shall establish the DHS Use of Force Council to provide a forum by which Components can share lessons learned regarding use of force policies, training, and oversight.  The DHS Use of Force Council will be chaired by the Office of Strategy, Policy, and Plans and comprised of one executive-level representative from each of the following DHS Components:

1.    Office of the Under Secretary for Management
2.    National Protection and Programs Directorate

---

**Appendix II – Department Policy on the Use of Force**

**FOR OFFICIAL USE ONLY**

**Page 70**

3. United States Customs and Border Protection
4. United States Coast Guard
5. United States Secret Service
6. Federal Emergency Management Agency
7. Transportation Security Administration
8. United States Immigration and Customs Enforcement
9. Office of the General Counsel
10. Federal Law Enforcement Training Centers
11. Office for Civil Rights and Civil Liberties
12. Privacy Office

C. Representatives of affected DHS Components will be responsible for reporting on use of force-related trends, developments, and lessons learned within their respective Components.

## IX. Military Activities

This policy shall not apply to the United States Coast Guard when operating under the Standing Rules of Engagement, or to other DHS personnel when they fall under Department of Defense control as civilians accompanying the force.

## X. No Right of Action

This policy is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity, against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

## XI. Definitions

A. *Deadly Force*: Any use of force that carries a substantial risk of causing death or serious bodily injury (see "Use of Force" and "Serious Bodily Injury"). Deadly force does not include force that is not likely to cause death or serious bodily injury, but unexpectedly results in such death or injury. In general, examples of deadly force include, but are not limited to, intentional discharges of firearms against persons, uses of impact weapons to strike the neck or head, any strangulation technique, strikes to the throat, and the use of any edged weapon.

B. *De-Escalation*: The use of communication or other techniques during an encounter to stabilize, slow, or reduce the intensity of a potentially violent situation without using physical force, or with a reduction in force.

C. *Disabling Fire*: Discharge of a firearm for the purpose of preventing a non-compliant moving vehicle, vessel, aircraft, or other conveyance from operating under its own power, but not intended to cause bodily injury.

---

D.     _Less-Lethal Device_:  An instrument or weapon that is designed or intended to be used in a manner that is not likely to cause death or serious bodily injury (see "Serious Bodily Injury").  Examples include, but are not limited to, conducted electrical weapons/electronic control weapons, impact weapons, and certain chemical agents. These are also commonly referred to as "intermediate force" or "less-than-lethal" weapons or devices.

E.     _Less-Lethal Force_:  Any use of force that is neither likely nor intended to cause death or serious bodily injury (see "Use of Force" and "Serious Bodily Injury").  Also known as "non-deadly," "intermediate," or "less-than-lethal" force.

F.     _Lessons Learned_:  Information gleaned through internal review and analysis of use of force incidents that is sufficiently significant or critical to consider a change to policies, procedures, or training standards.  Lessons learned may include, for example, information that can enhance law enforcement personnel skills; identify gaps in current training; identify current unique criminal trends being experienced in the field; provide information on new equipment recommendations or gaps; identify concerns with standard less lethal equipment/tactics; or any information that can prevent harm to the community, law enforcement, or arrestees.

G.     _Serious Bodily Injury_:  Physical injury that involves protracted and obvious disfigurement; protracted loss or impairment of the function of a bodily member, organ, or mental faculty; or a substantial risk of death.

H.     _Use of Force_:  The intentional application by law enforcement of any weapon, instrument, device, or physical power in order to control, restrain, or overcome the resistance, or gain compliance or custody, of another.

I.     _Warning Shot_:  Discharge of a firearm as a warning or signal, for the purpose of compelling compliance from an individual, but not intended to cause bodily injury.

---

**Appendix II – Department Policy on the Use of Force**

FOR OFFICIAL USE ONLY

ICE 0072

## APPENDIX III – ICE-APPROVED FIREARMS AND INTERMEDIATE FORCE WEAPONS

(As of January 2021)

As stated in Chapters 2 and 3 of the *ICE Firearms and Use of Force Handbook*, Authorized Officers may only carry those firearms and intermediate force weapons determined to be suitable by the Assistant Director for OFTP and specifically approved in writing by the Deputy Director or the respective Program Head.

This Appendix lists those firearms and intermediate force weapons approved by the Assistant Director for OFTP that Authorized Officers may carry when specifically approved in writing by their respective Program Head.

### A. Handguns

The following handguns are authorized in a configuration specified by OFTP:

1) Glock Models 17, 19, and 26 (9mm caliber Gen3 and Gen4);

2) Glock Models 17 MOS and 19 MOS (9mm caliber Gen4);

3) Glock Model 43 (9mm caliber; no new Glock 43s will be authorized; previously approved weapons remain authorized);

4) SIG Sauer DHS P320 F/C/SC (9mm caliber);

5) SIG Sauer P365/P365X/P365XL (9mm caliber);

**IMPORTANT NOTE: An Authorized Officer's approved handguns (semi-automatic) must be in the same trigger configuration (double action only/safe action or double-single). A process for transition from one configuration to another has been established through certification and coordination with OFTP.**

### B. Shotguns

HSI SRT and ERO SRT are authorized breaching and less lethal shotguns.

### C. Rifles and Automatic Firearms

Authorized Officers, with the written approval of their respective Program Head, are also authorized to carry the following rifles and automatic firearms:

1) Various manufacturer and configurations of the AR-15/M16/M4 rifles and carbines built to ICE specifications;

**Appendix III: ICE- Approved Firearms and Intermediate Force Weapons**                    **Page 73**
LAW ENFORCEMENT SENSITIVE – FOR OFFICIAL USE ONLY

ICE 0073

2) SIG Sauer MPX

(9mm caliber)

**D.    Specialized Weapons**

In addition to the firearms listed in Sections A, B, and C above, Authorized Officers assigned to approved tactical teams, with the written approval of their respective Program Head, are authorized to use the following weapons:

1) Remington 700 bolt-action rifle;

2) Knights SR-25/Mk11/M110/M110 K1;

3) ICE MK12 Rifle; and

4) Any other specialized weapon as deemed necessary by the Assistant Director of OFTP, with concurrence of the Deputy Director and/or Director of ICE.

**E.    Intermediate Force Options**

Authorized Officers, with the written approval of their respective Program Head, are authorized to use the following intermediate force weapons:

1) Oleoresin capsicum spray (OC);

2) Orthochlorobenzylidenemalononitrile gas (CS);

3) Collapsible steel baton;

4) EMDD and authorized electronic control devices; as approved by OFTP;

5) 40mm gas launcher as approved by the Assistant Director for OFTP;

6) 36-inch straight baton (as authorized); and

7) Authorized intermediate force weapons as approved by the Assistant Director for OFTP.

8) Authorized canine release as defined in HSI Canine Appendix VIII.

**Appendix III: ICE- Approved Firearms and Intermediate Force Weapons**      **Page 74**
<span style="color:red">LAW ENFORCEMENT SENSITIVE – FOR OFFICIAL USE ONLY</span>

ICE 0074

## APPENDIX IV – GUIDELINES AND PROCEDURES FOR ELECTRO-MUSCULAR DISRUPTION DEVICES (EMDDs)

Among the intermediate force devices approved by the *ICE Firearms and Use of Force Handbook* are electro-muscular disruption devices (EMDDs). This Appendix establishes ICE guidelines and procedures regarding the use of EMDDs. EMDDs may be used in a probe deployment mode or a touch (drive stun) mode to control an individual. All EMDD models must be approved by the Assistant Director for OFTP.

Authorized Officers who meet the requirements outlined in Chapter 2.A.1 of this Handbook may carry and use EMDDs as part of their law enforcement duties if expressly authorized by their Directorate or Program Office. The use of EMDDs must comply with applicable laws and the current DHS and ICE use of force policies. Authorized Officers must complete training on when and how to use EMDDs before they are allowed to carry their assigned EMDD. All deployments of EMDDs will be considered a hard technique within the ICE use of force continuum and must be properly reported and evaluated. Directorates and Program Offices may not acquire, test, or evaluate EMDDs without the approval of the Assistant Director for OFTP. Only ICE-issued EMDDs may be used for law enforcement duties. The carriage or use of personally owned EMDDs for law enforcement duties is strictly prohibited.

LAW ENFORCEMENT SENSITIVE – FOR OFFICIAL USE ONLY

ICE 0075

**Definitions**

1) Cartridge refers to a nitrogen powered cartridge manufactured specifically for use with the EMDDs.

2) Probe Deployment refers to the use of compressed nitrogen gas to propel two darts on wires from an EMDD to connect with an individual target. The EMDD then sends an electrical signal to the probes via the small wires, which can disrupt the body's ability to communicate messages between the brain and the muscles in the body, usually causing temporary neuromuscular incapacitation.

3) Anti-Felon Identification (AFID) system is a package of coded tags that deploy with the probes when a cartridge is discharged to identify the cartridge that was used.

4) Drive Stun Deployment refers to a technique where the device is brought into contact with a subject. Due to the narrow spread of the probes or contacts, this technique does not normally create neuromuscular incapacitation and is designed to effect compliance by sensory distraction.

**Training and Certification**

1) EMDDs will be issued only to Authorized Officers who have been trained and certified on when and how to use EMDDs.

2) Authorized Officers must be recertified annually on the use of EMDDs.

3) EMDD instructors must be recertified every 2 years. Additional training may be provided in between recertification sessions at the discretion of the Assistant Director for OFTP (*e.g.*, to convey information on technological updates for these devices).

4) Exposure to EMDDs as part of the training and certification process will be voluntary for Authorized Officers.

5) Authorized Officers assigned to units with EMDDs must obtain training from OFTP that outlines the techniques which accompany this technology, including use of force techniques when such devices are deployed. This training is intended to maximize the effectiveness of the device and enhance the safety of the officers and/or agents involved, the subject, and any bystanders.

6) All initial and follow-on training with EMDDs will be recorded in the ICE automated firearms system of record.

7) All EMDD-related training, whether for instructors or law enforcement officers, must be approved by the Assistant Director for OFTP before it is implemented.

LAW ENFORCEMENT SENSITIVE – FOR OFFICIAL USE ONLY

ICE 0076

**Carriage and Maintenance of EMDD**

1) Each EMDD that is carried on duty must be spark-tested by the Authorized Officer at the beginning of each shift, or prior to an operation if issued for a specific operation.

2) Each Authorized Officer is responsible for ensuring that the batteries and/or digital power magazine for his or her unit are in operational condition.

3) EMDDs must be carried on the non-gun side to avoid inadvertently drawing and discharging a live firearm.

4) Authorized Officers will carry at least one additional cartridge when carrying the device as an intermediate force device. The numbers and types of cartridges that will be issued to the Authorized Officer will be mandated by OFTP Defensive Tactics Coordinators and Instructors who have been EMDD certified.

5) Authorized Officers may carry their ICE-issued EMDD in the cabin of a commercial aircraft subject to the requirements set forth in Chapter 2.B of the *ICE Firearms and Use of Force Handbook* for flying armed on commercial aircraft. The Program Head may restrict this authority as he or she deems appropriate. Authorized Officers will not carry an EMDD as a substitute for their ICE firearm when traveling on a commercial aircraft.

6) A certified EMDD instructor should check any EMDD that does not appear to be functioning properly. If the issue cannot be corrected at the field office level, the unit must be returned to the Firearms Coordinator or Defensive Tactics Coordinator for shipment to the OFTP Armory for repair or replacement.

**Deployment of EMDDs**

1) Authorized Officers must always comply with all current DHS and ICE use of force policies when using an EMDD.

2) If operationally feasible, Authorized Officers should have at least one other officer available during deployment to assist with the arrest.

3) When practicable, Authorized Officers should verbally announce the pending use of an EMDD before deployment. This will warn other officers on the scene as well as the subject of a pending EMDD deployment.

4) Prior to using an EMDD, Authorized Officers must consider the severity of the offense, the subject's threat level to others, whether the subject is actively resisting arrest or attempting to evade arrest by flight, and the risk of serious injury to the subject.

5) Authorized Officers will deploy the EMDD for one standard cycle (five seconds) and

---

LAW ENFORCEMENT SENSITIVE – FOR OFFICIAL USE ONLY

ICE 0077

then evaluate the situation to determine if subsequent cycles are necessary to take the person safely into custody. Authorized Officers should consider that exposure to an EMDD for longer than 15 seconds (whether due to multiple applications or continuous cycling) may increase the risk of injury. After each application, the Authorized Officer must weigh the totality of the circumstances involved to determine if additional EMDD deployments would be effective in safely taking the person into custody or whether another use of force option should be considered at that point.

6) A supervisor will respond to any incident scene where an EMDD was deployed, if logistically feasible.

7) Following the deployment of an EMDD, an Authorized Officer on-scene must ensure that the probes, wires, expended cartridges, AFID tags, or other materials that can reasonably be retrieved, are retrieved and retained for any possible future use as evidence in an investigation and any subsequent proceeding.

**Special Circumstances**

1) EMDDs must be used in accordance with the *ICE Firearms and Use of Force Directive and Handbook* and not in situations where, based on the totality of the circumstances, deadly force is the only safe and effective means of achieving control.

2) Authorized Officers must not use EMDDs in the following situations unless the totality of the circumstances warrant the use of deadly force to prevent death or serious bodily injury to a person:

   a) While the subject is in or near a body of water sufficient to drown, could fall in that water if incapacitated, and would likely result in drowning;

   b) Where the risk of a fall would likely cause serious bodily injury;

   c) In areas where combustible vapors, liquids, or other flammable materials are known to the Authorized Officer;

   d) On a female subject who the Authorized Officer is aware is pregnant; or

   e) On small children, the elderly, and physically infirm individuals who, based upon a characteristic or a combination of characteristics known to the Authorized Officer, are susceptible to an increased risk of death or serious bodily injury from EMDD deployment.

3) Authorized Officers must not use EMDDs against persons operating a motorized conveyance unless the use is required to prevent death or serious bodily injury to a person, and the public safety interests outweigh the risks associated with the use.

4) Authorized Officers must not use EMDDs on a handcuffed or restrained person

---

**Appendix IV: Guidelines and Procedures for EMDDs**                                    **Page 78**
LAW ENFORCEMENT SENSITIVE – FOR OFFICIAL USE ONLY

unless the individual poses an articulable, immediate danger to the Authorized Officer or others.

5) Authorized Officers should be aware of the preferred target zones and should not intentionally fire an EMDD at the subject's head, neck, or genitalia.

6) EMDDs may be used on an aggressive animal if exigent circumstances warrant it. As part of a planned activity where contact with animals is anticipated, operational plans should include other support or capture options (*e.g.*, cage or muzzle). This is due to the limited range of the device, the brief period of incapacitation, the potentially rapid recovery, and the unpredictable reaction of the animal following the application.

7) Authorized Officers must not carry EMDDs into a hold room, except as necessary and appropriate to respond to a security incident.

## Medical Considerations

1) Each Authorized Officer will be issued a probe removal kit. The probe removal kit will, at a minimum, include the following: latex gloves, alcohol swabs, bandages, and appropriately marked containers that are approved for the disposal of biohazard waste consistent with existing ICE protocols for blood borne pathogens and training materials.

2) All fired probes embedded in a person's skin will be removed by an Authorized Officer once the scene has been secured, unless the probes are embedded in a sensitive area of the body, such as the eyes, head or neck, genitals, or known pre-existing injury areas. When the probes are embedded in sensitive areas of the body, the Authorized Officer must seek medical assistance before removing the probes.

3) When probes are removed from a person, they will be handled as "Biohazard Sharp" materials and sealed in approved containers marked appropriately with case identification information and cartridge serial number. (Note: Absent a unique case identifier, the container must also be marked with the name of the subject; the date of deployment; and the name of Authorized Officer.)

4) Any subject in ICE custody who has been exposed to an EMDD must be medically screened, as soon as practicable, before being placed in detention, regardless of whether or not there are any apparent injuries.

## Reporting Requirements

1) When reporting the deployment of an EMDD, Authorized Officers must follow all procedures outlined in the Chapter 4.B of the *ICE Firearms and Use of Force Handbook* for use of force reporting requirements. Supervisors are required to complete a Significant Incident Report (SIR) in the Significant Event Notification System (SEN); an ICE Use of Force, Assaults, and Discharge (UFAD) report; and a memorandum containing a narrative description of the event. In addition to the

---

LAW ENFORCEMENT SENSITIVE – FOR OFFICIAL USE ONLY

ICE 0079

information normally contained in a UFAD report, the following items – which are specific to the use of EMDD – must also be included:

  a)  The make, model, and serial number of the device used;

  b)  The number of cycles and duration used to gain compliance;

  c)  The type of clothing worn by the suspect;

  d)  The range at which the device was used;

  e)  The weather conditions at the time of deployment;

  f)  Any environmental issues the officer considered at the time of deployment;

  g)  The mode used (probe or drive stun);

  h)  The point of aim;

  i)  The point of impact of the probes;

  j)  The point of impact if drive stun is used;

  k)  The type of cartridge used and serial number;

  l)  Description of probe removal (uneventful, excessive bleeding, etc.);

  m) Disposition of the probes (retained as evidence, disposed as medical waste, etc.);

  n)  Medical care to the subject, if necessary;

  o)  Identifying information of who provided the medical screening of the subject; and

  p)  Observable physical conditions and/or behaviors of the subject.

2)  Each EMDD will have its record downloaded at least on a quarterly basis. The Firearms Coordinator or Defensive Tactics Coordinator will maintain the printout or electronic copy of the downloaded record for at least 5 years.

3)  A printout or electronic copy of the unit history via the device's data port must be attached with each report of an EMDD deployment outside of a training environment.

4)  The unintentional or inadvertent discharge of an EMDD outside of a training environment must be reported following the same procedures as the intentional discharge of the device.

**Accountability**

1) OFTP is the only ICE office that is authorized to place EMDDs in, or remove them from, the ICE inventory system of record.

2) Program Heads must approve the use of EMDDs before they are assigned to their respective Authorized Officers.

3) All EMDDs will be tracked in the ICE automated firearms inventory system of record and inventoried each year consistent with the accountability requirements outlined in the Chapter 6.B of the *ICE Firearms and Use of Force Handbook*.

4) An EMDD will be assigned to an individual user in the ICE automated firearms inventory system of record.

5) The Firearms Coordinator or Defensive Tactics Coordinator will issue, track, and inventory cartridges by serial number using a log or other system prescribed by the Assistant Director for OFTP.

6) EMDDs and cartridges must be secured consistent with the requirements contained in Chapter 6.D of the *ICE Firearms and Use of Force Handbook*. EMDD devices and cartridges must be securely stored when not in use.

7) Lost or stolen EMDDs must be reported in accordance with the procedures set forth in Chapter 6.F of the *ICE Firearms and Use of Force Handbook*.

**Recordkeeping**

1) Records related to law enforcement training, to include firearms, physical, and, will be retained by OFTP for 40 years, in accordance with the ICE Training Record Schedule (DAA-567-2015-0009), item 3, Completed Law Enforcement Course Student Records, as well as item 14, Student Training Records (post academy).

2) Records related to use of force incidents will be retained by OFTP for 45 years, in accordance with the ICE Protective Equipment Record Schedule (DAA-0567-2015-0008), item 1, Use of Force Incident Case Files.

3) Records related to inventory and control of firearms will be retained by OFTP for 15 years, in accordance with the Protective Equipment Records Schedule (DAA-0567-2015- 0008), item 5, Lost or Stolen Firearms and Body Armor Records.

LAW ENFORCEMENT SENSITIVE – FOR OFFICIAL USE ONLY

ICE 0081

## APPENDIX V – ICE COURSES ON DEMONSTRATION OF FIREARMS PROFICIENCY

### Handgun Qualification Course
(As of April 15, 2017)

**A.  Handgun Qualification Course**

**Firearms:** ICE authorized handgun

**Ammunition**: 50 rounds

**Target**: ICE QT Target

**Course of Fire**:

All stages will be fired as a hot range. Once prepared for duty carry, the shooter will be responsible for maintaining full magazines throughout the course of fire, reloading on command and/or when otherwise necessary.

**Stage 1:** 1.5 Yards (6 rounds)

Strong hand only from the holster using the bent elbow position with the support arm/hand placed against the upper centerline of the officer's chest.

On command, the shooter will: Draw and fire 1 round in 2 seconds and re-holster. Draw and fire 2 rounds in 2 seconds and re-holster. Draw and fire 3 rounds in 2 seconds and re-holster. Officers with a magazine capacity of less than 12 rounds will have to conduct a tactical reload or magazine exchange at the end of this stage of fire to be prepared for stage 2.

**Stage 2:** 3 Yards (6 rounds)

Using 2 hands from the holster -- point shoulder shooting, referencing sights.

On command, the shooter will: Draw and fire 3 rounds in the chest of the target in 3 seconds, and re-holster. Draw and fire 3 rounds in 3 seconds to the chest, perform a reload (emergency, tactical or magazine exchange) and re-holster.

**Stage 3:** 7 Yards (6 rounds)

**Body armor and cover drills.** 2 handed shooting using the sights.

On command, the shooter will draw and fire 2 rounds to the chest of the target and 1 round to the head of the target in 5 seconds and assume a high search position. From high search, move to an aimed in position and fire 2 rounds to the chest of the target and 1 round to the head of the target in for 4 seconds. At the end of this stage, the Firearms Instructor will check the

---

LAW ENFORCEMENT SENSITIVE – FOR OFFICIAL USE ONLY

ICE 0082

targets to score the head shots, as the 2 head shot rounds must be in the 5-ring head area for each to count as 5 points. The head area outside the 5 ring is worth 2 points. Officers with a magazine capacity of less than 12 rounds will have to conduct a tactical reload or magazine exchange at the end of this stage of fire to be prepared for stage 4.

**Stage 4:** 7 Yards (12 rounds)

**One-handed shooting.** On command the shooter will draw and fire 3 rounds, using both hands, then transfer the weapon to the strong hand only and fire 3 rounds in 10 seconds. Perform a reload (emergency, tactical, or magazine exchange) and re-holster.  Draw and fire 3 rounds, using both hands, then transfer the weapon to the support hand only and fire rounds in 10 seconds. Perform a reload (emergency, tactical, or magazine exchange) and re-holster.

**Stage 5:** 15 Yards (12 rounds)

**2 handed shooting from the standing and kneeling position.** On command, the shooter will draw and fire 6 rounds from the standing position in 10 seconds. Move to a kneeling position. When the target edges, or command is given that threat has diminished, the shooter performs a reload (emergency, tactical, or magazine exchange) in 5 seconds and assumes a ready position. When threat reappears, or command to fire is given, fire 6 additional rounds from the kneeling position in 10 seconds. Officers with a magazine capacity of less than 12 rounds will have to conduct a tactical reload or magazine exchange at the end of this stage of fire to be prepared for stage 6.

**Stage 6:** 25 Yards (4 rounds)

On command, the shooter will take 1 step to the rear and 1 to the right of the barricade. (This is to simulate moving from a place in the open to a position of cover.) When the threat appears or command to fire is given, move to cover, draw and fire 2 rounds from the right-side standing barricade position, move to the right-side kneeling barricade and fire an additional 2 rounds 20 seconds. While in a position of cover, perform a magazine exchange.

**Stage 7:** 25 Yards (4 rounds)

On command, the shooter will take 1 step to the rear and 1 to the left of the barricade. When the threat appears or command to fire is given, move to cover and fire 2 rounds from the left side standing barricade position, move to the left side kneeling barricade and fire an additional 2 rounds in 20 seconds.

A total of 50 rounds will be fired with a maximum possible score of 250 points. Minimum qualification score is 200 out of 250 for 80 percent.

**Marksmanship Ratings.**

**220-230 = Marksman;**
**231-240 = Sharpshooter;**

**241-249 = Expert; and**
**250 = Distinguished Expert.**

**Appendix V: ICE Courses on Demonstration of Firearms Proficiency**    **Page 84**
LAW ENFORCEMENT SENSITIVE – FOR OFFICIAL USE ONLY

ICE 0084

**Five Shot Handgun Qualification Course**
**Only Authorized for Undercover Use**
(As of April 15, 2017)

**B.  Five Shot Handgun**

  **Firearms**: ICE-authorized five shot handgun

  **Ammunition**: 50 rounds

  **Target**: ICE QT Target

  **Course of Fire**:

All stages will be fired as a hot range. Once prepared for duty carry, the shooter will be responsible for maintaining full magazines throughout the course of fire, reloading on command and/or when otherwise necessary.

**Stage 1:** 1.5 Yards (5 rounds)

Strong hand only from the holster using the bent elbow position with the support arm/hand placed against the upper centerline of the officer's chest.

On command, the shooter will: Draw and fire 1 round in 2 seconds and re-holster. Draw and fire 2 rounds in 2 seconds and re-holster. Draw and fire 2 rounds in 2 seconds and re-holster.

**Stage 2:** 3 Yards (5 rounds)

Using two hands from the holster -- point shoulder shooting, referencing sights.

On command the shooter will: Draw and fire 3 rounds in the chest of the target in 3 seconds and re-holster. Draw and fire 2 rounds in 2 seconds, perform an emergency reload [or reload], cover the threat, scan left and right and re-holster.

**Stage 3:** 7 Yards (5 rounds)

Body armor and cover drills. Two handed shooting using the sights.

**Note**: In high search, you should have both eyes open, and your gun lowered enough that you can see the hands of the threat.

On command the shooter will: Draw and fire 2 rounds to the chest of the target and one 1 round to the head of the target in 5 seconds and assume a high search position. From high search, move to an aimed in position and fire 1 round to the chest of the target and 1 round to the head of the target in 3 seconds. Cover the threat, scan left and right, then re-holster. At the end of

---

LAW ENFORCEMENT SENSITIVE – FOR OFFICIAL USE ONLY
ICE 0085

this stage, the 2 head shot rounds must be in the 5-ring head area for each to count as five (5) points. The head area outside the 5 ring is worth 2 points.

**Stage 4:** 7 Yards (10 rounds)

**One-handed shooting**. On command the shooter will: Draw and fire 3 rounds, using both hands, then transfer the weapon to the strong hand only and fire 2 rounds in 10 seconds. Perform an emergency reload, using both hands, cover the threat, scan left and right, and re-holster. Draw and fire rounds, using both hands, then transfer the weapon to the support hand only and fire 2 rounds in 10 seconds. Cover the threat, scan left and right, and re-holster. Reload as required.

**Stage 5:** 7 Yards (10 rounds)

On command the shooter will: Draw and fire 5 rounds from the standing position in 5 seconds. When the target edges, or command is given that the threat has diminished, the shooter performs a reload in 8 seconds. When the threat reappears or the command to fire is given, fire 5 rounds from the standing position in 5 seconds. When the threat disappears or the command is given, cover the threat area, scan left and right, then re-holster prior to standing.

**Stage 6:** 15 Yards (10 rounds)

**Two-handed shooting from the standing and kneeling position.** On command, the shooter will: Draw and fire 5 rounds from the standing position in 10 seconds. When the target edges or the command is given that the threat has diminished, the shooter performs a reload in 8 seconds and assumes a kneeling position while maintaining the weapon at the low ready. When the threat reappears or the command to fire is given, fire 5 rounds from the kneeling position in 10 seconds. When the threat disappears or the command is given, cover the threat area, scan left and right, then re-holster prior to standing up.

**Stage 7:** 25 Yards (5 rounds)

On command the shooter will: Take one step to the rear and one to the left of the barricade.

When the threat appears or the command to fire is given, move to cover, draw and fire 2 rounds from the left side standing barricade position, move to the right-side barricade and fire 2 rounds, then move to the right-side kneeling position and fire 1 round, all in 25 seconds.

**A total of 50 rounds will be fired with a maximum possible score of 250 points. Minimum qualification score is 200 out of 250 for 80 percent.**

**Marksmanship Ratings.**

**220-230 = Marksman;**
**231-240 = Sharpshooter;**
**241-249 = Expert; and**

**250Distinguished Expert.**

LAW ENFORCEMENT SENSITIVE – FOR OFFICIAL USE ONLY

ICE 0087

**Rifle Qualification Course**
(As of April 15, 2017)

## C. Rifle Qualification Course

**Firearm**: ICE-authorized rifle

**Ammunition:** 50 rounds

**Target**: ICE QT Target

If a 100-yard range is not available, the ICE QT-R reduced targets may be used at 50 yards to simulate the one 100-yard stage.

**Course of Fire**:

All stages will begin with the magazine loaded, a round chambered, and the safety on. Prior to commencing fire, the firearm will be held at hip level with the muzzle pointed downrange at a 45-degree angle to the ground. On signal to commence fire, shooters will move into the appropriate firing position. Slings should be utilized. Prior to firing at the 7-yard line, Firearms Instructors must ensure that the impact area is clear of obstructions (*i.e.*, rocks, lead buildup, etc.) that might cause a bullet to ricochet toward the shooter. If metal turning or static frames are used, the 7-yard phase of the course should be fired at 15 yards. Start the course with one fully loaded 30 round magazine and have one magazine loaded 20 rounds available for reload.

**Stage 1:** 100 Yards (10 rounds)

Semi-automatic, standing to kneeling position, fire 5 rounds from kneeling, and 5 rounds semi-automatic from the prone position.

Time Limit: 60 seconds.

**Stage 2:** 50 Yards (15 rounds)

5 rounds, semi-automatic mode, from the standing position, fire 5 rounds semi-automatic in the kneeling position and 5 rounds semi-automatic from the prone position.

Time Limit: 40 seconds.

**Stage 3:** 25 Yards (10 rounds)

5 rounds, semi-automatic mode, from the standing position, reload fire 5 rounds semi-automatic in the kneeling position.

Time Limit: 15 seconds**.**

---

LAW ENFORCEMENT SENSITIVE – FOR OFFICIAL USE ONLY

ICE 0088

**Stage 4:** 7 Yards (6 rounds)

6 rounds, semi-automatic fire from the standing position.

Time Limit: 2 seconds for 2 shots beginning from the ready position, repeated for a total of three iterations.

**Stage 5:** 7 Yards (9 rounds)
9 rounds, burst fire from the shoulder in the standing position.

Time Limit: 6 seconds.

**Note: For those weapons that are only capable of semi-automatic operation, fire 9 shots in 6 seconds, semi-automatic at this stage.**

A total of 50 rounds will be fired with a maximum possible score of 250 points. Minimum qualification score is 200 out of 250 for 80 percent.

**Marksmanship Ratings.**
**220-230 = Marksman;**
**231-240 = Sharpshooter;**
**241-249 = Expert; and**
**250 = Distinguished Expert.**

**D. Shotgun Qualification Course**
  **Firearms**: Service-authorized shotgun

  **Ammunition**: Five (5) Rounds of Rifled Slug and Ten (10) Rounds of 00 Buckshot.

  **Target**: ICE Target

  **Course of Fire**:

All stages will begin with the magazine loaded with four (4) rounds, the chamber empty, hammer down and safety off. Prior to commencing fire, the shotgun will be held at hip level or in a low ready position with the muzzle pointed downrange. On the signal to commence firing, shooters will move into the appropriate firing position. Slings may be used by the shooter in any manner as long as they do not impede the shooter or create a situation which compromises the shooter's safety.

  **Note: Low Ready Position – Butt plate held against the shoulder with muzzle pointed down at a 45-degree angle.**

  **Stage 1: 25 Yards (5 rounds of rifled slug)**

  **Fired from the shoulder in the standing position**. This stage will begin with the shotgun at

---

the hip position. The shotgun will be loaded with four (4) rounds in the magazine only. The shooter will have one round available for reload. After firing four (4) rounds, the fifth round will be loaded through the open ejection port and fired.

Time Limit: **Twenty (20) seconds**.

Stage 2: 15 Yards (5 rounds of 00 buckshot)

Fired from the shoulder in the standing position. The start position will be the same as Stage 1. In this stage the officer will load the shotgun with three (3) rounds of buckshot and have two (2) rounds available for tactical reload. On command the officer will fire two (2) rounds, tactical reload with two (2) rounds (loading through the magazine with the weapon pointed at the threat), and fire the remaining three (3) rounds.

Time Limit: **Twenty (20) seconds**.

Stage 3: 7 Yards (5 rounds of 00 buckshot shot)

Fired from the shoulder after moving the shotgun from the low ready position. Firing and reloading sequence will be the same as Stage 1.

Time Limit: **Ten (10) seconds**

Note: Prior to firing Stage 3, Firearms Instructors must ensure that the impact area is clear of obstructions (i.e., rocks, lead buildup, etc.), that might cause pellets to ricochet toward the shooter.

A total of five (5) rifled slugs will be fired with a minimum of four (4) rifled slugs required to be in the four (4) ring or higher at twenty-five (25) yards (Stage 1). The ICE shotgun qualification course scoring consists of a total of five (5) slugs with a maximum possible score of 250 points.

The minimum qualification score is two hundred (200) points. For stages two (2) and three (3), proficiency is measured by the ability to accomplish the stated task in the allotted time. If an officer fails to accomplish these tasks as required by the course of fire, he or she will not have met the minimum proficiency requirement.

When range facilities permit, two (2) silhouette targets may be used per shooter, one (1) target for slugs, and one (1) for 00 buckshot. Additionally, shooters should be encouraged to utilize any cover available while firing the qualification course.

### Submachine Gun Qualification Course
(As of April 15, 2017)
### E. Submachine Gun Qualification Course

**Appendix V: ICE Courses on Demonstration of Firearms Proficiency**    **Page 90**
LAW ENFORCEMENT SENSITIVE – FOR OFFICIAL USE ONLY

ICE 0090

**Firearm**: ICE-Authorized Submachine Gun

**Ammunition:** 50 rounds

**Target**: ICE Target

**Course of Fire:**

All stages will begin with the magazine loaded, a round chambered, and the safety on. Prior to commencing fire, the firearm will be held at high port with the muzzle pointed downrange at a 45-degree angle to the sky. On signal to commence fire, shooters will move into the appropriate firing position.

**Shooters will be instructed to prepare (2) 15-round magazines and one (1) 20-round magazine. Load one (1) 20-round magazine at the 25-yard line.**

**Stage 1:** 25 Yards 5 rounds

**Barricade Shooting.** Semi-automatic, standing to kneeling position, fire 3 rounds standing strong-side barricade, 2 rounds kneeling strong-side barricade.

Time Limit:10 seconds.

**Stage 2:** 25 Yards (5 rounds)

**Barricade Shooting.** Semi-automatic, standing to kneeling position, fire 3 rounds standing support-side barricade, 2 rounds kneeling support-side barricade.

Time Limit:10 seconds.

**Stage 3:** 15 Yards (20 rounds)

Semi-automatic, standing to kneeling position, fire 10 rounds from the standing position in 10 seconds, reload with a 15-round magazine in 5 seconds and fire 10 rounds in the kneeling position in 10 seconds.

Time Limit: 25 seconds

---

**Appendix V: ICE Courses on Demonstration of Firearms Proficiency**     **Page 91**
LAW ENFORCEMENT SENSITIVE – FOR OFFICIAL USE ONLY

**Stage 4:** 7 Yards (10 rounds)

**Body armor and cover drills.** Semi-automatic, standing, fire 3 rounds center-mass and 2 rounds to the head. Reload with a 15-round magazine and remain at high search. Semi-automatic, from high search, fire 3 rounds center-mass and 2 rounds to the head.

Time Limit: 5 seconds for first string of fire. 3 seconds for second string of fire**.**

**Stage 5:** 7 Yards (6 rounds)


Shooters must return to the high port position and move the selector lever back to the safe position between 2 round pairs.

Semi-automatic, standing, fire 2 rounds in 2 seconds repeated 3 times.

Time Limit: 2 seconds per facing.


**Stage 6:** 7 Yards (4 rounds)

**Shooters must begin with the selector switch in the safe position.  Shooters cannot move to the automatic position until after the fire command has been given.**

Semi-Automatic (Automatic, if so equipped), standing, fire 4 rounds center-mass, semi-automatic-fire (automatic, if so equipped) from the shoulder.

Time Limit: 2 seconds.


**Marksmanship Ratings.**
**220-230 = Marksman;**
**231-240 = Sharpshooter;**
**241-249 = Expert; and**
**250 = Distinguished Expert.**

**ERO SRT**
**(As of 11/08/2019)        Tactical Observer Qualification Course (TOQC)**

**F. Special Response Team (SRT) Rifle/Specialized Weapons Qualification Course**

**Firearm**: ICE-Authorized Rifle

**Range:** 100, 50, and 15 yards

**Ammunition:** 20 rounds

**Target**: ICE QT Target with TO overlay

**Course of Fire:**

The course prescribes 6 hits on the TO head target and 14 hits on the TO upper torso target. Only shots within the light grey scoring area are scored as hits. To pass the TOQC, the shooter must: 1) Hit the scoring area of the TO head target with the cold bore shot; and 2) obtain a total score of 95%.

**Stage 1:** 100 yards (1 round)

**Clean/cold, bore shot.** Must be the first round after the rifle is properly cleaned, preferably the first shot of the day.

Start position standing rifle empty and cased round magazine in case as if retrieved from vehicle on call out. On start signal, shooter deploys rifle, loads and fires 1 round at TO head overlay in 1 minute. **This portion of the course is go/no-go. *If a hit is not scored, the course is failed.***

**Stage 2:** 100 yards (3 rounds)

**Body Armor/Cover Drill.** Start position prone supported, loaded, safety on, aimed in.

On start signal, shooter fires 2 rounds to TO upper center mass overlay (roughly 5 ring from bottom of (**X**) ring) up and one (1) round to TO head overlay in 10 seconds.

**Stage 3:** 100 yards (2 rounds)

**Seated supported.** Start position standing with material to build support (*any support including tri-pod butt on the ground)*. On start signal, shooter has 2 minutes to build position. At unknown random time, in the following 30 seconds the shooter will receive the signal to fire. On fire signal, the shooter has 10 seconds to fire 2 rounds at TO upper center mass overlay.

---

**Appendix V: ICE Courses on Demonstration of Firearms Proficiency**          **Page 93**
LAW ENFORCEMENT SENSITIVE – FOR OFFICIAL USE ONLY

ICE 0093

**Stage 4:** 50 yards (2 rounds)

**Stress Shoot.** Start position standing with clear rifle at the 100-yard line. On the start signal, run to the 50-yard line, assume prone supported, load, and fire 2 rounds at TO head overlay in 40 seconds.

**Stage 5:** 50 yards (6 rounds)

**Unsupported.** Start position loaded and safe, standing. At the start signal, engage TO center mass overlay with 2 rounds standing, 2 rounds kneeling, and 2 rounds seated, in 30 seconds.

**Stage 6:** 50 yards (3 rounds)

**Support side prone supported body armor/cover drill.** Start position support side prone supported, loaded, safety on, and aimed in. On start signal, the shooter fires 2 rounds to TO upper center mass overlay and 1 round to the TO head overlay in 10 seconds.

**Stage 7:** 15 yards (3 rounds)

**Incapacitation failure drill.** Start standing low ready 15-yard line loaded safe.

On start signal, engage from standing TO head overlay with 1) round using primary optic and 2) rounds TO center mass overlay using secondary optic in 7 seconds.

**HSI SRT**
**Sniper Rifle Qualification Course (SRQC)**

**(As of 01/25/2019**TBD**)**

**Firearm: ICE-**Authorized Sniper Rifle

**Range:** 100, 50, and 15 yards

**Ammunition:** Fifteen (15) Rounds

**Target: ICE QT Target with** SRT Sniper Head overlay and SRT Sniper Chest overlay

**Course of Fire:**

Total rounds for course are 15, including the cold bore shot. Shooters must attain a score of 95% or better and place the stage 1 Cold/Clean bore shot in the 4" oval to pass. A maximum of 4 rounds must strike in the 4" oval of the SRT Sniper Head overlay, and a maximum of 11 rounds must be in the SRT Sniper Chest overlay. A visible miss (off the shaded body of the ICE Qual target) is a DNQ. A fired round that is unaccounted for is also a DNQ.

Note: All stages of fire will begin with an "on command" call. This call may be a command to

---

**Appendix V: ICE Courses on Demonstration of Firearms Proficiency**      **Page 94**
<span style="color:red">LAW ENFORCEMENT SENSITIVE – FOR OFFICIAL USE ONLY</span>

ICE 0094

fire, whistle, turning of targets, or other unambiguous signal that is briefed to all shooters before the SRT Quarterly Qualification Course is begun. Timers used will start simultaneously with the "on command" call.

**Stage 1:** 100 yards (1 round)

**Cold bore shot**

**Time Limit**: 1 minute

**Target:** SRT Sniper Head Overlay, ICE TQT Target

The shooter starts from the standing position. Rifle is empty and, in the case, with a magazine in the case. On command, the shooter will deploy the rifle, load, and fire 1 round from any position desired (i.e., standing, kneeling, prone) through a cold/clean bore within 1 minute. This portion of the course is Pass/Fail. The shot must strike the 4" oval of the SRT Sniper Head overlay target.

**Stage 2:** 100 yards (3 rounds)

**Stress Drill**

**Time Limit:** 1 minute

**Target:** SRT Sniper Head and Chest overlays, ICE TQT Target

Shooter will start from the standing position with a clear and unloaded rifle. The rifle bipod is collapsed, scope covers are on, and dust cover is closed. Rifle and magazine will be carried by the shooter. On command, shooter will run a total distance of one hundred (100) yards. Shooter will return to the 100-yard line and assume a prone supported position. Shooter will load and fire 2 rounds at the SRT Sniper Chest overlay, and 1 round at the SRT Sniper Head overlay in a time limit of 1 minute.

**Stage 3:** 100 yards (2 rounds)

**Seated Supported**

**Time Limit: Twelve (**12) seconds

**Target:** SRT Sniper Chest overlay, ICE TQT Target

Shooter will start from the standing position, rifle on safe, with materials to build support. On command, the shooter has 2 minutes to build a seated, supported position. A fire command will be given within 30 seconds after those 2 minutes have elapsed. The shooter will have 12 seconds to fire 2 rounds at the SRT Sniper Chest overlay. All rounds must strike within the Sniper Chest overlay.

**Stage 4:** 50 yards (5 rounds)

**Unsupported**

---

**Appendix V: ICE Courses on Demonstration of Firearms Proficiency**       **Page 95**
LAW ENFORCEMENT SENSITIVE – FOR OFFICIAL USE ONLY

**Time limit: Thirty (**30) seconds

**Target:** SRT Sniper Chest overlay, ICE TQT Target

Shooter will start from the standing position, rifle loaded, safety on. On command, shooter will engage the SRT Sniper Chest overlay with 1 round standing, 2 rounds kneeling, and 2 rounds seated, within 30 seconds.

**Stage 5:** 50 yards (3 rounds)

**Support side prone drill**

**Time Limit: Twelve (**12) seconds

**Target:** SRT Sniper Head and Chest overlays, ICE TQT Target

Shooter will start from a support side prone position, rifle loaded, and on safe. On command, the shooter will fire 2 rounds at the SRT Sniper Chest overlay, and 1 round at the SRT Sniper Head overlay, within 12 seconds.

**Stage 6:** 15 yards (1 round)

**Rapid close-range drill**

**Time limit: Five (**5) seconds

**Target:** SRT Sniper Head and Chest overlays, ICE TQT Target

Shooter will start from the standing Low ready or High ready positions, rifle loaded, and on safe. On command, shooter will engage with one (1) round to the SRT Sniper Head overlay within 5 seconds.

---

**Appendix V: ICE Courses on Demonstration of Firearms Proficiency**
LAW ENFORCEMENT SENSITIVE – FOR OFFICIAL USE ONLY

ICE 0096

**APPENDIX VI – CONDUCTING COURSES OF FIRE AND SCORING TARGETS**

### A. Conducting Courses of Fire

1) Firearms Instructors must conduct demonstration of firearms proficiency courses of fire using a Hot Range unless prohibited by the specific range facility. A Hot Range requires officers to reload without command at the end of each string of fire unless instructed otherwise. Failure to reload prior to starting the next string of fire will not be an alibi.

2) Authorized Officers must keep their fingers outside of the trigger guard unless they are ready to fire. Officers should not anticipate the command to fire. All officers must stop firing when the CEASE FIRE command is given.

3) Authorized Officers must keep their firearms holstered, slung, or pointed in a safe direction downrange at all times.

4) The Ready Pistol, Ready Rifle, or Ready Shotgun position is 45 degrees down from the horizontal with the muzzle pointed downrange. (In such a manner as to not impact the ground, should a discharge occur, within 2 yards of the officer.)

5) Authorized Officers may not move forward to the firing line unless instructed to do so by the Firearms Instructor. If an Authorized Officer drops any item, including a firearm, cartridge, magazine, or speed loader, he or she may not pick up the item until instructed to do so by the Firearms Instructor. Once on the firing line, Authorized Officers must stay in place and not move away from the firing line unless instructed to do so by the Firearms Instructor. Authorized Officers must be prepared by having all necessary equipment with them when on the firing line. Firearms Instructors must ensure that all Authorized Officers are given clear instructions regarding all required equipment before instructing them to go to the firing line.

6) All loading and reloading must be done on the firing line and will be done from speed loaders, magazines, speed loops, dump pouches, or from the pocket. All loose ammunition must be carried in pockets or belt-mounted pouches. No ammunition boxes or other unauthorized paraphernalia will be allowed on the firing line.

7) All Authorized Officers must be issued eye and ear protection for use at all times while on the range when shooting is in progress. At their discretion, Authorized Officers may wear both earplugs as well as ear protection simultaneously. (This is encouraged at indoor ranges.) Ear protection and impact resistant eye protection are required by all attendees, regardless of their shooting or observing status. In cases where the range facility requires double ear protection, all shooters must maintain both inner and outer ear protection at all times while shooting is under way.

8) All Authorized Officers must write their name on their target.

LAW ENFORCEMENT SENSITIVE – FOR OFFICIAL USE ONLY

ICE 0097

9) Targets will be scored by a Firearms Instructor. Authorized Officers may not score their own target. The scoring officer will mark the score on the target and sign his or her name next to the score. Any disagreements will immediately be referred to the Firearms Coordinator for review.

10) Authorized Officers are required to fire the number of rounds specified in the demonstration of firearms proficiency course of fire in the time frames specified. Alibis are not allowed for failure to fire all rounds during the time allotted unless there is a mechanical failure of the firearm that cannot be remedied by an immediate action drill, to include ammunition malfunctions or other circumstances beyond the control of the officer.

11) Alibis will be granted solely in the case of mechanical failure of the firearm, ammunition malfunction, range system malfunction or other circumstances beyond the control of the officer.

12) The Four Rules of Firearms Safety are:

   a) Treat all firearms as if they are loaded.

   b) Always keep your weapon pointed in a safe direction.

   c) Keep your finger off the trigger and outside of the trigger guard until your sights are on target and you have made the decision to fire.

   d) Identify your target, your backstop and beyond.

13) Fingers must be obviously and visibly outside the trigger guard during loading, unloading, drawing, holstering, while moving (unless actively engaging targets), and during malfunction drills. Enforcement of safety violations of this nature, or any others, is the responsibility of the Firearms Instructor or their designee, as well as any other officers.

14) Shooting Positions. The shooting positions are defined as follows:

   a) Standing. The Authorized Officer will be upright, standing on both feet, shoulder width apart, square to the target with body upright and facing downrange. When firing, the Authorized Officer should assume a slightly forward-leaning posture, aggressive in nature, which will keep the firearm properly and consistently mounted from shot to shot and help mitigate perceived recoil.

   b) Kneeling. The Authorized Officer will have at least one knee on the ground (or floor), with the intended spirit of the drill to simulate taking low cover or shooting from that position should a foot or leg be disabled. Kneeling on both knees is authorized. No portion of the Authorized Officer's buttocks may be in contact with

---

LAW ENFORCEMENT SENSITIVE – FOR OFFICIAL USE ONLY

ICE 0098

the ground/floor. With a handgun, drawing should be completed prior to moving to the kneeling position. Re-holstering may be performed either standing, or if can be performed safely—while kneeling—in such a way that the muzzle of the firearm does not sweep the legs or feet of the officer. The academy requires all holstering from a kneeling position to be accomplished with both knees on the ground.

c) Prone. The Authorized Officer will be lying with the front of their body on the ground/floor, with their head situated downrange, facing the target, with their feet in the opposite direction.

d) Use of Cover. The Authorized Officer should endeavor to utilize as much cover as possible. This will vary from officer to officer.

15) Handgun Presentation.

a) Demonstration of firearms proficiency must be performed using a strong side directional-draw belt holster that is firearm specific. Firearm specific means that it is made for that particular firearm.

b) Firearms Instructors should require Authorized Officers to replicate their daily carry preferences as worn for duty or off-duty carry. All appropriate safety precautions must be followed by firearms instructors during exercises where holsters other than strong side directional-draw belt holsters are permitted due to the lack of uniformity in firearm presentation.

c) If an Authorized Officer has a holster with a mechanical retention device such as a thumb break, strap, rotating hood, etc., then that device must be activated and in place between each string of fire throughout the entire course of fire. The Authorized Officer may not "stage" or "prep" the holster by deactivating any mechanical retention device between strings. If an officer is found to be purposely violating this mandate, then all shots taken post-draw will be deducted from his or her overall score.

## B.    Scoring Targets

1) Positive Method

a) The "positive" scoring method must be used when scoring targets.

b) The positive scoring method requires that the Firearms Instructor count the number of bullet holes on the target, noting the number of holes in the individual scoring zones and areas, and multiplying the number of bullet holes by their respective scoring values, resulting in a total score.

---

LAW ENFORCEMENT SENSITIVE – FOR OFFICIAL USE ONLY

ICE 0099

c) All identifiable hits should be marked, whether inside or outside of the scoring area.

2) Scoring Areas. Stages 2 and 3 of the ICE handgun demonstration of firearms proficiency course requires shots to be fired in the head and chest areas, specifically. The head and chest areas are defined below:

a) Scoring shots to the head.

i) Prior to firing Stage 3 (the body armor and cover drills) of the ICE handgun demonstration of firearms proficiency course, all hits on the target should be identified and marked. This ensures that previous hits are not mistakenly identified as the head shots that are going to be required during Stage 3.

ii) The head on the ICE Qualification Target (ICE QT) is defined as the outside perimeter of the silhouette of the head, including the ears, and above the horizontal line of the 4 ring across the chin. The head scoring area contains a 5-point value area inside the 5 ring, and a 2-point value area in the remainder of the head. The portion of the chin below the horizontal line of the 4 ring is not considered part of the head for scoring purposes. (See figure 1).

iii) Upon completion of Stage 3 (the body armor and cover drills), head shots will be scored as 5, 2, or 0 points. Shots that were fired and intended for the head but impacted outside of the head scoring area should be marked at the conclusion of that stage of fire to prevent crediting the Authorized Officer for a missed head shot, and then referenced upon completion of the course of fire when the target is scored.

iv) Shots that were fired and intended for the chest that impacted inside the head scoring area should also be marked at the conclusion of that stage of fire to prevent giving credit to the officer for a missed chest shot, and then referenced upon completion of the course of fire when the target is scored.

v) Upon completion of Stage 3, there should be a total of 2 shots in the scoreable head area and 4 additional shots in the scoreable chest. (Note: Shots fired during this stage of fire must be in the prescribed order, as defined in the ICE handgun demonstration of firearms proficiency course of fire. If a Firearms Instructor has difficulty in determining the order in which the rounds impacted the target, the impacts will be scored as though they were fired in the correct order.

b) Scoring shots to the chest. The chest on the ICE QT is defined as any portion of the target within the silhouette not previously defined as part of the head.

3) Excessive shots/hits. If an Authorized Officer fires more than the prescribed number of rounds in a stage, the officer will receive the lower point value. In addition to receiving the lower point value, the officer will, of course, not have a sufficient

**Appendix VI: Conducting Courses of Fire and Scoring Targets**                    **Page 100**
LAW ENFORCEMENT SENSITIVE – FOR OFFICIAL USE ONLY

ICE 0100

number of rounds to complete the remainder of the course of fire, which will adversely affect their final score.

4) In cases where the Firearms Instructor has a score that he or she does not deem definitive or is in doubt, the Authorized Officer will be given an alibi, permitted to re-fire and the score in question will not be counted as a demonstration of firearms proficiency attempt.

5) The Firearms Instructor will attempt to account for all rounds, to include rounds that impacted the scoring surface of the target, rounds impacting the non-scoring surfaces, any misses, and any shots not fired.

6) In the event that the bullet hole touches more than one scoring ring, the Authorized Officer will receive the higher value of the 2 scores.

7) A round fired as the target is edging, if turning targets are being utilized, causing an elongated hole possibly covering several scoring areas is commonly known as an "oblique strike." In the event that an Authorized Officer fires an "oblique strike," the Firearms Instructor will first determine:

   a) If the Authorized Officer fired as the target was moving to an edged position. There may be an occasion where a target does not edge completely, and an Authorized Officer could fire after the time limit and still register an oblique strike. The instructor would have to witness this to verify that this occurred. In such cases, the shot should be scored as a miss and no credit given.

   b) If the round entered the front or back side of the target. Generally, this can be determined by the presence of a "dark ring," which is the dark outer edge of the bullet hole caused by the bullet making contact with the target.

   c) If the bullet was fired within the allotted time and entered the front of the target, the officer will receive the highest point value which shows a residual dark ring. If the hole in the target is twice the diameter of the bullet itself or larger, it will be presumed that the shot was fired after the allotted time and it will be considered a miss.

   d) If the bullet entered the side or back of the target and the dark ring from the entrance of the bullet is on the back side of the target, it would be a verified miss and no points are earned for the shot.

   e) Rips, cracks, or tears caused by the round impacting the target will not count as hits.

8) If an Authorized Officer fires a group of multiple rounds that make contact with each other, making it impossible to count rounds that made contact with the target, the "negative" scoring method may be utilized, and the Authorized Officer shooting the course of fire will receive the benefit of the doubt. (The "negative" scoring method

---

**Appendix VI: Conducting Courses of Fire and Scoring Targets**                    **Page 101**
LAW ENFORCEMENT SENSITIVE – FOR OFFICIAL USE ONLY

assumes that all the rounds not accounted for are attributed to the large hole created by multiple, overlapping impacts, and subsequently deducting impacts in lower scoring areas from the total possible score achievable, resulting in an overall score.)

9) In the event that the Authorized Officer does not achieve the minimum passing score, another Firearms Instructor will independently score the target to confirm the previous score. Should both instructors arrive at different scores, another instructor will score the target.

10) In the event that a passing score was not attained, the Authorized Officer will be given the opportunity to evaluate the target and verify the score. The officer may not touch or alter the target in any way.

11) In the event that an Authorized Officer does not achieve the minimum passing score a second time, a second Firearms Instructor, if available, should score the target to verify the score. When marking targets to verify and count bullet holes, different color writing instruments could be useful to distinguish between the first and second time the target was scored. Additionally, the target could be viewed from the rear side to aid in the location of bullet holes.

12) The Firearms Instructor in charge of the demonstration of firearms proficiency session will make the final determination regarding proficiency.

LAW ENFORCEMENT SENSITIVE – FOR OFFICIAL USE ONLY

ICE 0102

**APPENDIX VII – USE OF FORCE TRAINING REQUIREMENTS**

A. **Introduction**. Chapter 5 of the *Firearms and Use of Force Handbook* requires that Authorized Officers demonstrate proficiency in the use of firearms and intermediate force. The training that Authorized Officers must complete to meet the requirements of the Handbook are outlined in Sections C and D of this document.

B. **Time Allotted**. Authorized Officers will be provided 8 hours each quarter to complete the core requirements and an additional 8 hours each quarter to complete the enhanced requirements.

C. **Core Requirements**. All Authorized Officers are required to complete the core requirements within the timeframe established below. Authorized Officers will be provided 8 hours each quarter to complete the core requirements.

| Core Requirements | Frequency | |
|---|---|---|
| | Quarterly | Annual |
| **Demonstrate firearms proficiency** with each firearm that the Authorized Officer is authorized to carry (*i.e.*, ICE-issued firearm or ICE-approved, pow).<br><br>An acceptable level of firearms proficiency includes the following:<br>☐ Achieving a numerical score that is at or above the minimum required for passing;<br>☐ Demonstrating safe and proper handling techniques and manual dexterity required to safely holster and draw (if applicable), load, unload, and operate the firearm;<br>☐ Demonstrating safe loading, unloading, and handling of the firearm and ammunition; and<br>☐ Successfully completing one qualification course of fire in no more than two consecutive attempts. | X | |
| **Intermediate use of force weapons proficiency**: Baton Proficiency (DTE-011) and/or OC Spray Proficiency (DTE-0012), and/or, as applicable, Electro-Muscular Disruption Devices (EMDD) as applicable.<br><br>Authorized Officers will be provided training in the use of the expandable baton, OC spray and, as applicable, the EMDD. OFTP lesson plans will define and articulate the terms for "successful completion" of this training. The instructor will determine whether the Authorized Officer has fulfilled the requirements for participation and successfully completed the training in accordance with those lesson plans. | | X |

LAW ENFORCEMENT SENSITIVE – FOR OFFICIAL USE ONLY

ICE 0103

| | | |
|---|---|---|
| **DHS and ICE use of force policy training**: This includes recent policy changes, case law updates, reporting requirements, and related policies (*e.g.*, HSI Arrest Procedures Handbook and ERO Use of Restraints Policy). | | X |
| **Training in the Application/Use of Restraint Devices** by participating in ICE Compliant Handcuffing Positions (DTE-020). Authorized Officers will be provided training in the use of approved restraint devices. OFTP lesson plans will define and articulate the terms for "successful completion" of this training. The instructor will determine whether the Authorized Officer has fulfilled the requirements for participation and successfully completed the training in accordance with those lesson plans. | | X |
| **Annual Firearms and Sensitive Property Training:** Training on the safeguarding of weapons, armor, and ammunition. It also includes training on the DHS and ICE requirements for quarterly, semi-annual, and yearly inventory, and verification of certain types of sensitive property. | | X |

D. **Enhanced Requirements**. In addition to the core requirements that apply to all Authorized Officers, the following Authorized Officers must also complete the enhanced requirements annually:

1) Field first-line supervisory officers and agents;

2) Field non-supervisory officers and agents; and

3) Field officers and agents in managerial positions who plan to participate in enforcement actions as part of their duties. Note: Officers and agents in managerial positions must complete the enhanced requirements before participating in any planned enforcement action as part of their duties.

Officers and agents listed above (D.1 – 3) must complete the enhanced requirements even when they are assigned to HQ on a temporary duty assignment. The Special Agent in Charge or the Field Office Director is responsible for ensuring that all officers and agents in the field, including officers/agents in managerial positions who plan to participate in enforcement actions, complete these enhanced requirements.

Authorized Officers will be provided 8 hours each quarter to complete the enhanced requirements listed below.

| **Enhanced Requirements**<br>(Frequency: Annual) |
|---|

**Appendix VII: Use of Force Training Requirements**

LAW ENFORCEMENT SENSITIVE – FOR OFFICIAL USE ONLY

ICE 0104

| **Malfunction Clearing (FTE-001)** |
|---|
| Officer has fulfilled the requirements for participation and successfully completed the training in accordance with those lesson plans. |
| **One Handed Manipulation and One-Handed Malfunction Clearing (FTE-002)**<br><br>Authorized Officers will be provided training in the fundamentals of one-handed manipulation of the handgun. OFTP lesson plans will define and articulate the terms for "successful completion" of this training. The instructor will determine whether the Authorized Officer has fulfilled the requirements for participation and successfully completed the training in accordance with those lesson plans. |
| **Reduced Light Shooting (FTE-003)**<br><br>Authorized Officers will be provided training in fundamentals of reduced light shooting. OFTP lesson plans will define and articulate the terms for "successful completion" of this training. The instructor will determine whether the Authorized Officer has fulfilled the requirements for participation and successfully completed the training in accordance with those lesson plans. |
| **Extreme Close Quarters Shooting (FTE-004)**<br><br>Authorized Officers will be provided training in extreme close quarters shooting, including the importance of the individual balance of speed and accuracy. OFTP lesson plans will define and articulate the terms for "successful completion" of this training. The instructor will determine whether the Authorized Officer has fulfilled the requirements for participation and successfully completed the training in accordance with those lesson plans. |
| **Concealed Carry (FTE-005)**<br><br>Authorized Officers will be provided training on the purpose of concealed carry as well as the advantages and disadvantages of various types of holsters available for purchase. OFTP lesson plans will define and articulate the terms for "successful completion" of this training. The instructor will determine whether the Authorized Officer has fulfilled the requirements for participation and successfully completed the training in accordance with those lesson plans. |
| **Body Armor (FTE-006)**<br><br>Authorized Officers will be provided training regarding the maintenance, care, limitations, proper wear, and policy regarding their ICE-issued body armor. OFTP lesson plans will define and articulate the terms for "successful completion" of this training. The instructor will determine whether the Authorized Officer has fulfilled the requirements for participation and successfully completed the training in accordance with those lesson plans. |
| **Cover/Concealment (FTE-007)**<br><br>Authorized Officers will be provided training on the principles of cover and concealment. OFTP lesson plans will define and articulate the terms for "successful completion" of this training. The instructor will determine whether the Authorized Officer has fulfilled the requirements for participation and successfully completed of the training in accordance with those lesson plans. |

**Appendix VII: Use of Force Training Requirements**

LAW ENFORCEMENT SENSITIVE – FOR OFFICIAL USE ONLY

**Officer Down (FTE-009)**

Authorized Officers will be provided training in survival shooting skills and various officer down/disabled positions. OFTP lesson plans will define and articulate the terms for "successful completion" of this training. The instructor will determine whether the Authorized Officer has fulfilled the requirements for participation and successfully completed of the training in accordance with those lesson plans.

**Long Arms Transitions to Handgun (FTE-010) (if applicable)**

Authorized Officers will be provided training on the installation and use of the VTAC, MK1 or MK2 sling on the ICE issued M-4 carbine. OFTP lesson plans will define and articulate the terms for "successful completion" of this training. The instructor will determine whether the Authorized Officer has fulfilled the requirements for participation and successfully completed the training in accordance with those lesson plans.

**Basic Entry/Room Clearing Tactics and Techniques (TTE-001)**

Authorized Officers will be provided training in basic tactics and techniques used when conducting criminal warrant building entry and clearing techniques associated with a search and arrest warrant service. OFTP lesson plans will define and articulate the terms for "successful completion" of this training. The instructor will determine whether the Authorized Officer has fulfilled the requirements for participation and successfully completed the training in accordance with those lesson plans.

**Active Shooter Response (TTE-002)**

Authorized Officers will be provided training on how to locate, isolate, contain and/or eliminate an active shooter(s) in accordance with ICE policies and applicable local law. OFTP lesson plans will define and articulate the terms for "successful completion" of this training. The instructor will determine whether the Authorized Officer has fulfilled the requirements for participation and successfully completed the training in accordance with those lesson plans.

**Undercover (UC) Rescue from Vehicles and Structures (TTE-003) (HSI only)**

Authorized Officers will be provided training on the rescue of undercover officers or confidential informants. OFTP lesson plans will define and articulate the terms for "successful completion" of this training. The instructor will determine whether the Authorized Officer has fulfilled the requirements for participation and successfully completed the training in accordance with those lesson plans.

**Officer Down – Extraction of a Downed Officer (TTE-004)**

Authorized Officers will be provided training on the procedures necessary for the safe and effective extraction of a downed or disabled officer. OFTP lesson plans will define and articulate the terms for "successful completion" of this training. The instructor will determine whether the Authorized Officer has fulfilled the requirements for participation and successfully completed the training in accordance with those lesson plans.

**Spontaneous Edged Weapon Defense (DTE-019)**

Authorized Officers will be provided training on how to defend against a spontaneous edged weapon attack by an assailant. OFTP lesson plans will define and articulate the terms for "successful completion" of this training. The instructor will determine whether the Authorized Officer has fulfilled the requirements for participation and successfully completed the training in accordance with those lesson plans.

**Ground Prevention/Ground Escapes (DTE-017/DTE-018)**

Authorized Officers will be provided training on how to defend against an attempted take-down as well as various ground escape techniques. OFTP lesson plans will define and articulate the terms for "successful completion" of this training. The instructor will determine whether the Authorized Officer has fulfilled the requirements for participation and successfully completed the training in accordance with those lesson plans.

**Appendix VII: Use of Force Training Requirements**

LAW ENFORCEMENT SENSITIVE – FOR OFFICIAL USE ONLY

**Strikes (DTE-010)**

Authorized Officer will be provided training on how to use strikes against an attacker. OFTP lesson plans will define and articulate the terms for "successful completion" of this training. The instructor will determine whether the Authorized Officer has fulfilled the requirements for participation and successfully completed the training in accordance with those lesson plans.

**Retaining the Holstered Weapon (DTE-013)**

Authorized Officers will be provided training on how to maintain possession of a holstered weapon and effect a release once a subject has actually grabbed an officer's weapon. OFTP lesson plans will define and articulate the terms for "successful completion" of this training. The instructor will determine whether the Authorized Officer has fulfilled the requirements for participation and successfully completed the training in accordance with those lesson plans.

**Escorts/Take-downs (DTE-008)**

Authorized Officers will be provided training on basic escorts as well as the arm bar for take-down. OFTP lesson plans will define and articulate the terms for "successful completion" of this training. The instructor will determine whether Authorized Officer has fulfilled the requirements for participation and successfully completed the training in accordance with those lesson plans.

LAW ENFORCEMENT SENSITIVE – FOR OFFICIAL USE ONLY

ICE 0108

**APPENDIX VIII – GUIDELINES AND PROCEDURES FOR CANINE USE OF FORCE**

This appendix establishes the guidelines and procedures relating to the use of specially trained canines to apprehend subjects during law enforcement operations. Permissible canine use of force is limited to apprehension by biting and holding by Certified Canines.

Certified Canine Handlers who meet the requirements set forth in this Appendix may release a Certified Canine as a use of force in the course of their law enforcement duties in criminal law enforcement operations. Certified Canines may not be used to apprehend a subject for civil immigration violations. Only non-bargaining unit employees may serve as Canine Handlers. The release of a Certified Canine must comply with all applicable directorate-level policies, as well as current U.S. Department of Homeland Security (DHS) and U.S. Immigration and Customs Enforcement (ICE) policies, most notably use of force and canine policies. The release of a Certified Canine is considered an intermediate use of force. In addition to training required by other directives, Canine Teams must complete all initial certification training prescribed in this Appendix before the Canine Team can be authorized for use of force in an operational setting. Canines may be certified to perform non-use of force duties by other policy directives.

## A.    Definitions

1.  Approved Canine Training: Basic Canine Handler Training, maintenance training, and remedial training provided by Canine Instructors.

2.  Basic Canine Handler Training: An ICE Directorate-approved Basic Canine Handler Training course that selected and certified law enforcement officers or agents must complete in order to become a Canine Handler.

3.  Certified Canine: A canine that an ICE Directorate received, approved, accepted and certified for training or field use for apprehension of subjects.

4.  Canine Bite: Any incident in which a Certified Canine inflicts or is alleged to have inflicted physical injury by biting a person other than in a training environment.

5.  Canine Deployment: The movement of a Canine Team to a field location, operation, or scene, for the intended purpose of utilizing the canine in a law enforcement operation.

6.  Canine Handler: An ICE officer or agent who is assigned to handle a Certified Canine and who successfully completed Basic Canine Handler Training and possesses current certification with an assigned Certified Canine.

7.  Canine Instructor: A Canine Handler who successfully completed an ICE Directorate-approved canine instructor course or other non-ICE canine instructors approved by the ICE Directorate.

8.  Canine Release: The act of commanding a Certified Canine (while on or off lead) to perform a physical apprehension by biting and holding.

LAW ENFORCEMENT SENSITIVE – FOR OFFICIAL USE ONLY

ICE 0109

9. Canine Team: A Canine Handler and a Certified Canine that successfully completed the training and certification process together and possess a current certification with each other.

10. Certification: The process of testing a Canine Team and attesting to the fact that the Canine Team demonstrated the ability to meet minimum standards of competence required by agency and program policy and handbooks.

11. Maintenance Training: Time devoted exclusively to maintaining a Canine Team's proficiency. Maintenance Training is conducted during official duty hours.

12. Physical Apprehension: Any Canine Release resulting in the Certified Canine physically controlling a subject by biting and holding.

13. Recertification: The process of reaffirming that a Canine Handler, a Certified Canine, or a Canine Instructor demonstrated the ability to meet minimum standards of competence required by agency and program policy and handbooks.

14. Release Warning: A verbal announcement from a Canine Handler prior to a release command, notifying a subject of the intent to release the Certified Canine if the subject does not comply with instructions.

15. Remedial Training: Required training to address and correct deficiencies in a Canine Team that failed to recertify in the prescribed 12-month period.

## B.   Certification, Training, and Documentation

1. Canine Handlers are required to successfully pass a Directorate-approved Basic Canine Handler Training course and complete the operational certification process with their assigned Certified Canine.

2. Canine Teams are required to recertify in their practiced disciplines on an annual basis. The certification tests are administered on a Pass/Fail basis. Failure to meet the minimum training requirements will result in team decertification for use of force.

3. Annual certification tests will be proctored by a Canine Instructor designated by the Directorate. Specific testing criteria will be covered in directorate-level policies.

4. Each Canine Team will complete maintenance training in certification areas as required by their Directorate.

5. Each Canine Handler must receive annual training on the ICE Canine use of force policy, as outlined in this Appendix and any relevant policies issued hereafter.

6. Upon decertification of a Canine Team, that team must successfully complete a 40-hour remedial training course and pass a recertification test to return to operations. Failure to

recertify during the second attempt because of noted canine and/or handler deficiencies may result in a team separation as outlined in the Directorate's policy. Detailed guidelines for team separation based on failure to recertify must be stated in the Directorate policy. Training records will be documented and maintained in accordance with Directorate requirements.

### C.  Guidelines for Canine Deployment and Release

1.  Canine Handlers are responsible for the actions of their assigned Certified Canine at all times, both in the performance of their duties and during off-duty hours. Certified Canines shall not be left unattended in any area to which the public may have unrestricted access to the Certified Canine.

2.  Certified use of force trained Canine Teams may be deployed for any law enforcement operation as authorized by Directorate policy, and as permitted by ICE policy and this Appendix.

3.  Any release of a Certified Canine must always be necessary and objectively reasonable in view of the facts and circumstances confronting the Canine Handler. Canine Handlers should consider all facts and circumstances when deciding whether to release a Certified Canine, including but not limited to the severity of the offense, the subject's threat level to law enforcement officers or others (including whether the subject is restrained), and whether the subject is actively resisting or attempting to evade arrest, including by hiding or fleeing from law enforcement. For example, a handler should generally not release a Certified Canine for a subject who is restrained, absent extraordinary circumstances.

4.  The release of a Certified Canine must always comply with this Appendix and all current DHS and ICE use of force policies.

5.  The Canine Handler's evaluation that release is not appropriate will not be overridden.

6.  If practical, the Canine Handler will conduct a canine operations brief prior to deployment of the Certified Canine, to include:

    - Positioning
    - Perimeter and entry team procedures
    - Canine apprehension procedures
    - Injured handler procedures
    - Injured non-law-enforcement individual procedures and
    - Injured canine procedures

7.  Prior to releasing the Certified Canine to apprehend a subject, the Canine Handler or another law enforcement officer will give a clear and loud verbal release warning, taking into consideration factors such as communication barriers (traffic noise, music, etc.), distance between officer and the subject(s), and probable location of the subject(s). A reasonable amount of time should be given for any individuals in the area to comply with

LAW ENFORCEMENT SENSITIVE – FOR OFFICIAL USE ONLY
ICE 0111

commands prior to the Certified Canine's release. A release warning is not required during exigent circumstances, if tactically unfeasible, or if such announcement may endanger the safety of the canine or officers or agents.

The release warning shall contain the following information:

- The identity of person giving the warning
- To whom the release warning is directed
- What the individual(s) are being asked to do
- What will happen if the individual(s) do not comply

*Example:* **"This is the Police. If you are in the building/area/field/yard speak to me now or I will send the canine and he will find you."**

If practical this release warning should be conducted a minimum of three times.

*Example:* **"This is the Police. If you are in the building/area/field/yard, speak to me now or I will send the canine and he will find you."**

**"Second warning, this is the Police. If you are in the building/area/field/yard, speak to me now or I will send the canine and he will find you."**

**"Third and final warning, this is the Police. If you are in the building/area/field/yard speak to me now or I will send the canine and he will find you."**

8. The size of the structure or area should be taken into consideration when giving a release warning. If the structure or area is large, additional release warnings may be required.

9. After the decision is made to release a Certified Canine, the Canine Handler will constantly assess/evaluate the Certified Canine, the subject, and the situation to determine if a change in tactics, including discontinuing the release of the Certified Canine, is appropriate.

## D.  Reporting Requirements

1. When reporting a use of force incident involving a Certified Canine, authorized officers must follow all procedures outlined in the ICE Firearms and Use of Force Handbook for use of force reporting requirements. Supervisors are required to complete a Significant Incident Report (SIR) in the Significant Event Notification System (SEN), an ICE Use of Force, Assaults, and Discharge (UFAD) report and a memorandum containing a narrative description of the event. In addition to the information normally contained in a UFAD report, any injuries resulting from the use of a Certified Canine must also be documented and reported in the memorandum. Documentation must describe reported injuries, including photographs of the injuries after medical attention, the attending physician's identification information, and the physician's diagnosis and prognosis of the sustained

---

LAW ENFORCEMENT SENSITIVE – FOR OFFICIAL USE ONLY

ICE 0112

injuries.

2. Lost or stolen Certified Canines and equipment associated with the use of a Certified Canine shall be reported in accordance with ICE or Directorate policy, and DHS Instruction Manual 119-03-001-01, *Personal Property Asset Management Manual* (May 22, 2018).

3. The Canine Handler must report any bite, whether the bite occurred during or outside of an operational deployment, to their supervisor as soon as practical but no later than 24 hours from the incident.

4. All injuries sustained from a Certified Canine bite shall be documented to include photographs of the injuries taken at the time of the incident or as soon as possible thereafter. When practical, photographs should be taken after the individual receives medical attention, but prior to the application of bandages.

5. Canine bite injuries must be reported in accordance with the Reporting Requirements as set forth in Section D of this Appendix and Chapter 4 of the ICE Firearms and Use of Force Handbook 19009.1.

## E. Canine Bites

1. When a Certified Canine is released to apprehend a suspect and a bite occurs, the Certified Canine will be separated from the subject when it is safe to do so, taking into consideration the safety of all officers, any other persons at the scene, and whether the subject has been controlled.

2. Whenever an injury related to the deployment or release of a Certified Canine occurs, or there is a complaint of an injury, the following actions shall be taken:

   - Canine Handlers must seek medical assistance as soon as practical. If medical treatment is refused by the injured party, the Canine Handler or the commanding officer on the scene will advise the party that a doctor is the only qualified person who can determine whether treatment is necessary. Treatment refusal will be documented in the corresponding report.

   - The Certified Canine involved in the bite should be removed from the scene as soon as practical.

LAW ENFORCEMENT SENSITIVE – FOR OFFICIAL USE ONLY