**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | Civil Action No. |
| | : | 3:26-cv-758 (VDO) |
| v. | : | |
| | : | |
| STATE OF CONNECTICUT; NED | : | July 23, 2026 |
| LAMONT, Governor of Connecticut, in his | : | |
| official capacity; WILLIAM TONG, | : | |
| Attorney General of Connecticut, in his | : | |
| official capacity; PATRICK GRIFFIN, | : | |
| Chief State's Attorney of Connecticut, in | : | |
| his official capacity; and ELIOT D. | : | |
| PRESCOTT, Deputy Chief State's | : | |
| Attorney, Inspector General, in his official | : | |
| capacity, | : | |
| Defendants. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF**

**SAIFULLAH KHAN'S MOTION TO INTERVENE**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND ......................................................................................................................4

    A. Plain-clothes officers tased Mr. Khan seven times at the Ribicoff Federal Building, then held him past a release order..................................................................................4

    B. Public Act 26-14 gives victims of official violence a state-forum remedy and preserves officer accountability. ........................................................................................6

    C. The United States seeks relief broad enough to reach the whole Act, on a theory broad enough to erase it. ..............................................................................................7

ARGUMENT ..........................................................................................................................9

    I. MR. KHAN IS ENTITLED TO INTERVENE AS OF RIGHT. ...........................................9

        A. The motion is timely. ....................................................................................9

        B. Mr. Khan's interests are direct, substantial, and legally protectable............................10

        C. Disposing of this action in Mr. Khan's absence may impair those interests as a practical matter...................................................................................13

        D. No existing party adequately represents Mr. Khan's interest. ....................................15

    II. INTERVENTION WILL PUT BOTH GOVERNMENTS TO THEIR POSITIONS—ON SECTION 1, AND ON WHERE ANY JUDGMENT STOPS..........................................20

        A. As presently aligned, the case lets each sovereign avoid the questions that matter most to the people the Act protects...........................................................20

        B. Only Mr. Khan will insist that any judgment stop at the provisions actually adjudicated. ...................................................................................21

    III. IN THE ALTERNATIVE, PERMISSIVE INTERVENTION IS WARRANTED...........22

CONCLUSION.....................................................................................................................23

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ayotte v. Planned Parenthood of N. New England,*
   546 U.S. 320 (2006)..................................................................................................14, 22

*Berger v. N.C. State Conf. of the NAACP,*
   597 U.S. 179 (2022)..............................................................................................15, 16, 18

*Brennan v. N.Y.C. Bd. of Educ.,*
   260 F.3d 123 (2d Cir. 2001)........................................................................................13, 16

*Brockett v. Spokane Arcades, Inc.,*
   472 U.S. 491 (1985)...............................................................................................................22

*Butler, Fitzgerald & Potter v. Sequa Corp.,*
   250 F.3d 171 (2d Cir. 2001)................................................................................10, 16, 17

*California ex rel. Lockyer v. United States,*
   450 F.3d 436 (9th Cir. 2006) ..............................................................................11, 18, 19, 21

*Cameron v. EMW Women's Surgical Ctr., P.S.C.,*
   595 U.S. 267 (2022)...............................................................................................................20

*Egbert v. Boule,*
   596 U.S. 482 (2022)...............................................................................................................14

*FDIC v. Meyer,*
   510 U.S. 471 (1994)...............................................................................................................14

*Hollingsworth v. Perry,*
   570 U.S. 693 (2013)...............................................................................................................19

*In re N.Y.C. Policing During Summer 2020 Demonstrations,*
   27 F.4th 792 (2d Cir. 2022) .................................................................................................15

*Karcher v. May,*
   484 U.S. 72 (1987)..................................................................................................................19

*Khan v. Noem,*
   No. 3:25-cv-471 (D. Conn.).....................................................................................................4

*Khan v. Uccello,*
   No. HHD-CV-26-6228240S (Conn. Super. Ct., J.D. of Hartford) ...............................2, 11, 13

*Leavitt v. Jane L.,*
   518 U.S. 137 (1996) (per curiam)........................................................................................21

*Marino v. Ortiz,*
   484 U.S. 301 (1988) (per curiam).........................................................................................19

*MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n,*
   471 F.3d 377 (2d Cir. 2006)....................................................................................................9

*Oneida Indian Nation of Wis. v. New York*,
732 F.2d 261 (2d Cir. 1984)............................................................................13, 14

*Town of Chester v. Laroe Estates, Inc.*,
581 U.S. 433 (2017)..............................................................................................9

*Trbovich v. United Mine Workers*,
404 U.S. 528 (1972)................................................................................15, 16, 20

*United States v. Arizona*,
No. 2:10-cv-1413-PHX-SRB (D. Ariz. Apr. 5, 2011)........................................23

*United States v. California*,
No. 26-926, 2026 WL 1088674 (9th Cir. Apr. 22, 2026).................................7, 8

*United States v. California*,
No. 2:25-cv-10999 (C.D. Cal. filed Nov. 17, 2025) .............................................8

*United States v. California*,
No. 2:18-cv-490-JAM (E.D. Cal. June 4, 2018) .................................................18

*United States v. New Jersey*,
No. 3:26-cv-1770 (D.N.J. filed Feb. 23, 2026)....................................................8

*United States v. New York*,
No. 1:25-cv-744 (N.D.N.Y. Nov. 17, 2025) .........................................................9

*United States v. Pitney Bowes, Inc.*,
25 F.3d 66 (2d Cir. 1994).....................................................................................10

*United States v. Texas*,
No. 1:21-cv-796 (W.D. Tex. Sept. 28, 2021) ......................................................12

*United States v. Windsor*,
570 U.S. 744 (2013).............................................................................................19

*Va. House of Delegates v. Bethune-Hill*,
587 U.S. 658 (2019).............................................................................................20

*Wash. Elec. Coop., Inc. v. Mass. Mun. Wholesale Elec. Co.*,
922 F.2d 92 (2d Cir. 1990)...........................................................................10, 12

**Statutes and Legislative Materials**

28 U.S.C. § 1442(a)(1)...............................................................................................11, 14

28 U.S.C. § 2402...............................................................................................................14

28 U.S.C. § 2674...............................................................................................................14

28 U.S.C. § 2676...............................................................................................................14

42 U.S.C. § 1983........................................................................................................6, 7, 22

Conn. Gen. Stat. § 1-3..........................................................................................3, 14, 21, 22

Conn. Gen. Stat. § 51-277a................................................................................................8

Conn. Gen. Stat. § 51-277e................................................................................................8

Conn. Gen. Stat. § 53a-22 .............................................................................................................8

Conn. Gen. Stat. § 55-3 ..............................................................................................................12

Substitute Senate Bill No. 397, Public Act No. 26-14 ......................................................... passim

**Rules**

D. Conn. L. Civ. R. 7 ..............................................................................................................10, 24

Fed. R. Civ. P. 5(a)(1)(C) ............................................................................................................23

Fed. R. Civ. P. 12(b)(1)................................................................................................................8

Fed. R. Civ. P. 16........................................................................................................................12

Fed. R. Civ. P. 24 ................................................................................................................. passim

Fed. R. Civ. P. 26(f)....................................................................................................................10

## PRELIMINARY STATEMENT

This motion asks one question: whether the only person who has actually sued under the statute the United States seeks to dismantle may appear as a party to defend it. Saifullah Khan is that person. On May 9, 2025, plain-clothes ICE officers tased him—seven discharges, by the account in his pending administrative claim—inside the Ribicoff Federal Building in Hartford, moments after his own immigration hearing ended; the Government's own arrest record adds, "Subject has no criminal history." Section 1 of Public Act No. 26-14 gives "the party injured" by such a deprivation an action for redress, and Mr. Khan's Section 1 suit is pending now in the Connecticut Superior Court. The United States' theory here—that a State may not regulate federal officers "in any manner and to any degree"—would erase that claim, and its complaint "reserves the right" to bring the challenge that would do it. The State's defense, mounted by officials who on their own account enforce none of the challenged provisions, protects Connecticut's sovereignty—something that survives this case no matter how it ends. Mr. Khan's remedy may not. He asks to intervene on terms that cost the parties nothing: no discovery of his own without leave of Court, no continuances, no separate relief, the existing schedule kept to the day. Counsel asked the parties for their positions, and both governments oppose. On every substantive question in this case the sovereigns disagree; on whether the man the Act calls "the party injured" should be heard as a party, they speak with one voice. That alignment is not a reason to deny this motion. It is the reason Rule 24 exists.

The government's own records tell the story of that afternoon. ICE's arrest record reports that the officers had "waited for the hearing to finish"; that one of them, in plain clothes, then "aimed his taser at KHAN's back and initiated a probe deployment"; and that the discharges continued—seven in all, by the account in Mr. Khan's administrative claim—until "neuromuscular

incapacitation (NMI) was then achieved." Ex. B (Form I-213, May 9, 2025) ("I-213"), App. 4; Ex. C (Standard Form 95, presented Feb. 2, 2026) ("SF-95"), App. 8. (Citations to "App." refer to the single, consecutively paginated Appendix of Exhibits filed with this motion.) The same federal record contains this entry: "Subject has no criminal history." I-213, App. 4.

What followed is set out in the exhibits: a hospital evaluation that evening; transfer out of Connecticut, first to Plymouth, Massachusetts, and then to a federal facility in Philipsburg, Pennsylvania; a bond hearing at which the government argued that Mr. Khan's attempt to run from armed men in plain clothes, displaying no badge or insignia he recognized, showed that he was dangerous; an immigration judge's May 27, 2025 order releasing him on a $7,500 bond; and three further days of detention before he walked free on the evening of May 30, 2025. Exs. C–E, App. 7–21. The United States has since granted him asylum.

Nearly a year later, on May 4, 2026, Connecticut enacted Substitute Senate Bill No. 397, Public Act No. 26-14 (the "Act"). Section 1 makes "[e]very person, including a federal or state officer or employee," who subjects another to the "deprivation of any rights, privileges or immunities secured by the United States Constitution" while acting "under color of any statute, ordinance, regulation, custom or usage, of the United States or the state of Connecticut," liable "to the party injured in an action at law or other proper proceeding for redress." Act § 1(a). Eleven days after the Governor signed the Act, the United States filed this suit against portions of Sections 3 through 6—and told the Court, in its first footnote, that it "reserves the right to bring additional challenges in the future." Compl. 2 n.1. The complaint itself identifies where such challenges would lead: it quotes the Governor's statement that the Act secures "the right to sue federal agents who break the law." Compl. ¶ 33. Mr. Khan has now brought that suit. *Khan v. Uccello*, No. HHD-

2

CV-26-6228240S (Conn. Super. Ct., J.D. of Hartford) (the "Superior Court Action"); Ex. G (summons and complaint), App. 27–40.

Mr. Khan does not ask to enlarge this case or to slow it. He accepts the briefing schedule the Court has set, and he seeks one thing: to defend the statute under which he holds a remedy. Nor does he suggest that Connecticut's lawyers lack zeal. The point is narrower. This case will be litigated, and could be resolved, between two sovereigns whose interests are institutional, while the Act's central promise runs to victims. Mr. Khan is the person that promise describes. No party now before the Court holds his claim, and none may speak for it—and that will remain true after the elections of 2026 and 2028 have twice reset the incentives of the officials who defend the Act today, while Mr. Khan's claim is still in the courts.

The defendants' first response, filed July 13, 2026, sharpens the point. The State did not answer; it moved to dismiss the complaint in its entirety for lack of standing, ECF No. 30, on the ground that the officials the United States chose to sue lack enforcement authority over the provisions it challenges—the Governor, the Attorney General, and the Chief State's Attorney over any of them, and the Inspector General over Section 6—and that an injunction would redress nothing, because whatever happens here, Connecticut's State's Attorneys "can and will prosecute any federal officials who violate Connecticut's criminal laws." Mem. in Supp. of Defs.' Mot. to Dismiss, ECF No. 30-1, at 8–14, 31. It is a serious jurisdictional defense, and Mr. Khan's proposed Answer asserts the same objection. But it is a sovereign's defense. What it protects—the State's enforcement power—survives this case no matter what becomes of the Act's specific guarantees, and the motion presses that very point: the challenged provisions "proscribe" nothing, prosecutions by the Inspector General are "rare," and the State can enforce its criminal law without them. *Id.* at 17, 21 n.10, 31–32. What Mr. Khan holds does not survive that way. His claim rises or falls with

3

Section 1—and no party now defending this case holds such a claim, administers that section, or has mentioned it in any filing to date.

There is a further reason to grant this motion, developed in Part II below: intervention will give the Court what the present alignment cannot—candor about this case's edges. The United States reserves a challenge to Section 1 without bringing it; the State defends the Act without saying a word about where an adverse judgment should stop. With Mr. Khan present, both governments must take positions: the United States on whether its theory reaches the remedy he has invoked, and the State on the severability its own law presumes. Conn. Gen. Stat. § 1-3. Making both governments say where they stand is not a complication. It is clarity this case needs before it decides things it was not asked to decide.

The complaint is one of at least eight suits the United States has filed since June 2025 against state and local laws that regulate the masking, identification, and courthouse conduct of federal officers. All eight are contests between sovereigns. In the others, the people those laws protect have appeared only as amici curiae—organizations speaking for absent members, without claims of their own—and no private party has moved to intervene. The difference here is not an appetite for litigation. The difference is Section 1: it gives an officer's victim a claim, and Mr. Khan has one. It is also why Mr. Khan asks to be a party and not an amicus. A brief filed by leave can comment on a statute; it cannot answer for a claim. An amicus cannot plead a defense, cannot insist that a judgment stop at the provisions actually adjudicated, cannot object to a negotiated disposition, and cannot appeal. What Mr. Khan holds requires what only Rule 24 provides.

## BACKGROUND

The account that follows is drawn from ICE's own records, contemporaneous press coverage, the docket, and the Declaration of Saifullah Khan submitted with this motion ("Khan Decl.").

**A. Plain-clothes officers tased Mr. Khan seven times at the Ribicoff Federal Building, then held him past a release order.**

Mr. Khan is a citizen of Afghanistan who first came to the United States in 2011, as a scholarship student at the Hotchkiss School, and began his studies at Yale in 2012; his most recent entry into the country, in January 2015, was in F-1 student status. Ex. G, App. 29–30; I-213, App. 3. A Connecticut jury acquitted him in 2018 of the charges that had interrupted his studies—a fact ICE's own arrest record confirms: "KHAN was acquitted of those charges." I-213, App. 6. He has had an asylum application on file since June 2016, is married to a United States citizen, and lives in New Haven. On March 21, 2025, he sued the Secretary of Homeland Security in this District to compel adjudication of that long-pending asylum application. *Khan v. Noem*, No. 3:25-cv-471 (D. Conn.) (Dooley, J.). On April 3, 2025, U.S. Citizenship and Immigration Services closed his asylum case and issued a Notice to Appear, placing him in removal proceedings. I-213, App. 5.

On May 9, 2025, Mr. Khan appeared, as directed, for a hearing before Immigration Judge Ted Doolittle on the sixth floor of the Ribicoff Federal Building at 450 Main Street in Hartford. Five ICE officers knew he was there—Homeland Security Investigations had referred his case to Hartford ERO four days earlier—and, by their own account, "waited for the hearing to finish." I-213, App. 4. When Mr. Khan emerged into the elevator foyer, a plain-clothes deportation officer approached him. What happened next is recorded in the I-213 prepared by that officer, App. 4:

5

KHAN then yelled "NO!" and immediately fled on foot back towards EOIR. KHAN ignored repeated commands of, "STOP!" and "POLICE!" While ignoring Officer's commands, KHAN was repeatedly yelling "JUDGE!" and running towards a known to be occupied courtroom.

The same narrative describes the force that followed:

Officer Uccello then aimed his taser at KHAN's back and initiated a probe deployment, striking KHAN with ineffective deployments, as multiple darts hit only his suit jacket and another hit his belt, before striking him with effective deployments in the upper right portion of his back and the lower right portion of his back. It appeared that neuromuscular incapacitation (NMI) was then achieved . . . .

By the account in Mr. Khan's administrative claim, the officers discharged their Tasers seven times. SF-95, App. 8. A man running toward a courtroom, calling for a judge, was fired on from behind until his muscles seized. (The State's own opposition exhibits—FBI and Marshals Service alerts about criminals impersonating federal officers, ECF Nos. 31-10, 31-11—explain why a shouted word from an unbadged man in street clothes is not identification.) The I-213 reports that Mr. Khan had "no visible injuries aside from probe deployment locations"; within the hour he was reporting cardiac symptoms, and ICE summoned emergency medical services, which transported him to Hartford Hospital. I-213, App. 5. Immigration Judge Doolittle came out of his courtroom and questioned the officers; they told him not to interfere, and—according to the account Mr. Khan's immigration counsel later gave in open court—officers afterward described the judge to Mr. Khan as a traitor for challenging them. Ex. D (E. Mahony, Hartford Courant, May 22, 2025), App. 14.

ICE moved Mr. Khan out of Connecticut—first to Plymouth, Massachusetts, then to the Moshannon Valley ICE Processing Center in Philipsburg, Pennsylvania. On May 22, 2025, Immigration Judge Donald R. Ostrom heard his bond motion; on May 27, 2025, the judge ordered him released on a $7,500 bond. Mr. Khan was not released until the evening of Friday, May 30,

6

2025. Khan Decl. ¶¶ 9–10; Exs. D–E (CT Insider, May 30, 2025). No stay existed during those three days: DHS's own Notice of Appeal, filed June 6, 2025—a week after the release—records its answer of "No" to the form's question whether DHS had invoked the automatic-stay provision, and its emergency motion for a discretionary stay came only with that same filing. Ex. F (excerpts of DHS's June 6, 2025 bond appeal and simultaneous emergency stay motion), App. 23–25. His treating psychologist—whom he first saw in September 2023, and to whom he returned two months after these events—has diagnosed post-traumatic stress disorder. Khan Decl. ¶ 10. Since those events, the United States has granted Mr. Khan asylum; his application for adjustment of status to lawful permanent residence (Form I-485) is pending, and no removal proceedings are pending against him. On February 2, 2026, he presented a $70 million administrative tort claim to ICE under the Federal Tort Claims Act; it remains pending. Ex. C. His January 8, 2026 FOIA request for ICE's records of the incident likewise remains open, with no records produced. Mr. Khan's declaration recounts these events from the other side of the Taser. Khan Decl. ¶¶ 5–10.

**B. Public Act 26-14 gives victims of official violence a state-forum remedy and preserves officer accountability.**

The General Assembly passed Substitute Senate Bill No. 397 on May 1, 2026; the Governor signed it on May 4, 2026; and its operative provisions, including Section 1, took effect upon passage. Section 1(a) provides:

> Every person, including a federal or state officer or employee who, under color of any statute, ordinance, regulation, custom or usage, of the United States or the state of Connecticut, subjects, or causes to be subjected, any citizen of this state or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the United States Constitution, shall be liable to the party injured in an action at law or other proper proceeding for redress.

Section 1(b) authorizes "nominal damages, actual damages, compensatory damages, punitive damages, injunctive relief and other appropriate equitable relief," and directs that a

7

prevailing plaintiff recover reasonable attorney's fees and expenses unless special circumstances would make the award unjust. Act § 1(b). Section 1(c) instructs that courts construing the section "shall be guided by interpretations given by federal and state courts to 42 USC 1983," except that "an injured person may bring a claim against a federal officer or employee"; it preserves for every defendant "any applicable immunities or defenses under federal or state law"; and it provides that "federal officers or employees shall be immune to the same degree as an equivalent state officer or employee." Act § 1(c). The section works no expansion of liability standards: it borrows section 1983's, wholesale.

Other provisions reinforce that remedial design. Section 6(d) provides that an officer who commits one of the enumerated intentional torts while wearing a facial covering in knowing and willful violation of the statute "shall not be entitled to assert any privilege or immunity for such officer's tortious conduct against a claim of civil liability." Act § 6(d). Section 8 regulates civil arrests on courthouse grounds. And Sections 3 through 5—the principal targets of the complaint—address the investigation of deadly-force incidents and the standards governing justification. The United States challenges portions of Sections 3, 4, 5, and 6 only; it does not (yet) challenge Section 1. Compl. ¶¶ 3, 29; *id.* 2 n.1.

**C.  The United States seeks relief broad enough to reach the whole Act, on a theory broad enough to erase it.**

The complaint rests on a single doctrine, intergovernmental immunity, pressed at its widest: it opens by asserting that states are forbidden "from regulating the federal government *qua* government" in any manner and to any degree. Compl. ¶ 1 (quoting *United States v. California*, No. 26-926, 2026 WL 1088674, at *5 (9th Cir. Apr. 22, 2026)). On May 22, 2026, the United States moved for a preliminary injunction, supported by five declarations from federal law-

enforcement officials. ECF No. 12. At a June 2, 2026 conference, the Court declined to consolidate the preliminary-injunction proceedings with the merits, but observed that it would be "open to reconsidering its decision on consolidation" should the parties "agree to a temporary stay in enforcement of the challenged provisions." ECF No. 21. The Court set the defendants' responses to the complaint and to the preliminary-injunction motion for July 13, 2026, ECF No. 23; the remaining briefing dates were adjusted by order of July 22, 2026, ECF No. 40; and argument is scheduled for August 25, 2026, ECF Nos. 37–38.

On July 13, 2026, the defendants responded—not with an answer, but with a motion to dismiss the complaint in its entirety under Rule 12(b)(1) for lack of standing. ECF No. 30. The supporting memorandum argues that none of the named defendants—the Governor, the Attorney General, the Chief State's Attorney, or, as to Section 6, the Inspector General—has any connection with enforcement of the challenged provisions, enforcement of Connecticut's criminal law belonging instead to the thirteen State's Attorneys, none of them a party. ECF No. 30-1 at 8–14. It argues that Conn. Gen. Stat. §§ 53a-22, 51-277a, and 51-277e "'proscribe' nothing, are not 'enforceable,' [and] cannot be 'violated,'" *id.* at 17, and that no injunction entered here would redress the United States' asserted injuries, because "[e]ven if the IG's authority were enjoined, the primary enforcers of criminal law in Connecticut, the DCJ and State's Attorneys, can and will prosecute any federal officials who violate Connecticut's criminal laws." *Id.* at 31. The defendants the same day opposed the preliminary-injunction motion, supported by nine declarations, ECF No. 31, and Citizens for Responsibility and Ethics in Washington moved, on consent, for leave to file an amicus brief, ECF No. 29; the Court granted leave on July 16, 2026, ECF No. 35. And on July 14, 2026, the case was reassigned to Judge Vernon D. Oliver for all further proceedings. ECF No. 34.

9

The Connecticut complaint is one of a series. Materially similar suits—each invoking intergovernmental immunity against state or local laws addressed to federal officers' masking, identification, or courthouse conduct—are pending in at least five other jurisdictions. *See United States v. California*, No. 2:25-cv-10999 (C.D. Cal. filed Nov. 17, 2025) (masking and identification laws), *injunction pending appeal granted*, No. 26-926, 2026 WL 1088674 (9th Cir. Apr. 22, 2026); *United States v. New Jersey*, No. 3:26-cv-1770 (D.N.J. filed Feb. 23, 2026) (executive order restricting civil arrests near courthouses); *see also* the United States' complaints against New Jersey's and New York's officer-masking statutes and a Philadelphia ordinance (D.N.J., W.D.N.Y. & E.D. Pa. 2026). An earlier entry in the series, challenging New York's Protect Our Courts Act, was dismissed in November 2025. *United States v. New York*, No. 1:25-cv-744 (N.D.N.Y. Nov. 17, 2025). No private party has moved to intervene in any of them; the people the laws protect have appeared, where at all, as amici.

## ARGUMENT

### I.    MR. KHAN IS ENTITLED TO INTERVENE AS OF RIGHT.

On timely motion, the Court "must permit" intervention by anyone who "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). The Second Circuit reads the rule to require a timely application, an interest in the action, a risk that disposition will impair that interest as a practical matter, and representation by the existing parties that may prove inadequate. *MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n*, 471 F.3d 377, 389 (2d Cir. 2006) (setting out the four conditions for intervention as of right). Each requirement is met. A threshold note: because Mr. Khan seeks to intervene as a defendant, and asks nothing beyond the

10

denial of relief that the existing defendants already seek, he need not establish Article III standing of his own—that requirement attaches only to an intervenor who "pursue[s] relief that is different from that which is sought by a party with standing." *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 440 (2017). The standing contest framed by the defendants' motion to dismiss, ECF No. 30, concerns the plaintiff's burden, not the intervenor's; in any event, the interests described below would satisfy any measure. Nor is it "different" relief to ask that whatever relief the plaintiff obtains be confined to the provisions actually adjudicated: that is less relief for the plaintiff, not new relief for the intervenor. And if a measure were ever needed, Mr. Khan has one: a pending damages claim whose value this case's judgment directly threatens is a concrete and particularized interest; the threat is imminent rather than conjectural; it is traceable to the relief the United States seeks; and it would be redressed by that relief's denial or limitation. Mr. Khan does not fear for the Act in the abstract. He has a case number.

### A.    The motion is timely.

Timeliness turns on how long the movant knew of his interest, the prejudice to existing parties from any delay, the prejudice to the movant if intervention is denied, and any unusual circumstances. *United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 70 (2d Cir. 1994) (listing the four timeliness considerations). This motion comes just over two months after the complaint was filed on May 15, 2026, and ten days after the defendants' first response to it. No defendant has answered: on July 13, 2026, the defendants moved to dismiss the complaint for lack of standing, ECF No. 30, and opposed the preliminary-injunction motion, ECF No. 31, and briefing on both remains open under the schedule as adjusted by the Court's July 22, 2026 order. ECF Nos. 23, 28, 40. The Court has ruled on no contested motion; no discovery has been taken; the parties' Rule 26(f) report is not due until July 24, 2026, ECF No. 28; on July 14, 2026, the case was reassigned to this Court

11

for all further proceedings, ECF No. 34; and the only argument the Court has scheduled will be heard on August 25, 2026, ECF Nos. 37–38—by which date this motion can be fully submitted: the oppositions will come due in mid-August, D. Conn. L. Civ. R. 7(a)(2), and Mr. Khan will file any reply within three days of the second opposition, waiving the balance of the fourteen days allowed by D. Conn. L. Civ. R. 7(d). To the extent the clock is measured instead from notice of the threat—the Second Circuit asks when the movant "realized or should have realized" that his interest might not be adequately protected, *Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 182 (2d Cir. 2001)—notice arrived on July 13, 2026, when the defendants' first responsive filings confirmed that no existing party would brief severability or speak for Section 1, and this motion followed within ten days. Mr. Khan accepts the briefing schedule as it stands, seeks no adjournment of anything, and adds no briefing to the pending motions. A motion filed before any answer, while the case's first contested motions are still being briefed, prejudices no one.

### B.      Mr. Khan's interests are direct, substantial, and legally protectable.

A qualifying interest must be direct, substantial, and legally protectable—not remote or contingent. *Wash. Elec. Coop., Inc. v. Mass. Mun. Wholesale Elec. Co.*, 922 F.2d 92, 97 (2d Cir. 1990) (holding that an interest contingent on future events does not satisfy Rule 24(a)(2)). Mr. Khan's interests are of the most concrete kind the law recognizes: a cause of action he presently holds, and statutory protections that presently govern his continuing dealings with federal immigration authorities.

First, Section 1 of the Act confers on "the party injured" by a federal officer's constitutional deprivation a damages action in Connecticut's courts. Act § 1(a). Mr. Khan has commenced the Superior Court Action under Section 1 against the officers involved in the events of May 9, 2025. Khan Decl. ¶ 13; Ex. G (summons and complaint, *Khan v. Uccello*), App. 27–40. That claim is not

12

contingent or hypothetical: it is pending, and—through removal under 28 U.S.C. § 1442(a)(1) and the appeals likely to follow—it will be litigated for years. The validity and enforceability of the Act—"the property or transaction that is the subject of" this suit, Fed. R. Civ. P. 24(a)(2)—is its foundation. Second, the Act protects Mr. Khan prospectively. The United States has since granted him asylum—confirmation, from the government itself, of what was true on May 9, 2025—but his status remains in federal hands: his application for adjustment of status to lawful permanent residence (Form I-485) is pending, and he must continue to appear before federal immigration authorities in Connecticut in connection with it. Khan Decl. ¶ 11. Sections 6 and 8 regulate whether the officers he encounters at those appearances will be identifiable and whether the buildings where the government requires his presence remain safe for the people who attend them. Third, the United States has reserved "additional challenges" to "other parts of the Act." Compl. 2 n.1. On the complaint's own telling, the Act's point is "the right to sue federal agents who break the law," Compl. ¶ 33—which is to say, Section 1. A ruling embracing the government's theory would be the opening judgment against the remedy Mr. Khan holds.

The case law has protected less. In *California ex rel. Lockyer v. United States*, 450 F.3d 436 (9th Cir. 2006), California sued the United States over the Weldon Amendment, and the health-care providers the Amendment was written to protect moved to defend it. They held no enforceable rights under it—it is a spending rider—and both sovereigns opposed their intervention. The Ninth Circuit ordered them made parties aligned with the United States, because a government defending a statute may "abandon or concede a potentially meritorious reading" of it. *Id.* at 444. When the United States sued Texas over S.B. 8, would-be claimants under that statute moved to intervene as defendants; the United States opposed; the court granted both motions within a week. Order, *United States v. Texas*, No. 1:21-cv-796 (W.D. Tex. Sept. 28, 2021), ECF No. 40; *see id.*,

13

ECF Nos. 28, 31 (motions), 38 (opposition). The parties' positions here are the same: counsel for Mr. Khan asked, and the United States and the defendants alike oppose his intervention. The same was true in both of those cases—and in neither was it the answer. The movants in those cases held a statute's protection and a statute's promise. Mr. Khan holds the statute's cause of action, already in suit.

Wash. Elec., 922 F.2d at 97, is not to the contrary; it is the measure Mr. Khan satisfies. The interest that fails under that rule is one "contingent upon the occurrence of a sequence of events before it becomes colorable"—an interest that might never come to exist at all. *Id.* A filed, pending action is the opposite—a present legal interest, whatever its ultimate fate—and Rule 24(a)(2) does not ask whether the intervenor will win the claim he seeks to protect; that question belongs to the court where the claim is pending. Nor is the interest outside the "transaction" because the complaint names Sections 3 through 6 and not Section 1. The subject of this action is the Act and the premise the United States deploys against it—pleaded without a stated limit, against "any" state regulation of federal officers "to any degree." Compl. ¶ 1. The complaint's first footnote reserves the rest of the Act for later; its paragraph 33 identifies "the right to sue federal agents who break the law" as what the Act is about. A plaintiff cannot draft around Section 1, reserve the right to come back for it, and then call a Section 1 claimant a stranger to the case. The schedule sharpens the point rather than blunting it: the deadline to amend the pleadings has passed, ECF No. 2, so Section 1 cannot now be put in issue here without leave under Rule 16—yet the judgment the United States seeks rests on reasoning that would decide Section 1's fate anyway. An interest threatened by a case that cannot formally adjudicate it is exactly why Rule 24(a)(2) speaks of practical impairment.

14

Nor is this interest diminished because Mr. Khan's injuries predate the Act. Whether and how Section 1 reaches his claims is a question for the Superior Court in the first instance, and the answer is not foreordained against him: Connecticut's presumption against retroactivity, Conn. Gen. Stat. § 55-3, applies to substantive enactments, while provisions that are procedural or remedial are presumed to apply to pending matters—and Section 1, which creates no new duty of conduct but supplies a forum and a remedy for rights the Constitution secured all along, is at least colorably such a provision. Mr. Khan is making that argument in the court the legislature chose. On this motion, the governing rule is procedural: "[e]xcept for allegations frivolous on their face, an application to intervene cannot be resolved by reference to the ultimate merits of the claims which the intervenor wishes to assert following intervention." *Brennan v. N.Y.C. Bd. of Educ.*, 260 F.3d 123, 129–30 (2d Cir. 2001) (quoting *Oneida Indian Nation v. New York*, 732 F.2d 261, 265 (2d Cir. 1984)) (reversing the denial of intervention to individuals asserting personal rights in an action brought by the United States). If the United States believes Section 1 cannot reach the events of May 9, 2025, that is a defense for the officers in *Khan v. Uccello*—not a reason to resolve the question here, in Mr. Khan's absence, on an intervention motion. What matters under Rule 24(a)(2) is that this case may effectively answer it against him before any court has heard him.

As for timing: the Superior Court Action is new because the Act is new. Section 1 took effect on May 4, 2026, and was some ten weeks old when Mr. Khan sued under it. Promptness is the innocent explanation, and the true one. A person who receives a fresh remedy and promptly uses it has not manufactured an interest; he has done what the statute was passed for. And if promptness proved opportunism, the United States filed this case eleven days after the Governor's signature. Nor does the interest run on the electoral calendar: its value, and its exposure to this case's judgment, will persist across the administrations that hold office while it is litigated.

15

## C.     Disposing of this action in Mr. Khan's absence may impair those interests as a practical matter.

Rule 24(a)(2) asks only whether disposition "may as a practical matter impair or impede" the movant's ability to protect his interest. Three practical mechanisms are visible on this docket.

First, the judgment itself: the United States seeks a declaration and an injunction resting on a theory of intergovernmental immunity that voids any state law regulating federal officers "in any manner and to any degree." Compl. ¶ 1. A judgment adopting that premise decides the fate of Section 1 in everything but name.[1] And the threat lies in the judgment's breadth as much as its bottom line: remedies law directs courts to "try not to nullify more of a legislature's work than is necessary," *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006), and Connecticut law presumes severability, Conn. Gen. Stat. § 1-3—but neither of the defendants' July 13 filings so much as mentions severability, and the State, which defends the challenged sections as its own enforcement machinery, has little occasion to brief where an adverse judgment should stop. *See infra* Part II.B. The party with every incentive to hold the line at the provisions actually adjudicated is the one who holds a claim under a provision that is not.

Second, precedent: any Section 1 suit Mr. Khan files against federal officers will be removed to this District under 28 U.S.C. § 1442(a)(1), where the reasoning of the judgment in this case will be the controlling backdrop. The Second Circuit has recognized that the stare decisis effect of a judgment can supply the practical impairment Rule 24 contemplates, at least in unusual circumstances. *Oneida Indian Nation of Wis. v. New York*, 732 F.2d 261, 265–66 (2d Cir. 1984)

---

[1] There is no tension between this practical-impairment showing and Mr. Khan's joinder in the defendants' standing defense. Article III redressability asks whether the requested judgment would remedy the plaintiff's asserted injury through its operation on the parties; Rule 24(a)(2) asks whether a disposition may, "as a practical matter," impair an absentee's ability to protect his interest.

16

(finding impairment where the intervenors' claims would be litigated against the backdrop of the judgment below). The circumstances here are exactly that: same district, same statute, same officers, same constitutional theory. The United States will answer that Mr. Khan has his own forum—that after removal he can litigate the Act's validity fully in his own case. That is the problem, not the answer: he would litigate it under hostile in-district precedent he had no hand in shaping. Rule 24(a)(2) asks about practical impairment, not preclusion, and a full right to relitigate a question this Court has already answered is not protection. It is the impairment *Oneida* describes.[2]

Third, negotiated disposition: the Court has already noted that the parties might "agree to a temporary stay in enforcement of the challenged provisions." ECF No. 21. No such stay yet exists—the June 2 order stayed only the defendants' deadline to respond to the complaint, since reset. ECF Nos. 21, 23. But the invitation illustrates the structural gap. Section 1 is not enforced by the defendant officials at all; it is invoked by victims in court. The defendants' dismissal papers underscore the point: on the State's own account, no named official enforces the challenged provisions either, and even the relief the United States seeks would leave the State's enforcement power intact. ECF No. 30-1 at 8–14, 31. Provisions a sovereign can accurately describe as expendable are provisions a sovereign can afford to trade; no holder of a Section 1 claim could describe Section 1 that way. In any bargain between two sovereigns over enforcement, the one provision no defendant administers is the one no defendant has reason to protect, and a stipulation

---

[2] Nor would the administrative claim pending under the Federal Tort Claims Act, Ex. C, make the loss of Section 1 harmless. The FTCA allows no punitive damages, 28 U.S.C. § 2674, and no jury, *id.* § 2402; it runs against the United States, not the officers; a constitutional tort is not cognizable under it at all, *FDIC v. Meyer*, 510 U.S. 471, 477–78 (1994), and the *Bivens* remedy is now all but foreclosed, *Egbert v. Boule*, 596 U.S. 482 (2022); and the judgment bar of 28 U.S.C. § 2676 means a judgment on the federal claim can extinguish companion claims against the officers themselves—the two tracks are rivals, not substitutes.

drafted to cover the Act at large would shadow the Superior Court Action with no party who holds it at the table. The sovereigns may lawfully bargain; Rule 24(a)(2) exists so that what is theirs to trade does not include what is his.

### D.  No existing party adequately represents Mr. Khan's interest.

The burden on this element is minimal: the movant need show only that representation by the existing parties may be inadequate. *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972) (treating the required showing as minimal). And the Supreme Court has cautioned against presuming adequacy simply because a governmental party already defends the challenged law; a state's practical interests may require the participation of different voices with different perspectives on the same statute. *Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 181 (2022) (rejecting a heightened presumption of adequate representation and permitting intervention alongside the state's existing defense). The Second Circuit has since enforced that caution in terms: in *In re N.Y.C. Policing During Summer 2020 Demonstrations*, 27 F.4th 792, 795 (2d Cir. 2022), it reversed the denial of intervention as of right to the police officers' own union in the actions seeking declaratory or injunctive relief over NYPD protest policies, holding the union's interest impaired where the shape of any relief "could turn on political calculations" to which even the officer defendants "may not even be privy," *id.* At 802, and the City's representation—objective shared, incentives not—potentially inadequate under *Trbovich*'s minimal burden. *Trbovich* itself arose this way: a union member sought to join the Secretary of Labor's own enforcement suit; the Secretary answered that his representation sufficed; the Court disagreed, because the government in such litigation serves "two distinct interests, which are related, but not identical." 404 U.S. at 538–39.

18

Here, the State defends its sovereignty and its criminal-enforcement machinery—the Inspector General's investigative jurisdiction under Sections 3 and 5, the justification standards of Section 4. It holds no damages claim; it answers to institutional interests, including its continuing relations with federal law enforcement; and the Court's June 2 order shows that enforcement-stay compromises are already in the air. ECF No. 21. Mr. Khan's interest is personal, retrospective, and compensatory: the survival of a private remedy for injuries already inflicted. A sovereign may rationally trade enforcement timing for litigation advantage; no victim would trade his cause of action for either. *Cf. Brennan*, 260 F.3d at 133 (representation inadequate where the existing party "may, in short, behave like a stakeholder rather than an advocate" once settlement beckons). To say this is not to question the vigor of Connecticut's able counsel; it is to recognize, as *Berger* did, that governmental and private perspectives on the same statute can diverge without any failure of zeal. There is also a matter of proof: the United States supports its motion with declarations from five federal officials describing the dangers of identification and restraint, ECF No. 12, and the defendants opposed it with nine more, ECF No. 31. None of the fourteen declarations now on file speaks from the receiving end of the force those policies authorize. Mr. Khan's, submitted with this motion, does—from a federal courthouse, seven Taser discharges in. Khan Decl. ¶¶ 5–11.

Nor does *Butler Fitzgerald* raise the bar. That decision demands "a more rigorous showing of inadequacy" from a movant who shares an existing party's "same ultimate objective," a presumption rebuttable by evidence of "collusion, adversity of interest, nonfeasance, or incompetence." 250 F.3d at 179–80. Its premise is what is missing here. Adequacy is measured against the interest the movant actually asserts, and as to Mr. Khan's defining interests—the Section 1 claim in suit, and the severability that would confine any adverse judgment to the provisions actually challenged—the existing defendants are not representing those interests

19

inadequately; they are not representing them at all. The complaint does not challenge Section 1; no defendant administers it; the defendants' motion to dismiss does not mention it. And where the defendants and Mr. Khan do share an objective—the defeat of this complaint—the defendants' own filings measure the distance between a sovereign's reasons and a victim's. The State's motion argues that the United States' claimed injuries are not redressable because the challenged provisions are, to the State, dispensable: the justification defense is "a boon, not harm," ECF No. 30-1 at 19; prosecutions by the Inspector General are "rare," *id.* at 21 n.10; and even an injunction against the Inspector General "does not matter," because "the State retains the inherent authority, through its prosecutors, to enforce its criminal laws," *id.* at 31. The argument costs the State nothing: the State's ultimate interest—its sovereign enforcement power—survives whatever becomes of the Act. Mr. Khan has no sovereign power to retreat to; what this case may cost him is not one instrument among many but the only claim he holds. A shared caption is not a shared calculus, and the divergence of interest that *Butler Fitzgerald* contemplates is, on this docket, not conjecture but briefing. The same filing discloses that the defendants have already advised the United States which officials "would be proper parties" to a challenge to Section 6—an amendment the United States has so far "declined" to make, ECF No. 30-1 at 12 n.5, while reserving "the right to bring additional challenges" to the Act, Compl. 2 n.1. That is ordinary candor between sovereigns. It is also a working illustration of what this defense is calibrated to protect: an allocation of enforcement authority among state officials, not the remedy the Act extends to federal officers' victims. The motion's own best outcome completes the picture: a dismissal for want of jurisdiction—without prejudice—would resolve the State's problem in full and Mr. Khan's not at all, leaving the Act under the same constitutional cloud, the United States'

20

reservation of "additional challenges" intact, and the proper-party route to the next complaint already mapped.

The parties' response to this motion completes the record on adequacy. Counsel for Mr. Khan conferred with counsel for the United States and for the defendants; neither consents, and both oppose intervention. That is their right, and Mr. Khan draws no accusation from it. But the alignment is worth stating plainly: on the one question in this case that directly concerns the victims the Act protects—whether one of them may be heard as a party—the two governments that agree on nothing else in this litigation speak as one. A defendant fully aligned with an absentee loses nothing by his presence at the table; resistance to it is at least some evidence of the divergence Rule 24(a)(2) asks about. *Lockyer* arose in the same posture, over the same objection, from both sovereigns—and intervention was ordered. 450 F.3d at 444. And the divergence credited there was proved, not predicted—the United States had "already" advanced the narrowing construction in its own summary-judgment papers, *id.*—just as the dispensability the State urges and the challenge the United States reserves are litigating positions of record here, briefed and pleaded rather than conjectured. ECF No. 30-1 at 17, 21 n.10, 31; Compl. 2 n.1.

What has happened in the parallel cases points the same way. Across the series, the communities the challenged laws protect have filed amicus briefs; none has sought to become a party. This docket now has its own example: an amicus appearance by an accountability organization, granted on consent, ECF Nos. 29, 35—the right instrument for an organization's policy interest, and no instrument at all for a filed claim. The one court to deny party status to movants on the states' side did so on facts that mark the line. In *United States v. California*, two membership organizations moved to defend the California Values Act "on behalf of their members and clients," and the court—applying a Ninth Circuit presumption that a government defendant

adequately represents everyone sharing its "ultimate objective"—held that "the proper role for Intervenor-Defendants is as amici." Order at 1, 6, 12, *United States v. California*, No. 2:18-cv-490-JAM (E.D. Cal. June 4, 2018), ECF No. 164. That order says nothing about a movant who asserts no one's interests but his own, in a claim already filed; *Berger* has since rejected heightened presumptions of the kind it applied; and the same circuit holds that representation fails where the government's litigating choices may "abandon or concede a potentially meritorious reading of the statute"—where the difference "go[es] to the heart of the defense." *Lockyer*, 450 F.3d at 444, 445. An enforcement-stay bargain of the kind the June 2 order contemplates is such a choice. ECF No. 21.

For the same reason, it is no answer that Mr. Khan's perspective could be received the way CREW's was—by brief, as a friend of the court. He respectfully does not seek that role, because it cannot do this work. An amicus assists a court's judgment; a party protects his own rights within it. An amicus cannot plead defenses, cannot be heard as of right on the scope of relief, cannot object to a stipulated disposition, and cannot appeal: only parties, or those who properly become parties, may appeal an adverse judgment, and "the better practice is for such a nonparty to seek intervention for purposes of appeal." *Marino v. Ortiz*, 484 U.S. 301, 304 (1988) (per curiam). Each mechanism of impairment described above—the judgment, its precedential shadow, a negotiated disposition—operates at the level of party action, and can be answered only at that level. For an organization with a policy interest, an amicus brief is the right fit. For the holder of a filed claim, it is a seat in the gallery at his own trial.

The divergence has a temporal axis as well. The Act was passed in an election year; its defense rests, for now, with elected officials; and those offices will be contested in November 2026 and again in November 2028, while Mr. Khan's Section 1 case is still being litigated. To say so is

22

to predict nothing about any official and to criticize no one—it is a description of representative government. But litigating positions do change hands with administrations. The United States declined to defend the Defense of Marriage Act even while continuing to enforce it, leaving the defense to congressional intervenors. *United States v. Windsor*, 570 U.S. 744 (2013) (statute defended by the Bipartisan Legal Advisory Group after the Executive declined). California's officials declined to defend Proposition 8, and when the initiative's proponents tried to carry the appeal themselves, no one with Article III standing remained. *Hollingsworth v. Perry*, 570 U.S. 693 (2013) (dismissing the appeal because the proponents lacked standing). A statute's legislative defenders lost the capacity to defend it the day they left their offices. *Karcher v. May*, 484 U.S. 72, 74, 81 (1987) (holding that intervenor-defendants who defended a statute as presiding officers could not pursue the appeal after losing those offices). And the Supreme Court has lately treated the mid-litigation abandonment of a state law's defense as a problem intervention exists to solve. *Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267 (2022) (holding the attorney general should have been permitted to intervene on appeal after the official who had defended the law declined to seek further review); *cf. Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658 (2019) (dismissing an appeal where, after the attorney general declined to appeal, the remaining would-be defender lacked standing).

Rule 24 does not require Mr. Khan to wait for that history to repeat itself and then ask leave to pick up a dropped defense; under *Trbovich*, the possibility is showing enough. Granting intervention now gives the Court an assurance no existing party can give: that whatever the political branches decide in 2026 or 2028, a party with a concrete, personal stake in the Act's validity—and in seeking review of any judgment touching his interests—will remain before it.

23

## II. INTERVENTION WILL PUT BOTH GOVERNMENTS TO THEIR POSITIONS—ON SECTION 1, AND ON WHERE ANY JUDGMENT STOPS.

### A. As presently aligned, the case lets each sovereign avoid the questions that matter most to the people the Act protects.

A case between sovereigns can be conducted ably, in good faith, and to final judgment without either sovereign ever stating a position on the questions that matter most to absent claimants. This one is being so conducted. The United States has challenged four sections, has "reserve[d] the right to bring additional challenges in the future," Compl. 2 n.1, and has built its complaint on a premise with no stated limit: that a State may not regulate federal officers "in any manner and to any degree." Compl. ¶ 1. On that framing, the United States need never say whether Section 1 stands or falls under its theory. It can take a judgment whose logic condemns the section while disclaiming any present challenge to it—and keep its reservation in hand for the day the judgment is safely on the books. But a litigant cannot have it both ways. It cannot hold a reserved challenge over the Act's central remedy and simultaneously insist that the person the reserved challenge threatens has no place in the case that will supply its reasoning.

The defendants' incentives run to a different silence. Their motion to dismiss is devoted to showing that the challenged provisions sit at the periphery of the State's power—that they "proscribe" nothing, that Inspector General prosecutions are "rare," that enjoining the Inspector General "does not matter" because the State's Attorneys will enforce Connecticut's criminal law regardless. ECF No. 30-1 at 17, 21 n.10, 31. That is able jurisdictional advocacy, and Mr. Khan's proposed Answer joins its conclusion. But a defense built on the dispensability of the challenged sections is not a defense anyone would build for Section 1, and neither of the defendants' July 13 filings mentions severability—or Section 1—at all. The State has no occasion to brief where an

24

adverse judgment should stop, because nothing the State ultimately depends on lies inside the blast radius. Everything Mr. Khan depends on does.

Intervention converts that double silence into positions. With Mr. Khan in the case, the United States will, as a practical matter, have to say whether its theory reaches Section 1: a disclaimer on the record would itself lift part of the cloud this case casts over the Superior Court Action, and an acknowledgment would confirm that the holder of a pending Section 1 claim is not adjacent to this case but at its center. Either answer clarifies the litigation; only a party with a stake in the answer will insist on one. The State, likewise, gains a co-defendant who has pleaded what it has not: that the Act's provisions are severable and that no judgment may run beyond the provisions actually adjudicated. Proposed Answer, Fourth Defense. Intervention exists for precisely this office—to keep a statute's fate from turning on the litigating choices of parties free to "abandon or concede a potentially meritorious reading" of it. *Lockyer*, 450 F.3d at 444. Putting the governments to their positions does not complicate the case. It makes sure the case is decided with its real consequences on the table.

### B. Only Mr. Khan will insist that any judgment stop at the provisions actually adjudicated.

Severability is a matter of state law, *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) (per curiam), and Connecticut has answered it by statute: if any provision of an act is held invalid, "such invalidity shall not affect other provisions or applications." Conn. Gen. Stat. § 1-3. Federal remedial doctrine runs the same way: a court should "try not to nullify more of a legislature's work than is necessary," *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006), because "the normal rule" is "partial, rather than facial, invalidation," *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985). The Act is built for that discipline. Section 1 is a

freestanding remedial provision: it borrows section 1983's standards wholesale, preserves every immunity and defense, and neither depends on nor cross-references the investigation, justification, masking, and courthouse provisions the complaint attacks. The United States' own charging decisions concede the sections' independence—it challenges four and leaves the rest, for now, alone. Compl. 2 n.1. But the premise it presses does not stop where its prayer does, and judgments have a way of being read for their premises.

Someone before the Court should therefore have the incentive, at every stage, to say where this judgment ends: that any injunction reach only the provisions and applications actually adjudicated; that any declaration be drawn no more broadly than the holding it announces; and that nothing entered in this case resolve—or be drafted loosely enough to appear to resolve—the validity of Section 1, which no pleading has put in issue. The United States will not say these things; breadth is its object. The State will not say them; its own motion argues that the challenged provisions barely matter, and a sovereign whose enforcement power survives any outcome has no client interest in arguing about where an adverse judgment ends. Mr. Khan will say them, because one section of this Act is the foundation of the only claim he holds. His proposed Answer pleads severability as a defense; his briefing, if remedy is ever reached, will press Conn. Gen. Stat. § 1-3 and *Ayotte*; and his presence assures the Court that the argument for a confined judgment will be made by a party entitled to make it—and entitled, if it is rejected, to appeal. That assurance costs the parties nothing. Its absence could cost Mr. Khan everything he has put in suit.

### III.    IN THE ALTERNATIVE, PERMISSIVE INTERVENTION IS WARRANTED.

Permissive intervention is available to anyone who, on timely motion, "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P.

24(b)(1)(B). Mr. Khan's defense of the Act's validity is not merely common to the main action; it is the main action. In exercising its discretion the Court considers "whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). There will be no delay: Mr. Khan will brief on the existing schedule, in a single consolidated memorandum, without new claims, without propounding discovery absent leave of Court, and without enlarging the briefing on the defendants' pending motion to dismiss, whose jurisdictional objection his proposed Answer already raises. He offers the conditions stated in the motion—no discovery propounded without leave, no continuances, consolidated and page-limited briefing, no separate hearing—as express terms of intervention. One clarification, so the conditions are not read for more than they say: as a party, Mr. Khan would be served with the papers the parties exchange, including discovery, Fed. R. Civ. P. 5(a)(1)(C)—a function of party status that imposes nothing on anyone—and if the Court should later open discovery, he would hold a party's ordinary rights, subject to the Court's control. That the parties withhold their consent does not change the calculus: Rule 24(b) turns on delay and prejudice, not permission, and there is none of either. What he adds is what the record otherwise lacks: the concrete, as-applied perspective of the one person the challenged statute was written about who is actually before a court, and—should the Court ever reach remedy—the severability briefing described in Part II.B that no existing party has an incentive to supply.

Permissive intervention has issued in this posture before. In the United States' challenge to Arizona's S.B. 1070, the district court let the Arizona State Legislature intervene as a defendant under Rule 24(b) on a motion filed seven months into the case, after a preliminary injunction had issued, because intervention "at this time will not unduly delay or prejudice the original parties."

Order at 1–2, *United States v. Arizona*, No. 2:10-cv-1413-PHX-SRB (D. Ariz. Apr. 5, 2011), ECF No. 148 at 2. Mr. Khan comes in early with unique interests that should be represented fully.

## CONCLUSION

The motion to intervene should be granted—on the conditions Mr. Khan has offered, if the Court finds them useful—and the attached Answer should be docketed. Mr. Khan respectfully asks that the motion be decided before the argument scheduled for August 25, 2026, ECF Nos. 37–38, so that the alignment of the parties is settled before the Court first hears this case. To that end, Mr. Khan will file any reply within three days of the second opposition, waiving the balance of the time allowed by D. Conn. L. Civ. R. 7(d).

Respectfully submitted,

THE PROPOSED INTERVENOR-DEFENDANT,
SAIFULLAH KHAN

By:  /s/ Alexander T. Taubes
Alexander T. Taubes, Esq.
470 James Street, Suite 007
New Haven, Connecticut 06513
Tel. (203) 909-0048
alextt@gmail.com
Federal Bar No. ct30100

28