UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, Plaintiffs, | : | |
| -against- | : | **MEMORANDUM & ORDER** |
| STATE OF CONNECTICUT *et al.*, Defendants. | : | 26-CV-758 (VDO) |

**VERNON D. OLIVER**, United States District Judge:

Incidents involving United States Immigration and Customs Enforcement ("ICE") agents have recently received national attention, and many Americans have expressed their opposition to the escalation of immigration enforcement in their communities. In response, some states have passed laws purporting to regulate federal law enforcement officers that operate within their borders, in an attempt to curtail what is perceived as an abuse of federal law enforcement power. Connecticut is one of those states. Sections 3, 4, 5, and 6 of its recently enacted law, Supplemental Senate Bill 397, enacted as Public Act 26-14 ("SB 397" or the "Act"), regulate federal officers' use of force and mandate that federal officers identify themselves and not wear face coverings in most circumstances. Federal officers are subject to civil and criminal penalties for deviation from Connecticut's standards.

But the Constitution's Supremacy Clause "prohibit[s] States from interfering with or controlling the operations of the Federal Government," and federal officers are immune from state prosecution when acting within the scope of their federal authority. *United States v.*

*Washington*, 596 U.S. 832, 838 (2022); *In re Neagle*, 135 U.S. 1, 75 (1890); *New York v. Tanella*, 374 F.3d 141, 146 (2d Cir. 2004).

Nonetheless, defendants, the State of Connecticut, Governor Ned Lamont, Attorney General William Tong, Chief State's Attorney Patrick Griffin, and Inspector General Eliot Prescott (collectively, "Connecticut" or "Defendants") move to dismiss the Plaintiff-United States' constitutional challenge to SB 397, principally arguing that the United States has no standing. The United States, in turn, moves for a preliminary injunction, arguing that SB 397 Sections 3, 4, 5, and 6 likely violate the Constitution's Supremacy Clause, will cause irreparable harm absent an injunction, and the balance of the equities and the public interest counsel in favor of an injunction.

The Court concludes that the challenged Sections of SB 397 likely violate the Supremacy Clause, and the Court further concludes that the United States has standing to challenge SB 397 and is warranted in attaining a preliminary injunction against most Defendants. But the Court also concludes that Attorney General William Tong is not a proper defendant to this suit, so he is dismissed from the case and cannot be enjoined from enforcing the law. The Court further concludes that while Inspector General Eliot Prescott is a proper party to this suit and that he can be preliminarily enjoined from enforcing Sections 3, 4, and 5 of the Act, he cannot be preliminarily enjoined from enforcing Section 6 of the Act.

## I. BACKGROUND

SB 397 seeks to regulate federal officers' conduct. But federal law already governs federal officers' conduct.

### A. SB 397 Regulates Federal Officers' Conduct.

On May 1, 2026, the Connecticut legislature passed SB 397, which Governor Lamont signed into law on May 4, 2026. Sections 3, 4, 5, and 6[1] of the Act took effect immediately.[2]

#### 1. Sections 3, 4, and 5

Sections 3, 4, and 5 of the Act regulate a "peace officer['s]" use of force while making an arrest or preventing escape, and these sections regulate federal agents directly by defining "peace officer" to include "any federal law enforcement officer as defined under 18 U.S.C. § 115(c)(1) and 34 U.S.C. § 50301(5)."[3]

Sections 3 and 5 grant Connecticut the authority to investigate and prosecute federal agents' use of force. Section 3(a)(2) provides that when an officer's use of deadly or physical force results in death, "the Division of Criminal Justice shall cause an investigation to be made" and the Connecticut Inspector General "shall" determine "whether the use of physical force by the officer was justifiable" under Connecticut law.[4] The same process applies if a person dies while in the custody of a federal officer.[5] If a death occurs, the Act provides that the Division of Criminal Justice and Inspector General "shall have the unrestricted right to access the scene and collect evidence," and they may seek injunctive relief in Connecticut state court if anyone "restricts" their right to access the scene and collect evidence—

---

[1] Section 3 amends Conn. Gen. Stat. § 51-277a. Section 4 amends Conn. Gen Stat. § 53a-22. Section 5 amends Conn. Gen Stat. § 51-277e. For ease of reference, each provision will be referred to by its section number in SB 397.

[2] *See* SB 397 §§ 3, 4, 5, 6 (stating "effective from passage").

[3] *See id.* at § 3(a)(1)(A); § 4(a)(1)(B) (same); § 5(a) (same).

[4] *Id.* § 3(a)(2); *id.* § 5(a).

[5] *Id.* § 3(a)(3)(A); *id.* § 5(a)(5).

regardless of whether only a federal officer was involved and whether the federal agents are also present at the scene investigating the same incident.[6] If Connecticut, through the Inspector General, determines that the use of force was unjustified[7] the "Office of the Inspector General shall prosecute" the case.[8]

Section 4 defines justifiable force. It provides that an officer is only justified in using force when the officer reasonably believes such use is necessary to "effect[] an arrest pursuant to a warrant," "prevent[] an escape from custody," or "defend himself or herself or a third person from the use or imminent use of physical force while effecting" an arrest or preventing an escape from custody, unless the officer knows "such warrant is invalid" or "that the arrest or custody is unauthorized."[9]

Section 4(c) goes further and provides that the use of force is justified "only" when the officer's "actions are objectively reasonable under the given circumstances."[10] Plus, the officer must "reasonably believe[]" deadly force is necessary to defend himself or a third party against "imminent use of deadly physical force," "reasonably determine[] that there are no available reasonable alternatives to the use of deadly force," and "reasonably believe[] that the force employed creates no unreasonable risk of injury to a third party," among other enumerated considerations.[11] More "factors to be considered" in evaluating whether deadly

---

[6] *Id.* § 3(a)(5)(B), (C).

[7] *Id.* § 3(c); *see id.* § 5(a)(2).

[8] *Id.*

[9] *Id.* § 4(a)(2), (b).

[10] *Id.* § 4(c)(1).

[11] *Id.* § 4(c)(1)(A), (B).

force was justified are provided in Section 4(c)(2), including whether the deceased "possessed or appeared to possess a deadly weapon," whether the officer "engaged in reasonable deescalation measures prior to using deadly physical force," and whether the officer's general conduct was "unreasonable" and "led to an increased risk of an occurrence of the situation that precipitated the use of such force."[12]

### 2. Section 6

Section 6 of the Act limits when federal officers[13] may wear face coverings and dictates when and how they must identify themselves to the public. Section 6(b) of the Act requires that "[a] peace officer, while carrying out the enforcement of laws of this state, any other state or the United States, shall not wear any facial covering or personal disguise while interacting with the public in the performance of such officer's duties[.]"[14] The few exceptions to the rule allow federal agents to wear masks for health, safety, or for an "active undercover operation or assignment," but only if wearing a facial covering in that undercover work is authorized by a supervisor or court.[15]

Section 6(c) requires that a federal officer be "clearly identified" by a "badge and name tag on the officer's uniform" when "conducting a planned arrest" or "interacting with

---

[12] *Id.* § 4(c)(2).

[13] Like Sections 3, 4, and 5, Section 6 of the Act applies directly to federal officers. *See* § 6(a)(1) (incorporating § 3(a)(1)(A)'s definition of "peace officer," which explicitly includes federal agents)

[14] *Id.* § 6(b).

[15] *Id.*

the public" in an official capacity.[16] The few exceptions involve undercover assignments, weather, or safety-related conditions.[17]

Any federal agent who violates either of Sections 6(b) or 6(c) "shall be guilty of a class D misdemeanor" which is punishable by up to 30 days in jail.[18] Section 6(d) also prohibits assertion of "any privilege or immunity" in civil tort cases if the agent was "wearing a facial covering or personal disguise in a knowing and wilful violation of this section."[19]

### B. Federal Law Already Regulates Federal Officers' Conduct.

The Constitution empowers the President to "take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3. This authority "extend[s] over the whole territory of the Union, acting upon the States and upon the people of the States." *Tennessee v. Davis*, 100 U.S. 257, 263 (1879). Given that "no single person could fulfill that responsibility alone, the Framers expected that the President would rely on subordinate officers for assistance." *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203–04 (2020). These subordinate agents inevitably "act within the States," including Connecticut. *Davis*, 200 U.S. at 263.

Federal law enforcement agencies are created by federal law. *See*, *e.g.*, 28 U.S.C. §§ 531 (Federal Bureau of Investigation), 561 (U.S. Marshals Service), 599A (Bureau of Alcohol, Tobacco, Firearms and Explosives); 6 U.S.C. § 252 (ICE); 6 U.S.C. § 211 (U.S. Customs and Border Protection). The heads of each agency have the power to govern the

---

[16] *Id.* § 6(c).

[17] *Id.*

[18] Conn. Gen Stat. § 53a26(d)(4).

[19] SB 397 § 6(d).

agency's affairs and direct their agents' activities. *See*, *e.g.*, 5 U.S.C. § 301 (authorizing the head of an Executive or military department to "prescribe regulations for the government of his department [and] the conduct of its employees"); 28 U.S.C. § 509 (vesting all functions of other officers, agencies, and employees of the Department of Justice in the Attorney General); 8 U.S.C. § 1103(a)(2) (authorizing the Department of Homeland Security Secretary to "control, direct[], and supervis[e]" all Department employees). The power to govern the agencies includes the power to determine how agents must conduct themselves when engaged in official duties. *United States v. Hoy*, 137 F.3d 726, 731 (2d Cir. 1998) (first citing 5 U.S.C. § 301; and then citing 28 U.S.C § 561(f)).

Federal law similarly empowers the Executive to provide for and dictate federal law enforcement officers' uniforms and equipment when carrying out their official duties. *See*, *e.g.*, 5 U.S.C. § 5901 (directing the head of each federal agency to furnish its employees a uniform or an allowance for a uniform); 29 U.S.C. § 668(a)(2) (requiring heads of federal agencies to, as part of their occupational safety and health programs, "acquire, maintain, and require the use of safety equipment, personal protective equipment, and devices reasonably necessary to protect employees").

SB 397 therefore purports to regulate federal officers' conduct that is already governed by federal law.

**C. Procedural History**

Eleven days after Governor Lamont signed SB 397 into law, the United States initiated this case by filing a complaint on May 15, 2026, that seeks declaratory and injunctive relief to invalidate Sections 3, 4, 5, and 6 of SB 397 as unconstitutional under the

Supremacy Clause.[20] The United States then moved for a preliminary injunction on May 22, 2026, citing a likelihood of success on the merits of the Supremacy Clause claim.[21] Defendants, in turn, moved to dismiss this case on July 13, 2026.[22] After briefing, this Court heard oral argument on both motions on September 3, 2026.[23] This Memorandum and Order follows.

## II. DISCUSSION

### A. The Supremacy Clause and the Doctrine of Intergovernmental Immunity

In the first decade following our country's independence, the fledgling republic quickly realized the necessity of a strong federal government with supremacy over the several states. At first, before the Constitution was ratified, the United States struggled under the Articles of Confederation. The Articles spawned an impotent federal government that was powerless to enforce its laws or levy taxes to help pay off its debts. In effect, the federal government was at the mercy of the individual states for both fiscal survival and policy enforcement.

The resulting instability threatened the newfound Union. In 1783, Continental Army soldiers demanding unpaid wages—a result of Congress's inability to raise funds—mutinied and staged a protest threatening the safety of Congress, at the time sitting in Philadelphia. Unable to protect itself with federal troops, Congress was forced to ask Pennsylvania for protection—but Pennsylvania refused—so Congress was forced to flee. Four years later, just

---

[20] *See* ECF No. 1 at 17.

[21] ECF No. 12.

[22] ECF No. 30.

[23] ECF No. 74.

miles from the Connecticut border in western Massachusetts, four-thousand rebels shut down courts across the region, took hostages, and attacked a federal armory in Springfield. Yet the federal government was powerless to respond, and Massachusetts was forced to put down the rebellion alone.

These events and others made it evident that a subordinate federal government was incompatible with a lasting, strong Union. So when the Framers gathered in 1787 to draft the Constitution, one of their objectives was to create a federal government capable of executing its mandates without state involvement or interference. The authors of *The Federalist Papers* wrote that the new federal government must possess an authority independent of, and superior to, the states. James Madison argued that without a superior federal government, federal law "would consequently be valid in some of the States, at the same time that it would have no effect in others," depending upon their respective policy preferences. THE FEDERALIST NO. 44 (James Madison). The result of such a scenario, Madison warned, is a "monster, in which the head [is] under the direction of the members." *Id.* Or as Alexander Hamilton put it, if the federal government's laws are not supreme, "[i]t is evident they would amount to nothing," because federal laws would otherwise be non-binding and merely "dependent on the good faith of the [states]." THE FEDERALIST NO. 33 (Alexander Hamilton).

To prevent such frustration of federal power, the Framers enshrined the principle of federal supremacy directly into the Constitution. Article VI, Clause 2—the Supremacy Clause—declares:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

The Supremacy Clause thus "prohibit[s] States from interfering with or controlling the operations of the Federal Government." *United States v. Washington*, 596 U.S. at 838. This principle is often referred to as the "intergovernmental immunity doctrine." *Id.*

As James Madison understood, nonetheless, it is inevitable in a republic of several states that any number of those states are certain to be dissatisfied with some—or many—federal policies and laws at any moment. *See* THE FEDERALIST NO. 44 (James Madison). And so—the Supremacy Clause notwithstanding—the states have often attempted to regulate the federal government. But the Supreme Court's response has always been the same: reaffirming that the states cannot interfere with the federal government's operations.

In *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819), the Supreme Court held that Maryland's taxation of the Second Bank of the United States unconstitutionally interfered with the federal government. Chief Justice Marshall wrote for the unanimous Court that, while states retained certain sovereign powers within their jurisdiction, "the states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government." *Id.* at 436. "This"—he continued—is "the unavoidable consequence of that supremacy which the constitution has declared." *Id.*

This is so even when the states vehemently disagree with federal policy and action. Just as Maryland unconstitutionally sought to impede the Second Bank of the United States' operations in *McCulloch*, the Supreme Court understood in *Davis*, that "[t]he legislation of a State may be unfriendly" to the federal government, and it may attempt to "affix penalties to acts done under the immediate direction of the national government . . . to paralyze [its] operations." 100 U.S. at 263. Try as the states may, however, they cannot succeed—because

"such an element of weakness" cannot "be found in the Constitution." *Id.* The federal government's "sovereignty . . . is supreme," so "[n]o State government can exclude [the federal government] from the exercise of any authority conferred upon it by the Constitution" or "obstruct its authorized officers against its will." *Id.*

If the rule were otherwise, there would be "a breakdown" of federal law enforcement nationally, due to "conflicts arising from inconsistent requirements" across the several states. *Mayo v. United States*, 319 U.S. 441, 445 (1943). Ultimately, "it is necessary for uniformity that the laws of the United States be dominant over those of any state." *Id.*

For these reasons, federal officers are immune from state prosecution when acting within the scope of their federal authority. *In re Neagle*, 135 U.S. at 75; *Martin v. United States*, 605 U.S. 395, 413 (2025) (collecting cases); *Tanella*, 374 F.3d at 152 (affirming the dismissal of an indictment against a Drug Enforcement Administration agent and holding that the agent is entitled to federal immunity under the Supremacy Clause). Guided by these enduring principles, the Court addresses the pending motions in turn.

### B. Connecticut's Motion to Dismiss

Connecticut moves to dismiss the United States' action in its entirety under Federal Rule of Civil Procedure 12(b)(1). Connecticut asserts that the United States lacks standing to contest SB 397 and further argues this case is not ripe. For the reasons that follow, the Court denies Connecticut's motion to dismiss as to all Defendants except Attorney General William Tong.

#### 1. Legal Standard

"A district court properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction if the court lacks the statutory or constitutional power to

adjudicate it," such as when "the plaintiff lacks constitutional standing to bring the action." *Cortlandt St. Recovery Corp. v. Hellas Telecomms.*, 790 F.3d 411, 416–17 (2d Cir. 2015) (cleaned up). "The plaintiff bears the burden of alleging facts that affirmatively and plausibly suggest that it has standing to sue." *Id.* (cleaned up). "[S]tanding cannot be 'inferred argumentatively from averments in the pleadings,' but rather 'must affirmatively appear in the record.'" *Martinez v. Malloy*, 350 F. Supp. 3d 74, 84 (D. Conn. 2018) (quoting *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 232 (1990)). In considering a Rule 12(b)(1) motion to dismiss, courts construe "the complaint in [the] plaintiff's favor and accept[] as true all material factual allegations contained therein." *Donoghue v. Bulldog Invs. Gen. P'ship*, 696 F.3d 170, 173 (2d Cir. 2012).

**2. Standing**

Connecticut argues that the United States lacks standing to contest the constitutionality of SB 397. "As the party invoking federal jurisdiction, Plaintiffs bear the burden of establishing Article III standing by showing three elements: (1) that they 'suffered an injury in fact,' (2) that the injury 'is fairly traceable' to Defendants' challenged conduct, and (3) that the injury 'is likely to be redressed by a favorable judicial decision.'" *Soule v. Connecticut Ass'n. of Schs., Inc.*, 90 F.4th 34, 45 (2d Cir. 2023) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). Plaintiffs need only demonstrate "general factual allegations of injury resulting from the defendant's conduct." *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

Here, Defendants directly challenge two of the three elements of standing: whether the United States suffered an injury in fact, and whether such an injury is redressable by their requested relief. Defendants also argue that the case should be dismissed because United

States has not named any proper defendants. Although Defendants do not directly present their proper-defendant arguments under the standing inquiry, the Court construes Defendants' proper-defendant arguments as a challenge to the traceability element of the standing inquiry.

For the reasons that follow, the United States has met its burden of demonstrating standing at the pleading stage against all Defendants except Connecticut Attorney General William Tong.

**a. Injury In fact**

The United States has suffered an injury in fact because SB 397 Sections 3, 4, and 5[24] regulate the actions of the federal government and therefore violate the Supremacy Clause, and a Supremacy Clause violation is an immediate injury to the sovereignty of the United States. *See Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000). Additionally, the United States has established that the Supremacy Clause violation here can cause federal officers to fear state prosecution for actions they take and decisions they make in the course of their federal service, which hampers the ability of the United States to enforce its laws.

Article VI, Clause 2 of the Constitution declares that "the Laws of the United States . . . shall be the supreme Law of the Land[,] . . . Laws of any State to the Contrary notwithstanding." In essence, the Supremacy Clause "prohibit[s] States from interfering with or controlling the operations of the Federal Government." *United States v. Washington*, 596

---

[24] Connecticut appears to concede that SB 397 Section 6 causes the United States an injury in fact and would be redressable by a favorable judicial decision. Connecticut therefore does not argue that the United States has standing to challenge Section 6 if the traceability element of standing were also satisfied as to Section 6.

U.S. at 838. "No State government can . . . obstruct [the federal government's] officers against [the United States'] will." *Davis*, 100 U.S. at 263.

Nonetheless, SB 397 Sections 3, 4, and 5 attempt to control and obstruct the operations of the federal government. Section 4 imposes restrictions on federal officers' use of force.[25] It provides numerous standards under which federal officers' use of force are considered "reasonable" and therefore "justified."[26] Section 3, meanwhile, requires any federal officers' use of force resulting in death or any use of deadly physical force to be investigated by the Connecticut Division of Criminal Justice, and it tasks the Connecticut Inspector General with determining whether that use of force was justifiable.[27] Section 3 further mandates that the Connecticut Inspector General's office "shall prosecute" any case where the Inspector General "determines that . . . the use of force by a peace officer was not justifiable."[28] Section 5 provides that the Inspector General shall investigate peace officers, in accordance with Section 3, and prosecute peace officers in cases where the use of force was found not to be justifiable under Section 4.[29] In short, Sections 3, 4, and 5 attempt to hold federal officers to Connecticut's use of force standards, and the Sections direct state officials to prosecute federal officers when those use of force standards are not met. That is quintessential regulation of federal officers' conduct.

[25] SB 397 §§ 4(a)–(d); *see also id.* § 3(a)(1)(A) (defining "Peace officer" to include "any federal law enforcement officer as defined under 18 USC 115(c)(1) and 34 USC 50301(5)").

[26] *See*, *e.g.*, *id.* § 4(b).

[27] *Id.* § 3(a)(2).

[28] *Id.* § 3(c).

[29] *Id.* § 5(a).

Sections 3, 4, and 5 therefore violate the Supremacy Clause—and that constitutional violation itself is an injury to the United States. Because "the Supremacy Clause gives the Federal Government a decided advantage in the delicate balance the Constitution strikes between state and federal power"—it "grants supreme status only to the Laws of the United States"—a violation of the Supremacy Clause effectively deprives the United States of its constitutional right to preeminence and freedom from state interference. *New York v. United States*, 505 U.S. 144, 159 (1992) (cleaned up); *Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. 299, 315 (2019) (cleaned up). And there is no question that "the alleged violation of a constitutional right triggers a finding of irreparable harm." *Jolly v. Coughlin,* 76 F.3d 468, 482 (2d Cir. 1996). It therefore follows that a violation of the Supremacy Clause constitutes an injury against the United States. Indeed, "[i]t is beyond doubt that the complaint asserts an injury to the United States" if it alleges an "injury to its sovereignty arising from violation of its laws." *Vermont Agency of Nat. Res.*, 529 U.S. at 771. And because "[t]he Constitution is the supreme law of the land," *United States v. Butler*, 297 U.S. 1, 62 (1936), a violation of the Constitution is thereby the greatest injury of all for standing purposes. The United States has suffered an injury in fact via the enactment of SB 397 Sections 3, 4, and 5.

Courts throughout the country have reached the same conclusion in similar cases. *See United States v. Missouri*, 114 F.4th 980, 985 (8th Cir. 2024) ("Interference with the federal government's interest in enforcing federal law is sufficient to establish that the Act's implementation injured the United States."); *United States v. California*, 173 F.4th 1060, 1069 (9th Cir. 2026) ("[I]rreparable harm necessarily results from allowing California to enforce a law invalid under the doctrine of intergovernmental immunity."); *United States v. Virginia*, No. 3:26-CV-545, 2026 WL 1909995, at *12 (E.D. Va. July 2, 2026) ("[B]eing

subjected to a state law that regulates an activity that is constitutionally delegated to the federal government is an infringement of the Supremacy Clause that constitutes an irreparable injury."); *cf. Stauffer v. Brooks Bros., Inc.*, 619 F.3d 1321, 1325 (Fed. Cir. 2010) ("The parties have not cited any case in which the government has been denied standing to enforce its own law.").

Connecticut counters that Sections 3, 4, and 5 do not proscribe any federal officer conduct at all and thus argues that the Act does not hamper the federal government nor violate the Supremacy Clause. In Connecticut's view, because the Act provides a reasonable force standard (that federal officers must abide by or risk prosecution), SB 397 instead provides an affirmative defense to the use of deadly force and consequently does not regulate federal officer conduct whatsoever. This framing is not persuasive. If federal officers do not abide by the complex reasonable force standards outlined in Section 4, the federal officers "shall" be prosecuted.[30] Before SB 397's enactment, federal officers operating in Connecticut were not subject to this reasonable force standard. That is, the Act imposes new conditions on how federal officers must operate or otherwise risk criminal sanctions. Regardless of how Connecticut frames the Act, it has "no power" under the Constitution to "burden" the federal government in such a way. *McCulloch*, 17 U.S. (4 Wheat.) at 436. And it is this violation that itself impinges on the United States' sovereignty and constitutes an injury in fact.

Even if the mere existence of SB 397, which infringes on the United States' constitutionally-derived supreme sovereignty, was insufficient to confer an injury in fact, the

[30] *Id.* § 3(c).

United States would still have standing to challenge the Act, because its law enforcement officers are under imminent threat of enforcement.

"[W]here a statute specifically proscribes conduct, the law of standing does not place the burden on the plaintiff to show an intent by the government to enforce the law against it." *Vitagliano v. Cnty. of Westchester*, 71 F.4th 130, 138 (2d Cir. 2023) (quoting *Tweed-New Haven Airport Auth.* v. *Tong*, 930 F.3d 65, 71 (2d Cir. 2019)). Instead, courts "presume such intent to enforce the law in the absence of a disavowal by the government or another reason to conclude that no such intent existed." *Antonyuk v. James*, 120 F.4th 941, 1006 (2d Cir. 2024) (cleaned up). Ultimately, "a plaintiff need not 'demonstrate to a certainty that [he] will be prosecuted under the statute to show injury, but only that [he] has an actual and well-founded fear that the law will be enforced against [him].'" *Kempner v. Town of Greenwich*, 562 F. Supp. 2d 242, 245 (D. Conn. 2008) (quoting *Vermont Right to Life Comm. v. Sorrell,* 221 F.3d 376, 382 (2d Cir. 2000)). After all, "[w]hen the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest . . . he should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Id.* (quoting *Vermont Right to Life*, 221 F.3d at 382).

Here, not only has Connecticut not disavowed its intention to enforce SB 397, it has expressly suggested that the law should and will be enforced. Governor Lamont proclaimed that SB 397 is "the law of the land here in the State of Connecticut," adding "this is what Connecticut is all about."[31] The Governor also posted on X: "Today I signed SB 397 into

[31] WFSB 3, *Ice protections bill signed by Gov. Lamont*, at 11:35–11:53 (YouTube, May 4, 2026), https://www.youtube.com/watch?v=5Z1etP04_As.

law. Connecticut will not stand by while federal agents violate the constitutional rights of our residents. Protected areas, accountability measures, and the right to sue federal agents who break the law."[32] And Connecticut Attorney General William Tong announced that the "passage of Senate Bill 397 reaffirms a simple truth. In Connecticut, no one is above the law, including federal immigration officials."[33] For its part, the United States has expressed its intention to direct its law enforcement officers to disobey the Act.[34] In all, the United States "has an actual and well-founded fear that" Connecticut will attempt to enforce SB 397 against federal officers, causing an injury sufficient to confer standing. *Kempner*, 562 F. Supp. 2d at 245 (quoting *Vermont Right to Life*, 221 F.3d at 382).

Moreover, the actual and well-founded fear of enforcement is likely to immediately hamper federal law enforcement officers in the exercise of their duties. Given the threat of enforcement, federal officers may hesitate before acting in intense, dangerous situations that require immediate decisive action. They may decide, either consciously or subconsciously, to ignore their federal directives and training and instead attempt to abide by the complex Connecticut use of force standard. They may be less willing to put themselves in situations that could potentially result in use of force, even when they are required to do so in their federal line of duty. Accordingly, the Court finds that SB 397 Sections 3, 4, and 5 are likely to negatively affect federal law enforcement officers in the discharge of their federal duties, which causes an injury to the United States.

---

[32] Governor Ned Lamont (@GovNedLamont), X (May 4, 2026, 1:02 PM), https://x.com/GovNedLamont/status/2051346777710968992 [https://perma.cc/Z5PV-2839].

[33] The Office of the Attorney General William Tong, *Attorney General Tong Praises Senate Passage of Bill 397* (April 14, 2026) [https://perma.cc/7Q5F-ZXUE].

[34] *See*, *e.g.*, ECF No. 54 at 21.

**b. Redressability**

The United States' Supremacy Clause injury is likely to be redressed by a favorable judicial decision here.[35] *Spokeo*, 578 U.S. at 338. Injunctive and declaratory relief would ensure that federal officers are no longer threatened with state prosecution for the acts they undertake in the course of their federal duties. A favorable judicial decision would thus allow federal officers to not second-guess the extensive federal training they have received, which is especially important in potentially dangerous situations involving use of force, where split-second decisions must be made, to which SB 397 applies. Just as importantly, a favorable judicial decision would immediately relieve the United States of the infringement on its sovereignty that SB 397's enactment has created via violation of the Supremacy Clause.

Connecticut submits that the United States cannot satisfy the redressability prong of the standing inquiry, however, because federal officers are still subject to the state's general criminal laws, even if SB 397 would no longer apply. But, as the United States correctly notes, Connecticut's redressability argument is a red herring.

It is true that "federal employees do not enjoy blanket immunity from criminal prosecution and are subject to state-law restrictions if their actions exceed federal authority or are not 'justified by [the] federal duty.'" ECF No. 30-1 at 29 (quoting *State v. Ivory*, 906 F.2d 999, 1002 (4th Cir. 1990)). Even when federal agents are authorized to act under federal law and are acting within the scope of their duties, the defense of federal immunity applies only if their actions included no more than what was "necessary and proper." *Tanella*, 374

[35] To repeat, Connecticut does not appear to challenge that an alleged injury caused by SB 397 would be redressable by a favorable decision, so the Court only analyzes redressability here in the context of Sections 3, 4, and 5.

F.3d at 147. A favorable judicial decision would not—and could not—change this rule. But that is not what the United States seeks in its pursuit of injunctive and declaratory relief. While federal officers will always be subject to state prosecution if their actions "*exceed* federal authority," ECF No. 30-1 at 29 (emphasis added), the United States instead seeks for its officers to not be subject to state prosecution for their actions undertaken *within* federal authority. SB 397 attempts to hold federal law enforcement officers to a new, and additional, Connecticut use of force standard. The United States seeks for its officers to instead be held to the federal standard—and the Supremacy Clause indeed mandates that the federal standard prevail to "protect[] federal operations from the chilling effect of state prosecution." *See Tanella*, 374 F.3d at 147; *see also In re Neagle*, 135 U.S. at 75 (federal officers are immune from state prosecution when acting within the scope of their federal authority). A favorable judicial decision will ensure that federal officers are no longer chilled by SB 397's standard while operating within the scope of their federal duties in Connecticut—even if they remain subject to prosecution if they stray outside the scope of their federal duties—so the United States' harm is redressable.

**c. Traceability and Proper Parties**

Connecticut additionally argues that the United States names improper defendants. The Court construes these arguments to target the traceability element of standing. As Connecticut notes, "Article III requires 'a causal connection' between the injury and each defendant's conduct." ECF No. 30-1 at 8 (quoting *Lujan*, 504 U.S. at 560). That is, "the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party." *Lujan*, 504 U.S. at 560 (cleaned up). "When a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular statutory

provision," therefore, "the causation element of standing requires the named defendants to possess authority to enforce the complained-of provision." *Greater Chautauqua Fed. Credit Union v. Marks*, 600 F. Supp. 3d 405, 423 (S.D.N.Y. 2022) (cleaned up). !

Connecticut's submits that Governor Ned Lamont, Attorney General William Tong, and Chief State's Attorney Patrick Griffin are improper defendants as to all claims because they "have no connection with enforcement of any challenged provisions" and so there is no causal connection between the United States' injury and each defendant's conduct as required to establish Article III standing.[36] Connecticut further argues that the State of Connecticut is an improper defendant, citing *Ex Parte Young*, 209 U.S. 123 (1908).[37]

Chief State's Attorney Griffin is responsible for "exercis[ing] all powers and duties with respect to the investigation and prosecution of criminal matters." CONN. GEN. STAT. § 51-277(a). Furthermore, he "shall take all steps necessary and proper to prosecute all crimes and offenses against the laws of the state." *Id.* § 51-277(b). And in some contexts, the Chief State's Attorney "may represent the state in lieu of a state's attorney for a judicial district in any investigation, criminal action or proceeding." *Id.* § 51-277(d)(3). Connecticut's argument that the Chief State's Attorney has "no connection with enforcement of any challenged provisions," so enjoining his enforcement would not redress the United States' injury,[38] is belied by the plain text of Connecticut's own statutes.

---

[36] ECF No. 30-1 at 8 (citing *Lujan*, 504 U.S. at 560).

[37] *Id.* at 12–13.

[38] *See id.* at 8.

The same goes for Governor Lamont. The Governor is the Chief Executive of Connecticut. He possesses "[t]he supreme executive power of the state" and is empowered to "investigate into, and take any proper action concerning, any matter involving the enforcement of the laws of the state and the protection of its citizens." CONN. GEN. STAT. § 3-1; *see also* CONN. CONST. art. IV § 5 ("The supreme executive power of the state shall be vested in the governor."). Contrary to Connecticut's assertion, Governor Lamont is absolutely connected to the enforcement of Connecticut laws like SB 397—Connecticut's statutes and constitution so provide.

Inspector General Prescott, meanwhile, has statutory authority "to prosecute any case in which the Inspector General determines a peace officer used force found to not be justifiable pursuant to [SB 397 Section 4]." CONN. GEN. STAT. § 51-277e. He is thus a properly named party to this case, given United States' challenge to SB 397 Sections 3, 4, and 5, which describe Connecticut's use of force standard and provide for criminal prosecution for deviation from the state's standard. Connecticut does not seem to dispute that the Inspector General is a properly named party, at least to the challenge against Sections 3, 4, and 5. The Inspector General and his authority to investigate and prosecute use of force incidents is indeed mentioned throughout SB Sections 3, 4, and 5. He cannot be dismissed from the case.

Attorney General Tong is situated differently. He "shall have general supervision over all legal matters in which the state is an interested party, except those legal matters over which prosecuting officers have direction." CONN. GEN. STAT. § 3-125. Because the Attorney

General does not have criminal prosecuting authority[39] he cannot aid in enforcing the challenged provisions of SB 397. The Second Circuit has instructed that when a state "Attorney General has no connection with the enforcement of" a challenged law, he "therefore cannot be a party to th[e] suit." *Mendez v. Heller*, 530 F.2d 457, 460 (2d Cir. 1976). Relying on *Mendez*, the Honorable Jeffrey A. Meyer concluded that the Connecticut Attorney General also cannot "be sued because of his authority 'to defend actions in which the state is interested,' because 'the Attorney General does so, not as an adverse party, but as a representative of the State's interest in asserting the validity of its statutes.'" *Beatty v. Tong*, 659 F. Supp. 3d 219, 232 (D. Conn. 2023) (quoting *Mendez*, 530 F.2d at 460).

Here, given that Attorney General Tong has no prosecutorial authority and the Second Circuit's counsel that his defense of actions in which Connecticut holds an interest (like this one) does not transform him into a proper party, *Mendez*, 530 F.2d at 460, the United States' harm cannot be caused by the Attorney General, so he is not a proper party to this suit unless the challenged Sections of SB 397 otherwise grant him some enforcement authority over those specific provisions. They do not—so Attorney General Tong must be dismissed from this action.

Connecticut finally submits that the State of Connecticut is not a proper defendant, relying in part on *Ex parte Young,* 209 U.S. 123 (1908), for the proposition that "a state officials' enforcement of an allegedly unconstitutional statute is, by definition, not

---

[39] There is one exception. Conn. Gen. Stat. § 20-341 allows the Connecticut Office of the Attorney General to prosecute certain criminal misdemeanors under the Connecticut Home Improvement Act.

attributable to the State itself."[40] That argument is without merit. *Ex Parte Young* dealt with sovereign immunity, specifically the Eleventh Amendment's limitations on *individuals* suing states. *See* 209 U.S. at 149. But the federal government is not so limited by the Eleventh Amendment. *See* U.S. CONST. amend. XI (restricting judicial power over suits by "Citizens" against the states). Indeed, as the United States did here, the federal government "bring[ing] suit in federal court against a State" is a well-recognized "method[] of ensuring the States' compliance with federal law." *Seminole Tribe of Fla. v. Florida.*, 517 U.S. 44, 71 n.14 (1996); *Mora v. New York*, 524 F.3d 183, 197–98 (2d Cir. 2008) ("the United States, in an action brought by the federal government, can sue state and local governments to ensure compliance"); *Barrett v. United States*, 853 F.2d 124, 130 (2d Cir. 1988) ("The federal government, of course may sue a state in federal court under any valid cause of action") (cleaned up); *Atl. States Legal Found. v. Babbit*, 83 F. Supp. 2d 344, 347 (N.D.N.Y. 2000) ("it is well-settled that the Eleventh Amendment does not preclude the federal government from bringing suit against states or their officers in federal court to ensure compliance with federal law"); *Torres v. Texas Dep't of Pub. Safety*, 597 U.S. 580, 618 (2022) (Thomas, J., dissenting) ("all agree that the United States could lawfully sue Virginia in federal court to secure an injunction requiring it to comply with federal law"). Connecticut is a proper defendant in this suit brought by the United States to enjoin a Connecticut law.

In all, the United States has standing against all Defendants except Connecticut Attorney General William Tong.

[40] ECF No. 30-1 at 13.

### 3. Ripeness

Connecticut further urges that this dispute is not "prudentially ripe."[41] In considering Connecticut's argument, this Court is mindful that the Supreme Court has "cast doubt on 'the continuing vitality of the prudential ripeness doctrine.'" *Civ. Rts Corps v. LaSalle*, 184 F.4th 104, 118 (2d Cir. 2026) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014)). The Second Circuit has correspondingly "emphasized that the Supreme Court's cautious approach to prudential ripeness is a reminder that the doctrine constitutes a narrow exception to the strong principle of mandatory exercise of jurisdiction." *Id.* (cleaned up). When the doctrine is still wielded, it "serves as a tool that courts may use to enhance the accuracy of their decisions and to avoid becoming embroiled in adjudications that may later turn out to be unnecessary or may require premature examination of, especially, constitutional issues that time may make easier or less controversial." *Id.* (cleaned up).

"To determine if a claim is prudentially ripe, a court asks two questions: (1) whether the claim is fit for judicial resolution and (2) whether and to what extent the parties will endure hardship if decision is withheld." *Id.* (cleaned up). The first prong of this inquiry, fitness, "is concerned with whether the issues sought to be adjudicated are contingent on future events or may never occur" and whether the court would "benefit from any further factual development" so that it can "be in [a] better position to adjudicate the issues in the future." *Am. Sav. Bank, FSB v. UBS Fin. Servs., Inc.*, 347 F.3d 436, 440 (2d Cir. 2003) (cleaned up). The second prong, hardship, "involves an evaluation of whether the challenged action creates a direct and immediate dilemma for the parties." *Id.* (cleaned up).

---

[41] *See* ECF No. 30-1 at 32.

Applied here, this case is ripe, because (1) this is a facial challenge to the constitutionality of SB 397 that involves purely legal questions for which no further factual development is required and (2) as previously outlined, SB 397's enactment has caused the United States hardship at this stage.

First, no further facts are needed to determine whether SB 397 violates the Supremacy Clause. The United States has brought a facial constitutional challenge to SB 397. As the Second Circuit has explained, "[a] challenge to the facial constitutionality of a . . . statute is a pure question of law. And . . . a purely legal question is eminently fit for judicial review." *United States v. Quinones*, 313 F.3d 49, 59 (2d Cir. 2002) (cleaned up). Likewise, "[a] pre-enforcement challenge to the facial validity of a law is normally fit for judicial review as of the law's enactment, because such challenges involve purely legal questions." *All. of Auto. Mfrs., Inc. v. Currey*, 984 F. Supp. 2d 32, 46 (D. Conn. 2013). Accordingly, here, where determining SB 397's facial constitutionality pre-enforcement involves analysis of SB 397, the Supremacy Clause, and federal courts' application of the Supremacy Clause alone, the question before the Court is purely legal in nature and thus ripe for review.

Connecticut contends that "a claim challenging a hypothetical prosecution under a hypothetical set of facts, circumstances, and charges is not ripe. . . . The question of whether an officer's actions are protected by Supremacy Clause immunity is highly factual and depends upon the circumstances presented to an officer at the time of an incident."[42] Connecticut frames the inquiry incorrectly. Additional facts are not needed, as Connecticut suggests, to determine whether "an officer's actions are protected by the Supremacy

[42] ECF No. 30-1 at 35.

Clause."[43] Rather, the mere fact that SB 397 purports to impose Connecticut standards, at risk of prosecution, on federal officers in the exercise of their federal duties violates the Supremacy Clause—full stop. *See, e.g.*, *McCulloch*, 17 U.S. (4 Wheat.) at 436; *In re Neagle*, 135 U.S. at 75. And while it is true that a full factual contour would be needed to determine whether a federal officer's use of force was reasonable under Connecticut's standard—this indeed proves the point. A federal officer acting within the scope of his federal duties cannot be certain that he is abiding by a state use of force standard. The Supremacy Clause forbids this scenario, and so no additional facts are needed to arrive at this legal conclusion.

As to the second ripeness prong, hardship, as already explained above, SB 397 "creates a direct and immediate dilemma" for the United States. *Am. Sav. Bank, FSB*, 347 F.3d at 440 (cleaned up). SB 397 may cause federal law enforcement officers to hesitate before using force in their line of duty, given Sections 3, 4, and 5 subjecting the officers to state prosecution if Connecticut determines that they did not abide by Connecticut's use of force standards. Moreover—because Connecticut appears to argue that this case is not ripe as to SB 397 Section 6 too—the Court can also consider that federal officers are now faced with the dilemma of either (1) violating Connecticut's facial covering and identification mandates or (2) potentially risking their own safety and the safety of their families through display of their identities, while engaging in undoubtedly intensely politically contentious federal actions. These hardships are real, and they are present now, because SB 397 is currently in effect.

---

[43] *Id.*

In making these findings, the Court does not discount the importance of open and transparent law enforcement and the related need for accountability in the exercise of police powers. There is no doubt that law enforcement "must be dedicated, in our democratic society, to exercising the authority of their office in a manner that protects . . . constitutional rights . . . and encourages respect for the rule of law by its proper enforcement." *United States v. Gribben*, 984 F.2d 47, 52 (2d Cir. 1993). And transparency in law enforcement likewise "vindicates 'the paramount public interest in a free flow of information'" that facilitates social, political, and moral development. *Massimino v. Benoit*, 188 F.4th 120, 130 (2d Cir. 2026) (quoting *Garrison v. Louisiana*, 379 U.S. 64, 77 (1964)). *See also Floyd v. City of New York*, 739 F. Supp. 2d 376, 381–82 (S.D.N.Y. 2010) ("The public has a profoundly important interest in . . . reasonable transparency from law enforcement agencies."); *Belch v. Jefferson Cnty.*, 108 F. Supp. 2d 143, 148 (N.D.N.Y. 2000) (we "rightfully expect police agencies to enforce the law in a fair and just manner") *Cavanaugh v. Allstate Ins. Co.*, No. 87 CIV. 1933, 1988 WL 59327, at *2 (S.D.N.Y. June 1, 1988) ("The public has a clear interest in having [law enforcement] officers, engage in honest, ethical and legal conduct").

But because Connecticut attempts to impose upon federal law enforcement officials measures, it believes, reinforce these longstanding ideals, the Supremacy Clause stands in the state's way. And SB 397's enactment and Supremacy Clause violation, however well-intentioned it may be, places hardships on the United States now. No additional facts are needed to decide this purely legal dispute either, so this case is ripe for judicial review.

To conclude, Connecticut's motion to dismiss must be denied as to all named Defendants except the Attorney General, who lacks enforcement authority over the

challenged provisions. The United States has standing, and this case is ripe for review, against all Defendants to this suit except the Attorney General.

**C. United States' Motion for a Preliminary Injunction**

The United States moves for a preliminary injunction to enjoin enforcement of SB 397 Sections, 3, 4, 5, and 6.[44] The United States argues that it is entitled to a preliminary injunction because it is likely to succeed on the merits that SB 397 Sections 3, 4, 5, and 6 violate the Supremacy Clause, it will suffer irreparable harm without the injunction, and the balance of the equities and the public interest weigh in the United States' favor. For the reasons that follow, the Court grants the United States' motion for a preliminary injunction against all Defendants for all challenged Sections, except that the motion is denied as to the Connecticut Attorney General for all challenged Sections, and it is denied as to the Inspector General for Section 6.

**1. Legal Standard**

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A party seeking "a preliminary injunction that will affect government action taken in the public interest pursuant to statute or a regulatory scheme" must demonstrate: (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, (3) public interest weighing in favor of granting the injunction, and (4) that the balance of equities tips in its favor. *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 279–80 (2d Cir. 2021) (quoting *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir.

[44] ECF No. 12.

2020)), *opinion clarified*, 17 F.4th 368 (2d Cir. 2021); *see also Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020). When the government is a party to the suit, the balance of the equities and public interest factors of the preliminary injunction standard merge. *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58–59 (2d Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

A movant seeking injunctive relief has a "heavier burden" than a plaintiff who must plead a "plausible claim necessary to avoid dismissal." *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 165 (2d Cir. 2020). Indeed, on preliminary injunction, a court is not required to accept a plaintiff's "allegations as true or draw all reasonable inferences in its favor." *Id.* Rather, "a court may consider the entire record including affidavits and other hearsay evidence." *J.S.R. by & through J.S.G. v. Sessions*, 330 F. Supp. 3d 731, 738 (D. Conn. 2018).

**2. Likely Merit**

The United States is likely to succeed on the merits of its claim that SB 397 violates the Supremacy Clause, against all Defendants except the Connecticut Attorney General. The Court has already concluded above that the United States has standing to challenge SB 397 against all Defendants except the Attorney General; and in doing so, the Court concluded that Sections 3, 4, and 5 violate the Supremacy Clause because they impermissibly infringe upon the federal government's operations with the specter of state prosecution. For similar reasons, the Court now concludes that SB 397 Section 6 is likely unconstitutional. But because, as the Court already concluded, the Attorney General is not a proper defendant to this action given his lack of criminal law enforcement powers, the United States is unlikely to succeed on the merits of a claim against the Attorney General. Additionally, because the Inspector General has no enforcement authority over SB 397 Section 6, the United States is

unlikely to succeed on the merits of a claim against the Inspector General as to Section 6 specifically, although it is likely to succeed against the Inspector General as to Sections 3, 4, and 5.

**a. Standing**

Standing is established by showing three elements: (1) an injury in fact, (2) that the injury is fairly traceable to the defendants' challenged conduct, and (3) the injury is likely redressable by a favorable judicial decision. *Spokeo*, 578 U.S. at 338. In their opposition to the United States' motion for a preliminary injunction, "Defendants incorporate their standing arguments from their motion to dismiss and [do] not repeat them at length."[45] The Court has already concluded that the United States has standing to challenge SB 397 against all Defendants except Attorney General William Tong, and Connecticut posits no new arguments here.

As more fully explained above, the United States has suffered an injury in fact because the Act attempts to regulate federal officers in the course of their line of duty by holding them to a state-imposed use of force standard. That attempt by the state to interfere with the operations of the federal government violates the Supremacy Clause. *See*, *e.g.*, *United States v. Washington*, 596 U.S. at 838. A violation of the Supremacy Clause is in itself an injury to the United States for standing purposes. *See Vermont Agency of Natural Resources*, 529 U.S. at 771. Moreover, because the Act exposes federal officers to prosecution for failure to abide by Connecticut's use of force standards, federal officers may act differently for fear of criminal liability, and the United States is thereby further injured.

[45] ECF No. 31 at 19.

As also more fully explained above, the injury to the United States caused by the enactment of SB 397 is redressable, because a favorable judicial decision will immediately remove the encroachment on the United States's sovereignty that the Act creates, and federal officers will no longer be regulated and thereby influenced to act differently in the course of their law enforcement duties. The Court further rejected Connecticut's ripeness argument above, because the United States' facial constitutional challenge to SB 397 raises purely legal questions that do not require further factual development, and the United States is harmed by SB 397's enactment given its sovereign injury and the effect enactment has on federal officers performing their duties.

However, the Court did conclude above that all Defendants are properly named in this action except for Connecticut Attorney General William Tong. Attorney General Tong does not have prosecutorial authority, and the challenged Sections of SB 397 do not otherwise name him or grant him or his Office any control over enforcement of the challenged Sections. *See* CONN. GEN. STAT. § 3-125. The United States is therefore unlikely to succeed in satisfying the traceability element of standing as to him, and it is thereby unlikely to succeed on the merits of its claim as to him, so the Court cannot enjoin the Attorney General from enforcing SB 397 at this preliminary stage.

Inspector General Prescott is a properly named defendant in this case given his enforcement authority related to the use of force standards found in Section 3, 4, and 5. *See also* CONN. GEN. STAT. § 51-277e. As for Section 6, however, neither Section 6 nor any other statutory provision provide the Inspector General with any authority to prosecute or otherwise affect Section 6's regulation of federal officer's facial coverings and identification requirements. The United States does not appear to argue otherwise. So while Inspector

General Prescott remains a proper party to this case given his enforcement authority for some challenged Sections, his lack of authority over Section 6 enforcement means that the United States is unlikely to succeed in establishing the traceability element of standing as to him for Section 6, so he cannot be enjoined from enforcing SB 397 Section 6.

**b. SB 397 Sections 3, 4, and 5 Are Likely Unconstitutional**

The Court has already concluded above that SB 397 Sections 3, 4, and 5 violate the Supremacy Clause. To summarize, Sections 3, 4, and 5 attempt to regulate federal officers in the course of their line of duty by holding them to a state-imposed use of force standard at risk of prosecution. But such an attempt by the state to interfere with the operations of the federal government through the specter of state prosecution violates the Supremacy Clause. *See*, *e.g.*, *United States v. Washington*, 596 U.S. at 838. Indeed, federal officers are immune from state prosecution when acting within the scope of their federal authority and doing no more than what was necessary and proper. *In re Neagle*, 135 U.S. at 75; *Tanella*, 374 F.3d at 147.

Connecticut briefly adds in its opposition to the United States' motion for a preliminary injunction that, under the Tenth Amendment, SB 397 Sections 3, 4, and 5 "are valid exercises of Connecticut's Tenth Amendment right to control its criminal justice system and dictate the authority and duties of its prosecutors."[46] The Tenth Amendment states that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. CONST. amend. X. As outlined above, however, the standards by which federal law enforcement officers must conduct themselves while performing federal duties is a power delegated to, and exercised by, the

[46] ECF No. 31 at 29.

United States through the Executive Branch. Consequently, there is no remaining power to regulate the conduct of federal law enforcement officers in their discharge of duties that is reserved to any state, including Connecticut. *See New York v. United States*, 505 U.S. 144, 156 (1992) ("If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States"). Connecticut's invocation of the Tenth Amendment to save SB 397 Sections 3, 4, and 5 thus likely fails, and Sections 3, 4, and 5 are likely unconstitutional.

**c. SB 397 Section 6 Is Likely Unconstitutional**

For similar reasons as SB 397 Sections 3, 4, and 5, Section 6 of the Act is also likely violative of the Supremacy Clause. Section 6 of the Act limits when federal officers[47] may wear face coverings and dictates when and how they must identify themselves to the public. Section 6(b) of the Act requires that "[a] peace officer, while carrying out the enforcement of laws of this state, any other state or the United States, shall not wear any facial covering or personal disguise while interacting with the public in the performance of such officer's duties," subject to few exceptions. [48] Section 6(c), meanwhile, requires that a federal officer be "clearly identified" by a "badge and name tag on the officer's uniform" when "conducting a planned arrest" or "interacting with the public" in an official capacity, also subject to few exceptions.[49] Any federal agent who violates either of Sections 6(b) or 6(c) "shall be guilty

[47] Like Sections 3, 4, and 5, Section 6 of the Act applies directly to federal officers. *See* § 6(a)(1) (incorporating § 3(a)(1)(A)'s definition of "peace officer," which explicitly includes federal agents)

[48] *Id.* § 6(b).

[49] *Id.* § 6(c).

of a class D misdemeanor" which is punishable by up to 30 days in jail.[50] Section 6(d) also prohibits assertion of "any privilege or immunity" in civil tort cases if the agent was "wearing a facial covering or personal disguise in a knowing and wilful violation of this section."[51]

SB 397 Section therefore plainly imposes conditions on how federal officers must conduct and present themselves during the course of their federal duties, and it subjects them to criminal and civil penalties if they do not abide by those state-imposed conditions. But the Supremacy Clause ensures that federal operations are not chilled by state prosecution and that federal officers are immune from state prosecution when acting within the scope of their federal authority. *In re Neagle*, 135 U.S. at 75; *Tanella*, 374 F.3d at 147. SB 397 Section 6 without question attempts to "control[] the operations" of the federal government—but the Constitution grants it "no power" to do so. *McCulloch*, 17 U.S. (4 Wheat.) at 436. The United States is almost certain to succeed on establishing that SB 397 Section 6 is unconstitutional.

**3. Irreparable Harm**

The United States will suffer irreparable harm absent injunctive relief. In analyzing the injury that the United States suffers for purposes of the standing inquiry, and in analyzing the harm that the United States suffers for purposes of the ripeness inquiry, the Court has already outlined the negative consequences that SB 397 imposes upon the United States. These injuries constitute irreparable harm for purposes of the preliminary injunction inquiry.

[50] Conn. Gen Stat. § 53a26(d)(4).

[51] SB 397 § 6(d).

To summarize, because SB 397 Sections 3, 4, 5, and 6 violate the Supremacy Clause, the Act infringes upon the supreme sovereignty afforded the federal government by the Constitution. Infringement upon the United States' constitutionally-granted sovereignty is an irreparable harm. *Jolly*, 76 F.3d at 482 ("the alleged violation of a constitutional right triggers a finding of irreparable injury"); *United States v. California*, 173 F.4th at 1069 ("[I]rreparable harm necessarily results from allowing [a state] to enforce a law invalid under the doctrine of intergovernmental immunity.").

Beyond this impermissible challenge to the United States' sovereignty, irreparable harm also results from the tangible effects that SB 397 has on federal law enforcement officers that the Court previously described above. Because Sections 3, 4, and 5 subject federal officers to Connecticut's multi-faceted use of force standard at the risk of criminal prosecution, federal officers will hesitate before acting in dangerous, high-stress situations that they may experience during the course of their federal duties. They may also second-guess or choose to disregard their extensive federal use of force training. Federal officers' safety is thus put at risk by SB 397 Sections 3, 4, and 5—so the United States is irreparably harmed absent an injunction.

The same is true for SB 397 Section 6, which demands that federal officers identify themselves and not wear face coverings in most circumstances. This law places federal officers and their families at a heightened risk of retributive attacks, especially given the contentious nature of federal law enforcement activity. These safety concerns create an irreparable harm to the United States absent an injunction.

#### 4. Balance of the Equities and the Public Interest

The merged balance of the equities and the public interest factor weigh in favor of an injunction. Simply put, "the public interest is well served by the correction of [a] constitutional harm." *Mid Vermont Christian Sch. v. Saunders*, 151 F.4th 86, 96 (2d Cir. 2025) (quoting *A.H. ex rel. Hester v. French*, 985 F.3d 165, 184 (2d Cir. 2021)); *see also Hartford Courant Co., LLC v. Carroll*, 474 F. Supp. 3d 483, 507 (D. Conn. 2020) ("there is a public interest in avoiding violations of constitutional rights"). Enjoining the Act to correct the Supremacy Clause violation is thus in the public interest.

Connecticut points to numerous policy justifications for SB 397 that, in its view, tip the scales against an injunction.[52] In essence, Connecticut suggests that the Act's regulation of the federal government is clearly the most prudent policy choice. Yet no matter how well-intentioned or well-reasoned SB 397 may be, the Supremacy Clause overrides Connecticut's policy arguments—because the Constitution has already dictated the policy choice: "[T]he Laws of the United States . . . shall be the supreme Law of the Land[,] . . . Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. The Framers experienced the failures of the Articles of Confederation firsthand and understood that the supremacy of the federal government is essential to a strong and lasting Union. Indeed, without the Supremacy Clause, federal law would "amount to nothing," because states could disregard it at their leisure. THE FEDERALIST NO. 33 (Alexander Hamilton). Connecticut may be well-intentioned in attempting to insert additional, state-created, restraints on federal law enforcement in the specific areas that SB 397 seeks to regulate—but such a scenario is incompatible with our

[52] ECF No. 31 at 47–50.

Constitution and its wisdom. To refashion some recent praise for our underappreciated, yet vital, constitutional structure:

> For some today, the weight of [the Supremacy Clause's] virtues is apparent. For others, it may not seem so obvious. But if history is any guide, the tables will turn and the day will come when those disappointed by today's result will appreciate the [Supremacy Clause] for the bulwark of liberty it is.

*Learning Resources, Inc. v. Trump*, 607 U.S. 229, 300 (2026) (Gorsuch, J., concurring).

## III. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is **GRANTED IN PART AND DENIED IN PART**, and Plaintiff's Motion for Preliminary Injunction is **GRANTED IN PART AND DENIED IN PART**.

Defendants' motion to dismiss is denied as to all Defendants except as to Attorney General of Connecticut William Tong, who is hereby dismissed from this case. Plaintiff's motion for a preliminary injunction is denied as to Attorney General William Tong for SB 397 Sections 3, 4, 5, and 6. And Plaintiff's motion for a preliminary injunction is denied as to Inspector General Eliot Prescott for SB 397 Section 6, but granted as to Inspector General Eliot Prescott for SB 397 Sections 3, 4, and 5. Plaintiff's motion for a preliminary injunction is granted in full as to all other Defendants.

Because the Court has determined that Sections 3, 4, 5, and 6 of SB 397 likely violate the Supremacy Clause in the United States Constitution and fully granted Plaintiffs' motion for preliminary injunctive relief as to all Defendants except Attorney General William Tong and Inspector General Eliot Prescott, it is hereby **ORDERED** that the State of Connecticut, Governor Ned Lamont, and Chief State's Attorney Patrick Griffin, and their officers, agents, servants, employees, and attorneys, and all other persons who are in active concert or

participation with the State of Connecticut, Governor Ned Lamont, and Chief State's Attorney Patrick Griffin, are enjoined from enforcing Sections 3, 4, 5, and 6 of the Act as to federal officers, agents, and employees. It is hereby further **ORDERED** that Inspector General Eliot Prescott and his officers, agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with him, are enjoined from enforcing Sections 3, 4, and 5 of the Act as to federal officers, agents, and employees.

**SO ORDERED.**

Hartford, Connecticut
November 20, 2026

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge